UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 14-81395-CIV-MARRA

FEDERAL TRADE COMMISSION, and
STATE OF FLORIDA,

    Plaintiffs,

v.

INBOUND CALL EXPERTS, LLC also
d/b/a ADVANCED TECH SUPPORT, a
limited liability company, et al.,

    Defendants.
_____/

## ORDER GRANTING PRELIMINARY INJUNCTION

This cause comes before the Court on Plaintiffs' motion for a preliminary injunction (see DE 6), on which the Court held a three-day hearing between December 16 and 18, 2014, (DEs 68–70). Having considered the Plaintiffs' complaint (DE 4), motion for a preliminary injunction, the PC Cleaner Defendants' Opposition to Preliminary Injunction (DE 57), Plaintiffs' Reply in Support of Motion for Preliminary Injunction (DE 63), and the evidence presented at the evidentiary hearing, the Court concludes that a limited preliminary injunction should issue against Defendants.

### I. Background

On November 10, 2014, Plaintiffs Federal Trade Commission ("FTC") and the State of Florida initiated this action against two sets of Defendants: Inbound Call Experts, LLC, Advanced Tech Supportco, LLC, PC Vitalware, LLC, Super PC Support, LLC, Robert D. Deignan, Justin M. Wright, Paul M. Herdsman (the "ICE Defendants"); and PC Cleaner, Inc., Netcom3 Global, Inc., Netcom3, Inc., and Cashier Myricks, Jr. (the "PC Cleaner Defendants").

(DE 4).  Plaintiffs, proceeding ex parte on a sealed record, sought a Temporary Restraining Order alleging that Defendants engaged in and were likely to engage in acts or practices that violate Section 5(a) of the Federal Trade Commission Act, 15 U.S.C. § 45(a), the FTC's "Telemarketing Sales Rule," 16 C.F.R. Part 310, and Section 501.204 of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA").  This Court issued a Temporary Restraining Order ("TRO") and appointed a Receiver over the ICE Corporate Defendants.  (DE 12).

> A.   **The Complaint**

Plaintiffs allege that the PC Cleaner Defendants market and sell "PC Cleaner Pro," a registry cleaner software marketed to consumers as a tool to enhance personal computer ("PC") safety and performance.  (DE 4 ¶ 38).  PC Cleaner Pro is available on the PC Cleaner Defendants' website, where consumers can access a free trial of the software and perform a system scan of their PC.  (Id. ¶ 39).  Without fail, the scan reveals a host of "problems" with the consumer's PC, sometimes numbering in the thousands.  (Id.).  Plaintiffs allege that these "problems" are innocuous files or non-existent security vulnerabilities.  (Id. ¶¶ 39-42).  With consumers' concern raised, PC Cleaner Pro urges consumers to "fix all" problems by downloading the full version of the software at a cost of $29.99.  (Id. ¶ 43).  After purchase, the Order Confirmation screen prominently directs consumers to "[a]ctivate your new software by calling" a toll-free number.  (Id. ¶ 44).  This leads consumers to the ICE Defendants' call center. (Id.).

Plaintiffs allege that the ICE Defendants operate an inbound call center know as Advanced Tech Support.  (Id. ¶ 33).  The ICE Defendants generate calls both by directly targeting consumers and partnering with software developers to offer activation and technical

support services for their products, such as PC Cleaner Pro.  (Id. ¶¶ 33-37).  Plaintiffs allege that the ICE Defendants engage in deceptive practices once they have consumers on the phone.

Specifically, Plaintiffs allege that ICE phone representatives follow a "scripted sales pitch" to convince consumers that their PC is in need of repair, regardless of whether problems exist.  (Id. ¶ 46).  ICE representatives remotely access the consumer's PC and open programs such as Window's task manager and Event Viewer to diagnose the PC.  (Id. ¶¶ 48–54).  In particular, ICE representatives prey on consumers' lack of technical understanding by pointing out "warning" and "error" entries in the Event Viewer, which are not necessarily indicative of computer problems, to induce them into purchasing a support package.  (Id. ¶¶ 52-54).  These technical support packages cost consumers hundreds of dollars and often include recurring monthly fees for ongoing support.  (Id. ¶ 57).  Plaintiffs allege that these practices earned the ICE Defendants over $100 million.  (DE 6 at 10).

    **B.**    **Evidentiary Hearing**

When this Court entered the TRO, it scheduled a preliminary injunction hearing for November 24, 2014.  (DE 12 at 27).  That hearing was moved by agreement to December 16, 2014.  (DE 27 at 1).  All Defendants were present and represented at the hearing.  Direct examination was had by way of declaration, and witnesses were presented for cross examination. The hearing lasted three full days.  The declarations presented for the Court's consideration are too numerous and too lengthy to detail here.  However, the Court has read all declarations presented, carefully considered them, and considered the testimony and evidence presented at the hearing.  In the discussion to follow, the Court will discuss pertinent parts of that testimony and evidence as necessary.

## II. Discussion

Under 15 U.S.C. § 53(b), the Court may issue a preliminary injunction if the FTC proves both (1) a likelihood of ultimate success on the merits and (2) that the balancing of equities favors such action.  See F.T.C. v. Univ. Health, Inc., 938 F.2d 1206, 1217 (11th Cir. 1991).  The FTC bears a "heavy burden" in establishing its entitlement to the "extraordinary and drastic remedy" of a preliminary injunction.  F.T.C. v. Sterling Precious Metals, LLC, 894 F. Supp. 2d 1378, 1382-83 (S.D. Fla. 2012).  When balancing the equities, a court should keep in mind that injunctive relief "is appropriate if the defendant's past conduct indicates that there is a reasonable likelihood of further violations in the future"; however, such relief may not be appropriate in instances where the defendant's actions are unlikely to recur.  See F.T.C. v. USA Fin., LLC, 415 Fed. App'x 970, 975 (11th Cir. 2011) (unpublished).

### A. Likelihood of Success

Section 5 of the FTC Act prohibits "unfair or deceptive acts or practices in or affecting commerce."  15 U.S.C. § 45(a)(1).[1]  To establish § 5 liability, the FTC must establish that (1) there was a representation; (2) the representation was likely to mislead customers acting reasonably under the circumstances, and (3) the representation was material.  F.T.C. v. Tashman, 318 F.3d 1273, 1277 (11th Cir. 2003).

The FTC need not prove that the representations at issue were done with intent to defraud

---

[1] Likewise, the Telemarketing Sales Rule prohibits "false or misleading statement[s] to induce any person to pay for goods or services."  16 C.F.R. § 310.3(a)(4).  Section 501.204 of the FDUPTA prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."  Fla. Stat. Ann. § 501.204(1).  Thus, the Telemarketing Sales Rule and FDUPTA counts are essentially coterminous with the § 5 count.  (See DE 6 at 25).

4

or deceive.  See F.T.C. v. Free Commc'ns, Inc., 401 F.3d 1192, 1202 (10th Cir. 2005).  "Instead, the 'cardinal factor' in determining whether an act or practice is deceptive under § 5 is the likely effect the promoter's handiwork with have on the mind of the ordinary consumer."  Id.  (quoting F.T.C. v. Sterling Drug, 317 F.2d 669, 674 (2d Cir. 1963)).  Nor does the FTC have to prove actual reliance by consumers if it is likely that a reasonable consumer would rely on the representations.  See F.T.C. v. Figgie Int'l, Inc., 994 F.2d 595, 605 (9th Cir. 1993).

For purposes of determining liability under § 5, it is irrelevant whether the product or service sold provided value to the consumer: "the salient issue in fraudulent-misrepresentation cases 'is whether the seller's misrepresentations tainted the customer's purchasing decisions,' not the value (if any) of the items sold."  F.T.C. v. IAB Mktg. Assocs., LP, 746 F.3d 1228, 1235 (11th Cir. 2014); Freecom Commc'ns, 401 F.3d at 1207; Figgie Int'l, 994 F.2d at 606 ("The fraud in the selling, not the value of the thing sold, is what entitles consumers in this case to full refunds or to refunds for each [product] that is not useful to them.").

With these principles in mind, and after carefully reviewing the pleadings, declarations, evidence, and testimony of witnesses, the Court concludes that Plaintiffs have established at least a likelihood of success on the merits against both the PC Cleaner Defendants and the ICE Defendants.

    **1.**    **PC Cleaner Defendants**

Regarding the PC Cleaner Defendants, the evidence demonstrates that, as to the selling of PC Cleaner Pro, the PC Cleaner Defendants made material representations that were likely to mislead the reasonable consumer.

Initially, the manner in which PC Cleaner Pro altered consumers to thousands of

5

purported "problems" on their PC was likely to mislead the reasonable consumer. As the FTC's expert, Edward Skoudis, testified, aggregating the problems together was misleading because many of the items listed as "problems" were nothing more than normal system behavior or default settings on the computer. (Pl. Ex. 18 at 72-73). While it is true that many of the items the PC Cleaner Pro scan listed may be harmful to a PC—such as cookies that might pass privacy information to malevolent sources (II Prelim. Inj. Hr'g Tr. [hereinafter "Tr."] 150:2–14)—calling all such items "problems" in the aggregate is misleading as to the ordinary consumer. As the ordinary consumer generally lacks the technical acumen to assign relative weight to the various "problems" PC Cleaner Pro details, the scan results screen is rife with the possibility for consumer deception. Additionally, the Order Confirmation page—even when viewed in its entirety—prominently directs consumers to call a toll-free number to activate the product. (Pl. Ex. 38; Def. Ex. 57). The Court finds that the ordinary consumer would be misled into believing that a call to the ICE Defendants' call center was necessary to activate the product.

       The Court is aware that evidence, including the testimony of the FTC's expert, demonstrates that PC Cleaner Pro can benefit, and has benefitted numerous consumers. (See II Tr. 129:19–130:4). However, the merit of the product is irrelevant when considering whether unfair or deceptive representations were used to market it. See IAB Mktg., 746 F.3d at 1235. Also irrelevant to the determination of § 5 liability is whether such misrepresentations ceased. (Compare 15 U.S.C. § 45(a)(1) and 15 U.S.C. § 53(b)(1), the former not requiring continuing or future acts). These considerations will come into play as discussed below. As to the first preliminary injunction requirement, the Court finds that the FTC has demonstrated a likelihood of ultimate success on the merits against the PC Cleaner Defendants.

6

### 2. ICE Defendants

Regarding the ICE Defendants, the evidence demonstrates that, as to the selling of support services, the ICE Defendants made material representations that were likely to mislead the reasonable consumer.

At the time of the FTC's investigation, sometime before late summer 2014, Advance Tech Support representatives used the Microsoft "Event Viewer" as the final step to diagnose a consumer's PC. (See II Tr. 26:1–9). ICE's phone representatives adhered to, or at least were directed to adhere to a script in which misleading statements about the Event Viewer display were made. (Pl. Ex. 18 at 76-77; Pl. Ex 35 at 1041-42; I Tr. 87:4–17; II Tr. 31:16–32:16; III Tr. 41:3–22).

Again, the Court is aware that evidence demonstrates that many of the services provided by Advance Tech Support benefitted consumers and that many consumers were satisfied with the services they paid for. (II Tr. 18:3–15). However, for § 5 purposes, the Court may only consider whether Advance Tech Support's methods tainted consumer's purchasing decisions. See IAB Mktg., 746 F.3d at 1235. The Court finds that the FTC has made the showing necessary to demonstrate a likelihood of ultimate success on the merits against the ICE Defendants.

### B. Balancing the Equities

After carefully reviewing the pleadings, declarations, evidence, and testimony of witnesses, the Court concludes that Plaintiffs have met their burden of proving that the equities favor a preliminary injunction against Defendants, albeit a limited one.

### 1. PC Cleaner Defendants

As to the PC Cleaner Defendants, the public interest in being free of material

misrepresentations on the PC Cleaner website is strong and entitled to great weight.  Also, the PC Cleaner Defendants' past conduct—including their failure to update PC Cleaner Pro 2014 to account for the terms of a class action settlement raising similar allegations (III Tr. 139:12–140:21)—demonstrates that preliminary injunctive relief is necessary to prevent ongoing deception.

However, the preliminary injunction determination must take into account how likely it is that the defendant will continue or resume its conduct.  See 15 U.S.C. § 53(b)(1) (FTC may seek preliminary injunction only when defendant "is violating, or is about to violate" the law).  The FTC's investigation and Mr. Skoudis's expert report were based on the 2014 version of PC Cleaner Pro.  (See III Tr. 140:15–17; Pl. Ex. 18 at 74).  As Cashier Myricks, an officer of PC Cleaner, Inc., testified, the PC Cleaner Defendants have developed a new version of their software, PC Cleaner Pro 2015.  (See III Tr. 181:19–23).  The new version changes the way scan results are presented to the consumer, including changes to many of the features Plaintiffs found objectionable in the 2014 version.  (Id. at 182:24–184:18).  Moreover, the Order Confirmation page for PC Cleaner Pro 2015 does not contain a prominent phone number, or any phone number, that would lead a consumer into believing that an activation call is necessary.  (Id. at 189:16–17).  The PC Cleaner Defendants intend to sell only PC Cleaner Pro 2015 going forward.  (Id. 189:12–15).

Evidence demonstrates that PC Cleaner Pro is a valuable product that is capable of protecting and enhancing consumers' PCs.  Continuation of the TRO in its present form will result in the destruction of the PC Cleaner Defendants' business.  As such, in balancing the equities and weighing what is in the public interest, the Court finds that continuation of the PC

Cleaner Defendants' business with the restrictions imposed by this Order will be in the public interest. In fact, consumers may actually be harmed if PC Cleaner Pro 2015 is kept off the market, and satisfied customers of PC Cleaner 2014 may be harmed if they are denied support and updates for their purchase. The Court finds the PC Cleaner Defendants to be credible and sincere in their representations relative to future business practices. Thus, the injunction will only bar the future selling or marketing of PC Cleaner Pro in a way that violates § 5 of the FTC Act. Of course, the Court shall retain jurisdiction to monitor this restriction.

### 2. ICE Defendants

Many of the same considerations apply regarding the ICE Defendants. The public interest in being free from material misrepresentations contained in the scripts used by Advance Tech Support representatives is strong and entitled to great weight. In view of the violations that this Court has found, preliminary injunctive relief is necessary to prevent ongoing violation of § 5.

However, the evidence also demonstrates that the deception of which Plaintiffs complain is unlikely to continue until the date of final resolution of this matter. For three or four months prior to this action, the ICE Defendants did not use Event Viewer as the final step in their remote diagnostic of consumers' PC. (See II Tr. 26:1–9). Moreover, the ICE Defendants testified to their willingness to avoid partnering with software providers that do not feature prominent self-activation keys on their websites. (See III Tr. 212:7–9).

The ICE Defendants provide many services other than software activation. (III Tr. 67:5–12; id. at 116:2–7). Evidence demonstrates that these services are valuable to consumers, and many consumers are wholeheartedly satisfied with the services they received. Continuation of the TRO in its present form will result in destruction of the ICE Defendants' business. As

such, in balancing the equities and weighing what is in the public interest, the Court finds that continuation of the ICE Defendants' business with the restrictions imposed by this Order will be in the public interest. In fact, consumers may actually be harmed if Advance Tech Support's doors are shut for the pendency of this proceeding. The ICE Defendants should be permitted to provide their valuable services to customers who have already signed up for them, and be permitted to solicit new customers using fair means. Therefore, the injunction will only bar the future selling and marketing of support services—whether through scripts or other means—in ways that violate § 5 of the FTC Act. The Court retains jurisdiction to monitor this restriction.

Additionally, because the ICE Defendants have already made some of the changes that Plaintiffs deem necessary, and have shown amenability to working toward a final resolution of this matter, the Court finds that freezing all of the ICE Defendants' assets is inequitable. As mentioned, many consumers (and many ICE employees (see DE 59)) stand to benefit if Advance Tech Support is permitted to reopen its doors. The asset freeze negates that possibility. The injunction will unfreeze a portion of the assets held by the Receiver. However, the Court finds it prudent to maintain a portion of the ICE Defendants' assets in escrow as part of the injunction to ensure the availability of funds for consumer restitution, if entitlement to restitution is indeed found. Therefore, $2 million will remain frozen, and be placed by the Receiver in a interest bearing account, with the remainder of receivership assets being made available for ICE's operating needs.

### III. Conclusion

Accordingly, it is **HEREBY ORDERED AND ADJUDGED** that the **TEMPORARY RESTRAINING ORDER** (DE 12) shall extinguish immediately, and the following

**PRELIMINARY INJUNCTION** issues forthwith:

## PRELIMINARY INJUNCTION

The Court hereby incorporates all definitions contained in the Temporary Restraining Order (DE 12 at 4-6) by reference, and such definitions apply as if set forth herein.

### I.

### PROHIBITED ACTIVITIES

**IT IS HEREBY ORDERED** that Defendants and their Representatives, whether acting directly or indirectly, in connection with the marketing, advertising, promotion, distribution, offering for sale, or sale of any goods or services, are hereby enjoined from engaging in unfair or deceptive acts or practices, either orally or in writing, expressly or by implication, in violation of 15 U.S.C. § 45(a)(1), the Telemarketing Sales Rule (16 C.F.R. § 310.3(a)(4)), or § 501.204 of the FDUPTA (Fla. Stat. Ann. § 501.204(1)).

### II.

### CONDUCT PROHIBITIONS REGARDING MARKETING

**IT IS HEREBY ORDERED** that Defendants and their Representatives, whether acting directly or indirectly, in connection with the marketing, advertising, promotion, distribution, offering for sale, or sale of any goods or services, are hereby enjoined from:

    A.  Using any false or misleading statement to induce any person to pay for goods or services; or

    B.  Violating the Telemarketing Sales Rule, 16 C.F.R. Part 310.

### III.

**LIMITED ASSET FREEZE**

**IT IS FURTHER ORDERED** that two million dollars ($2,000,000.00) of the Receivership Defendants' assets held by the Receiver in bank accounts shall be **FROZEN** until a final adjudication on the merits of this action. The Receiver shall make the determination of which funds shall be subject to this freeze. The Receiver shall place the frozen assets in an interest bearing account forthwith. The Receiver shall report to the Court within thirty (30) days of this Order as to the steps he has taken to secure these funds from the Receivership Defendants' control.

IV.

**CONSUMER CREDIT REPORTS**

**IT IS FURTHER ORDERED** that pursuant to Section 604(1) of the Fair Credit Reporting Act, 15 U.S.C. § 1681b(1), any consumer reporting agency served with this Order shall promptly furnish consumer reports as requested concerning any Defendant to counsel for Plaintiffs. Plaintiffs may also directly access any Defendant's consumer report.

V.

**PRESERVATION OF RECORDS AND REPORT OF NEW BUSINESS ACTIVITY**

**IT IS FURTHER ORDERED** that Defendants and their Representatives, as well as any document custodians receiving actual notice of this Order, whether acting directly or through any entity, corporation, subsidiary, division, director, manager, member, affiliate, independent contractor, accountant, financial advisor, or other device, are hereby enjoined from:

A. Destroying, erasing, falsifying, writing over, mutilating, concealing, altering, transferring, or otherwise disposing of, in any manner, directly or indirectly, Documents that

relate to: (1) the business, business practices, Assets, or business or personal finances of any Defendant, (2) the business practices or finances of entities directly or indirectly under the control of any Defendant, or (3) the business practices or finances of entities directly or indirectly under common control with any other Defendant, including: any and all marketing materials, Internet pages, consumer complaints, call detail records, telephone logs, telephone scripts, contracts, correspondence, e-mail, corporate books and records, accounting data, financial statements, receipt books, ledgers, personal and business canceled checks and check registers, bank statements, calendars, appointment books, and tax returns;

  B. Failing to create and maintain Documents that, in reasonable detail, accurately, fairly, and completely reflect Defendants' incomes, disbursements, transactions, and use of the Defendants' Assets; and

  C. Creating, operating, or exercising any control over any new business entity, whether newly formed or previously inactive, including any partnership, limited partnership, joint venture, sole proprietorship, or corporation, without first providing counsel for the Commission with a written statement disclosing: (1) the name of the business entity; (2) the address and telephone number of the business entity; (3) the names of the business entity's officers, directors, principals, managers, and employees; and (4) a detailed description of the business entity's intended activities.

## VI.

## LIMITED CONTINUATION OF RECEIVERSHIP

**IT IS FURTHER ORDERED** that the Receiver shall turn over control of the Receivership Defendants' assets and businesses forthwith, with the exception that the

Receivership shall remain in effect for the limited purpose of maintaining control of two million dollars ($2,000,000.00) of the Receivership Defendants' assets, which shall remain frozen pending further order of this Court.

## VII.

## RETENTION OF JURISDICTION

**IT IS FURTHER ORDERED** that this Court shall retain jurisdiction of this matter for all purposes.

**DONE AND ORDERED** in chambers in West Palm Beach, Palm Beach County, Florida, this 22nd day of December, 2014, at 2:45 p.m.

_____
KENNETH A. MARRA
United States District Judge