1              UNITED STATES DISTRICT COURT
                SOUTHERN DISTRICT OF FLORIDA
2
              Case No. 14-81395-CIV-MARRA
3
FEDERAL TRADE COMMISSION AND )
4  STATE OF FLORIDA,           )
                              )
5      PLAINTIFFS,             )
                              )
6      -v-                     )
                              )
7  INBOUND CALL EXPERTS, LLC,  )
   ET AL.,                     )
8                              )
       DEFENDANTS.             )    West Palm Beach, Florida
9                              )    December 18, 2014
   _____)
10

11            VOLUME 3 - PAGES 1 - 256

12   TRANSCRIPT OF PRELIMINARY INJUNCTION PROCEEDINGS

13      BEFORE THE HONORABLE KENNETH A. MARRA

14           UNITED STATES DISTRICT JUDGE

15

16  Appearances:

17  (On Page 2.)

18

19  Reporter                  Stephen W. Franklin, RMR, CRR, CPE
    (561)514-3768             Official Court Reporter
20                            701 Clematis Street
                              West Palm Beach, Florida  33401
21                            E-mail:  SFranklinUSDC@aol.com

22

23

24

25

```
 1    Appearances:

 2    FOR THE COMMISSION          Colleen B. Robbins, ESQ.
                                  Federal Trade Commission
 3                                600 Pennsylvania Avenue Northwest
                                  Washington, DC 20580
 4
                                  Emily C. Burton, ESQ.
 5                                Federal Trade Commission
                                  600 Pennsylvania Ave Northwest
 6                                Mail Stop CC-8528
                                  Washington, DC 20580
 7
      FOR THE STATE               Katherine A. Kiziah, ESQ.
 8                                Office of the Attorney General
                                  Consumer Protection Division
 9                                1515 North Flagler Drive, Ste. 900
                                  West Palm Beach, FL 33401
10
      FOR THE DEFENDANTS          David L. Ferguson. ESQ.,
11                                Jonathan M. Streisfeld, ESQ., AND
                                  Seth D. Haimovitch, ESQ.
12                                The Kopelowitz & Ostrow Firm, PA
                                  200 Southwest 1st Avenue
13                                12th Floor
                                  Fort Lauderdale, FL 33301
14
                                  Robert N. Nicholson, ESQ.
15                                Nicholson & Eastin, LLP
                                  707 Northeast Third Avenue
16                                Suite 301
                                  Fort Lauderdale, FL 33304
17
                                  William H. Edmonson, ESQ.
18                                Doll, Amir & Ely, LLP
                                  1888 Century Park East, Suite 1850
19                                Los Angeles, CA 90067

20                                      * * * * *

21

22

23

24

25
```

```
 1          (Call to the order of the Court.)
 2               THE COURT:  Good morning, everyone.  Please be
 3     seated.
 4               Okay.  We ready to proceed?
 5               MR. FERGUSON:  Yes, Your Honor.
 6               MR. NICHOLSON:  Yes, Your Honor.
 7               THE COURT:  Who's our next witness?
 8               MR. STREISFELD:  Our next witness is Andrew von
 9     Ramin Mapp.  He's our expert.
10               THE COURT:  All right.
11               MR. STREISFELD:  I believe his declaration is
12     number 11, would be in Volume 2 of the notebooks that we
13     provided to you, is already in evidence.
14               THE COURT:  Sir, would you raise your right hand,
15     please.
16          Andrew von Ramin Mapp, Defendant's witness, sworn.
17               THE COURT:  Sir, can you tell us your name and spell
18     your last name, please?
19               THE WITNESS:  Sure.  It's Andrew von Ramin Mapp.
20     And it's spelled V-o-n, second part is R-a-m-i-n, and third
21     part is M-a-p-p.
22               THE COURT:  Thank you.
23               THE WITNESS:  Yes, Your Honor.
24               THE COURT:  All right.  Cross-examination.
25                         Cross-examination
```

```
 1   BY MS. ROBBINS:

 2   Q    Good morning.  My name is Colleen Robbins, and I'm an

 3   attorney with the Federal Trade Commission.

 4   A    Good morning.

 5   Q    So you said in your declaration that you reviewed the

 6   exhibits to Mr. Skoudis' declarations; is that correct?

 7   A    Correct.

 8   Q    And are you referring, when you say exhibits, to the

 9   telemarketing scripts?

10   A    I was referring to the information in his actual report.

11   Q    Okay.  Did you review the telemarketing scripts at all in

12   this case?

13   A    I briefly looked at them, but not in depth.

14   Q    So the telemarketing scripts were actually attached to

15   Mr. Skoudis' second declaration.  So when you were reading

16   Mr. Skoudis' second declaration, did you look at the

17   telemarketing scripts that were attached to that declaration?

18   A    As I said, I looked at them, but I did not review or

19   study them in depth.

20   Q    You say in your declaration that the use of the Windows

21   task manager is a safe and essential tool in troubleshooting

22   a Windows computer; is that right?

23   A    Yes.

24   Q    So can you tell me if you were going to use the task

25   manager as a troubleshooting tool, what would you do?
```

```
 1   A    Well, it would depend on the type of troubleshooting or
 2   the problem.
 3   Q    So you'd have to know what the problem was before --
 4            THE COURT:  Counsel, can you let him finish the
 5   answer before you interrupt?
 6            MS. ROBBINS:  Sorry.
 7            THE WITNESS:  I wouldn't need to know what the exact
 8   problem is, because otherwise we of course wouldn't have to
 9   troubleshoot it.  But I would have to know an indicator as to
10   if I'm told that the computer is performing poorly or if it's
11   not booting up at all.  So I would need some sort of
12   indicator in what direction to go, but --
13   BY MS. ROBBINS:
14   Q    Right, because -- sorry.
15   A    But as far as utilizing the task manager, it provides us
16   information such as the utilization of the CPU, which is the
17   computer's processor, the memory and the processes that are
18   running.  So more than likely I would examine those.
19   Q    So you would look at the CPU, you said?
20   A    Correct.
21   Q    Okay.  And you would look at the memory?
22   A    Correct.
23   Q    And you would look at -- you would look at the processes?
24   A    If the problem appears to be a performance issue or an
25   issue with malware or misconfiguration of the system where it
```

```
 1    just doesn't perform as expected.
 2    Q    And if you were looking at the processes, would you just
 3    look at the number of processes, or would you actually look
 4    further to see which ones were actually running?
 5    A    I would look further to see which ones are running.
 6    Q    I'm showing you what's been marked as exhibit 35.  This
 7    is the script to Ed Skoudis' declaration, and it's page 1038.
 8         So can you tell me, can you please look at step one
 9    of that script, and can you tell me what it tells the
10    salesperson to do?
11         MR. STREISFELD:  Objection, Your Honor.  This
12    witness was not offered as an expert with regard to the
13    scripts.  He was not provided any opinions to rebut
14    Mr. Skoudis' comments about the scripts in the second
15    declaration.  He was asked, as you can see from his
16    declaration, he was asked to comment on the utilities of
17    certain of the functionalities that Mr. Skoudis commented on.
18         THE COURT:  Overruled.
19    BY MS. ROBBINS:
20    Q    Can you tell me, did you -- sorry.  Did you have a chance
21    to look at step one of that script?
22    A    I did.
23    Q    Okay.  And can you tell me what the script tells the
24    telemarketer to do with the task manager?
25    A    It says to click the performance tab.
```

```
1    Q    Uh-huh.

2    A    And if the process count is high, alert the customer.

3    Q    So it tells the salesperson to look at the processes,

4    right, and just count the numbers?

5    A    Well, it doesn't specifically say to count the numbers

6    per se, from what I can see here, but it says click the

7    performance tab, and if the count is high, alert the

8    customer.

9    Q    Okay.  Doesn't tell the -- that script doesn't tell the

10   salesperson to look at the CPU, does it?

11   A    At least not specifically in that section.

12   Q    Okay.  And can you turn the page and look at the next

13   part, and before you get to step two, is there anything in

14   that paragraph that tells the salesperson to look at the CPU?

15   A    It does not.

16   Q    And does it tell the person -- the salesperson to look to

17   see what processes are actually running?

18   A    No, it does not.

19   Q    Now, you also stated in your declaration that the Windows

20   Event Viewer is also a useful tool in troubleshooting

21   problems; is that right?

22   A    That is correct, yes.

23   Q    And if you were going to use the Windows Event Viewer to

24   troubleshoot a problem, what would you do?

25   A    I would review the events, of course, to see what could
```

 1   potentially be an issue or cause of concern.

 2   Q   Would you have -- would you just merely look at the

 3   screen, or would you have to click on an event to see what

 4   the detailed information was about that?

 5   A   Well, it's a tricky question.  If you're familiar with

 6   the Event Viewers, you probably don't have to.  So, for

 7   example, when I was dealing a lot with troubleshooting in an

 8   Event Viewer, I didn't have to just because I clearly would

 9   know what to identify as far as the ID of the particular

10   event.  But if -- if someone would not have that great a

11   familiarity with it, then they probably would have to double

12   click on it and review the entire detail.

13          But generally that probably would be a good idea.

14   Q   Okay.  So if you were a salesperson and had little to no

15   computer experience, then that wouldn't be a very useful

16   tool, to just look at the number of process -- or the events

17   in that log?

18   A   Well, it would depend on how much information one wants

19   to accumulate.  So one can take a look at it and can see that

20   there could potentially be a problem by seeing a lot of

21   alerts and a lot of errors, but, of course, if one would want

22   to receive more details of the underlying problems, then that

23   should be -- should be done, and that would be the process,

24   yes.

25   Q   And can you please look at the step in the telemarketing

```
 1   script.  I believe it is step four, where it talks about the

 2   use of the Event Viewer, and if you could just take a look

 3   and read it to yourself, please.

 4   A    Actually, step four is referring to MS config.

 5   Q    I'm sorry, step five then.

 6   A    (Perusing exhibit.)

 7        Would you like me to read the options, as well?

 8   Q    No, no.

 9   A    Okay.

10   Q    So in that process, in that step five, does it tell the

11   telemarketer to click on any of the event logs?

12   A    It doesn't appear to specifically state that, no.

13   Q    And isn't it true that it just tells the salesperson to

14   just look at the numbers of warnings and errors that are in

15   the log?

16   A    It does say to look at that in particular to see

17   warnings, yes.

18   Q    Okay.  And I want to refer you to exhibit H of your

19   declaration, which is about the Event Viewer.

20        I'll wait 'til you get there.  Just let me know when

21   you're there.

22   A    Okay.

23   Q    So exhibit H says that advanced users might find details

24   in Event Viewers helpful when troubleshooting problems with

25   Windows; is that right?
```

1    A    That is correct.

2    Q    And exhibit H doesn't say that the Event Viewer is for

3    salespeople who have no computer skills; is that correct?

4    A    Well, it doesn't specify, no.

5    Q    And in exhibit H it says that you need to click on an

6    event log in the left pane and you double click on the event

7    to view the details, right, of the event, and that's what we

8    talked about?

9    A    Yes.

10   Q    And, again, the script doesn't tell the salesperson to

11   double click on that event to look at it in any detail, does

12   it?

13   A    It does not.

14   Q    Can you just read what the definition of an error is in

15   exhibit H, please?  I'm sorry.  Under application it says

16   events are?

17   A    "Events are classified as error, warning or information,

18   depending on the severity of the event."

19   Q    Okay.  And it says an error is a significant problem,

20   such as loss of data; is that correct?

21   A    That would be one issue, correct.

22   Q    Okay.  But it doesn't say that an error is a red flag

23   that evidences a certain amount of damage, does it?

24   A    It does not specifically state that, no.

25   Q    And it says that a warning is an event that isn't

1    necessarily significant but might indicate a possible future

2    problem, isn't that right?

3    A    Correct.

4    Q    And it does not say in that document, does it, that a

5    warning is a red flag that evidences a significant amount of

6    damage?

7    A    While it does not specifically state that, there are

8    issues or events where a warning could lead to significant

9    damage.  So despite it not being specified here, you know,

10   there are occasions where a warning should be taken very

11   serious.

12   Q    And if you were going to -- if there was a warning that

13   needed to be taken seriously, wouldn't you need to be an

14   advanced computer user to know that?

15   A    I think it really would depend on the knowledge of the

16   individual.  So it's difficult for me to evaluate or state

17   that.

18   Q    So do you think a salesperson who had little to no

19   computer experience would know --

20           MR. FERGUSON:  Your Honor, I'm going to object.

21           THE COURT:  Sorry?

22           MR. FERGUSON:  The record is that the --

23           THE COURT:  Who's handling the witness?

24           MR. STREISFELD:  Apologize.

25           Your Honor, the record in this case reflects that

```
 1    the salespeople get training.  Mr. Deviny testified to that
 2    yesterday.  There's other evidence in the record to suggest
 3    that.  So the assumption that they're not getting any
 4    training, the assertion, I'm sorry, that they're not getting
 5    any training is inaccurate as to what's in the record, Your
 6    Honor.
 7               THE COURT:  You can argue that later.
 8               MR. STREISFELD:  Thank you, Your Honor.
 9               THE COURT:  He says he's an expert.  He can give
10    opinions based upon assumptions.
11               So you can answer the question.
12               THE WITNESS:  Could you repeat the question one more
13    time, please?
14               MS. ROBBINS:  Now I forgot the question.
15               Could you read it back, please?
16        (The court reporter read back the requested portion of
17    the transcript.)
18    BY MS. ROBBINS:
19    Q    -- would know that the event that they were looking at or
20    the warning or error that they were looking at would actually
21    lead to a significant problem?
22    A    If one would have no computer experience, then definitely
23    not.
24    Q    So you had mentioned earlier that before using the task
25    manager, say, that you would need to know something.  You
```

1    would need to know what you were about to troubleshoot,

2    whether it be performance issues, or slowness or just

3    something in general about -- and then to know what you were

4    actually going to look for; is that right?

5    A    That would be my approach, yes.

6    Q    Okay.  And I'd like you to look at the script one more

7    time and look at the beginning of the script, the first part,

8    up from the top of the script down to step one.  Can you just

9    read that to yourself, please.

10   A    I'm sorry, which step?

11             MS. ROBBINS:  May I approach the witness?

12             THE WITNESS:  Yes.

13   BY MR. FERGUSON:

14   Q    In reading that, does the sales agent ask the consumer

15   what the problem is before going into that diagnostic test?

16   A    It does not state so.

17   Q    So according to the script, the salesperson would have no

18   knowledge of what the computer problem was before going into

19   that diagnostic; is that correct, according to the script?

20   A    Well, I was under the assumption that when the call is

21   placed, that there is some type of a problem with software or

22   performance.  So what I was specifically referring to when I

23   would not involve the task manager or need to know specifics

24   is because we're not just looking at -- when we're looking at

25   computer problems, we're not just looking at software or

```
 1    malware.  There are a large variety of problems that can

 2    occur, such as hardware malfunctions on the hard drive,

 3    graphic cards, et cetera, et cetera.

 4            So being able to know what type of problem it is

 5    from my troubleshooting process would be essential.  In this

 6    type of situation, we have a computer that at least functions

 7    to the point where the Internet can be accessed for a remote

 8    control session.  So that leads to the conclusion that at

 9    least some of the hardware failures wouldn't be applicable in

10    this situation.

11    Q    But if someone was just calling to activate software,

12    that doesn't necessarily indicate that they have a problem

13    with their computer, does it?

14    A    No, it wouldn't.

15    Q    And in that script, it doesn't say anywhere -- it doesn't

16    tell the salesperson in that script to ask the consumer what

17    their problem is, does it?

18    A    No, it does not.

19    Q    So you also mentioned the system configuration tool, that

20    that's a useful tool also in help troubleshooting problems;

21    is that right?

22    A    Yes, that's correct.

23    Q    And the system -- and you attach a document from

24    Microsoft about the steps you would take if you were going to

25    use that system configuration tool; is that right?
```

```
 1    A    Well, I've attached a document from Microsoft stating how
 2    to utilize it.
 3    Q    Right.
 4    A    But, of course, there are different ways how a process or
 5    troubleshooting can be approached, but that is the way that
 6    Microsoft recommended it in that particular case.
 7    Q    Doesn't it say in that document that you attached that
 8    advanced computer users use this to troubleshoot system
 9    configuration issues?
10    A    It does, yes.
11    Q    Also in that Microsoft document, it also has a list of
12    things for -- in order to troubleshoot, right?  It says that
13    you need to go to the startup, and then often you would
14    restart the computer.  It also tells a sales -- it tells the
15    advanced computer user to select files for the computer to
16    load when the computer is restarted; is that correct?
17    A    You're referring to exhibit E, correct?
18    Q    Yes.
19         Actually, it was actually exhibit D.  If you look at
20    method one, the diagnostic and selection startup modes?
21    A    Okay.  And could you repeat the question one more time
22    for me, please?
23    Q    So when you look at this document and you look at the
24    diagnostic startup and the selective startup and then you go
25    through the document, doesn't it give a series of steps that
```

```
 1    if you were going to troubleshoot a problem using system

 2    configuration, you would have to go through a series of

 3    steps; isn't that right?

 4    A    Well, this would be the method of ruling out certain

 5    processes that are loading, so essentially it's

 6    troubleshooting by process of elimination.

 7    Q    Okay.  So in some instances you might need to click on

 8    certain programs, and then you might -- or select certain

 9    files, I should say, and then you might need to restart the

10    computer to then see what happens on startup?

11    A    Correct.

12         Although the entire workflow, as it is here, does

13    not necessarily have to be executed every time.  So you may

14    just execute a certain subsection.

15    Q    Can you please take a look again at the sales script.

16    And I'll show you.

17         MS. ROBBINS:  May I approach the witness one more

18    time?

19         THE COURT:  Yes.

20    BY MS. ROBBINS:

21    Q    Can you please look at step three and read it to yourself

22    and then tell us what step three tells the salesperson to do

23    with the system configuration tool?

24    A    (Perusing exhibit.)

25         Okay.
```

1    Q    What does the script tell the salesperson to use -- to do

2    with the MS configuration tool?

3    A    To start it up and to hide all Microsoft services.

4    Q    And is that it?

5    A    And then to tell the consumer that the majority of these

6    programs that are installed are aftermarket programs.

7    Q    You also mentioned in your declaration about trace

8    elements.

9    A    Correct.

10   Q    And you say that you -- it sounds like you don't have any

11   knowledge, personal knowledge, of trace elements, but just

12   that you've heard it colloquially used; is that correct?

13   A    I've heard it being used, and I've made reference to it

14   having been used.  So, yes.

15   Q    And that term is used to mean the remnants left over from

16   the un-installation of software; is that correct?

17   A    That's the way I understand it.

18   Q    Okay.  And you attached attachment J, which is, I guess,

19   an article called "De-clutter Your PC for Better Security and

20   More Storage?"

21   A    Yes, I did.

22   Q    And this attachment says that sometimes un-installed

23   processes can leave trace elements, right?

24   A    Yes.

25   Q    Does it say anywhere in the document, in the article,

1    that these trace elements can cause the computer to run slow

2    or work harder?

3    A   It doesn't specify that.

4    Q   And does it say that the trace elements can cause error

5    codes or the dreaded blue screen?

6    A   It doesn't specify that either.

7    Q   Okay.  Now, I want you to turn to attachment K.  That's

8    Mark Russinovich's blog.

9    A   Uh-huh.

10   Q   And he also talks about trace elements and about the

11   traces of applications, right?

12   A   Yes, he does.

13   Q   And he doesn't say anywhere in this article that the

14   trace elements cause the computer to run slow or work harder,

15   does it?

16   A   Give me just a moment to review it.

17   Q   Sure.

18   A   (Perusing document.)

19          Actually, the way I read it here, it specifies that

20   in his instance of troubleshooting, the Internet Explorer

21   hung, meaning that it did not function as it should, and

22   that's when he started his research and found in the registry

23   that there were old values from a previous install, a

24   previous program that caused the issue.

25   Q   So does that -- are you saying, then, that those trace

```
 1   elements would cause the computer to run slow or work harder
 2   based on that?
 3   A   Well, you asked if the trace elements would cause any
 4   issues.  In this particular instance it caused an issue with
 5   the Internet Explorer, which was the browser to utilize the
 6   Internet.  So in this instance it prevented the computer from
 7   properly getting onto the Internet.
 8   Q   Okay.  But does it say anywhere in the article that the
 9   trace elements would cause the computer to run slow or work
10   harder?
11   A   It did not specify that, no.
12   Q   And does it say in the article that these trace elements
13   could cause error codes or the dreaded blue screen?
14   A   It did not specify that.
15   Q   In fact, doesn't the article say that registry junk is a
16   Windows fact of life?
17   A   It does.
18   Q   Now, I want you to look at the last attachment, I
19   believe.  It's attachment L.  And this article, it states
20   that the un-installation of software leaves traces, right?
21   A   Correct.
22   Q   And it also says that he doesn't recommend that the
23   consumer do anything about this, does it?  He says the
24   consumer should do nothing.
25   A   Correct.
```

```
 1    Q   And it doesn't say anywhere in this article that these

 2    trace elements cause the dreaded blue screen, does it?

 3    A   It does not specify that.

 4            MS. ROBBINS:  I have nothing further.

 5            THE COURT:  Redirect.

 6            MR. FERGUSON:  Yes.

 7                        Redirect Examination

 8    BY MR. FERGUSON:

 9    Q   Good morning.

10    A   Good morning.

11    Q   Going back to where we left off talking about tab J,

12    which is the "De-clutter Your PC for Better Security and More

13    Storage" piece in which there is a reference to trace

14    elements, you were asked the question, does that say in the

15    article that clutter could cause errors or computer to run

16    slow.

17            It doesn't say it, you said, correct?

18    A   Yes.

19            MS. ROBBINS:  Objection, Your Honor, I didn't say

20    clutter.  I said trace elements.

21            MR. FERGUSON:  Well, the article is about clutter.

22    So what she said.

23            THE COURT:  I'm sorry.  Which one are you referring

24    to?

25            MR. FERGUSON:  Your Honor, I'm at J, exhibit J to
```

```
 1    the witness' declaration.
 2              THE COURT:  Did she talk to him about J?
 3              MR. FERGUSON:  Yes, sir.  It's the one that says
 4    "De-clutter Your PC for Better Storage and More Security,"
 5    and that is the article that has the term "trace elements."
 6              THE COURT:  Okay.
 7              MR. FERGUSON:  So we got there when she was talking
 8    about trace elements and she asked what the article does not
 9    say.
10    BY MR. FERGUSON:
11    Q    So does it say that trace elements could cause errors or
12    a computer to run slow?
13    A    It doesn't specify that, per se.
14    Q    Could trace elements cause a computer to run slow or in
15    any way contribute to errors?
16    A    It could.
17    Q    So the fact that this author didn't say those words
18    doesn't mean that that's not a fact, does it?
19    A    Correct.
20    Q    In fact, what would you recommend if a computer has
21    clutter building up and trace elements or artifacts of
22    un-installed software?  Would you believe it's recommendable
23    to delete that stuff and clean it out of the system?
24    A    I would.
25    Q    Okay.  At the beginning of your cross-examination, you
```

```
 1    were asked about the part of the script where the ATS agent
 2    is told to go to running processes.  Do you recall that?
 3    A    I do.
 4    Q    So we'd get there, as seen in the script and as you know
 5    from your experience, by typing MS config., enter?
 6    A    Uh-huh.  Correct.
 7    Q    And that would open up what?
 8    A    The system configuration utility.
 9    Q    And then there's a tab for startup.
10    A    Correct.
11    Q    Click that, right?
12    A    Uh-huh.
13    Q    And that shows you what processes are in the startup
14    protocol, correct?
15    A    For the most part, with few exceptions, yes.
16    Q    Okay.  And you were asked whether you saw anywhere in the
17    script a direction to go to the CPU usage tab; and that's not
18    in there, is it?
19    A    That is correct.
20    Q    And when you go to the CPU usage tab, it shows you a
21    graph that basically shows out of a hundred percent how much
22    of the CP is being used at that moment, correct?
23    A    Yes, it does.
24    Q    But isn't it true that when you go to active processes
25    and you look at the active processes, not only does it show
```

```
 1   you what processes are active, but there's also a column that
 2   shows you the percentage of the CP usage occurring at that
 3   moment while you're looking at the screen?
 4   A   Correct, it shows the CPU and the memory usage of each
 5   process.
 6   Q   So if a sales agent is looking at active processes in the
 7   task manager function aspect of the script, not only are they
 8   going to see the processes that are active, they will also
 9   see specifically --
10   A   Actually, I apologize.  I was in error here, and I think
11   we both may have conflicted the -- that would be the task
12   manager.
13   Q   Okay.  So despite the fact that the agent is not directed
14   to go to the CPU usage under MS config. -- I mean under task
15   manager, when they do click the tab for active processes,
16   they will see immediately which active processes are using
17   how much of the CPU?
18   A   That is correct.
19   Q   And it changes before your eyes?
20   A   It changes in realtime, correct.
21   Q   So, for example, if you opened up active processes and
22   someone said their computer was running slow, if you saw one
23   of the active processes was using 90 percent of the CP -- CPU
24   capabilities, that would be obviously a problem, wouldn't it,
25   possibly a contributor to the slow running machine?
```

1    A    Yes.

2    Q    So the script doesn't need to tell the agent to go to CPU

3    usage for them to be able to clearly observe how much CPU

4    capability the active processes are using, would they?

5    A    That is correct.

6    Q    Not to belittle what anyone does or how hard it is to be

7    proficient in computers, but let's be honest.  We're not

8    talking about rocket science here when we're talking about

9    checking MS config. or looking at the active processes or

10   what's in the startup menu, are we?

11   A    No.

12   Q    Would you expect that most people with no computer

13   experience whatsoever could be taught to do that proficiently

14   in one week?

15   A    That sounds feasible.

16   Q    Are you aware, contrary to the representation or the

17   assertion in the questions asked to you that the agents have

18   no training or little training, that they do, in fact,

19   receive a week training before they are allowed to speak to

20   customers?

21   A    I was not aware of that.

22   Q    And some of them go to an additional week training in the

23   incubator, or if they don't need that they go right to the

24   floor, like witness Tomich did, who we heard from?

25          MS. ROBBINS:  Objection, Your Honor.

```
 1                THE COURT:  Sustained.

 2                MS. ROBBINS:  Counsel's testifying.

 3     BY MR. FERGUSON:

 4     Q    The Event Viewer.  Clearly, when you open it up it says

 5     Event Viewer across the top, doesn't it?

 6     A    It does.

 7     Q    And who designed the Event Viewer?

 8     A    Microsoft.

 9     Q    And who dictated the format and the appearance of Event

10     Viewer?

11     A    Microsoft did.

12     Q    Are you aware of whether -- are you aware that the ATS

13     sales agents are instructed never to attempt to repair a

14     computer?

15     A    No, I was not aware.

16     Q    Have you seen any representation in any script or in

17     anything that you've seen by which ATS sales representatives

18     would tell consumers that they were, in fact, going to repair

19     their computer?

20     A    Not that I recall of.

21     Q    Take a look at the script that you were asked about, the

22     first page.  You there?

23     A    No.

24                Which step?  Is that prior to step one?

25     Q    The very first page.
```

```
 1            MR. FERGUSON:  May I approach, Your Honor, just to
 2    make sure we're on the same page?
 3            That's fine, yes.
 4    BY MR. FERGUSON:
 5    Q    So were you asked to review scripts for giving your
 6    expert opinion?
 7    A    I was not.
 8    Q    But you were shown one here and asked some questions.
 9    I'll ask you a few follow-up questions.
10            Do you understand the circumstances in which this
11    script would be used?
12    A    (No Response.)
13    Q    Let me ask it this way.
14            Are you aware that a consumer would purchase a
15    product, like PC Cleaner Pro, and then would call in for
16    activation, and this script would be part of the
17    presentation?
18    A    I'm aware of that.
19    Q    So the tech would know what product was purchased -- I'm
20    sorry, the sales agent would know what product was purchased
21    when the call came in?
22            MS. ROBBINS:  Objection, Your Honor.
23            THE COURT:  Sustained.
24            If you want to ask him a hypothetical, ask him a
25    hypothetical.
```

```
 1   BY MR. FERGUSON:

 2   Q    Let's assume the tech was aware of what product was

 3   purchased because they're going to have to activate it.  So I

 4   would assume, unless they've got their eyes closed or their

 5   back to the monitor, they're going to see what they're

 6   activating.  Would you say that's safe to assume?

 7   A    Yes.

 8   Q    So they know they're dealing with a customer who's either

 9   having some issues or worried about having issues with their

10   machine, correct?

11          MS. ROBBINS:  Objection, Your Honor.

12          THE COURT:  Ask a hypothetical.

13   BY MR. FERGUSON:

14   Q    Let me give you a hypothetical.

15   A    Okay.

16   Q    A consumer has dialed a phone number to activate software

17   to help them optimize the performance of their computer.  Do

18   you assume that the person -- would you assume that the

19   person on the other end of the phone to help them activate

20   the software knows they're having some issue or are worried

21   about an issue with their computer?

22   A    I would.

23   Q    Okay.  The script itself, does it say anywhere, interrupt

24   the caller, don't have any discussion with them, and make

25   sure you read this script to them?
```

```
 1    A    No, it does not.

 2    Q    Does it say, excuse me, sir or ma'am, I have something I

 3    need to read to you, or anything to that effect?

 4    A    No, it does not.

 5    Q    Would it be reasonable to assume there would be some

 6    discussion interlaced in between the text of this script as a

 7    natural phone call was going forward?

 8    A    Based on having been on both sides of receiving tech

 9    support call and having been on both sides of the spectrum, I

10    would say yes.

11    Q    Okay.  Are you aware that this is not the only version --

12              MS. ROBBINS:  Objection, Your Honor.

13              THE COURT:  Sustained.

14              MR. FERGUSON:  I have nothing further.

15              THE COURT:  Any --

16              MR. NICHOLSON:  No questions.

17              THE COURT:  All right.  Any recross?

18                        Recross-examination

19    BY MS. ROBBINS:

20    Q    So you were not asked to read the scripts in this case,

21    is that what you just testified to?

22    A    I was not asked specifically to read the scripts.  I was

23    asked specifically to take a look at the task manager, the

24    Event Viewer, the system configuration, quote, MS config.,

25    and the registry, and then to provide my opinion on trace and
```

```
 1    trace elements.
 2    Q    Okay.
 3    A    And to provide my opinion on the software security
 4    concerns of the remote connection.
 5    Q    Okay.
 6    A    That was pretty much the scope of what I was asked to
 7    review and provide an opinion on.
 8    Q    So you weren't asked to review the scripts and then see
 9    how those scripts were -- compare to what you would do in
10    troubleshooting a computer using system config. and Event
11    Viewer and the task manager; is that right?  You weren't
12    asked to compare the two?
13    A    To compare the sales script and -- no, I was not.
14    Q    And you don't have any personal knowledge of the sales
15    calls that the ICE salespeople would take from consumers, do
16    you?
17    A    I was not provided with a recording or anything, if
18    that's what you're asking.
19              MS. ROBBINS:  Thank you.
20              THE COURT:  Thank you, sir.
21              THE WITNESS:  Thank you, Your Honor.
22              THE COURT:  Next witness.
23              MR. STREISFELD:  Next witness is Justin Wright.
24               Justin Wright, Defendant witness, sworn.
25              THE COURT:  Please be seated.
```

 1            Sir, if you could tell us your name and spell your

 2     last name, please.

 3            THE WITNESS:  My name is Justin Wright, last name is

 4     W-r-i-g-h-t.

 5            THE COURT:  Thank you.

 6            All right.  Cross-examination.

 7                         Cross-examination

 8     BY MS. ROBBINS:

 9     Q   Good morning, Mr. Wright.  My name is Colleen Robbins,

10     and I'm an attorney with the Federal Trade Commission.  I'm

11     going to ask you some questions.  Okay?

12            So first, I wanted to ask you a little bit about

13     your prior company that you worked with that you talked about

14     in your declaration, iS3.  Okay?

15            Now, can you tell me what -- you had mentioned in

16     your declaration that the product of iS3 was STOPzilla; is

17     that correct?

18     A   Correct.

19     Q   And then that at some point, there was a tech support

20     component to the STOPzilla product, or was that part of iS3?

21     Could you explain that?

22     A   Yeah.  I just want to clarify before.  We had multiple

23     products.  It wasn't exclusively iS3 -- or exclusively

24     STOPzilla.

25     Q   But STOPzilla is the only one you talked about in your

1    declaration, though.

2    A    Yes.

3    Q    And so can you talk about -- just tell us about what the

4    tech support component was to the STOPzilla product?

5    A    Sure.

6         As I state in my declaration, we were -- you know,

7    the product was anti-malware product, and the malware that

8    our customers were seeing was becoming more and more

9    malicious, and what was occurring was the malware was

10   blocking our install.  So it just wasn't exclusive to our

11   product, but other Norton and McAffe and other products.

12        So when the computer was already compromised, it was

13   difficult for us to install the product.  So we placed a

14   phone number on the "thank you for downloading page," and the

15   customer could call in and get a manual technician or a

16   customer service at that time to bypass the infection,

17   disable it and then install STOPzilla.

18   Q    So the malware you're referring to, it didn't block the

19   download?

20   A    It did.

21   Q    Then how would people get the 800 number when you -- you

22   said that they downloaded it and with the activation page

23   they got -- did I miss --

24   A    Let me clarify.

25        What I meant was when the person landed at the

```
1    landing page, they would click the download button.  If the

2    install would not fire, they would land at a page notifying

3    that if you didn't see this install box pop up, then it's

4    potentially being blocked by malware and to call us.

5    Q    And is that the malware on the consumer's computer?

6    A    Yes.

7    Q    So was STOPzilla ever blocked by other antivirus vendors?

8    A    There may have been times where we were inaccurately

9    listed.  We would notify them.  It's pretty common in the

10   antivirus industry where, you know, based on heuristic

11   blocking, where the product had some similar behaviors of --

12   and we would have to contact that vendor and get white

13   listed.

14   Q    Similar behaviors as what?

15   A    Heuristics, when you're targeting malware, as Mr. Skoudis

16   testified, it's not a perfect science, and sometimes if there

17   is a registry key that's similar to, you know, something that

18   they are blocking, then it may be a false positive.

19   Q    Okay.  So what you're saying is that at some point other

20   antivirus companies tagged STOPzilla as malware?

21   A    Inaccurately.

22   Q    Right.

23        But it tagged it as malware and it blocked it.  But

24   what you're talking about here is the consumer's computer

25   blocking the STOPzilla; is that correct?
```

```
 1   A    No.

 2   Q    In paragraph 12?

 3   A    No.  What I'm saying is that the consumer's computer was

 4   already compromised with malware, infected, and that malware

 5   had prevention code put into it to stop legitimate anti --

 6   they were trying to control their distribution, remain on the

 7   box.

 8   Q    How did you market STOPzilla?

 9   A    Online.

10   Q    And did you take out Google AdWords?

11   A    Yes.

12   Q    So you bought key search terms so when consumers would

13   search online, then your product would come up?

14   A    Correct.

15   Q    In paragraph 12 of your declaration, you state that rogue

16   creators started to arm the malware with computer code.  What

17   do you mean by "the malware?"  Was it one piece of malware in

18   particular, or are we talking any type of malware?

19   A    Do you have my declaration?

20   Q    I do not.

21          MR. FERGUSON:  Tab 2, it should be.

22          THE WITNESS:  Okay.  I'm sorry.  Which part?

23   BY MS. ROBBINS:

24   Q    Paragraph 12, on page 4.

25   A    In that sentence I'm referring to the rogues that were
```

1    extremely prevalent at that time.

2    Q    So it's not just one, though, it's multiple; is that

3    right?  Or is it just one malware called rogue?

4    A    No, Rogue anti-spyware is fake anti-spyware.  It's

5    prevalent right now.  One came out yesterday.  But at that

6    time it was an absolute epidemic, just constantly coming out

7    with -- Rogue anti-spyware is malware that is designed to

8    look like legitimate software, run a completely bogus scan,

9    display fake results and attempt to trick the victim into

10   purchasing the software.

11   Q    So when you're talking about the malware, you're talking

12   about any Rogue anti-spyware product on the market at that

13   time?

14   A    In that particular sentence when I'm talking about the

15   Rogues, yes.

16   Q    And so you said that it appeared -- in paragraph 12, at

17   the end of paragraph 12, the last sentence, it says:  "It

18   appeared to the user that STOPzilla simply did not load, and

19   they would abandon STOPzilla and look for another product."

20   A    Correct.

21   Q    So does that mean that other products were not blocked by

22   the malware on that consumer's computer?

23   A    No, that's not what that means.  If they went to another

24   product, the same exact course of actions would occur.  So

25   what I'm referring to there is when you're infected with

```
 1    these programs and you click the download button, the
 2    download box would not come up as traditionally people were
 3    used to the executable.  So nothing happened whatsoever, and
 4    customers didn't know that malware had this capabilities of
 5    what they had.  So as they went to find another solution,
 6    they would incur the same exact thing.
 7    Q    So this happened no matter what product they downloaded?
 8    A    If malware was targeting that security, if you're talking
 9    about a reputable security product at that time, you know, to
10    the best of my knowledge, that malware was targeting all of
11    the vendors.
12    Q    So then you state in paragraph 13 that you internally
13    created what's called a blocked install page.
14    A    Correct.
15    Q    And what is that?
16    A    That was what I described before.
17    Q    Okay.  So -- okay.  So can you just explain it one more
18    time, though?
19    A    Sure.
20            So when a user types in a problem, I have, you know,
21    Win 7 anti-spyware, which was a Rogue at the time, and they
22    landed at our page, when they clicked the download button to
23    install it would go to a thank you for downloading page.  On
24    that thank you for downloading page, we added content saying
25    if you didn't see the executable pop up, you know, if you're
```

```
 1    experiencing this symptom, then call in and we will bypass
 2    the infection for you and install STOPzilla.
 3    Q   Okay.  And then, so that's how you started getting
 4    inbound calls; is that right?  And for that purpose, people
 5    would call in because they'd want to --
 6    A   We were receiving those calls before that.  That's how it
 7    came to be.  The symptoms that the customers were
 8    experiencing, we had some people that e-mailed and called in.
 9    We had customer service at the time.  So that wasn't the
10    beginning of inbound calls.
11    Q   And how else did you receive inbound calls?  From what
12    other leads?
13    A   They weren't leads.  People could not activate, they
14    could not register STOPzilla.  That was the chief problem,
15    you know, normal billing calls, normal software support
16    calls.
17    Q   Okay.  And what was the -- was the tech support arm of
18    iS3 called anything else?
19    A   It was called Smart Support.
20    Q   Smart Support.  Now, the people who answer the phone for
21    ICE are called sales agents, right?
22    A   Correct.
23    Q   Okay.  And it's not required for a sales agent who
24    applies to work at ICE to have any kind of computer
25    experience beforehand; is that right?
```

```
 1    A     In the interview process we expect and we ask them, you
 2    know, whether they know their way around a computer, they're
 3    comfortable with a computer, they understand computers.  If
 4    someone came in and they just had a sales background with
 5    zero ability to operate a computer, then, no.
 6    Q     Okay.  And isn't it true that the key responsibilities of
 7    a sales agent are to answer the phone, right?  Answer the
 8    inbound calls?
 9    A     Amongst other, yes.
10    Q     Amongst other things, right?  Answer inbound calls?
11    A     Sure.
12    Q     And to remotely log into the customer's computer?
13    A     Sure.
14    Q     And activate the software that the customer's already
15    purchased?
16              THE COURT:  Is that a "yes"?
17              THE WITNESS:  Correct, I'm sorry.
18    BY MS. ROBBINS:
19    Q     And run a diagnostic on the computer?
20    A     That, and part of the diagnostic is, as you've seen from
21    the calls the FTC made and from the consumer witnesses that
22    have come up here, part of it is asking the question of what
23    is wrong with the computer, why did you call in, why did you
24    download the software.
25    Q     But it doesn't say that on the script, though, does it?
```

```
 1   A    It does on other variations.  That was occurring in the
 2   natural conversation.
 3            The one thing that's I think sort of missing is
 4   there were dialogues here and there were conversations from
 5   the consumer, even, you know, as I stated, the consumer
 6   witnesses that came up here and the calls, that those
 7   questions were asked.
 8   Q    But isn't it true that sales agents were supposed to
 9   stick to the script and read the script verbatim?
10   A    We called it a guideline.  If a customer asked a
11   question, they could certainly deviate.  They could build
12   rapport.  They could ask what was wrong with the computer.
13   Q    They could deviate from the script?
14   A    They could deviate from having a conversation.  We want
15   to maintain the path of the call.
16   Q    So could they -- could they deviate from the script and
17   not sell tech support?
18   A    Sure, sure.  There were plenty of calls where people just
19   wanted to be activated, we activated.  There were calls where
20   people had a problem with the original software, they wanted
21   a billing question.
22   Q    So that wasn't an infraction to do that?
23   A    I don't understand.
24   Q    So a salesperson who deviated from the script and
25   decided, you know what, you don't need any tech support, they
```

```
 1    didn't get a warning for that?
 2    A    If the customer didn't need any tech support, they could
 3    offer the preventive maintenance program that we had.
 4    Q    Could they not offer anything?
 5    A    It depended on the customer.  There were definitely calls
 6    where people had billing issues with the original software,
 7    and, no, they wouldn't offer -- if the customer called in and
 8    said there was nothing wrong with my computer, they shouldn't
 9    offer it.
10    Q    So if a customer called in after activating a product --
11    A    Uh-huh.
12    Q    -- that salesperson reading that script could deviate
13    from the script and not sell tech support?
14    A    Depending on the question, what's wrong with your
15    computer, the response to that.
16    Q    I want to show you --
17         THE COURT:  I'm sorry, you didn't let him finish.
18         Go ahead.  Finish your answer.
19         THE WITNESS:  I lost my train of thought, I guess.
20         MS. ROBBINS:  You can have it read back if you want.
21    BY MS. ROBBINS:
22    Q    I want to show you PX37, page 1795.  And I'm going to
23    show you the first page.
24    A    Uh-huh.
25    Q    Can you tell me -- can you please read to yourself from
```

```
 1   the top of the page down to step one, and then look up when
 2   you're ready.
 3           MR. STREISFELD:  Excuse me, Ms. Robbins.  I didn't
 4   hear what you said, which page?
 5           MS. ROBBINS:  It's PX37, and I don't know which
 6   page.
 7           THE WITNESS:  1795.
 8           Okay.
 9   BY MS. ROBBINS:
10   Q   Does it say anywhere in that first part of the script for
11   the representative to ask the consumer what their problem is?
12   A   It does not, but that does not mean that did not occur.
13   Q   Okay.  I'm showing you PX37, page 1537, and then --
14   actually, 1537 and 1189.
15           First, 1537.  Can you please read what that document
16   says?  What is that document?
17   A   To be honest with you, I'm not familiar with this.  I've
18   seen it before.  You know, my role in the company was not
19   really in the sales department.  I focused on the recruiting.
20   Q   But you were president of ICE, weren't you?
21   A   Yeah, uh-huh.
22   Q   And what does that document say?
23   A   It says The Golden Rules of every call.
24   Q   And what does number 3 say?
25   A   It says read all the worlds in the script.  Do not add
```

```
 1    any words or leave any out.
 2          But like I said, based on the transcripts, it's
 3    clear that there's a dialogue going on here in conversation.
 4    Q   But in that -- in those golden rules, they are told that
 5    they have to read every word from the script; isn't that
 6    right?
 7    A   It says that.
 8    Q   And you heard yesterday from Mark Campeau in the script
 9    training notes that he tells the trainees that they are
10    actors and actresses, and they have to read every word on the
11    script; isn't that true?
12    A   Mark who?
13    Q   Campeau.  Your sales -- oh, sorry, Mark Deviny.  Sorry.
14    I messed up the names.
15          So Mark Deviny is a sales trainer; isn't that true?
16    A   It's true.
17    Q   And yesterday he testified.
18    A   Uh-huh.
19    Q   And yesterday he said that he, in his training, tells
20    sales agents that they are actors and that they cannot
21    deviate from the script.  Isn't that true?
22    A   That he testified that; is that true?
23    Q   Yes.
24    A   Yes, he said that.
25    Q   And I'm showing you PX37, page 1189.  This is a meeting
```

1    script that's from -- was one of the call rooms.

2            And can you please read step one, the five steps

3    under step one?

4    A    Sure.

5            It says:  "Log onto every computer, read all the

6    words from the script, make sure you don't add anything or

7    leave anything out, ask for money, learn how to rebut well,

8    resell value, ask for money again."

9    Q    Okay.  And in that document, does it say that it's a

10   guide, or does it call it a script?

11   A    It says meeting script.

12   Q    Under step one, when it says read all the words, does it

13   refer to it as a guide or as a script?

14   A    Script.

15   Q    Now, I'm also showing you from exhibit 37 page 1539 and

16   page 1544.

17           Can you please tell me what those documents are?

18   A    These are -- these are employee warning reports from the

19   sales managers.

20   Q    And on the first document, what did the salesperson do

21   wrong?

22   A    I would need the context of the call to see if this

23   response is accurate.

24   Q    I'm showing you the document that was found in your

25   business premise called Employee Warning Report.

```
1    A    Uh-huh.

2    Q    So can you please tell us what the employee did on that

3    first one that caused him to have an Employee Warning Report

4    written up about him or her.

5    A    It says:  Details of the infraction:  Agent was off the

6    script throughout the whole call."

7    Q    And what does the second one say?

8    A    "Details of infraction:  Telling customers how to remove

9    infections off computer.  Also not following the infection

10   pitch, wasting company's time -- customer's time and his own

11   time."

12   Q    So on the second one you read, it said that the

13   infraction was telling customers how to remove infections off

14   computers.  So the sales agents were not allowed to help the

15   consumer at that point in fixing the computer, were they?

16   A    No.  Removing an infection without being a certified

17   technician is extremely dangerous.

18   Q    And the first one says the agent was off script

19   throughout the whole call, and that was an infraction,

20   correct?

21   A    Correct.

22   Q    Now, you signed a contract with Ripoff Report, correct?

23   A    Yes.

24   Q    And Ripoff Report is an online service that allows

25   consumers to file complaints, right?
```

1    A    Correct.

2    Q    Okay.  And you were very adamant in your declaration that

3    Ripoff Report does not take down posts that have already been

4    posted, right?

5    A    Correct.

6    Q    Okay.  But your contract, what your contract says, is

7    that it will hold complaints before they're even posted,

8    right?  So the consumer has to wait a few days before it will

9    get posted; is that correct?

10   A    That was one part of -- I forget the details of the

11   contract, but there were specifics on when the complaint

12   would be published.

13   Q    Well, let's look at the contract.

14   A    Okay.

15   Q    I was trying to find the right page for you.

16            This is PX37.  Starts at page 1426.

17            This is page 1428.

18            So in that contract, isn't it true that consumers

19   have to wait until Ripoff Report e-mails the consumer, and

20   then the consumer must wait five days before contacting

21   Advanced Tech Support, and that was supposed to be a cooling

22   off period, right?

23   A    That's their policy, yes.

24   Q    Okay.  But you paid for that service, right?

25   A    Yes.

1    Q    And you paid $15,000 to Ripoff Report; isn't that right?

2    That was your upfront fee?

3    A    I can't recall the exact amount.

4    Q    Well, it's in the contract.  You can look and see.

5    A    If you say so, yeah.

6    Q    And isn't it true that in that contract, Ripoff Report

7    can decide to wait for the consumer to e-mail Ripoff Report

8    back before responding, and that Ripoff Report cannot post a

9    report if the consumer does not respond within 10 days?

10   A    Yes.

11          My objection to what Mr. Aiken put in his report is

12   that he wrote that Wright signed the agreement to Ripoff

13   Report to not display complaints after ICE corporate

14   Defendants on its website, and after I signed the contract,

15   those complaints would be displayed on the website still.

16   Q    On whose website?

17   A    On Ripoff Report.  My complaint did not remove complaints

18   from the website.  So the way the sentence is written is

19   incorrect.

20   Q    So -- but the question is is that the consumer may not

21   have their report posted at all, isn't that right?

22   A    But what I'm referring to in my declaration, what you're

23   referring to now, is strictly to that comment that Mr. Aiken

24   put in there, which is very specific, which is incorrect.

25   Q    But that's not what I'm asking you.  What I'm asking you

```
 1   is isn't it true that consumers' complaints may never get
 2   posted at all under this contract?
 3   A   In certain -- in certain circumstances.
 4   Q   Now, you mentioned in your declaration -- I'm sorry -- so
 5   this is paragraph 67 and 68.  You talk about Eric Haus.
 6   A   Yes.
 7   Q   And the FTC had submitted a declaration from Eric Haus
 8   with an e-mail exchange for purposes of the TRO; is that
 9   right?
10   A   Yes.
11   Q   And that e-mail exchange was between you and between
12   Mr. Haus?
13   A   Correct.
14   Q   And you chose to put in portions of that e-mail exchange
15   into your declaration; is that right?
16   A   I didn't think it was appropriate to put the entire
17   dialogue into my declaration, since it was already in
18   evidence.
19   Q   But you chose to put in the portions -- well, strike
20   that.  Eric Haus is a malware researcher at ThreatTrack
21   Security?
22   A   ThreatTrack Security is a product of GFI.  Eric Haus
23   works for GFI.
24   Q   Okay.  But he -- and that company has a product called
25   Viper Internet Security?
```

```
 1    A    Yes.

 2    Q    Isn't it true that at one point Viper Internet Security

 3    blocked advancedtechsupport.com, your domain?

 4    A    Yes, and it was particularly surprising, because our

 5    anti-malware product is powered by Viper.

 6    Q    But in that e-mail exchange, Eric told you that it was

 7    blocked due to numerous complaints and your BBB revocation;

 8    isn't that correct?

 9    A    Yes, and he supplied one link to a single complaint where

10    the -- if my recollection's correct, the person was saying

11    that we didn't fix the computer properly, and at the end of

12    that complaint he said the customer said that they were

13    satisfied.

14    Q    So your testimony is that he only provided you with one

15    link to one complaint?

16    A    If I recall, yes.

17    Q    And did he say anything else about any other complaints,

18    or was it just the one complaint that you had with Ripoff

19    Report, that was on Ripoff Report?

20    A    Yes, he said that his organization has received

21    complaints about us, some of our tactics.  He didn't provide

22    any additional information or have a way that I could verify

23    that they were our customers.

24    Q    But didn't he tell you that the site was being blocked

25    because of widespread complaints about the service being a
```

```
 1   scam or fraud?

 2   A    He said that he's received complaints about that, but,

 3   again, he provided no evidence of whether that was our

 4   customer or not, and he said the main reason, I think it's in

 5   follow-up, was the BBB revocation.  The revocation of the BBB

 6   was the main, if I'm recalling correctly.

 7   Q    Isn't it true that he said that your site was blocked

 8   because of widespread complaints about the service being a

 9   scam or a fraud, and that he gave you an example of the

10   complaint from Ripoff Report?

11   A    Right.  And that example, if you look at the content of

12   what that person said, that was not the person complained

13   about their computer not being fixed.

14   Q    Didn't he also tell you that the complaints had been bad

15   enough that the BBB recently revoked the company's

16   accreditation?

17   A    He had no personal knowledge of why it was revoked.

18   Q    And did you ask him that?

19   A    No.

20   Q    So you have no idea what he --

21   A    I explained it, what happened in the follow-up e-mail.

22   Q    Isn't it true that in that follow-up e-mail, that he told

23   you that they personally, he personally had received

24   complaints directly from consumers about Advanced Tech

25   Support, and that, in fact, they were reporting that the
```

```
 1   company's representatives used baseless scaremongering
 2   tactics, i.e. remotely connecting to users' PCs and showing
 3   them routine errors in the Windows Event Viewer in order to
 4   pressure them into buying unnecessary and outrageously
 5   expensive remediation services and products.  Isn't it true
 6   that he told you that based on his own knowledge?
 7   A   That was in the previous line that you questioned me
 8   about earlier.  That was connected with that.
 9   Q   Now, you said in your declaration that consumers who have
10   different infections --
11   A   I'm sorry.  Where was --
12   Q   Oh, sorry.
13           Okay.  It's paragraph 59.
14   A   Yes.
15   Q   Yes.
16           Okay.  So you said in your declaration in
17   paragraph 59 that consumers who have different infections --
18   so if you have an FBI virus and you Google search that --
19   your company bought AdWords, Google AdWords, right, or search
20   terms?  I guess you bought search terms?
21   A   Correct.
22   Q   So that way when consumers Google something, your domain
23   would display; is that correct?
24   A   Correct.
25   Q   And so what you say in your declaration is that because
```

```
 1    of that, your sales agents would know exactly what infection
 2    the person had before calling in; is that correct?
 3    A   Do I say that?  If I say that, I miswrote.  No, the
 4    agents did not know the specific exact infection.  They did
 5    know that if it was a malware experts call or a similar
 6    website, that that person had some type of variation of some
 7    type of virus.
 8    Q   So -- and then -- and your phone system could recognize
 9    that this was supposed to be an infection call, and it would
10    display the infection script, right?
11    A   Correct.
12    Q   I'm showing you the infection script, which is
13    exhibit 37, page 1571.  Just take a look at it, and I'm going
14    to need it back.
15    A   Okay.
16    Q   So that's the script that a sales agent would use if the
17    consumer called in about an infection, correct?
18    A   Correct.
19    Q   And there's no other infection script, is there?  That's
20    the only one that pops up?
21    A   I mean, like I said, I didn't focus in the sales part.
22    I'm not a hundred percent sure.
23    Q   But in your declaration you talk about the fact that
24    consumers would -- that when the phone system would recognize
25    that this was an infection call, that they would display the
```

1    infection call guideline, which was script four; is that

2    correct?

3    A    Correct.

4    Q    And, so, no matter what infection a consumer called in

5    about, that would be the script that the sales agent would

6    read; is that right?

7    A    Correct.

8         I'm sorry.

9    Q    Okay.  So in paragraph -- sorry.  Let me take that back.

10   Thanks.

11        In paragraph 47 of your declaration, you talk about

12   the Event Viewer, and that the Event Viewer -- that ICE

13   historically trained its phone agents on the utility of the

14   Event Viewer to educate a consumer who already believes his

15   computer is not working correctly, that errors listed in the

16   Event Viewer may show evidence of a problem that should be

17   addressed by a technician; is that true?

18   A    Correct.

19   Q    And isn't it true that the majority of the customers that

20   call in to Inbound Call Experts are calling to activate

21   software?

22   A    No.

23   Q    So what percentage of calls that Inbound Call Experts

24   receives are from activating software?

25   A    I don't know.  I don't know.  We receive customer service

1    calls, we receive billing calls, call-backs, activation

2    calls, infection calls.

3    Q    In terms of new calls, so not repeat callers, what do you

4    think -- do you know what the percentages of inbound calls

5    that relate to activating products or services?

6    A    I don't know.

7    Q    Have you ever seen the activation page of when a consumer

8    does purchase a program and then downloads it?  Have you ever

9    seen the page that pops up to tell consumers to call Inbound

10   Call Experts?

11   A    There's many variations of it.

12   Q    But you've seen it?

13   A    Uh-huh.

14   Q    So you know what it looks like?

15          THE COURT:  Is that a "yes"?

16          THE WITNESS:  Yes.

17   BY MS. ROBBINS:

18   Q    And isn't it true that that on that activation page, that

19   the thing that consumers see, the phone number in big bold

20   letters rather than seeing the activation key?

21          MR. NICHOLSON:  Objection as to which activation

22   page.  There's a number of them.

23   BY MS. ROBBINS:

24   Q    Have you ever seen the PC Cleaner activation page?

25   A    I've seen it in the trial so far.

```
 1    Q    So did you ever download PC Cleaner yourself?

 2    A    Not that I recall.  I don't think so.

 3    Q    So you never once download -- did you download any of the

 4    other software products that you partner with?

 5    A    Yes.

 6    Q    Okay.  And when you've downloaded those products, did you

 7    see the activation page?

 8    A    I have seen it.  I didn't always make a purchase.

 9    Sometimes I made a test purchase.  So I have seen it.

10    Q    Okay.  So now I know you said you haven't downloaded PC

11    Cleaner.  I'm going to show you the PC Cleaner -- have you?

12    A    I said I wasn't sure.

13    Q    Well, let me show you --

14         MR. NICHOLSON:  Objection, no foundation.  He's just

15    testified he's not familiar with it, then there's no

16    foundation for him testifying about it.

17         THE COURT:  Overruled at this point.

18  BY MS. ROBBINS:

19    Q    So I'm going to show you what this activation page looks

20    like, and tell me if it looks familiar to you.

21         MR. NICHOLSON:  Can I see the exhibit first please?

22         MS. ROBBINS:  This is exhibit 38?

23         MR. NICHOLSON:  I'm going to object to this exhibit,

24    because it does not represent the full page, and it's

25    misleading.
```

```
 1                  THE COURT:  Overruled.

 2                  MS. ROBBINS:  Can you see it, Your Honor?

 3                  THE COURT:  If you want me to see it.

 4     BY MS. ROBBINS:

 5     Q    Can you see that, sir?

 6     A    Okay.

 7     Q    Does that page look familiar to you?

 8     A    Yes, it's not the entire page, but the first half of the

 9     page looks familiar.

10     Q    But when it's on a computer screen, right, you don't see

11     the whole page, you'd have to scroll down to see the rest of

12     the page, isn't that right?

13     A    That depends on the monitor size, a very small monitor.

14     It would actually be -- it could be cut off where it says

15     order confirmation, and you would have to scroll down.  A

16     very large monitor, say even a TV screen, you would get the

17     entire page.

18     Q    Right.

19              But in a smaller monitor, that could be all that you

20     see; isn't that right?

21     A    Well, it could be even less.

22     Q    Right.

23              Okay.  And from looking at that, can you see what

24     the activation code is?  Can you find it?

25     A    It's cut off.
```

```
 1    Q    Okay.  So do you see the box in the middle that says

 2    activate your software by calling?

 3    A    Yes.

 4    Q    Okay.  And that's ICE's phone number?  Or was one of

 5    ICE's phone numbers?

 6    A    I can't confirm that.

 7    Q    You don't know for sure?

 8    A    I don't.  I don't.

 9    Q    Okay.  And isn't it true that a consumer could activate

10    the software on their own?

11    A    Yes, many did.

12    Q    And if a consumer -- strike that.

13         Isn't it true that ICE has posted ads, like on

14    Craigslist and other places like that, careerbuilder.com?

15    A    For recruiting?

16    Q    Sorry, for recruiting for sales agents?

17    A    Yes.

18    Q    Isn't it true in those ads that they say, for the sales

19    agent job, that no computer experience is necessary?

20    A    I'm not sure.  Does it?

21         I know in our original iterations we said computer

22    experience, computer experience, we want computer experience,

23    and we could get no one to show up.  So the rare person who

24    has, you know, a ton of computer experience and they're a

25    tech and the ability to sell, it's just there's not too many
```

```
 1    people out there.
 2    Q    So if you had someone who applied to who had computer
 3    experience, you'd probably use them as a tech, then, instead
 4    of a sales agent, right?
 5    A    No, that doesn't mean that.
 6    Q    So you wouldn't use a person who had computer experience
 7    as a tech?
 8    A    It completely depends on their personality, their
 9    background, their resume.
10    Q    But in your ad that you place, you say that no computer
11    experience is necessary?
12    A    Correct.
13            MS. ROBBINS:  I don't have anything further.
14            THE COURT:  Thank you.
15            Any redirect?
16            MR. STREISFELD:  Yes, Your Honor.
17                        Redirect Examination
18    BY MR. STREISFELD:
19    Q    Good morning, Mr. Wright.
20    A    Good morning.
21    Q    You were asked some questions about the infection script
22    this morning, correct?
23    A    Yes.
24    Q    And in relation to the use of AdWords, correct?
25    A    Correct.
```

1    Q   Okay.  Can you explain for the Court how your company

2    used the AdWords specific to the infection script?

3    A   Yes, we would -- I've been in marketing, security,

4    anti-spyware and the security industry for 12 years now, and

5    people Google.  They don't -- certainly, people Google the

6    word "malware," but we found that people started getting a

7    little more educated in what they queried, so they would

8    query the specific infection they had.  So the FBI virus is

9    very prevalent right now, and so people would query how to

10   remove the FBI virus, I need help removing the FBI virus,

11   help to remove the FBI virus, and derivatives like that.  We

12   would bid on those keywords.

13   Q   So then what would happen if that phraseology that you

14   just mentioned was inputted by a consumer?  What would happen

15   next on the Internet?

16   A   The AdWords ads is an auction, so there's other companies

17   bidding on those phrases.  Google would display the results

18   based on a complex algorithm that they had that determines

19   bid price and quality rank, and our ad would show based on

20   where we fell into that equation.

21   Q   And what would happen if a consumer, or anyone for that

22   matter, clicked on that ad?

23   A   They would land at our page that would display a guide on

24   how to remove the infection.

25   Q   Okay.  And did it also display a telephone number if the

```
 1   individual wanted to contact your company?
 2   A   In the ad?
 3   Q   Yes.
 4   A   No.
 5   Q   Okay.  There was no outbound calling done with regard to
 6   what we're discussing, correct?
 7   A   No.
 8           THE COURT:  No, it's not correct, or, yes, that is
 9   correct?
10   BY MR. STREISFELD:
11   Q   Is it correct that there was no outbound calling done by
12   ATS or ICE with regard to what we just discussed?
13   A   Yes, that is correct.
14           MR. STREISFELD:  Thank you, Your Honor.
15   BY MR. STREISFELD:
16   Q   You were asked some questions about the hiring of sales
17   agents, do you recall that?
18   A   Yes.
19   Q   In the more recent times in the conducting of your
20   business, of your company's business, when sales agents are
21   hired, do they have to pass any sort of testing in order to
22   be put onto the floor?
23   A   Not every single time, but we -- it depends on different
24   things.  But we would put them through some type of
25   standardized testing, personality tests, computer efficiency
```

```
 1    tests, and the scoring out.  Was the test given to every
 2    single person?  I don't believe so.
 3    Q    During the process when someone is calling, for example,
 4    the activation number that's displayed on the exhibit on the
 5    easel --
 6    A    Yes.
 7    Q    -- there's a process by which the consumer will be asked
 8    if the sales agent can remotely connect to the customer --
 9    the caller's computer, correct?
10    A    Correct.
11    Q    And, in fact, at the point in time that that person is --
12    dialed the number, that person is not yet a customer of ATS,
13    correct?
14    A    Correct.
15    Q    And is it also correct that in order for your sales agent
16    to be connected to that computer remotely, it requires at
17    least an activity to be done by the caller?
18    A    Yes, there is remote confirmation and at least three or
19    four actions that the customer has to take to authorize us.
20    Q    Including putting in a code that the sales agent gives in
21    order to allow for the system to connect, correct?
22    A    Correct.
23    Q    To your knowledge, had some customers of ATS become
24    customers even though the sales agent didn't complete the
25    script entirely?
```

```
 1   A   Yes, it happens a lot.  In the beginning of the call, the
 2   customer would often tell us the systems, the problems that
 3   they're having:  Can you fix me, can you help me.  A lot of
 4   people are not aware of the technology of being able to
 5   remote into a computer.  So they think their only solution at
 6   that point is unhooking everything, driving it to Geek Squad,
 7   or hiring a technician to be in their living room, so that
 8   they only think those are the only two options, and the
 9   remote technology is a huge, huge asset to the consumer.
10   Q   And if a caller had cut the customer service -- I'm
11   sorry.  Strike that.
12           If the caller had said at some point during the call
13   to the sales agent that I've heard enough, I'd like to buy
14   support services to get the computer fixed, is it acceptable
15   under your policies for the sales representative to complete
16   that transaction without going through all the steps in the
17   script?
18   A   Absolutely.
19           MR. STREISFELD:  Excuse me, Your Honor.
20           May I approach?
21           THE COURT:  Yes.
22   BY MR. STREISFELD:
23   Q   I'm going to show you a document that Ms. Robbins showed
24   you.  For the record, it's PX37, 1189.
25           Mr. Wright, do you recall being asked a few
```

```
 1    questions about step one on this meeting script document?
 2    A    Yes.
 3    Q    Can you read item number 2 under step one for the Court,
 4    please?
 5    A    "Read all the words in the script.  Make sure you don't
 6    add anything or leave anything out."
 7    Q    And based upon your knowledge of the sales
 8    representative's work, was that sentence intended to make the
 9    sales agents robots such that they couldn't interact with the
10    customer based upon the questions and the comments made by
11    the customer during a call?
12    A    No, not at all -- as I stated, the transcripts of the
13    calls that they made, there was dialogue, that the consumer
14    witnesses that came in testified that there was dialogue.  On
15    every single call there's a conversation that occurs.
16    Q    Okay.  Number 4 in step one says learn how to rebut well.
17    Do you see that?
18    A    Yes.
19    Q    What does that mean in the context of the sales call that
20    a -- strike that.
21          What does that mean in terms of the context of a
22    call where someone has dialed an activation number, such as
23    the one on the easel?
24    A    That means there is -- if the customer has objections,
25    there are certain rebuttal tactics I believe that the sales
```

```
 1   agents had in there that they could use.
 2   Q    And those things, were those things that they were
 3   trained to do as part of the overall training maybe separate
 4   from script itself?
 5   A    Yes.
 6   Q    You can lay that in front of you.
 7            MR. STREISFELD:  May I approach, Your Honor?
 8            THE COURT:  Yes.
 9   BY MR. STREISFELD:
10   Q    Mr. Wright, you have before you the document that was
11   marked PX37, page 1544.  Do you see that?
12   A    Yes.
13   Q    You were asked about this document by Ms. Robbins,
14   correct?
15   A    Yes.
16   Q    Can you remind the Court what this document is?
17   A    It's a Employee Warning Report.  This is -- the sales
18   managers use this report.
19   Q    And Ms. Robbins took you through the -- if I recall
20   correctly, took you through the description of the infraction
21   and the plan for improvement sections of this warning form,
22   do you see that?
23   A    Yes.
24   Q    Do you agree that's what she did?
25   A    Yes.
```

1    Q    Below that plan for improvement section, there's a

2    section called consequences of further infractions.  Do you

3    see that?

4    A    Yes.

5    Q    What is handwritten to the right of that?

6    A    Possible termination.

7    Q    Okay.  Is it correct that ICE, doing business as ATS,

8    from time to time terminated people for not following company

9    policies?

10   A    Sure.

11   Q    So do you view this warning report as indicating that

12   someone -- this particular person, I guess it's Mr. Davis,

13   might be terminated as a result of this conduct?

14   A    Yes, especially telling a customer how to remove an

15   infection without being certified is a pretty serious

16   infraction.  That could cause serious damage to a caller's

17   computer.

18   Q    There is a signature line for the employee below in the

19   acknowledgment of receipt of warning section, correct?

20   A    Correct.

21   Q    So it was ATS's policy that the employee actually have to

22   sign the warning report, as opposed to just putting something

23   in their file and not telling them about it, correct?

24   A    Correct.

25   Q    And as part of the processes of your company, would that

```
 1    employee be counseled by someone in management?

 2    A    Yes, his manager.

 3    Q    You were shown another employee warning during your

 4    testimony, correct?

 5    A    Yes.

 6    Q    And the format of that report was the same, correct?

 7    A    Yes.

 8    Q    Including the fact that the employee had to sign that

 9    report, correct?

10    A    Yes.

11    Q    You were asked some questions about the Ripoff Report, do

12    you remember that?

13    A    Yes.

14    Q    To your knowledge, is it a fact of life in this day and

15    age with the Internet that there are a variety of websites

16    that go up that are asking people to comment about a

17    particular company or rate a particular company?

18    A    Yes.  The most reputable charity, the Red Cross, are on

19    the Ripoff Report for being -- you know, having problems.

20    There's not a company that's not on there.

21    Q    And the Government's trying to make something out of the

22    fact that your company contracted with the owners of Ripoff

23    Report to get involved in a back and forth service, so to

24    speak, in order to be able to have an opportunity to address

25    potential complaints, correct?
```

```
 1    A    Correct.
 2         One of the key features about the advocacy program
 3    that I liked about Ripoff Report is that it opened up a
 4    pipeline to us and the customer where Ripoff Report would be
 5    the proxy in between, but at least we would have
 6    communication with them, and we could investigate it and help
 7    them out the best we could.
 8    Q    I'm happy to show you the contract if you need to review
 9    it, but Ms. Robbins asked you some questions about the
10    process, the back and forth process once a complaint is made,
11    correct?
12    A    Correct.
13    Q    And she asked you a question about the number of days of
14    delay between the time that Ripoff Report would receive the
15    complaint before it would go up, correct?
16    A    Correct.
17    Q    It was a matter of a few days, correct?
18    A    Correct.
19    Q    And is it not correct that under the terms of the
20    agreement, the -- if the customer through the back and forth
21    process had indicated to the Ripoff Report company that the
22    matter was resolved because your company had an opportunity
23    to address it, that that would be the instance in which the
24    report would not go up on the website.
25    A    Correct.
```

```
 1    Q    And so your company used that as an assistance of

 2    customer satisfaction; is that correct?

 3    A    Correct.

 4    Q    And also as an assistance to avoid -- to try to help deal

 5    with the issue that a company like Ripoff Report might post

 6    something and leave it up there without having any

 7    opportunity to address it, correct?

 8    A    Correct.

 9            MS. ROBBINS:  Objection, Your Honor.

10            THE COURT:  What's the objection?

11            MS. ROBBINS:  He's testifying.

12            THE COURT:  Sustained.  Rephrase your question.

13    BY MR. STREISFELD:

14    Q    What purpose being involved in the corporate advocacy

15    program have beyond what you already testified to?

16    A    It would ensure that we could communicate with the

17    customer and make them whole, make them happy.  If they want

18    a refund, we would give them a refund, if they haven't got

19    one yet, or attempt to fix the computer and get a refund, we

20    wanted to make sure they were happy.

21    Q    Okay.  You were asked some questions about your

22    communications with Mr. Haus at ThreatTrack.  Do you recall

23    that?

24    A    Yes.

25    Q    Prior to the issuance of the temporary restraining order
```

 1   in this case, what was your company's status with

 2   ThreatTrack?

 3   A    We were white listed, and he thanked me.

 4   Q    Okay.  What do you mean by he thanked you?  And I assume

 5   you're referring to Mr. Haus?

 6   A    Yes, Mr. Haus sent a follow-up e-mail where he received

 7   a -- if I'm recalling the contents correctly, he received --

 8   a customer said that we installed a temp version of Viper on

 9   their machine, and I asked the customer's name, I

10   investigated the matter.  I even listened to the call.  It

11   turned out that the customer was an active member of Advanced

12   Tech Support.  They asked us to install Viper.

13          We did not have the registry activation key for

14   Viper, so we un-installed it, and reinstalled it, and then we

15   told them that they had to go to Viper to get their

16   activation key if they couldn't find it in their e-mail from

17   the past purchase.

18          He responded back that -- he thanked me at that

19   point, and that was the last I heard.

20   Q    Just for the Court, so it has context, what is Viper?

21   What are you referring to?

22   A    Viper is an Internet security product.  It also can be an

23   Internet security SDK engine.  It's an anti-malware product.

24          MR. STREISFELD:  Just give me one second.

25          MR. NICHOLSON:  Judge, while he's doing that, may I

```
 1   retrieve that exhibit?
 2            Thank you.
 3   BY MR. STREISFELD:
 4   Q    Do you recall whether the Viper product that you just
 5   identified for the Court is something that ATS sold to that
 6   customer?
 7   A    Viper powered our PC MRI anti-malware product.
 8   Q    I see.
 9            And in the discussion about Mr. Haus that you had
10   with Ms. Robbins, there was a reference made to the Better
11   Business Bureau; is that correct?
12   A    Yes.
13   Q    And around or after that point in time, did the Better
14   Business Bureau restore ATS's status?
15   A    They did, and I notified Mr. Haus, and he white-listed us
16   immediately after that.
17   Q    Were there times when ATS would get calls for
18   activation -- calls using the activation number, for example,
19   on the board that Mr. Nicholson took to prepare anything he
20   wanted to ask you about -- let me do it again.
21            So with regard to example of that --
22            MR. STREISFELD:  It's okay.
23   BY MR. STREISFELD:
24   Q    -- were there times where people that had bought one of
25   your partners' products, for example, PC Cleaner, might use
```

```
 1    that activation number to contact your -- contact your
 2    company even though they had completed the installation of
 3    the software on their own?
 4    A   Yes.
 5    Q   And can you give the Court a couple of examples of why
 6    those people might contact you even though they had
 7    successfully activated the software by themselves?
 8    A   It could be many, many.  They could be unhappy with the
 9    software potentially, have billing questions, they have a
10    much more common and much more serious problem with the
11    computer that's out of scope of what the software they
12    downloaded.  It was various.
13              MR. STREISFELD:  Nothing further.  Thank you, Your
14    Honor.
15              THE COURT:  How much do you have?
16              MR. NICHOLSON:  Five minutes or less.
17              THE COURT:  Okay.
18                        Cross-examination
19    BY MR. NICHOLSON:
20    Q   With respect to exhibit, Government exhibit -- or
21    Plaintiffs' exhibit number 38, you're familiar with,
22    generally speaking, the activation screens of the various
23    software partners you have?
24    A   Yes.
25    Q   And are you generally familiar with computer screens in
```

 1   general from your background in the tech support business?

 2   A   Absolutely.

 3   Q   Does it appear to you that this is a complete screen shot

 4   of the information that would appear associated with this

 5   screen?

 6   A   Not at all.

 7   Q   I don't know if you can read it from there.  If you

 8   can't, I'll come over to you.  But you can tell me what the

 9   heading on the top of this screen says?

10   A   You're testing me here.

11   Q   I can walk closer if you need.

12   A   I think I got it.  Order confirmation, license key and

13   instructions.

14   Q   Would that seem to indicate that somewhere on this page

15   one would expect to find a license key?

16   A   Yes.

17   Q   Let me show you what we're going to mark as defense

18   exhibit number 10 --

19            MR. NICHOLSON:  Which, Your Honor, I would move to

20   continually admit for the purpose of this witness and with

21   the subject of Mr. Myricks authenticating it.

22            THE COURT:  Any objection?

23            MS. ROBBINS:  No, Your Honor.

24            MR. NICHOLSON:  May I approach the witness?

25            THE COURT:  Admitted without objection.

```
 1        (Defendants' Exhibit No. 10 entered into evidence.)
 2   BY MR. NICHOLSON:
 3   Q    Can you just take a look at that screen there?  First,
 4   take a look at that as compared to this.  And can you tell us
 5   whether they are in the same format?
 6   A    No, they are not.  This is -- exhibit 38 is cut off right
 7   where the third download button is and right where the
 8   license key is.
 9   Q    So what's right below -- let me retrieve this.  This was
10   one of those days where I wish we did have the ELMO up and
11   running.
12        All right.  So on 38, it's cut off.  Right here you
13   said it's cut off right at the third download, correct?
14   A    Right.
15   Q    And on exhibit number 10, what is right after that third
16   download?
17   A    The license key.
18   Q    And just so --
19        MR. NICHOLSON:  Judge, I don't expect with our eyes
20   that you'll be able to see it from there.  I'm going to point
21   to this.
22   BY MR. NICHOLSON:
23   Q    That would be right here under the point that says --
24   right here under the third download, right?
25   A    Yeah, it has the key icon in the box.
```

```
 1    Q    In a bolded box?

 2    A    Yes.

 3    Q    With the word "license key?"

 4    A    Yes.

 5    Q    Now, let me go back to this again, since this one's

 6    easier to read.

 7              Right under the block where it says activate the

 8    software, activate your new software by calling, can you read

 9    the instructions or the directions that appear right below

10    that?

11              You got it right there.

12    A    "To quickly activate your software, call us toll free at

13    the number above.  Our technicians will securely connect to

14    your PC and remotely activate your software for you.  At your

15    request, we will diagnose your PC for other hard to identify

16    problems."

17    Q    When PC Cleaner Pro customers would contact ICE, were

18    they instructed -- your sales staff, were they instructed to

19    activate the software when the customer called in?

20    A    Yes.

21    Q    Did they have to purchase anything for you to activate

22    that software?

23    A    No.

24    Q    And where would they get the activation key in order to

25    do that?
```

```
 1    A    Where would who get?

 2    Q    Your customer service rep.  Where would they get that

 3    activation key in order to enter it to activate the software?

 4    A    They could get it from the page, they could get it

 5    from -- we had a lookup tool, and they could get it from

 6    there.  The customer's e-mail, if the customer went into

 7    their e-mail and grabbed it.

 8    Q    And if they remotely logged in on the customer's

 9    computer, would it be there on the screen?

10    A    Yes.

11              MR. NICHOLSON:  I have no further questions.

12              THE COURT:  Any recross?

13              MS. ROBBINS:  Just a few questions.

14                        Recross-examination

15    BY MS. ROBBINS:

16    Q    Mr. Wright, I'm just showing you People's exhibit 30,

17    page 1002, 1003.  This is the job description on the Inbound

18    Call Experts website.

19    A    Okay.

20    Q    And can you just read on that first page the first bullet

21    on position highlights?

22    A    Yes.

23              "Anyone with any type of sales experience excels at

24    this position."

25    Q    And on the next page under job specifics, can you just
```

```
 1   please read what is written there under job specifics for the
 2   job for the sales agent.
 3   A    "Prequalified inbound calls from people with computer
 4   problems.  You sell the service of our IT technician
 5   workforce.  You are not expected to repair the computer.  You
 6   sell; the technicians do the work, it is simple.  No cold
 7   calls ever."
 8   Q    And isn't it true that employees could be terminated for
 9   instructing a customer how to activate the software
10   themselves?
11   A    No.
12   Q    I'm showing you exhibit 37, page 1545.  Can you please
13   read what that is?  Is that an employee warning?
14   A    Employee Warning Report.
15   Q    Okay.  And what is -- under the infraction, what does it
16   say?
17   A    It says "Miguel picked up a driver support call, stopped
18   trying to log onto the computer after a few minutes, then
19   instructed the customer how to activate the software
20   themselves.  Then offers refund number to customer in case
21   she ran into any problems."
22   Q    And under consequences what does it say?
23   A    Well, the infraction relates to not trying to log onto
24   the computer.  We have a policy where, if you don't make
25   significant attempts to remote onto the computer, that is the
```

```
 1    infraction that he's stating here.  That's what he's talking
 2    about.
 3              Consequences of further infractions, it says
 4    possible termination.
 5    Q   So what you're saying is that even though the infraction
 6    says they stopped attempting to log on and activated the
 7    customer's software -- or told the customer how to activate
 8    the software themselves and gave them the refund number, the
 9    two things after, those don't count?  Those aren't the
10    infraction?
11    A   No, what I'm saying -- yes, it's poorly written.  The
12    specific infraction is that the agent stopped trying to log
13    onto the computer after only a few minutes.
14    Q   But under the infraction they don't just say --
15              THE COURT:  One at a time, please.
16              THE WITNESS:  It does say, then instructed the
17    customer how to activate software themselves.
18              MS. ROBBINS:  Thank you.
19              I don't have anything further, Your Honor.
20              THE COURT:  We'll take a recess, 15 minutes.  We'll
21    see you in 15 minutes.  Thank you.
22         (A recess was taken from 10:54 a.m. to 11:11 a.m., after
23    which the following proceedings were had:)
24              THE COURT:  Please be seated, everyone.
25              Are we ready for the next witness?
```

```
 1              MR. FERGUSON:  Yes, Your Honor.  We call Robert
 2   Deignan.
 3              We're going to move his declaration into evidence.
 4              MR. STREISFELD:  Well, actually, his declaration is
 5   already in evidence as tab 1 of or Volume 1 of our notebook,
 6   Judge.  But in addition to that, we would like to mark as
 7   exhibit 50 an amendment to his declaration.  Just picking 50
 8   randomly to space it out from the PC Cleaner Defendants and
 9   to use the number that you used yesterday, which we haven't
10   actually used yet.
11              So exhibit 50 would be the amendment to declaration
12   of Robert Deignan that I believe is in your notebook, and it
13   was filed with the Court at docket entry 64-1, to address a
14   math error in paragraph 3.
15              THE COURT:  Any objection?
16              MS. BURTON:  No.
17              MS. ROBBINS:  No, Your Honor.
18              THE COURT:  They'll both be admitted without
19   objection.
20         (Defendants' Exhibit No. 50 entered into evidence.)
21              Robert Deignan, Defendants' witness, sworn.
22              THE COURT:  Please be seated.
23              Sir, if you could tell us your name and spell your
24   least name, please.
25              THE WITNESS:  My name is Robert Deignan, last name
```

```
 1    D-e-i-g-n-a-n.

 2              THE COURT:  Thank you.

 3              THE WITNESS:  Thank you.

 4              THE COURT:  Cross-examination.

 5                         Cross-examination

 6    BY MS. ROBBINS:

 7    Q    Good morning, Mr. Deignan.  My name is Colleen Robbins

 8    and I'm an attorney with the Federal Trade Commission.  I'm

 9    just going to ask you some questions about your declaration.

10    A    Okay.

11    Q    So you wrote out a declaration in this case, correct?

12    A    Yes.

13    Q    And you wanted to be truthful and accurate and give the

14    Court as much information as possible about this case, isn't

15    that right?

16    A    Of course.

17    Q    Okay.  And you spent a lot of time actually talking about

18    your interactions with the Better Business Bureau; is that

19    right?

20    A    Yes.

21    Q    Okay.  So you talked about the Better Business Bureau in

22    paragraphs 22, 23, 24, 25, 27 and 28 of your declaration; is

23    that right?  You can take a look and confirm.

24    A    Where did you start?

25    Q    Twenty-two, 23, 24, 25, 27 and 28.
```

```
1    A    Yeah, we -- yeah.

2    Q    Okay.  And you say in your declaration that you

3    personally responded to every complaint; is that true?

4    A    Up until May of this year.

5    Q    And who responded to the complaints after this year?

6    A    Aaron Barge.

7    Q    Did you review any of them before he responded to them,

8    or did you just stop reviewing them in May?

9    A    Yeah, I mean, as the CEO of the company I probably held

10   onto it a little too long, but Aaron was a perfect fit to be

11   able to handle it.  So he took over everything from the

12   initial to the whole process.

13   Q    So you stopped reviewing them in May of 2014, then?

14   A    I stopped reviewing -- which part, the actual complaint?

15   Q    Yes.

16   A    Yeah, but the team would keep me up to speed with what

17   was going on.

18   Q    Okay.  So they would just fill you in if you had

19   received -- if the company received complaints, but you

20   wouldn't then personally review them?

21   A    No, I was aware that we were getting complaints.  When I

22   say that I turned it over to Aaron, that was for him to

23   respond.  I actually kept -- okay.  Let me take a step back.

24   Q    Sure.

25   A    How the Better Business Bureau works is they have an
```

```
 1    Internet, right?  So if there's a complaint it will go to the
 2    Better Business Bureau, and you would receive an e-mail
 3    notifying you that there was a complaint.  So you would log
 4    in and you would be able to read that.  I still to this day
 5    receive those.  I just don't do the initial response.  Okay.
 6    So up until May I did the initial response, and then around
 7    mid May, Aaron started taking over that.  But I still did get
 8    the initial correspondence from the BBB.
 9    Q   Got it.
10          So you -- so you stopped reviewing them -- sorry.
11    You stopped responding to them in May, but you reviewed them
12    continuously throughout, since July 2012, when you were first
13    accredited with the BBB; is that right?
14    A   Yes.
15    Q   And you also made it a policy to refund every customer
16    that wanted a refund from the BBB complaints; is that true?
17    A   I don't believe I made a policy to do that, no.
18    Q   But did you refund consumers who complained to the BBB?
19    A   For the most part, yes, but not everybody.
20    Q   Okay.  And when would you decide not to refund a
21    customer?
22    A   Sometimes I believe we would get it resolved, and there
23    wasn't a refund that was warranted, and a lot of times when I
24    was handling it initially, there was a section from the BBB
25    that says the customer's desired response.  If that was a
```

1    refund, we would refund them, and we would still reach out to

2    them to find out what happened.

3    Q    Okay.  And you also said that you made sure to review and

4    act upon every complaint; is that right?

5    A    Yes.

6    Q    Okay.  Now, in all these paragraphs that you talk about

7    the Better Business Bureau, you never once mentioned that

8    Advanced Tech Support had its accreditation revoked in

9    August 2013, did you?

10   A    I did not.

11   Q    And you failed to mention in your sworn declaration that

12   the revocation was because you failed to cooperate with the

13   BBB in its efforts to eliminate the cause of pattern of

14   complaints; is that right?

15   A    Can you repeat that?

16   Q    So the BBB letter that you received stating that you were

17   initially suspended and then revoked was because of a failure

18   to eliminate the cause of pattern of complaints; is that

19   right?

20   A    There was a pattern of complaints, yes.  That was the

21   reason for it to happen the first time, yeah.

22   Q    But it's also the failure to eliminate the cause of the

23   pattern of complaints; isn't that true?

24   A    That's what they stated, but that's why we made sure that

25   we set up a meeting with them to discuss that with them.

```
 1    Q    Okay.  And you actually were able to get your
 2    accreditation back, right?
 3    A    That's correct.
 4    Q    Okay.  But then you also fail to mention in this sworn
 5    declaration that you were -- that the BBB suspended your
 6    accreditation pending revocation on October 21st, 2014; isn't
 7    that correct?
 8    A    Yes, I did.  That was the same date of the declaration
 9    from Sara Taylor to this Court, October 21st.
10    Q    Sara Taylor didn't submit a declaration to the Court on
11    October 21st because the FTC hadn't filed a lawsuit yet,
12    isn't that true?
13    A    The lawsuit, I don't --
14         MR. FERGUSON:  I'm going to object, Your Honor.  He
15    didn't say she submitted anything.  He said it was the date
16    of the declaration, and it, in fact, is.
17         THE COURT:  Rephrase your question.
18    BY MS. ROBBINS:
19    Q    Isn't it true that on October 21st, 2014, you received a
20    letter from the BBB -- excuse me.  Isn't it true that you
21    received a letter from the BBB dated October 21st, 2014,
22    stating that Advanced Tech Support, its accreditation, was
23    suspended pending revocation?
24    A    I did receive a letter, and I did have a conversation
25    with Sara Taylor after that.
```

```
 1   Q    And in that letter, again, it was, you were suspended for
 2   failure to cooperate with the BBB in its efforts -- in
 3   efforts to eliminate the cause of pattern of complaints, is
 4   that what the letter said?
 5   A    Every time that we had that happen, it was because of the
 6   pattern of complaints.
 7   Q    Okay.  Now, in your declaration, I'll turn to the page,
 8   paragraph 37, you refer to ICE's sales guidelines; is that
 9   correct?
10   A    Yes.
11   Q    But, in fact, these are actually referred to as scripts
12   within your business; isn't that true?
13   A    We've called it both, guidelines and scripts.  I
14   personally always called it a guideline.
15   Q    But when the trainers would train the salespeople, they
16   would refer to them as scripts, isn't that true?
17   A    Most of them did, yes.
18   Q    Okay.  And -- okay.  I'm going to show you -- show you --
19   you had several types of scripts, didn't you?  The company
20   had several types of scripts; isn't that true, for different
21   things?
22   A    Yes.
23   Q    Okay.  So I want to go through those scripts.
24        So you had a script that had the Event Viewer as
25   part of the diagnostic; isn't that true?
```

```
 1   A   Yes.

 2   Q   I'm going to hand you exhibit 37, page 1784.  This, in

 3   fact -- this one was actually found in your office.  Do you

 4   recognize that?

 5   A   We've had a bunch of variations of this, but this looks

 6   familiar.

 7   Q   And then you also had -- oh, and, actually, can you

 8   please look at the Event Viewer portion of the script, which

 9   is, I believe, step five?

10   A   Okay.

11   Q   And can you just read at the top where it says Event

12   Viewer?  Can you read what it says?

13   A   Next to step five?

14   Q   Yes.

15   A   "Do not say Event Viewer."

16   Q   Okay.  Now, you also have another script called the

17   hijack -- well, it talks about browser hijackers; isn't that

18   true?  I'm going to show you exhibit 37, page 1204.

19           Can you look at that script, please.

20   A   Okay.

21   Q   And that script does not have the Event Viewer in it,

22   does it, as a diagnostic step?

23   A   It does not.

24   Q   But that script has a list of browser hijackers; isn't

25   that true?
```

1    A    Yes.

2    Q    Now, I'm also going to show you, there's also a script

3    that has System Advisor in it; isn't that true?

4    A    Yes.

5    Q    This is exhibit 37, page 1269.  And if you could just

6    review that.  Is that the script that has the System Advisor

7    in it for the diagnostic step?

8    A    Step five, System Advisor, yes.

9    Q    You also have a script that deals with customers who call

10   in for infections; isn't that true?  Isn't that correct?

11   A    Yes.

12   Q    I'm showing you exhibit 37, page 1384.

13        And is that the script that salespeople would use

14   when consumers would call in with a particular infection?

15   A    A particular infection, yes.

16   Q    Okay.  And you also have a wrap-up script; isn't that

17   true?

18   A    Yes.

19   Q    Okay.  Which I think is attached to one of those?

20        And you also have a script that talks about other

21   products and services; isn't that true?

22   A    I'd have to see that.

23   Q    So you have a script -- well, I'll show you.

24        So this is a script that talks about Panda,

25   up-selling Panda; is that true?  And then PC MRI, you also

1    sell PC MRI; is that right?

2    A    Yes.

3    Q    And ID Watchdog?

4    A    Yes.

5    Q    These are all things that are sold to consumers after

6    they've already purchased; is that correct?

7    A    For the most part, yes.  There were times that somebody

8    would call in and they didn't want our service, and if they

9    needed antivirus, we would sell that to them.

10   Q    And then also the wrap-up script is back here.

11            So I'll just show you, this is exhibit 37,

12   page 1665.

13            Are those products you would sell to consumers

14   typically after a consumer would make a purchase?

15   A    Yes.

16   Q    Now, you also had a script for responses to consumers'

17   questions, isn't that right?  So your sales agents would know

18   how to respond to somebody when they asked a particular

19   question; is that right?

20   A    Okay.  Rebuttals?

21   Q    Well, I'll get to the rebuttals in a second.  You have --

22   well, I guess these are also considered rebuttals.

23            So you have a rebuttal for, I'll just buy a new

24   computer; is that correct?  And you have a rebuttal for, I'm

25   not sure I want to spend that much money; is that correct?

```
 1              THE COURT:  I'm sorry, you need to answer.
 2              THE WITNESS:  Yes.
 3              THE COURT:  Was that yes to both of those?
 4              THE WITNESS:  I'd like to see it if that's okay?
 5              MS. ROBBINS:  So, sure.  Take a look.
 6   BY MS. ROBBINS:
 7   Q   So you have a rebuttal for, I'll just buy a new computer?
 8   A   Yes.
 9   Q   And you have a rebuttal for, I'm not sure I want to spend
10   that much money?
11   A   Yes.
12   Q   And you have a rebuttal for, I have no money?  Might not
13   be on that one.
14   A   Yes, it is.
15   Q   Do you have a rebuttal for, I have a family member or
16   friend that can fix this?
17   A   Yes.
18   Q   And do you have a rebuttal for, I have to ask my husband
19   or wife?
20   A   Yes.
21   Q   Okay.  And you also have a script for when someone is put
22   on hold, isn't that right?
23   A   I'd have to see that.
24   Q   I'll show you.  This is exhibit 37, page 1218.
25   A   I've never seen this before.
```

```
 1    Q    Does it appear to be if somebody is on hold, I'm calling

 2    in about an infection, that that would be the script someone

 3    would read?

 4    A    Yeah, I don't know if this is something that was

 5    constructed to be put on the voicemail system or if this was

 6    something that was instructed for someone to read.  So I've

 7    never seen this before.

 8    Q    Okay.  And these are all scripts that your salespeople

 9    are directed to follow verbatim; isn't that true?

10    A    I think being able to follow a script verbatim, I know

11    we've put a lot of emphasis on that, I don't think that

12    that's possible.  I don't want to say it's impossible.

13    Anything's possible.  But I don't -- when somebody would call

14    in, there was dialogue that took place between the consumer

15    or the caller and our representative.

16         Many times the caller called in and told us exactly

17    what was going on with their computer.  Many times as we were

18    trying to log in at the beginning of the call we would ask

19    you what the problem was, what made you buy the software

20    today, what made you go to Google and type in malware, what

21    made you type in slow computer?

22         So there's a lot of things -- to sit here and say

23    that the script is exactly how the phone call went, there's

24    no way.

25    Q    That wasn't my question.
```

1          My question is is that the salespeople were directed

2   to stick to the script and not add any words or take any

3   words away; isn't that true?

4   A   It was with regards to getting to the technical part to

5   show the consumer what it was we could do.  There was

6   dialogue that took place.  It wasn't somebody wouldn't call

7   in and say hi, and we say you're not allowed to talk, okay,

8   and we would go through a 25-minute presentation, and at the

9   end of that presentation the customer said, okay, thanks, I

10  just want to -- I just had a billing question.  That would be

11  a terrible experience.

12         So the script was focused on when we got into the

13  components of showing the consumer what we could do.  There

14  was a lot that took place before then.

15  Q   Okay.  So --

16  A   And if you look at the three calls that you guys did, on

17  each one of them that took place.  On the first two the

18  computer was slow before we ever got into any component of

19  the diagnostic.  On the third one the call came in and we

20  talked about Panda not working properly and that the machine

21  wasn't working, was running slow.

22         So the scripts were set up at the point for the

23  diagnostic, but there is dialogue that takes place.  There is

24  communication.  There is the consumer telling us that there

25  was a problem with their computer way before we get into

```
 1   this.
 2   Q    But just to be clear, once they get to the diagnostic
 3   they have to follow the script?
 4   A    We want them to follow the script.  We don't want them
 5   making up that you're normal to have 10 processes as opposed
 6   to the other processes, right, because that would be
 7   misleading.  You can't say something like what Phil Tomich
 8   said yesterday, like if this was me, I would never use this
 9   computer.  That would get you terminated.
10        There were things with regards to the technical
11   component of the pitch which our Microsoft, our head
12   Microsoft certified technician put together, that you, as a
13   sales rep, could not deviate from.
14   Q    So you couldn't deviate from the, say, the Event Viewer
15   script, because you could be terminated?
16   A    With regards to that component, with the processes and
17   the Event Viewer, you were told to stick to that part.
18   Q    Now, isn't it true that you had some other competitors in
19   this space?
20   A    Yes.
21   Q    And John Paul Vasto was -- had been an employee of yours;
22   is that correct?
23   A    He was.
24   Q    Isn't it true he left ICE and started OMG Tech Help or
25   Vast Tech?
```

```
 1   A    He was terminated by ICE and did that, yes.

 2   Q    Did he take anything from you when he left?

 3   A    I would have no way to know that.

 4   Q    Did he take any scripts or anything from you when he

 5   left?

 6   A    I would tend to think maybe he did, but I don't know.  I

 7   have no factual information about that.

 8   Q    And you tend to think he did because they were using the

 9   same script as you?

10   A    No, because we actually had litigation with him, and one

11   of the complaints that we had in that litigation was that

12   they actually had some of our IP.  We had thought they took

13   our ATS tool kit, which is a tool kit that our own

14   technicians built to help us clean up machines.

15          So part of our complaint with them was that they had

16   that, so it could be true that they had other things like a

17   script, but I don't know for sure.

18   Q    And you considered OMG a competitor of yours; isn't that

19   right?

20   A    Yes.

21   Q    And there were other competitors, like Fast Fix 123 and

22   ASAP and First Choice, right?  Those were competitors of

23   yours?

24   A    I don't know if I would classify them exactly as

25   competitors.  They were groups that were popping up in South
```

```
 1    Florida to provide tech support services.  How they did it,

 2    the avenues that they went to make the phone ring, I wouldn't

 3    consider us competitors.  I don't believe they partner with

 4    software companies like we did.  But they were providing tech

 5    support space, and they were in South Florida.

 6    Q    And you had a meeting with Blair Williams on

 7    November 12th, 2014; is that right?

 8    A    Yes.

 9    Q    Who is Blare Williams?

10    A    William Blare.

11    Q    William Blare, excuse me.

12    A    They're an investment group out of Chicago.

13    Q    And what was that meeting about?

14    A    We have some investors in our company, and they had been

15    communicating with them about potentially taking an

16    investment.  They were the majority owners of our company,

17    and they wanted us to meet with them to see if there was

18    anything there with regards to them getting an investment or

19    selling the company.

20    Q    So you were thinking about maybe either selling the

21    company or having investors come in?

22    A    Yes.

23    Q    You said in your declaration that you've read virtually

24    every complaint from the BBB that you've received or

25    reviewed?
```

```
1    A    Yeah.

2    Q    Was that a "yes"?

3    A    It is virtually every complaint.  I mean there were

4    complaints that I skimmed through.  There were ones that I

5    read in detail.  Some of them were lengthy.  So, I mean, to

6    sit here and say that I've read every single one thoroughly,

7    no.  But I did review them.

8    Q    Okay.  So in your declaration, when you say you

9    personally responded to every complaint or made sure you

10   reviewed and acted upon every complaint, is that accurate?

11   A    It is.

12        If you remember how the BBB is set up, there's the

13   initial correspondence that they received from the consumer

14   or the caller.  Then the notification is sent to the company,

15   of which I would do that communication.  Normally, it was

16   very brief.  Sorry for the inconvenience.  We want to make

17   sure that we keep you happy.  If there was a refund, we let

18   them know that we refunded you, but we're going to have

19   somebody call you to find out what happened.  That's kind of

20   the part that I would handle.

21        And then I would pass it off to the appropriate

22   division in the company to -- for them to look into it.

23   Q    Okay.  So you know, then, from your review of these

24   complaints, that people would frequently complain about the

25   initial software that was purchased prior to them activating
```

1   that software and being led to your company; is that true?

2   A   What was the complaint?

3   Q   So in the BBB complaints, did you ever see in the text

4   consumers complaining about the software they had downloaded

5   prior to making the phone call to you?

6   A   That they weren't happy with that software?

7   Q   Correct.

8   A   I can't recall.  I remember the majority of the Better

9   Business Bureau complaints were that the consumers weren't

10  happy with the state of their computer when we were done with

11  it.

12  Q   Okay.  So when you -- your recollection is that the

13  complaints were primarily about your business but not

14  necessarily about the software products, is that what you --

15  A   Again, I can't remember every single complaint.  The

16  pattern of complaints that we discussed when I went to the

17  Better Business Bureau was that the computer was not fixed to

18  their satisfaction, or in some cases, unfortunately, it was

19  in worse shape, which was upsetting to us.

20       So that's really -- the pattern of complaints that

21  we discussed with the Better Business Bureau was that the

22  machine wasn't fixed properly.

23  Q   Do you recall reading any complaints that dealt with PC

24  Cleaner Pro and the complaints about that product and then

25  the complaint also about your company within the same text?

```
1    A    I don't recall.

2    Q    But yet you did say in your declaration that you

3    responded to every complaint prior to May 2014; is that

4    right?

5    A    I did.

6    Q    Okay.

7    A    Again, the initial, which was a notification that there

8    was a complaint, not necessarily on the merits of what

9    happened.  So that there was a complaint, here's the

10   complaint.  I would then -- you need to respond to the

11   consumer.  So one of the reasons why I held onto it for so

12   long because I didn't want, God forbid, something to happen

13   with the Better Business Bureau and somebody just forgot to

14   respond.  You could lose your accreditation with them just

15   simply by not responding.

16        So that's why I held onto it.  I felt like it was

17   important, so I handled that initial response with the BBB to

18   the customer.

19   Q    So do you recall seeing any complaints prior to May 2014

20   that had to do with PC Cleaner Pro and Advanced Tech Support?

21   A    The two together I don't recall.

22   Q    Okay.  Would anything refresh your recollection?

23        MS. ROBBINS:  Actually, Your Honor, may I refresh

24   his recollection with a complaint that is prior to May 2014?

25        THE COURT:  You can try.
```

```
 1    BY MS. ROBBINS:

 2    Q    Mr. Deignan, that's a Better Business Bureau complaint,

 3    isn't that right?

 4    A    It looks like it.  I don't see anything that notifies

 5    it's a BBB complaint.  Yeah, it is, here at the end, yeah.

 6    Q    And isn't it true that that complaint has to do -- number

 7    one, isn't it true that that complaint is from prior to

 8    May 2014?

 9    A    Yeah, this is July 2013.

10    Q    Okay.  And isn't it true that that complaint is about PC

11    Cleaner Pro and Advanced Tech Support?

12    A    Yes.

13    Q    And isn't it true that you -- the business responded, ICE

14    responded to that complaint?

15    A    Yes.

16    Q    So that would have been you responding to that complaint;

17    isn't that true?

18    A    Yes.

19    Q    And can you --

20          MS. ROBBINS:  Your Honor, I'd like to introduce that

21    into evidence as Plaintiffs' exhibit 42.

22          THE COURT:  Any objection?

23          MR. FERGUSON:  As long as it's with our response,

24    Your Honor.  We understand that the response is a party

25    opponent statement anyway.  We just want it in context.
```

```
1              Again, our objection to the hearsay and our

2     interpretation of your requirement that any consumers that

3     were going to be used against us at this phase of the

4     proceeding be here to be cross-examined, I believe that we're

5     crossing that line, but, you know, I'm in a difficult

6     position, because we're dealing with 323 total complaints out

7     of over half a million customers.  I don't want the Court to

8     perceive that we're hiding the ball.

9              So the complaints exist.  We've got no problem with

10    the Court taking notice of 323 complaints.  We do think, if

11    we're called to task about every single complaint without an

12    ability to cross-examine the Complainant, that we would be

13    prejudiced, but I don't think we've crossed that line right

14    here yet, but I'm worried that we could easily.

15             THE COURT:  Okay.

16             MR. FERGUSON:  Long objection.  No objection.

17             MR. NICHOLSON:  What he said.

18             THE COURT:  Fine.

19             MR. NICHOLSON:  If this is going to be a string of

20    these --

21             MS. ROBBINS:  No.

22             MR. NICHOLSON:  If it's one for an example, which,

23    by the way, I would like to see it first, at least.  I don't

24    have a problem with that.  Again, the total number is not an

25    issue.  I don't want it to seem like, you know, one, after
```

```
 1   one, after one that we don't have a chance to rebut.
 2            As to this one, no objection as long as it's --
 3            THE COURT:  Admitted without objection.
 4        (Plaintiffs' Exhibit No. 42 entered into evidence.)
 5            MS. ROBBINS:  Your Honor, I have copies for them.
 6            THE COURT:  The longest non-objection I've ever
 7   heard.
 8   BY MS. ROBBINS:
 9   Q   Mr. Deignan, can you please read the first line of the
10   details, the nature of the dispute?
11   A   "Nature of dispute:  Pop-up on computer tricked me into
12   thinking something was wrong with computer and they would fix
13   it."
14   Q   Okay.  Actually, read the first down to here.
15            MR. FERGUSON:  Is this when he was just reading?
16            MS. ROBBINS:  Yes.
17            THE WITNESS:  You want me to read the entire
18   paragraph?
19   BY MS. ROBBINS:
20   Q   Yes, please.
21   A   Okay.  I'll start over.
22            "Pop-up on computer tricked me into thinking
23   something was wrong with my computer and they would fix it.
24   Browsing the Internet, my computer, so I thought popped up a
25   message that said my computer was infected and running slow.
```

```
 1    The pop-up suggested I install PC Cleaner Pro.  It looked
 2    legit, and they offered a phone number to call to start the
 3    process.  I called the number, and indeed it seemed very
 4    legit.  I provided a credit card number, and they used a
 5    software called Log Me In to take control of my computer.
 6            "Over the next hour or so I watch as they remotely
 7    move my mouse around, deleted and un-installed various
 8    softwares and installed their softwares, PC Cleaner Pro, My
 9    PC Backup and Advanced Tech Support.  When they were done,
10    the computer seemed to work fine.  A day later the machine
11    became incredibly slow, and I started receiving pop-ups that
12    I needed to buy the subscription to fix the slow issues."
13    Q   Now, so you, in responding to this complaint, had
14    information about consumers' complaints on the software
15    products that were -- consumers would download to -- and then
16    call into Inbound Call Experts?
17            THE COURT:  Can you say that again?
18            MS. ROBBINS:  Maybe I should restate that.  Sorry.
19    I'll rephrase that.
20            MR. FERGUSON:  Your Honor, before we get past this,
21    if we're talking about the response, do you have copies of
22    the response that we could see?  I thought it was attached,
23    but it's not.
24            MS. ROBBINS:  They are.
25    BY MS. ROBBINS:
```

```
1    Q    So as you testified earlier, you reviewed and responded

2    to complaints prior to May 2014; isn't that right?

3    A    In some cases I responded, then reviewed.

4    Q    Okay.  And have you ever purchased PC Cleaner Pro before?

5    A    I have not.

6    Q    You've never purchased PC Cleaner Pro ever?

7    A    You know, I may have done a test order, so I -- I don't

8    recall, but I would lean more towards yes, just to do a test

9    to see if the phone number was being displayed.

10   Q    So would you -- did you ever test the software products

11   that you were partnering with?

12   A    We had teams that did that.  I don't think we did it for

13   every single product, but there were times that we would --

14   you know, we would run the product and see how it -- to see

15   how it interacted up at the computer, so on and so forth.

16   Q    So --

17   A    But I didn't do it personally.

18   Q    So you never did it personally.  Did you ever direct

19   anyone, then, to, as a procedure, download and test products

20   that you were -- with companies that you were partnering

21   with?

22   A    I didn't create a procedure for that, no.

23   Q    Okay.  So even though you had a complaint, at least one

24   complaint that you saw about one of those products that you

25   partnered with, you didn't test it or download it or see what
```

```
 1   happened with it?
 2   A   I did not.  A lot of the times when I got these
 3   complaints, I tend to scratch my head.  And this one, as I
 4   was reading it, I virtually did that.
 5            I provided a credit card number, and then they used
 6   a software called Log Me In.  We would never -- we remoted on
 7   for free.  So when I read something like that, we didn't ask
 8   somebody for their credit card number so that we can remote
 9   in, so . . .
10   Q   But my question is, so -- well, if you received a
11   complaint about a software product that you were -- with a
12   company that you were partnered with, would you then go out
13   and see exactly what that product was doing, test it, see if
14   your phone number displayed?
15   A   Yeah, I agree.  I've run some test purchases.
16   Q   So do you run test purchases on every single product that
17   you're partnered with?
18   A   No.
19   Q   How many do you think you've run tests on?
20   A   Probably five or six.
21   Q   Okay.  And isn't it true that you have about 50 software
22   products that you are partnered with?
23   A   I don't recall exactly how many.
24   Q   I'm showing you exhibit 37, page 1279.
25            Is that a list of all of the products that your
```

1    company has partnered with?

2    A    Yes.

3    Q    And does that look like it could be about 50 on that

4    list?

5    A    You're going to make me do that?

6    Q    Would you agree with me that that looks like about 50?

7    A    I'm going to count.

8    Q    Okay.  Go ahead.

9    A    Yeah, it's about 50.

10   Q    Okay.  Now, you mention -- well, it's been mentioned, and

11   actually, you mention it in your declaration, that you have a

12   very low charge-back rate; is that right?

13   A    Yes.

14   Q    And, in fact, actually, in your declaration you say that

15   it was an exceptionally low charge-back rate; is that right?

16   A    I believe so, yes.

17   Q    Okay.  So you said actually it was .55 percent, and

18   that's less than the one percent allowed by Visa and

19   MasterCard; is that right?

20   A    Yeah, about a half a percent.

21   Q    Isn't it true that you use Revenue Wire as your processor

22   for consumer payments?

23   A    Yes.

24   Q    And Revenue Wire also has set you up with other software

25   partners, right?  So sometimes -- like that's how you came

 1    into contact with PC Cleaner Pro; isn't that true?  PC

 2    Cleaner, Inc.?

 3    A    Yeah, that's correct.

 4    Q    Okay.  And Revenue Wire is owned by Elton Perrera and Don

 5    Warren; is that right?

 6    A    That's correct.

 7    Q    And those two also own ICE Venture Capital Corp, correct?

 8    A    Correct.

 9    Q    And ICE Venture Capital Corp actually owns now 80 percent

10    of ICE; is that right?

11    A    That's correct.

12    Q    And in July 2014, you and your partners actually sold

13    your -- some more shares to Ice Venture Capital Corp, and you

14    each made $4 million on that sale; is that right?

15    A    That's correct.

16    Q    And that was in July of 2014, correct?

17    A    That's correct.

18    Q    And you also have a policy that you have to sell the tech

19    support and the software separately, that the charges show up

20    on the credit card statements separately; is that right?

21    A    No, there's transactions that are all -- we call them

22    SKUs.  So you would see -- there's -- many times there's a

23    SKU where it has our support services and the actual product

24    on it, but most of the transactions went down that way, yes.

25    Q    Okay.  So one charge for the tech support and one charge

1    for the product after the fact, either Panda Security or PC

2    MRI or whatever product they bought after the fact?

3    A    Yes.

4    Q    And isn't it your policy to try to refund customers if

5    they complained?

6    A    If somebody's not happy with our services, we will refund

7    them, yes.

8    Q    And when you give refunds to consumers, then they have no

9    reason to charge-back the sale; is that right?

10   A    I would hope not.

11   Q    And yesterday -- strike that.

12        So the receiver filed a report in this case and

13   included 12 cash withdrawals that were made between

14   October 14th and November 10th, and I will show you what they

15   look like.

16        MS. ROBBINS:  Your Honor, I'm just going to give

17   defense counsel a copy of what was from the -- this is

18   actually . . .

19   BY MS. ROBBINS:

20   Q    So in the receiver's report, the receiver mentioned that

21   you had made -- that you had withdrawn 12 cash withdrawals

22   between October 14th and November 10th, and --

23        Did I hand you one?

24   A    No.

25   Q    I'm sorry.  And all of these were marked as entries as

```
 1    either spiff or cash.
 2            What is a spiff?
 3    A   Well, I'm on the third one, and I don't see an entry as
 4    spiff or cash.
 5    Q   No, I'm sorry.  In the receiver's report he mentioned --
 6    these are just the underlying transaction activity.
 7    A   Yeah, I'm on the third one right now, and that definitely
 8    wouldn't be a spiff or cash.  That was a payment to a
 9    gentleman we called Papi for his -- the food that he makes
10    for the guys on the weekends.
11    Q   So that's the 1645?
12    A   I just know that number.  That definitely wouldn't be a
13    spiff.
14    Q   And all of the other numbers, though, are even amounts,
15    6000, 7000, 5000, 5000, 5000, 8000, 8000, 5000, and they're
16    all under the $10,000 amount; isn't that right?
17    A   Yes.
18    Q   And they're all in even amounts except for that one that
19    you said is not a spiff, number 3.
20    A   Yeah, I'm not finished with it.
21            Okay.
22    Q   So what are spiffs?
23    A   Well, I mean -- okay.  Spiffs, there was a mention of the
24    wheel that we had.  And so to create a fun atmosphere, we had
25    a wheel that if somebody did 2500 a day in sales on the sales
```

```
1   end, they would get the opportunity to spin the wheel either

2   the next day or when their shift started again.  If they spun

3   the wheel, if I can recall correctly, if they -- there were

4   numbers on the wheel, just like one through, I believe 18.

5   If they hit the actual number 1, they got $500 cash.  Which

6   they signed off on they got $500 cash, and then we process it

7   through HR so they could take it out of their paycheck with

8   ADP.

9            If they landed on an odd number, I believe it was 50

10  bucks, and if they landed on an even number it was a hundred

11  bucks.

12  Q   And isn't it true that prior months prior to

13  October 2014, that the cash withdrawals made for spiffs was

14  not merely near 12 withdrawals, that in other months it was

15  usually, like, three or four withdrawals?

16  A   I don't know if it was that low.  It's always been a

17  significant amount.  But I think what we have going on here

18  is a misclassification of spiff, which was something that

19  Briana may have put in the lower left-hand corner.  Some of

20  them don't say spiffs, some say 5000 in fifties and hundreds.

21           So how it works with regards to our business is as

22  the summer kind of slows down with software sales and we take

23  the activation calls, and as winter starts to come into play,

24  we start to get more phone calls.  My estimation is because

25  in Minnesota in the summer you can be out throwing the ball
```

```
1    with your son, and in November, especially this year, you may

2    not be, so you're online more, you're buying software more.

3         And so one of the things that we -- that was always

4    something that was difficult for us was getting the weekend

5    shift covered.  So in this timeframe we were aggressively

6    getting people -- we were giving them 50-dollar bonuses to

7    come in on the weekend.

8         So they were -- give you an idea, there were five

9    shifts amongst the sales divisions and upwards of 40 people

10   on a Friday night, 40 or 50 on a Saturday day, you have

11   Saturday night the same amount, you have Sunday day a little

12   bit lower amount and Sunday night a little bit lower amount.

13        It could be as high as 150 to 200 people that would

14   receive a 50-dollar cash bonus to come in at that time to

15   help with us the calls.

16   Q   Okay.  But it wasn't typical that in a typical month that

17   you would make 12 withdrawals of dollar figures, like 6000,

18   within three days of each other, two days of each other,

19   6000, 7000, 5000, 8000?  That wasn't typical, was it?

20   A   Again, I think this got accelerated because of the fact

21   that we were getting people to come work on the weekend.

22        And to be honest with you, there wasn't much rhyme

23   or reason associated with the amounts.  That's why they were

24   kind of flat amounts.  We wanted to make sure that we had the

25   money in case somebody hit $500 on the wheel, we wanted to
```

```
 1    make sure we had it for them, right?

 2            In addition, if somebody did come in on that

 3    weekend, to be able to give them that bonus at that time.

 4    That was important for us to be able to recruit them in the

 5    future, as well.

 6    Q    Okay.  And isn't it true that on September 29th, 2014,

 7    that the -- that you were aware that the FTC obtained a

 8    temporary restraining order against a tech support company

 9    named Pairsys in upstate New York?

10    A    I was.

11    Q    And you knew that the FTC obtained an injunction that

12    included an asset freeze, isn't that true?

13    A    Yeah, I believe that's what it -- can I see it?

14    Q    Because on your desk, isn't it true that you had both the

15    press release from the Federal Trade Commission and a copy of

16    the complaint?

17    A    Yeah, I had it on my desk because Robby came in that day,

18    and we were going to -- I wanted to discuss that with him.

19    Q    So that's a yes, that you knew about it?

20    A    I did know about it, yes.

21            MS. ROBBINS:  I don't have anything further.

22            Oh, wait.

23            Oh, Your Honor, this exhibit is actually exhibit 43,

24    the one we just entered.

25                        Redirect Examination
```

```
 1   BY MR. FERGUSON:
 2   Q    Do you know who Nathan Scott is?
 3   A    I do.
 4   Q    What does he do for the -- is he an employee of the
 5   company?
 6   A    He is.
 7   Q    What are his job duties?
 8   A    He was mostly focused on development of software products
 9   for us.
10   Q    Did he do any testing for the company?
11   A    I believe he did.
12   Q    Anybody else help him with that?
13   A    Testing?
14   Q    Of the products.
15   A    I believe he did some testing of the products.
16   Q    When you were asked if you did testing, you said you've
17   tested a few, but that wasn't your job to go test the
18   software products?
19   A    No, that wasn't my job.
20   Q    Are there any folks in addition to him at the company
21   that were involved in that, to your knowledge?
22   A    With regard to the testing, Edwin Ramirez may have been
23   involved with some of that.
24   Q    What about Mr. Herdsman?
25   A    Mr. Herdsman would be, yeah.
```

1   Q    But product testing wasn't in your silo of

2   responsibilities?

3   A    No.

4   Q    The list of 50 or so products -- you don't need to go to

5   it -- well, go ahead and look at it.  Were all of those

6   active products being supported by ATS at the time the TRO

7   was served?

8   A    Well, the first one wasn't, I can tell you that.

9   Q    We don't need to go line by line.  I just want to know if

10  you have an appreciation for whether that list, it would be a

11  current list of --

12  A    This seems like an old list.

13  Q    All right.  We heard about the Better Business Bureau

14  letter that was sent to you the same day that Ms. Taylor was

15  filling out the declaration that was subsequently filed by

16  the Plaintiffs in this action.  You said you spoke to Sara

17  Taylor after that letter.  What did she tell you?

18  A    I left her a few messages.  We finally had a chance to

19  speak.  She told me that if I wanted to send her any

20  information with regards to the -- to the suspension, that I

21  could send it to her, and that if I wanted to -- I believe,

22  I believe she told me to have it in before Thanksgiving,

23  which unfortunately I didn't get a chance to do.

24  Q    Tell the Court why you didn't get a chance to do that.

25  A    Because on November 13th we had a TRO.

```
1    Q    You got locked out of the business?

2    A    We got locked out of the business, yeah.

3    Q    And since that day, you've spent a great deal of time

4    preparing for this very event, this proceeding?

5    A    That's all I've been focused on.

6    Q    Okay.  Had not the TRO and receivership been dropped over

7    the company, was it your intention to fully respond to that

8    inquiry?

9    A    One hundred percent.

10   Q    And you had done so in the past?

11   A    Yes.

12   Q    Successfully?

13   A    Yes.

14   Q    Were you hopeful that you would be able to achieve the

15   same result?

16   A    I was.

17         As a matter of fact, through my conversation with

18   Ms. Taylor, she told me that she was actually on the

19   committee from the first time with regards to us going in and

20   explaining who we were and them realizing that we had a

21   significant customer base, and that the number of complaints

22   was actually relatively low.

23         I think Mr. Colemeyer (phonetic), who was senior

24   vice president at the time, said, wow, that's low.  I think

25   that was his actual words in the meeting.  And then they
```

```
 1    broke and they had a board of directors meeting, of which I
 2    learned on that call that Sara Taylor was part of it, who
 3    gave the thumbs up that when you looked at the number of
 4    complaints relative to the number of customers that we had,
 5    that it was meritorious to turn us back on.
 6             So when she told me that, I felt good that we would
 7    be going down the same path we did before and be able to get
 8    turned back on.
 9    Q    In the letter Sara Taylor sent you, she didn't mention
10    that simultaneous with this letter, or on this very date I've
11    also signed a declaration to be filed against you in an FTC
12    action, did she?
13    A    No.
14    Q    When you called, she didn't say you can get this stuff in
15    by Thanksgiving if you want to rebut, but you're about to get
16    sued by the FTC?
17    A    No.
18             MS. ROBBINS:  Objection, Your Honor.  He doesn't
19    know that.
20             MR. FERGUSON:  I'm asking him if he --
21             THE COURT:  Overruled.
22             THE WITNESS:  What was the question?
23    BY MR. FERGUSON:
24    Q    When you spoke to her on the phone, she led you to
25    believe you'd have an opportunity to get the material in, but
```

1    she didn't mention that there was any FTC action coming your

2    way?

3    A    No.

4    Q    Was it your intention to put together the information you

5    thought would assist the BBB in evaluating the suspension in

6    a timely fashion?

7    A    I did.  I actually thought it would be easier, because as

8    of November, in the month of November, or even in October, I

9    think we had five Better Business Bureau complaints, which

10   was substantially down.  So I felt like it would be actually

11   easier to do.  I believe in November we had one at the time

12   of the TRO, so . . .

13   Q    So you believe the complaints going through the BBB were

14   trending down?

15   A    I do.

16   Q    You didn't get a response in by Thanksgiving?

17   A    No.

18   Q    And what happened after that?

19   A    They suspended the business I believe on November -- it

20   was two weeks after, maybe, November 26th-ish.

21   Q    Again, after the lawsuit was filed and after you were

22   locked out of the facility?

23   A    Yes.

24   Q    We talked -- we heard about the BBB complaint, the

25   specific one where I launched possibly the longest

1   non-objection objection that the judge has heard.

2   A   Yeah.

3   Q   That one involved -- if I'm right, did it involve you

4   weren't able to fix the machine?

5   A   I was skimming through it.  I believe I read that.

6   Q   That's what I heard you read?

7   A   Okay.

8   Q   Let's assume that that's truthful and that's what the

9   customer was complaining about.

10  A   Okay.

11  Q   Is ATS able to fix all machines?

12  A   No.

13  Q   Does ATS claim to be able to do so?

14  A   No.

15  Q   Why aren't you able to fix all machines?

16  A   Computers are complicated.  There's times that there may

17  be a hardware issue that we don't detect until after the sale

18  is made and after our technicians are trying to clean things

19  up.  So it can be a hardware issue, which, really, you can

20  only get resolved by what we call a truck roll or if you were

21  to bring your computer to Staples or Geek Squad.

22          Sometimes there's infections that are pretty nasty.

23  There's rootkits that are out there that can get below the

24  kernel level of the operating system and it can cause a

25  problem for our guys to be able to remove it.  Sometimes we

```
 1   just didn't do a good job, you know, but we stood behind it

 2   and we would give them a refund.  But to say that we could

 3   fix every single problem, we couldn't.

 4   Q   How does it make you feel when you hear that you were not

 5   able to fix a customer's computer to their satisfaction?

 6   A   It makes me feel bad.

 7             MR. FERGUSON:  I don't have anything further, Your

 8   Honor.

 9             THE COURT:  All right.

10             MR. FERGUSON:  Thank you.

11             THE COURT:  Anything?

12             MR. NICHOLSON:  No.

13             THE COURT:  Anything else?

14             Anything else, Ms. Robbins?

15             MS. ROBBINS:  No, Your Honor.

16             THE COURT:  Thank you, sir.

17             THE WITNESS:  Thank you.

18             THE COURT:  All right.  What are we going to do the

19   rest of the day, if anything?

20             MR. FERGUSON:  Let me consult with co-defense

21   counsel real quick.

22             Your Honor, I believe the Defendants have two more

23   witnesses to go, Mr. Herdsman and Mr. Myricks, the last two

24   witnesses.

25             MS. BURTON:  Just to clarify, you will not be
```

```
 1    putting on your additional expert?

 2              MR. NICHOLSON:  Not necessary.

 3              MS. BURTON:  Okay.

 4              THE COURT:  All right.  Well, let's try and finish

 5    up then, at least with the witnesses.

 6              Are you going to have any rebuttal witnesses?

 7              MS. ROBBINS:  No, Your Honor.

 8              THE COURT:  Let's take five minutes, and we'll try

 9    and finish up the witnesses.  All right?

10              MR. FERGUSON:  Very well.

11         (A recess was taken from 12:02 p.m. to 12:11 p.m., after

12    which the following proceedings were had:)

13              THE COURT:  Please be seated, everyone.

14              Next witness.

15              MR. FERGUSON:  Your Honor, the Defendants call Paul

16    Herdsman.

17              MR. STREISFELD:  He's tab 3 in the notebook, Judge.

18              THE COURT:  Sir, raise your right hand.

19              Paul Herdsman, Defendants' witness, sworn.

20              THE COURT:  Please be seated.

21              THE WITNESS:  I'm sorry.  I have a cough.

22              THE COURT:  No problem.

23              Tell us your name, sir, and spell your last name,

24    please.

25              THE WITNESS:  First name's Paul, last name's
```

1    Herdsman, H-e-r-d-s-m-a-n.

2              THE COURT:  Thank you.

3              Cross-examination.

4              MS. ROBBINS:  Thank you, Your Honor.

5                        Cross-examination

6    BY MS. ROBBINS:

7    Q   Good afternoon, Mr. Herdsman.  My name is Colleen

8    Robbins, and I'm an attorney with the Federal Trade

9    Commission, and I'm going to ask you some questions.

10             So your payment processor is a company called

11   Revenue Wire, correct?

12   A   Correct.

13   Q   And Revenue Wire contacted you about a company called PC

14   Cleaner; is that right?

15   A   Correct.

16   Q   Okay.  And Matt Humphreys at Revenue Wire, he's the one

17   that set up the meeting between you -- between Advanced Tech

18   Support and PC Cleaner; is that right?

19   A   I never actually had an introduction meeting.  I think

20   Matt was the liaison between Advanced Tech Support and PC

21   Cleaner.

22   Q   But he sent you an e-mail introducing you to each other

23   in March 2013?

24   A   Yes.

25   Q   And according to your contract with Revenue Wire, Cashier

1    Myricks receives 40 percent from the tech support sales that

2    are made from his lead generation; is that correct?

3    A    He does receive 40 percent.   That was a rate negotiated

4    between Revenue Wire and PC Cleaner.

5    Q    Okay.   And is it your understanding that all of the

6    software companies that you partner with, do they also

7    receive 40 percent cut from the sale made from a lead, or do

8    you not know?

9    A    Not all of them.   Some get less.

10   Q    And what would be an average percentage that they would

11   receive?

12   A    I'd be guessing; 33 percent.

13   Q    Okay.   So some may receive 20, some receive 40 percent?

14   A    There's a range.

15   Q    Is that accurate?

16        Now, you stated in your -- on page 5 of your

17   declaration that -- it's the end of paragraph 17, the last

18   sentence.

19   A    Page 5.

20   Q    And it says:   "We also learned that software was a main

21   driver of phone calls due to post-purchase activation issues,

22   download installation issues and software compatibility

23   issues."

24        So when you say that software was a main driver of

25   the phone calls to ICE, can you estimate what percentage of

```
 1    phone calls were driven by software activation?

 2    A    Total phone calls coming into ICE per day?

 3    Q    The percentage of calls coming in that had to do with

 4    activating software.

 5    A    Yeah, versus total amount of calls?

 6    Q    Sorry, yes.

 7    A    Oh, 40 percent.

 8    Q    Okay.  And so what was the other 60 percent made of?

 9    A    Other 60 percent were made of current customers,

10    customers that would call for non-activation issues, such as

11    infection issues, customers calling for billing questions,

12    customers calling for inapplication (phonetic) issues, a

13    range of those types of calls.

14    Q    And when you say that customers call due to post-purchase

15    activation issues, what did you mean by that?

16    A    I think I wrote this in context of what we learned while

17    when we were at iS3, STOPzilla.  So basically, sometime in

18    2007, 2008, we started seeing the shift from malware creating

19    more problems than just getting on the box or getting on the

20    computer and doing whatever.  I don't want to try to get too

21    technical, but malware would get on the box, we would

22    identify it, we would remove it, and we would be good.

23         As it started evolving, malware would get on the

24    box, start causing major issues with regards to widespread

25    issues, and then we would remove the malware, but the other
```

```
1    issues were still lingering, and I think that's what caused

2    people to call back and say, hey, something's still wrong.

3    Q   Okay.  But that's different from what you're saying here

4    is that the software is the main driver of phone calls due to

5    post-purchase activation issues.

6           Do you mean there that the person who downloads the

7    software has to call a phone number to activate the software?

8    A   No, what I mean is that through our -- you know, our

9    research and development of what we learned at iS3, that, you

10   know, someone would say -- someone would say my computer's

11   still running slow, and they may download a registry cleaner

12   to try and speed that up, and the fact was that they still

13   had a piece of malware on there.  And just because they type

14   in "a slow computer" doesn't mean they didn't know that there

15   was a -- you know, some underlying issue that was causing the

16   computer to run slow.

17          So, again, it relates back to the evolution of

18   malware in 2008.

19   Q   Now, have you ever seen the post-purchase activation

20   screen that consumers receive when they download a product

21   like PC Cleaner Pro?

22   A   I have.

23   Q   Okay.  And I'm showing you what's marked as exhibit 37,

24   page 1777.  So I'm going to show you this exhibit.  This is

25   actually an activation page that was found in your office.
```

```
 1   A    Okay.
 2   Q    Does that look like an activation page that a consumer
 3   would see when they've downloaded software?
 4   A    On some of the products, yes.
 5   Q    Okay.  And is your phone number -- is ICE's phone number
 6   on that page?
 7   A    I would have to confirm that phone number, but there is a
 8   phone number on this page.
 9   Q    Okay.  But if it was in your office on your computer, is
10   it likely that it would be ICE's phone number on that page?
11   A    No.
12   Q    No?  So you would -- so did you test other products and
13   download them that were not associated with ICE?
14   A    Sure.
15   Q    Okay.  But if we could -- if we showed you a list of the
16   phone numbers from Five9 that ICE paid for, would that
17   refresh your recollection if that was a phone number that
18   belonged to ICE?
19   A    Yeah, I can match it up what's in the Five9 records,
20   sure.
21             MR. FERGUSON:  If it's on there, we --
22             THE WITNESS:  Yeah.
23   BY MS. ROBBINS:
24   Q    Does it say on that page how a consumer can use that --
25   or let me step back.
```

```
 1              On that page, is there a license key?
 2    A    I do see a key on here, but I'm not sure if it's for --
 3    I'm not sure which product it's for.  But I would like to
 4    elaborate that we don't design the thank you pages.  We have
 5    no -- we leave that up to the software provider.
 6    Q    Okay.  So -- but your phone number goes on those pages,
 7    though, for people to call?
 8    A    Yes, it does.
 9    Q    Okay.  And on that page, isn't it true that there is no
10    instruction on there for a consumer to actually activate the
11    software themselves?
12    A    There is no instruction on this page, no.
13    Q    Now, turning to page 7 of your declaration, and I just
14    wanted to go through a little bit of your timeline just to
15    clarify.
16              So you said that Super PC Support was used
17    originally.
18    A    Oh, page 7?
19    Q    Page 7, paragraph -- well, whole page 7, starting at
20    paragraph 24.
21    A    Okay.
22    Q    So in April of 2012, you started using, it looks like
23    from here, your scripts, or what you refer to in your
24    declaration as a sales guideline; is that correct?
25    A    Correct.
```

```
 1   Q    And you said in your -- in here that you updated the

 2   sales guideline approximately six times.  Or, no, you said

 3   six times, or approximately six times.

 4   A    Yeah.  It says on or about.  We've had limited access to

 5   our data to really collect everything, so this is to the best

 6   of my knowledge.

 7   Q    Okay.  And to -- but -- so on or about April 12th you had

 8   your initial script.

 9   A    Uh-huh.

10   Q    And then you updated the script six times; is that

11   correct?

12   A    Approximately.

13   Q    Okay.  And so on November 12th, you added ID Watchdog,

14   correct?

15   A    Uh-huh.

16   Q    And that was a product that you would sell after you'd

17   sell the tech support?

18   A    Or, you know, we could sell it by itself.  You know, if

19   someone came in with an infection, and, you know, infections

20   want to try and steal your identity, we would let them know

21   that, and some would take advantage of it.

22   Q    Okay.  And then on April 15th, 2013, on or about, you

23   added in a reminder about using Notetaker, right?

24   A    Yes.

25   Q    And then on or about July 10th -- and, I'm sorry, and the
```

1    Notetaker, that was just to take notes for the technician,

2    correct?

3    A    That was to take everything we've learned from the start

4    of the call to the end of the call, to pass onto the

5    technician.

6    Q    Okay.  And then the next one is on July 10th, 2013,

7    you -- for step one of a diagnosis, you increased the amount

8    of processes that you would tell the salespeople were run --

9    were for a normal computer.  So, for example, originally the

10   script said 30 to 60, and then you changed the script to say

11   40 to 80; is that correct?

12   A    Yes.

13   Q    And that was the only change in terms of step one that

14   you made on July 10th, 2013; is that correct?

15   A    You know, I tried to go through them line by line.

16   That's the best of my recollection, yes.

17   Q    Okay.  And then -- and then on or about February 5th, you

18   updated the script to address the new remote access software,

19   which was provided by Support.com, and that's your nexus

20   platform; is that correct?

21   A    Correct.

22   Q    So that was the platform that your salespeople would use

23   to take the calls, I guess, to identify the calls coming in

24   and catalog all the information they were getting from the

25   consumers?

1   A   That was what we used to remote on the computers.   It

2   also served as our CRM.

3   Q   Okay.   Then on or about May 1st, 2014, you updated your

4   order summary process.   So that was the wrap-up process after

5   a sale was already made; is that correct?

6   A   No.   The order summary process is, basically, we explain

7   to the customer exactly what they're purchasing, exactly what

8   it costs, when they're going -- and our extended maintenance

9   program, when they're going to be rebilled, and we have to

10   ask their permission to process the order.   If they don't get

11   the permission, they can't process the order.

12   Q   Then on or about August 15th you decided to change the

13   Event Viewer to System Advisor, which is step five of the

14   diagnostic, but that didn't actually end up being completed

15   in terms of the rollout until September 26th, 2014; is that

16   correct?

17   A   That's correct.

18   Q   Okay.

19   A   You know, rolling things out in a 24/7 environment is

20   very difficult, and we learned our lesson from Nexus.   So

21   that has to be done in a very calculated way.

22   Q   So in the six changes or six updated iterations that you

23   talk about in paragraph 24, there were two times that you

24   changed the script that salespeople used in terms of the

25   diagnostic, it looks like from what you've listed.

1          So in D, step one of the diagnostic, we talked

2    about, you changed the number of processes run on a normal

3    computer, and G, you removed the Event Viewer and replaced it

4    with System Advisor.  Those are the only two changes in this

5    list that had to do with the actual script that salespeople

6    would read in terms of the diagnostic; is that correct?

7    A   That we would have used on the floor exclusively, yes.

8    Q   Okay.

9    A   Yeah.

10   Q   And you were involved with the scripts, right, with

11   writing the scripts; is that true?

12   A   I didn't write the scripts.  I would look them over and

13   make some general edits to the scripts.

14   Q   Right.

15          So you would go in and you would look at the script,

16   and you would type in changes and make red line copies of

17   those scripts?

18   A   Sure.

19   Q   And did you write the script with the Event Viewer in it?

20   A   I did not.  I was -- I was part of that.  Our technical

21   team wrote that, or our head tech.

22   Q   Who was that?

23   A   Edwin Ramirez.

24   Q   So he wrote that script?

25   A   He wrote the technical piece, yes.

```
 1    Q    What do you mean by the technical piece?

 2    A    The piece where we talk about the diagnosis.  We relied

 3    on his expertise to guide us through that, and he took --

 4    he's the one who put that together for us.

 5    Q    And is he still with the company?

 6    A    Yes, he is.

 7    Q    But he didn't come in and testify about this script?

 8    A    No, he didn't come in.

 9    Q    So on~-- who is Barry Dodd?

10    A    Barry Dodd works for a company by the name of

11    ParetoLogic.  I think he's currently the CEO.

12    Q    And what is ParetoLogic?

13    A    ParetoLogic is a software developer.  They develop

14    software.

15    Q    So do they develop software products that you would

16    partner with?

17    A    Sure.

18    Q    And how often would you deal with Barry?  Would you deal

19    with him directly?

20    A    Yeah, I dealt with Barry directly.

21    Q    And is that -- did you deal with him in terms of the

22    contracts you had with the software products, or what were

23    your dealings with him?

24    A    I've dealt with him probably a dozen times, and it would

25    be about various issues.  It would be, you know, if we had a
```

1    complaint where one of our agents may have been rude to a

2    customer, we'd have to research that and find out what

3    happened.  We'd talk about things on the business side of

4    what they're doing versus what we're doing, and we'd talk

5    about preparation for the upcoming season.  If their software

6    sales went up, calls would probably go up.  We would have to

7    make sure we're properly staffed so we're not dropping calls.

8    Operational items.

9    Q    Did you ever talk to him about your sales scripts?

10   A    It's possible.  I've known him for a few years now, so I

11   don't want to say no.  It is possible.

12   Q    Isn't it true that on October 5th, 2012, you received an

13   e-mail from Barry Dodd sending you a link to a news story

14   about the FTC's action against six tech support companies?

15   A    If he did, yes, then I got it.

16   Q    Well, let me show you --

17        MS. ROBBINS:  Your Honor, I'd like to show him

18   Plaintiffs' exhibit 44, and I have a copy.

19   BY MS. ROBBINS:

20   Q    Isn't it true that on October 5th, that Barry Dodd sent

21   you a link to a news story about the FTC's action against six

22   tech support companies?

23   A    Yes, it is.

24   Q    And isn't it true in that case that the FTC was granted

25   temporary restraining orders, including injunctions and asset

1    freezes?

2    A    If that's what it says.  I read it, yes.

3    Q    Well, isn't it true, though, that you stated at the

4    e-mail exchange that you read the FTC ruling yesterday?

5    A    Yes.

6    Q    And when you said FTC ruling, did you mean the complaint

7    or the temporary restraining order?

8    A    I can't remember.

9    Q    And isn't it true that when he sent you this e-mail, that

10   he also told you, FYI, using Event Viewer as a sales tactic?

11   A    He wrote that in there, but that's not -- that was

12   nothing new to us.  I mean, we came from, like Justin

13   expanded on, at iS3 we ended up with Smart Support, our

14   technical support group, and we've known about India for a

15   long time, and we've known -- and we consider it a Microsoft

16   scam, you know, where they have people sitting in a room like

17   this, dialing someone at home that, you know, doesn't have a

18   problem with their computer and telling them, hey, you have

19   serious problems, I'm from Microsoft, I need to get on your

20   computer.

21          We've known that all along.  We didn't consider

22   it -- Event Viewer as the scam.  The scam was them

23   representing themselves as Microsoft and telling people they

24   have a problem when they don't.

25   Q    Did you read the FTC's complaint?  You said you read the

```
 1   FTC's ruling.  Did you receive -- did you read the complaint?

 2   A    Probably not, because I knew about -- I knew about India.

 3   I knew about the things they were doing.

 4   Q    Did you know that the FTC alleged in its complaint that

 5   the Event Viewer was used as a deceptive diagnostic tool?

 6   A    No, I hadn't read that, you know, and I've never 'til

 7   this day -- you know, I don't know who made the opening

 8   remarks, but I think one of you said they've been on notice

 9   about the Event Viewer for a long time, and I wrote in my

10   notes, sitting down, I said, we've been on notice, question

11   mark, because, again, we've known about India, but we've

12   known that they're using several tools.

13          You know, they get on your computer and open up

14   command prompt and make lines go all over the place and shake

15   the screen.  We consider that the Microsoft scam.

16   Q    But I'm not talking -- what I'm talking about is the FTC

17   ruling that you say you read.  Isn't it true that the FTC, in

18   those cases, alleged that the Event Viewer was used as a

19   deceptive tool?

20          MR. FERGUSON:  Objection, asked and answered, Your

21   Honor.

22          THE COURT:  How is he supposed to know?

23          MS. ROBBINS:  Well, he said he read the FTC ruling.

24          THE COURT:  Okay.

25          MS. ROBBINS:  Okay.
```

```
 1              THE COURT:  What does that . . .
 2   BY MS. ROBBINS:
 3   Q   But you knew that the Event Viewer was being used as a
 4   sales tactic?
 5   A   No.
 6              Again, I knew that groups in India were calling
 7   people sitting at home in their living room, eating dinner,
 8   picking up the phone and saying, hi, I'm John, from
 9   Microsoft.  I need to get into your computer right now,
10   because your computer is reporting back to us there's a
11   virus, and your computer is going to blow up, or whatever it
12   is, I need to get on there.
13              And we considered that the Microsoft scam.  They
14   used numerous tactics.  And we've known this because we've
15   come from this industry.  We knew this for a long time.
16              We've never equated an FTC ruling to the Event
17   Viewer or anything of that nature.  We looked at it from a
18   group doing an outbound call to someone that didn't have a
19   problem, using various tactics.
20   Q   But isn't it true that on October 5th, 2012, Barry Dodd
21   sent you an e-mail that said, FYI, using Event Viewer as a
22   sales tactic?  Did he send you that e-mail?
23   A   Yes, that's what Barry sent me.  That's what Barry said.
24   Q   Okay.  And from that date, October 5th, 2012, until
25   sometime between August and September 2014, you were using a
```

```
 1    script that had the Event Viewer in it?  Isn't that true?

 2    A    Yes, our script had the Event Viewer in it.

 3    Q    And isn't it true that in that script, it says, when you

 4    get to the Event Viewer part of the diagnostic, do not say

 5    Event Viewer?

 6    A    It does say do not say Event Viewer.

 7              MS. ROBBINS:  I don't have anything further.

 8              THE COURT:  Thank you.

 9              Any redirect?

10                        Redirect Examination

11    BY MR. FERGUSON:

12    Q    When you open up the Event Viewer, what does it say

13    across the top of the window?

14    A    Event Viewer.

15              MR. FERGUSON:  No further questions, Your Honor.

16              MR. NICHOLSON:  I just have one.

17                        Cross-examination

18    BY MR. NICHOLSON:

19    Q    Where that's log-on screen?

20    A    It's not yours.

21    Q    Thank you.  That's one I want to get to.

22              Ms. Robbins showed you, I don't see it having a

23    separate exhibit number, but it's PX37, page 1777, an

24    activation screen, and asked you about that, this document

25    here that I just took from you, right?
```

1    A    Yes.

2    Q    Is that a PC Cleaner Pro activation screen?

3    A    No, it is not.

4    Q    Okay.  Which software program is that?

5    A    It says PC Health Fix.

6    Q    Do you know of any relationship between PC Health Fix and

7    PC Cleaner Pro?

8    A    I do not.

9         MR. NICHOLSON:  No further questions.

10        MS. ROBBINS:  I don't have any questions.

11        THE COURT:  Thank you, sir.

12        MR. FERGUSON:  Your Honor, I have one question.

13        Did you move this welcome page into evidence?

14        MS. ROBBINS:  I did not.

15        MR. FERGUSON:  Your Honor, one thing we would ask

16   is --

17        MS. ROBBINS:  You can admit it.  That's fine.

18        MR. FERGUSON:  Without objection, we just want to

19   give you the document that was referred to, the activation

20   page, in color, because it actually is in color.  I think we

21   would just like you to see it in its actual state.

22        THE COURT:  That's fine.

23        MR. STREISFELD:  Your Honor, just further on that,

24   based upon the fact that it's in color, the way we printed it

25   from the Court's docket when it was filed, it should be in

1   color already in the record, but we just would like you to be

2   able to see the colors.

3            THE COURT:  Okay.  You can step down, sir.

4            MR. FERGUSON:  Your Honor, we're going to make this

5   Defendant's 51.

6            THE COURT:  All right.

7            MR. FERGUSON:  The color version of the welcome

8   page.

9            THE COURT:  Admitted without objection.

10      (Defendant's Exhibit No. 51 entered into evidence.)

11           THE COURT:  Thank you.

12           Next witness.

13           MR. FERGUSON:  Your Honor, my clients rest.  We're

14   turning it over to PC Cleaner.

15           MR. EDMONSON:  Your Honor, PC Cleaner is going to

16   call Cash Myricks and in the beginning of doing so, would ask

17   to move the two declarations that Mr. Myricks submitted into

18   evidence.  There's one from December 11th, which we've marked

19   as PC Cleaner's Defendant's 3, and there's one from

20   December 15th, which we've marked as Defendant's 4.  That one

21   we will move in, with the exception of exhibit D to the

22   declaration, which was erroneously printed incorrectly.

23           And so we have the correctly printed version of that

24   exhibit, which we would add as Defendant's exhibit number 7.

25           I've provided copies of that to the Government.

```
 1              THE COURT:  You lost me with the numbers there.

 2              MR. EDMONSON:  Okay.  So the first declaration, the

 3      one from December 11th, exhibit 3.  The second one from

 4      December 15th is exhibit 4.  But we will strike the last

 5      exhibit to the declaration, which is a large set of printouts

 6      from the Internet.  There was an error in the printing of

 7      that, so in substitution for it, we have the correct copy,

 8      which we can either attach to that, or I would suggest we

 9      could mark it as number 7 for clarity.

10              THE COURT:  Any objection?

11              MS. BURTON:  Well, I believe actually the exhibits

12      are positive reviews of the company, and they're sort of --

13      we intend to respond to them as part of our reply to the

14      motion in limine, because this is part of their opposition to

15      the motion in limine.  So we do have objections, but I

16      understand that for the purposes of today you're planning on

17      considering those issues later.

18              THE COURT:  So you want to admit the criticisms but

19      not the positives, is that --

20              MS. BURTON:  No.

21              THE COURT:  The complaints are admissible, but the

22      positive comments are inadmissible?

23              MS. BURTON:  Well, as you'll see in our reply, the

24      complaints are admissible because they fall under 807.  It is

25      our position that these do not fall under that exception, but
```

```
 1    for purposes --

 2              THE COURT:  The catchall?

 3              MS. BURTON:  The catchall, yes.

 4              THE COURT:  Yours come into the catchall but their's

 5    don't?

 6              MS. BURTON:  Yes, I believe that is the case.

 7              THE COURT:  All right.  I'll deal with it later.

 8              MR. FERGUSON:  Your Honor, if I may make a

 9    suggestion?  We've referenced them in our declarations, the

10    16,000-plus customer endorsements.  Rather than burn up a lot

11    of time about arguing don't take in the Better Business

12    Bureau complaints, and literally, it could take an hour and a

13    half to go through Aiken's declaration and cull out every

14    footnote and everything, what I would request, and we've

15    given them a copy, but I would request that you take our

16    positives, their positives, and take the negatives that they

17    put into the record.

18              We trust that you'll sort through this and come to

19    the right conclusion and weigh these hearsay documents

20    accordingly.

21              But I can't, for the life of me, fathom why their's

22    come in and ours wouldn't, as you're asking them now.  And I

23    just -- we're running out of time today.  I just don't think

24    it will be productive to go --

25              THE COURT:  I'm going to do the same with yours as I
```

```
 1   did with hers.  I'll accept them now and decide whether I'm

 2   going to give them any weight and admit them later.

 3            MR. FERGUSON:  If I may, we would like to, if it's

 4   going to be argued further later, but I would like to

 5   tentatively have our 16,000 as Defendant's 52.

 6            THE COURT:  Okay.  Well, again, I'll accept it with

 7   the same caveat that I did with their complaint letters.

 8            MR. FERGUSON:  We appreciate that.

 9            THE COURT:  And what was your number?

10            MR. NICHOLSON:  It's number 7, Judge.  Defense 7.

11            THE COURT:  I'll take 7 with the same caveat.

12            Do you have any objection to the declarations 3 and

13   4?

14            MS. BURTON:  Pardon?

15            THE COURT:  Do you have any objections to the

16   declarations 3 and 4?

17            MS. BURTON:  No.

18            THE COURT:  Those will be admitted without

19   objection.

20       (Defendants' Exhibit No. 7 entered into evidence.)

21            Cashier Myricks, Defendants' witness, sworn.

22            THE COURT:  Sir, if you could tell us your name and

23   spell your last name, please.

24            THE WITNESS:  Cashier Myricks, last name is

25   M-y-r-i-c-k-s.
```

```
 1              THE COURT:  Why don't you spell your first name
 2    also?
 3              THE WITNESS:  Cashier, C-a-s-h-i-e-r.
 4              THE COURT:  Thank you.  Cross-examination.
 5                         Cross-examination
 6    BY MS. BURTON:
 7    Q   Good afternoon, Mr. Myricks.
 8              So this isn't the first time the FTC has sued you,
 9    is it?
10    A   No.
11    Q   In 2005, the FTC sued you for deceptive Internet
12    advertising; is that correct?
13    A   Correct.
14    Q   And did those advertisements promise consumers that
15    downloading music, movies and games using your software would
16    be a hundred percent legal guaranteed?
17    A   Yes.
18    Q   And did you settle that case with the FTC in March of
19    2006?
20    A   Correct.
21    Q   And as part of that settlement, were you subject to
22    certain compliance reporting requirements?
23    A   Yes.
24    Q   And how long were you required to report to the FTC
25    regarding your compliance?
```

```
 1    A    I don't remember the exact date, but from --

 2    Q    Does three years sound right?

 3    A    Sounds about right, yeah.

 4    Q    Okay.  I can refresh your recollection if you'd like by

 5    showing you the document.

 6    A    Yes.

 7    Q    Would you like to see the document?

 8    A    Yes, please.

 9    Q    Okay.  I am giving you a copy of -- actually, let me,

10    while I'm up there, I'm going to give you a copy of your

11    declaration, too, all of your declarations.

12    A    Okay.

13    Q    Does that look like a copy of the settlement agreement

14    that you signed with the FTC?

15    A    Yes.

16    Q    And if you flip -- I wish I knew what section, but

17    towards the back there's a compliance reporting section.

18    It's in the last, maybe, three pages, and it specifies there

19    that you're required to report for three years from the date

20    of entry.

21    A    Yes.

22    Q    So you agree it's three years?

23    A    Yes.

24    Q    So your compliance period ended March of 2009; is that

25    correct?
```

```
 1   A    Correct.

 2   Q    And how soon after that compliance period ended did you

 3   start selling PC Cleaner products?

 4   A    PC Cleaner products, 2011.

 5   Q    Okay.  Prior to that, had you sold any other registry

 6   cleaner products?

 7   A    Yes, I did.

 8   Q    And what were the names of those?

 9   A    Netcom3 Smart -- I'm sorry, Netcom3 Smart Cleaner and

10   Intellinet Security.

11   Q    Okay.  I'm going to now hand you something marked

12   Plaintiffs' exhibit 29.  This is page 460 through 471.

13             What do those documents appear to be?

14   A    Incorporation.

15   Q    Okay.  So if you look at page 460.

16   A    Yes.

17   Q    It's an incorporation document for which company?

18   A    PC Cleaner, Inc.

19   Q    And who is listed as the incorporator?

20   A    The agent of service?  Which part are you referring to?

21   Q    Is there someone listed as the incorporator on that

22   document?

23   A    M-f-o-n-i-s-o-e-k-a?  Correct.

24   Q    Do you know who that is?

25   A    My accountant.
```

1    Q    So your accountant actually was the incorporator for your

2    company?

3    A    Right, right.

4    Q    What was your role at this time?

5    A    What was my role?

6    Q    With the company, yes.

7    A    The CEO, starting the company.

8    Q    And flip to page 462, which is a Statement of Information

9    that's filed with the Secretary of State for California.  And

10   that document I believe references PC Cleaner, correct?

11   A    Correct.

12   Q    PC Cleaner, Inc.?

13   A    Correct.

14   Q    And it lists the -- what address is listed for PC

15   Cleaner, Inc.?

16   A    220 Newport Center Drive.

17   Q    Okay.

18   A    Newport Beach, California, 92660.

19   Q    But, in fact, that's a mail drop, correct, not an actual

20   business premises?

21   A    Right.

22   Q    Flip to page 464.  This is Netcom3, Inc.'s Articles of

23   Incorporation.  And here you're listed as the corporation's

24   incorporator on this document; is that correct?

25   A    Yes.

1   Q   And the address that's on this form, is this also a mail

2   drop?

3   A   Yes.

4   Q   Flip to page 466.  This is an amendment statement of

5   information for Netcom3, Inc., and the address listed on it,

6   could you read that back to me, for the corporation?

7   A   Yes, 30025 Alicia Parkway, number 106.

8   Q   And you also used that same address throughout the entire

9   form for the address for the principal executive office, the

10  principal business office and even for your own address; is

11  that correct?

12  A   Correct.

13  Q   And that, in fact, is also a mail drop.

14  A   Yes.

15  Q   A few days earlier on the statement of information filed

16  for Netcom3 Global, Inc., which you also have, you filled it

17  out the same way; is that correct, with a mail drop as all

18  relevant addresses?

19  A   Correct.

20  Q   Thank you.

21          In August of 2013, a group of plaintiffs filed a

22  class action against PC Cleaner, Inc.; is that correct?

23  A   Correct.

24  Q   And the Plaintiffs' allegations in that case are very

25  similar to what the FTC is alleging here, correct?

```
 1    A    Correct.
 2              MR. EDMONSON:  Objection, calls for legal
 3    conclusion.
 4              THE COURT:  Overruled.
 5    BY MS. BURTON:
 6    Q    And you settled that case in August of 2014, right?
 7    A    Correct.
 8    Q    And the settlement --
 9    A    I'm sorry, what did you say?  What year?  August --
10    Q    I might have said 2002, I'm sorry.  You settled that in
11    August 2014, correct?
12    A    I'm not sure if it was -- I am not sure of the exact
13    date.
14    Q    It was recently, though, several months ago?
15    A    Okay.
16    Q    And the settlement, part of the terms of the settlement,
17    is that it requires you, your company, PC Cleaner, to
18    eliminate the term "damage level" to refer to the harm posed
19    by things that were detected during a scan; is that correct?
20    A    Correct.
21    Q    Did you make that change to get rid of the phrase "damage
22    level" before the TRO was entered in this case?
23    A    Yes.
24    Q    You had made that change prior to the TRO being entered
25    in this case?
```

```
 1    A    For the 2015 version we were developing, yes.

 2    Q    So you were developing it, but what was available on your

 3    website at the time the TRO was entered, did that still

 4    contain the phrase "damage level"?

 5    A    When the software was scanning it did say damage still.

 6    Q    Okay.  So who decided that the scan would use that term,

 7    "damage level," in the first place?

 8    A    I did, based on industry software leaders that's doing

 9    the same thing.  So I decided it was something I thought was,

10    you know, I can be -- I can use also.

11    Q    Do you recall an e-mail correspondence in December of

12    2011, back when you were developing this software, between

13    you and someone named Alexander Keroski (phonetic)?

14    A    Uh-huh.

15              THE COURT:  Is that a "yes"?

16              THE WITNESS:  I'm sorry.  I'm not sure yet.  I'm not

17    sure what the e-mail is.

18    BY MS. BURTON:

19    Q    Do you know who Alexander Keroski is?

20    A    One of my developers.

21    Q    I'm going to hand you a document.  I've got copies for

22    everyone that I believe is a copy of that e-mail.

23              MS. BURTON:  Plaintiffs would like to admit this

24    into evidence as Plaintiffs' exhibit 46.

25              THE COURT:  Any objection?
```

```
 1                MR. EDMONSON:  There's no foundation for it, but
 2    assuming she can lay one . . .
 3                THE COURT:  All right.
 4                MR. EDMONSON:  And excepting the fact we haven't had
 5    a chance to read it, there's no objection right now.
 6                THE COURT:  Lay a foundation.
 7    BY MS. BURTON:
 8    Q    Do you use the e-mail address cash@Netcom3.com?
 9    A    Yes, I do.
10    Q    And do you recognize this e-mail chain?
11    A    Yes.
12    Q    Is this one of the documents that you produced to the
13    Federal Trade Commission?
14    A    Whatever's in my e-mail address, yes.
15    Q    Okay.  So did you produce e-mails --
16    A    Yes.
17    Q    -- from this address to the Federal Trade Commission?
18    A    Correct.
19                MS. BURTON:  I'd like to admit this into evidence.
20                MR. EDMONSON:  No objection.
21                THE COURT:  All right.  Admitted without objection.
22    What was the number again?  I'm sorry.
23                MS. BURTON:  Forty-six.
24                THE COURT:  Thank you.
25           (Plaintiffs' Exhibit No. 46 entered into evidence.)
```

```
 1  BY MS. BURTON:

 2  Q   If you could turn back to page -- well, actually, we'll

 3  just start on page 1, even though that will be reading the

 4  chain backwards.

 5          Do you see in the middle of the page it says that on

 6  December 15th, you wrote:  "Please make identical to what I

 7  showed on screen shot," and then if you skip down a bit:  "I

 8  changed the content, quote, security level, to, quote, damage

 9  level."

10          Is it accurate to say that you were involved not

11  only in choosing that but in generally designing the look of

12  the entire results screen?

13  A   I helped, yeah.

14  Q   And what was your motivation in making the change from

15  severity level to damage level?

16  A   I'm not sure.

17  Q   What was your motivation in making any types of

18  adjustments to the screen?  What was your end goal?

19  A   I think damage and severity is similar, you know.  I

20  probably changed the damages, looking at my competitors and

21  seeing that they were doing the same thing.

22  Q   So you did it to match what your competitors were doing?

23  A   My top competitors, yeah.  Norton, they did the same

24  thing, and McAfee.  I've always watched them.  I want to be

25  just like the big guys, yeah.
```

```
 1    Q    So if you skip down a couple more lines, it says:  "On

 2    the results screen I changed the description title, quote,

 3    system performance, to performance problems."

 4    A    Where are you at again?  Same page?

 5    Q    Same page, just a couple lines down from the line I read

 6    before.  Do you see that?

 7    A    Okay.

 8    Q    So changing the description title from system performance

 9    to performance problems, that was a decision that you made, I

10    believe you testified, also to mirror what your competitors

11    were doing?

12    A    Yes, uh-huh.

13    Q    Flip over to the next page.  In the middle of the page

14    you say:  "Can we please have an important discussion?  I'll

15    be back online in five hours.  It regards one of the main

16    reasons conversions are much lower than Speedy PC."

17              What do you mean by conversions?

18    A    Conversions is a sale.  Well, a conversion is how well

19    the software is converting to a sale.

20    Q    Okay.  So it's how frequently someone who sees that

21    screen purchases the product, correct?

22              THE COURT:  What was the answer?

23              THE WITNESS:  Correct, yes.

24    BY MS. BURTON:

25    Q    Is Speedy PC one of these top competitors that you're
```

1    referring to?

2    A   They're one of my competitors.

3    Q   Are they like the Norton or the big guys that you were

4    just referring to?

5    A   No.  Yeah, they're comparable.  They're comparable, but

6    they're not -- I don't, you know, say that they're comparable

7    to Norton.  They may be.  I'm not saying they're not good.

8    Q   Okay.  Flip over to page 9.  And if you see -- I

9    apologize.  This is the way it was produced to us.  You got

10   it?

11   A   Hold on a second.

12        Okay.

13   Q   This appears to be a discussion where you're discussing

14   how to make it look more like Speedy PC.  You say: "Also, I

15   notice how Speedy PC when it loads up, it does this."

16        Maybe just glance through that page.

17        Was the goal of your changes at this point in time

18   to mirror what Speedy PC looked like?

19   A   No, my design was if -- no, not exactly.  I mean, you

20   know, like a certain feature to have, like a certain part may

21   looks more appealing, but I'm not saying I mocked it

22   completely, no.

23   Q   Okay.  So at the bottom of page 10 it says: "BTW, the

24   reason I'm basing a lot of changes to be similar to Speedy PC

25   is because they are as of now converting about .5 percent

```
 1    better than PC Cleaner as of last week."
 2            And, again, these conversions you're talking about,
 3    that's how many sales they're making, correct?
 4    A   Yes, correct.
 5    Q   So were you tracking your competitors' sales?
 6    A   Yes, basically.  Yes, I was.
 7    Q   And then making adjustments to your screen to look more
 8    like their's, correct?
 9    A   Similar, yes.
10    Q   And the goal of that was to increase your own
11    conversions, as well, correct?
12    A   Correct.
13    Q   As one of the things that you asked Alexander Keroski to
14    do, back on the first page, it was to change the content
15    severity level to damage level.
16    A   Uh-huh.
17    Q   And you ask him to do that in a day?
18    A   (No Response.)
19    Q   Um, is there a reason that it now would take you many
20    months to change -- to get rid of the term "damage level" on
21    your screen shot, on your results screen?
22    A   Well, we did -- we had made a lot of improvements in
23    development in -- using different platforms.  So it's not as
24    easy to make some changes now.  It would be a little bit more
25    difficult.
```

```
1    Q    So you waited to make any changes until you could make

2    them all at once; is that correct?

3    A    I'm sorry, repeat that again?

4    Q    In making the adjustments that were required by the class

5    action settlement, you decided to wait and make a series of

6    changes at the end rather than changing -- getting rid of

7    damage level, for example, right after you agreed to that

8    settlement; is that correct?

9    A    No.  There was other changes that were required, and I

10   changed it before we even settled.  I made changes right away

11   as we were discussing with the other side.  It was other

12   changes that they were asking to make, and I made them.

13   Q    But the change regarding getting rid of the phrase

14   "damage level" was not made as of the time of the TRO; is

15   that correct?

16   A    No, not correct.  Not completely.  Damage level was on a

17   scan results page and also when it's scanning.  We made a

18   change.  It was a bug.  So that bug is being fixed.  2015, it

19   is fixed.  But if you look at the scan, when it's scanning it

20   still said damage.  When it stopped scanning it was gone.  It

21   was supposed say concern level.  But it didn't say concern

22   level or damage level.  So that was a bug.  We did fix it.

23   Q    Thank you.

24            Did you ever sell a product called PC Cleaner 2007?

25   A    2007?  No.
```

```
 1   Q   Okay.  Is it fair to say that you were concerned about
 2   the online reputation of your company?
 3   A   Yes.
 4   Q   And did you ever offer to pay a company or an individual
 5   to help you improve your ratings or rehabilitate your
 6   reputation online?
 7   A   I don't recall, no.  I'm not sure.
 8   Q   Do you recall having an e-mail exchange in October of
 9   2012 in which you sought assistance rehabilitating your
10   status with the Web of Trust Community?
11   A   Now, yes, I do.
12   Q   I'm going to hand you a document.
13   A   You said Web of Trust?
14   Q   Web of Trust.
15   A   Let me take a peek at it.
16           Oh, yeah.
17   Q   Do you use the e-mail address cash@PC-cleaners.com?
18   A   Yes.
19   Q   Does this appear to be an e-mail from you to Ridley
20   (phonetic) Ruth at stopthehacker.com?
21   A   Yes.
22   Q   Was this among the e-mails that you would have produced
23   to the FTC?
24   A   Yes.
25           MS. BURTON:  Plaintiffs request that this be
```

```
 1    admitted into evidence as Plaintiffs' exhibit 47.

 2              THE COURT:  Any objection?

 3              MR. EDMONSON:  No objection.

 4              THE COURT:  Admitted without objection.

 5         (Plaintiffs' Exhibit No. 47 entered into evidence.)

 6    BY MS. BURTON:

 7    Q    Can you turn to page 4 of the document?

 8    A    Okay.

 9    Q    And in the middle of the page, could you start reading

10    with "I understand they are your partners?"

11    A    Yes.

12    Q    Have you read through that?

13    A    Yes.

14    Q    Okay.  The document asks for assistance getting your

15    site, PC Cleaner, to a good green status so that you can get

16    a My WOT Seal of Trust.

17    A    Right.

18    Q    What was your status at the time you wrote this e-mail?

19    A    I don't know the exact -- I'm not sure.

20    Q    It was not green?

21    A    It could have been not green or it could have been not

22    rated.  I'm not sure.

23    Q    And what is WOT, if you know?

24    A    Web of Trust, I guess.  Web of Trust.

25    Q    Okay.  But do you know what it is?
```

1   A   It's similar to -- I mean, it's just a reporting -- a

2   site that kind of give a status on different customer reviews

3   that come to the site and post and give you a rating.

4   Q   So does it aggregate customer reviews and then give a

5   product a rating based on customer reviews?

6   A   If they're true reviews, yes.

7   Q   And then you say:  "I'll be happy to pay you $10,000 to

8   assist me at this," correct?

9   A   Correct.

10  Q   And you say:  "My site and software is used by many

11  million happy customers for over 10 years now."

12          Did you, in fact, have millions of customers at that

13  point?

14  A   No, not million customers.  Maybe I should say a million

15  people downloading the software, yeah.

16  Q   So in 2012 you had already had more than a million

17  downloads of PC Cleaner?

18  A   No.  I mean, maybe I kind of exaggerated the 10 years.  I

19  should -- but this -- yeah.

20  Q   So how many years had you actually been selling this

21  product at this point?

22  A   This point now, I've been in business over 10 years, but

23  not selling this product.  So that's why I said 10 years, but

24  . . .

25  Q   Okay.  And then just flip over to page 2.  In the first

1  e-mail on that page, you again assert you would be willing to

2  pay at least $10,000 to get you to a green status; is that

3  correct?

4  A   Yes.

5  Q   And on the first page, Ridley Ruth then responds to you,

6  and she provides the Web of Trust's advice about what you

7  should do to help your status, correct?

8  A   Yes.

9  Q   And that advice quoted from Web of Trust is:  "For

10 example, if users find scareware advertising unethical,

11 changing the marketing tactics and informing the community

12 about it would most likely result in an improved reputational

13 rating," correct?

14 A   What part again?

15 Q   This is in the third paragraph of their response.

16 A   Page 2?

17 Q   Sorry, page 1.  I'll hold it up so you can see where I've

18 highlighted.

19 A   All right.  I see.

20 Q   You see that language?

21        And did you, in fact, at that point take that advice

22 and change your sales tactics?

23 A   I'm not sure what the next step was, but that's what it

24 shows here.

25 Q   Okay.  Do you remember taking any steps after receiving

```
 1    that e-mail to change the way your product was sold?
 2    A    Yeah, it shows that I made changes based on some of the
 3    community posts, yeah.
 4    Q    But after receiving that advice, did you make any
 5    changes?
 6    A    I offered a 30-day free trial, complete trial where you
 7    can actually use the product to see, and just to prove that
 8    my software does work.  Yeah, I did that.
 9    Q    Okay.  Did you ever threaten to sue companies or
10    individuals who gave you bad ratings -- gave PC Cleaner bad
11    ratings or reviewed it negatively online?
12    A    Sue companies?  No, I don't --
13    Q    You don't believe you ever threatened to bring legal
14    action against a company that denigrated your product's
15    reputation?
16         MR. EDMONSON:  Asked and answered almost
17    identically.
18         THE COURT:  Overruled.
19         THE WITNESS:  I'm not sure, no.
20 BY MS. BURTON:
21    Q    You're not sure?  You may have, or you're --
22    A    I don't think I have -- sue the person who give me a bad
23    rating, no.
24    Q    I didn't ask if you had sued them.  I asked if you had
25    threatened to sue them.
```

```
 1    A    I don't recall.

 2    Q    And who is David Holt?

 3    A    David Holt is a company I get my domain names from.

 4    Q    In January 2013 do you recall Go Daddy warning David Holt

 5    that your domain, PC Cleaner dash update was sending spam

 6    e-mails?

 7         MR. EDMONSON:  Objection, assumes facts not in

 8    evidence.

 9         THE COURT:  Overruled.

10         THE WITNESS:  Yes.

11 BY MS. BURTON:

12    Q    Did he send you an e-mail to that effect?

13    A    Yes.

14    Q    Did you use the merchant descriptor safe cart --

15    A    I'm sorry.  Go back.

16         What was the domain name again?

17    Q    The domain name involved was PC Cleaner dash update.

18    A    Yes, and we resolved it, and it was still working up to

19    today, the Go Daddy.  It was a typical mistake that Go Daddy

20    made that resolved.

21    Q    Did you use the merchant descriptor safecard.com asterisk

22    PC Cleaner?

23    A    Did I use the domain name?

24    Q    A merchant descriptor for MasterCard.

25    A    That's who processed my credit cards.
```

```
1    Q    Right.

2         And do you -- is one of your merchant descriptors

3    safecard.com * PC Cleaner?

4    A    I'm not sure what your question is.

5    Q    Does your company use different merchant descriptors --

6    when a consumer purchases PC Cleaner, on their credit card

7    bill the charge will show up with a descriptor of who made

8    those charges.

9    A    Right, correct, Safe Card.

10   Q    And is one of the descriptors that you use for PC Cleaner

11   safecard.com * PC Cleaner?

12   A    I'm not sure.  I think so.  If they purchase the Safe

13   Card it should show the statement Safe Card, yes.

14   Q    Okay.  I'm going to --

15   A    I don't know if I'm getting the question right.

16   Q    You're fine.

17        Let me give you -- this might help refresh your

18   recollection.  Let me give you Plaintiffs' exhibit 29.  This

19   is page 665.

20        So in April 2013, do you recall being notified that

21   that particular descriptor we have been discussing had been

22   flagged for violating MasterCard's excessive charge-back

23   program rules?

24   A    You said do I recognize this?  Okay.  Yes.

25   Q    And do you have an understanding of what a --
```

```
 1    A    I'm not sure if this -- you know, there's most of PC

 2    Cleaner -- there's multiple softwares that's named PC

 3    Cleaner.  I'm not sure if this is pertain to my --

 4    Q    Well, I believe that document designates a particular

 5    merchant descriptor that it is about, and that merchant

 6    descriptor I believe on that document is

 7    safecard.com * PC Cleaner.

 8    A    Yeah, I see that.

 9    Q    Is that one of your merchant descriptors?

10    A    Yes, Safe Card is.

11    Q    And do you recall being notified that that descriptor had

12    been flagged for having excessive charge-backs?

13    A    It's possible.

14    Q    Do you have other merchant scripters that you use besides

15    that one?

16    A    I've used others, yeah.

17    Q    Have any of those been flagged by MasterCard for

18    excessive charge-backs?

19    A    No.

20    Q    What about with Visa, have any of your merchant scripters

21    been flagged?

22    A    No.

23    Q    Um --

24    A    I say, no, I don't recall.

25    Q    You don't recall?
```

1    A    No, you don't.

2    Q    Before your company became involved with Inbound Call

3    Experts -- so prior to, I believe, March of 2013 -- you were

4    directing purchasers of PC Cleaner to call a different call

5    center to activate their software; is that correct?

6    A    Correct.

7    Q    What was the name of that call center?

8    A    TLC.

9    Q    And what does TLC stand for?

10   A    Tech Live Connect.

11   Q    Any others?

12   A    No, that's it.

13   Q    When did you start directing calls to Tech Live Connect?

14   A    Don't know the exact date.  I think around 2012, early

15   2012.  I think it was around there.

16   Q    Did you ever use another call center before that in

17   connection with PC Cleaner software?

18   A    No.

19   Q    Did the excessive charge-back rate notification that you

20   received there have anything to do with your decision to end

21   your relationship with TLC?

22   A    I don't remember, but it could possibly be.

23   Q    Where is TLC located?

24   A    TLC, where were they located?  I have to look at the

25   contract.  I'm not sure.

```
1   Q   Are they in the United States?

2   A   Yes.

3   Q   They are not -- you believe they're in the United States,

4   not in India?

5   A   No, the office is -- I know they have offices in the

6   United States.  They did have an office -- call centers in

7   India, and that's why I ended the relationship because

8   complaints came in.

9   Q   So you were receiving complaints from people who had

10  purchased PC Cleaner about Tech Live Connect; is that

11  correct?

12  A   Yes, regarding the clarity of conversation.  It wasn't

13  the best.

14  Q   Is that the only thing consumers were complaining about?

15  A   That was one of the main complaints.

16  Q   And when consumers called Tech Live Connect and were

17  connected with someone in India, do you know what happened at

18  that point in the call?

19  A   I'm sorry, say that again?

20  Q   Do you know what happened when your customers called that

21  number?  Did you ever test the number?

22  A   At the beginning I did do some tests and I monitor

23  occasionally.

24  Q   And what happened when customers called that number to

25  activate their software?
```

```
 1    A    They get the activation, the software activated, and they
 2    do a diagnostic to see if there's any other issues with the
 3    computer.
 4    Q    Did that diagnosis include the Event Viewer?
 5    A    I don't recall.  I don't remember.
 6    Q    Did you get a percentage of the sales?
 7    A    Yes.
 8    Q    Of Tech Live Connect sales?
 9    A    Yes.
10    Q    What percentage did you receive?
11    A    I think around 45 percent.
12    Q    Does Revenue Wire process payments for Tech Live Connect?
13    A    They did.
14    Q    So you would receive your cut, your 45 percent, directly
15    through Revenue Wire?
16    A    Yes, because Revenue Wire connected me with Tech Live
17    Connect.
18    Q    And they also connected you with Inbound Call Experts; is
19    that correct?
20    A    Correct.
21    Q    Did you make the decision to switch from Tech Live
22    Connect to Inbound Call Experts, or did Revenue Wire make
23    that decision?
24    A    Combined decision.  It was a decision together because
25    we -- you know, we -- I was having issues as far as customers
```

```
 1    complaining about their -- they couldn't understand the
 2    agents, and Revenue Wire, a U.S.-based company, which I felt
 3    was a perfect match.
 4    Q    Is it fair to say that your years directing customers to
 5    Tech Live Connect were pretty profitable years for you?
 6    A    Yes.
 7    Q    In 2012, were Netcom3 Global's gross receipts over
 8    $20 million?
 9    A    Gross, yes.
10    Q    And in 2013, were the gross receipts over $30 million?
11    A    Gross, yes.
12    Q    And your own personal income from Netcom3 Global was
13    about $4.8 million in 2012; is that correct?
14    A    Yes.
15    Q    And about $5.3 million in 2013, does that sound about
16    right?
17    A    Yes.
18    Q    And during this 2012-2013 period when you were sending
19    calls to Tech Live Connect, did you own a Bentley?
20              MR. EDMONSON:  Objection, relevance.
21              THE COURT:  Overruled.
22              THE WITNESS:  Say that again?  I'm sorry.
23    BY MS. BURTON:
24    Q    Did you own a Bentley?  Was that one of your vehicles?
25    A    In 2012?
```

```
 1   Q   Yeah.

 2   A   I think, yes, it is.

 3   Q   And a Porsche?

 4   A   Yes.

 5   Q   A Mercedes?

 6   A   Yes.

 7   Q   Any other luxury vehicles?

 8   A   When you say own --

 9   Q   Leased?

10   A   Yes.

11   Q   Could you look at paragraph 15 of your declaration?  I

12   just want to clarify some dates.

13            You said in paragraph 15 -- do you have it?  On

14   page 5.

15   A   Okay.

16   Q   You say that the PC Cleaner Defendants had no

17   relationship with the ICE Defendants until March of 2013,

18   correct?

19   A   Correct.

20   Q   In paragraph 16, you say that in December of 2011,

21   Revenue Wire approached you about participating -- well, so

22   you had this conversation, and then in 17 you say they

23   emphasized to me that ICE had a strong reputation for quality

24   customer service.

25            Are you saying that in 2011 Revenue Wire approached
```

1   you and told you positive things about Inbound Call Experts?

2   A   I'm sorry, can I read it?

3   Q   Sure.

4   A   (Perusing document.)

5           Yeah, the date is correct when he first introduced

6   me, was 2011 is when he introduced me to the call stream, and

7   that's when I connected with TLC.  That's when I first

8   started.

9   Q   But was it in 2011 that they talked to you about Inbound

10  Call Experts, or was it 2013 that you're saying --

11  A   Right.  It's -- 2011 is when they introduced me to call

12  stream.  Around 2012, I'm not sure the exact date when I

13  started with TLC.  2013, March, is when I connected with

14  Inbound Marketing.

15  Q   So it was much later than December of 2011 --

16  A   Yes, it was.

17  Q   -- that they said positive things about Inbound Call

18  Experts to you?

19  A   They said it -- yes, 2013 is when he said, yeah.

20  Q   I just wanted to make sure I understood that.

21          In paragraph 19, you said that based on the

22  recommendation of Revenue Wire and ICE's representations, you

23  did not actively monitor the activities of any of ICE's call

24  centers; is that correct?

25  A   Yes, I said that.  I mean, I monitored -- at the

```
 1   beginning I did.  I made calls, I checked it out and, you

 2   know, see the quality of the agents, and I was happy with it.

 3   Q    So you did, in fact, make sales calls -- make calls to

 4   Inbound Call Experts to see what kind of experience your

 5   customers would have if they purchased PC Cleaner and were

 6   directed to that call center?

 7   A    Correct.

 8   Q    Just as you had done with Tech Live Connect?

 9   A    Correct.

10   Q    So did you hear the sales pitch?

11   A    I -- partial, yeah, I did, but I never went through the

12   full call as far as accessing my computer.  I just called in

13   to see how they react with the customer and just say I'm

14   going to call back.

15   Q    So you never let them remote access into your computer

16   and go through the sales pitch?

17   A    No.

18   Q    Did you ever do that with Tech Live Connect?

19   A    No.

20   Q    Okay.  So you called to make sure that the number

21   worked --

22   A    How they act with the customer, and I asked questions

23   about my computer and see how they react with me as a

24   customer, without having to go through the process of

25   accessing my computer.
```

```
 1    Q    When you were deciding to switch your -- switch the calls
 2    to Inbound Call Experts, did you inquire about what was being
 3    sold by Inbound Call Experts?
 4    A    Subscription services I know they was selling, yes.
 5    Q    Did you get a list of other products that they might
 6    sell?
 7    A    I don't recall.
 8    Q    Did you review sales scripts?
 9    A    No.
10    Q    Did you visit the site?
11    A    No.
12    Q    Did you meet in person with any of the individual
13    defendants?
14    A    I think at a affiliate summit I met one, once we met.
15    Q    Who did you meet?
16    A    I think it was Paul.  We met at a affiliate summit, just
17    briefly.  Just introduce ourselves.
18    Q    Did you look online for complaints about Inbound Call
19    Experts?
20    A    No.
21    Q    Did you do any other due diligence or research about
22    Inbound Call Experts before deciding to switch your customers
23    to them?
24    A    No, I trusted Revenue Wire.  They -- you know, they -- we
25    had a contract with Revenue Wire, so long as whoever I worked
```

1    with have a contract, that we have to abide by the rules and

2    regulations.

3    Q    But you had also trusted Revenue Wire's recommendation

4    for TLC; is that correct?

5    A    Right.  That's why they recommended me to move on to a

6    better company, and I took their advice and moved on.

7    Q    What percentage would PC Cleaner receive by -- from ICE

8    calls that -- from sales generated by Inbound Call Experts?

9    A    Around 40 percent.  Less than TLC, actually.

10   Q    Okay.  So I think you said TLC was 45 percent?

11   A    Forty-five percent.

12   Q    This is about 40 percent?

13   A    Thirty-seven, 40.

14   Q    And if Inbound Call Experts sold a plan that had

15   recurring monthly charges, would you also get 40 percent of

16   each monthly recurring charge?

17   A    Yes.

18   Q    Who was your main point of contact at Inbound Call

19   Experts?

20   A    I think it was Paul.  I had -- Paul is who was the main

21   person I was introduced to.

22   Q    And did you exchange e-mails with him periodically to see

23   how sales were doing?

24   A    At the beginning.

25   Q    Did you monitor call volume and revenue from the calls

```
 1  that were forwarded to ICE on a regular basis?

 2  A    What do you -- did I monitor calls?

 3  Q    Sorry.

 4        Did you just monitor the number of calls that -- on

 5  a daily or weekly basis?

 6  A    Daily basis, I could kinda see.

 7  Q    Throughout this whole relationship, you monitored on a

 8  daily basis how many calls were going to Inbound Call

 9  Experts?

10  A    Yeah, maybe daily, yes, I'd come see.

11  Q    And did you also monitor the revenue from all those calls

12  on a daily basis?

13  A    Somewhat, yeah.

14  Q    About how many calls were forwarded, how many PC Cleaner

15  purchasers then called Inbound Call Experts on a typical day

16  on average?

17  A    On average, probably -- I mean, it just depends, you

18  know, like -- the last year or just overall?

19  Q    Sure.

20  A    The last year, maybe 30, 40 calls.

21  Q    Thirty or 40 calls, is it, per day?

22  A    Per day it was -- yes, not many calls.  Now, at the

23  beginning it was more.

24  Q    How much more?

25  A    I don't remember, you know.  Probably 300, maybe, 340,
```

```
 1    400 calls.

 2    Q    Do you know why it decreased so substantially from the

 3    early days until the present?

 4    A    You said why it decreased?

 5    Q    Right.

 6            You said that originally they were getting about 400

 7    calls a day from your purchasers, and now later in 2014; is

 8    that correct, you were getting more like 30?

 9    A    Less calls, right.

10    Q    Do you know the reason for that change?

11    A    I'm not sure why.

12    Q    In 2013, how much would you estimate your company has

13    earned from its cut of ICE's sales for PC Cleaner leads?

14    A    2013?

15    Q    Uh-huh.

16    A    Net, I'm thinking about 2 million, 2.5.  I'm not sure

17    exact numbers.

18    Q    Okay.  And I think you testified earlier that, for

19    example, in 2013, you earned it was in excess of 20 million?

20    A    Right.  Gross or net?

21    Q    Let's talk gross.

22    A    Okay.

23    Q    So what percentage of that came from what you received

24    from Inbound Call Experts up-sells or sales?

25    A    2013, okay, probably around gross, maybe around
```

```
1    10 million.

2    Q    So about half of your total came from your cut of the

3    sales that ICE made?

4    A    Right.  About 40 percent, close to.

5    Q    What percentage of PC Cleaner customers sought a refund?

6    A    What percentage?  Probably around anywhere from nine to

7    12 percent.

8    Q    And what about cancellations?

9    A    Cancellations, that's hard to say.  I'm not sure.

10   Q    Okay.  What percentage of PC Cleaner's customers agreed

11   to the auto renew every six months?

12   A    The auto renew, agrees to it?  Say about 60 percent.  I

13   mean, 50 to 60.

14   Q    And on the purchase screen, would the box for auto

15   renewal be pre-populated with a checkmark?

16   A    At the very top?

17   Q    Yes.

18   A    Yes.

19   Q    Did you review refund request e-mails?

20   A    Yes, uh-huh.

21   Q    What about e-mails seeking to cancel the auto renew

22   feature?

23   A    Yes, I seen some.

24   Q    Did you review all the e-mails that came in?

25   A    No, I have a team that review the e-mails, but I did go
```

1    over some of them to see what they were coming in, yeah.

2    Q    So you were aware of the reasons that people were seeking

3    refunds generally?

4    A    Generally, yes.

5    Q    And you were aware of the reasons that people were

6    canceling generally?

7    A    Yes.

8    Q    Did you search online for reviews of the PC Cleaner

9    product or the company?

10   A    Say again?  Did I --

11   Q    Did you search online to see what people were saying

12   about your company or your product?

13   A    Yeah, I did research.

14   Q    Did you receive civil investigative demands from state

15   attorneys general offices over the -- over the course of the

16   last two to three years?

17   A    Have I did what again?  I'm sorry.

18   Q    Were you contacted by State Attorney Generals offices

19   over the last several years?

20   A    Yes, I've been contacted.

21   Q    Were you served civil investigative demands?  It's sort

22   of like a document request where they ask you to answer

23   questions and produce documents.

24   A    I'm not sure.

25   Q    Okay.  Any other law enforcement agencies reach out to

```
1    you in the last couple of years?

2    A    No, I'm not sure.

3    Q    You're not sure, or no?

4    A    I'm not sure what -- no, no.

5    Q    Did you make any business -- any changes to your business

6    practices based on these inquiries from State Attorney

7    Generals?

8    A    Did I do what again?  I'm sorry.

9    Q    Make any changes to your business practices?

10   A    Like what changes?  I'm not sure what -- no.

11   Q    No, you did not?

12   A    No.

13   Q    Would you be able to sell the PC Cleaner Pro product

14   without the free scan?

15   A    You said without the free scan?

16   Q    Yes.

17   A    Yes.

18   Q    And would you be able to stay in business if you let your

19   customers enter the license key themselves and didn't forward

20   them -- didn't offer them a phone number to call to activate

21   the license key?

22   A    Yes, I did before.

23   Q    Before when?

24   A    Before I started with TLC.  I did it about a year.  I

25   think that's -- about a year, you know, selling without
```

1  support.

2  Q   Okay.  So it would be -- it would be feasible for you to

3  continue to sell PC Cleaner Pro without directing customers

4  to call an additional phone number?

5  A   Yes.

6        MS. ROBBINS:  Thank you.  That's all I have, I

7  think.

8        THE COURT:  How long do you think this is going to

9  be?

10        MR. EDMONSON:  Maybe not a full half an hour, maybe

11  20 minutes.

12        THE COURT:  Now, I have other hearings at

13  2:00 o'clock, and I haven't had a break all morning.

14        MR. EDMONSON:  I'll go as quickly as I can.

15        THE COURT:  So, you know, I thought we were going to

16  be finished by 1:00 o'clock.

17        MR. NICHOLSON:  Your Honor, pick back up at 3:30,

18  then?

19        THE COURT:  How much more are we going to have after

20  that?

21        MR. EDMONSON:  I have about 20 minutes with the

22  witness, I believe, and then after that.

23        MS. BURTON:  Then it's just closings.

24        THE COURT:  Let's get back at 3:30, finish up.

25    (A recess was taken from 1:28 p.m. to 3:42 p.m., after

```
 1   which the following proceedings were had:)
 2              THE COURT:  Please be seated, everyone.
 3              All right.  We're going to do some redirect?
 4              MR. EDMONSON:  Yes, Your Honor.
 5              THE COURT:  Okay.
 6                        Redirect Examination
 7   BY MR. EDMONSON:
 8   Q    Afternoon, Mr. Myricks.
 9              Have you ever testified before?
10   A    No.
11   Q    Have you ever been deposed?
12   A    No.
13   Q    So when Ms. Burton asked you questions prior to the
14   break, that was the first time you had ever been examined as
15   a witness?
16   A    Correct.
17   Q    Or answered questions under oath in person?
18   A    Yes.
19   Q    You nervous?
20   A    Yes.
21   Q    We're going to go back over a few of the things that she
22   asked.
23              First is pertaining to the 2006 FTC action.
24   A    Yes.
25   Q    Can you turn to page -- I believe you have a copy of it.
```

 1   It should be page 587 of the record, which is the judgment in

 2   the FTC action.

 3            THE COURT:  587 of what?

 4            MR. EDMONSON:  Of the record.  It's exhibit 29,

 5   attachment DD.

 6   BY MR. EDMONSON:

 7   Q    Could you look down at the bottom of the page.  Do you

 8   recognize this document?

 9   A    Yes.

10   Q    Could you read the sentence that starts on line 27?

11   A    Commission act, FTC?

12   Q    The sentence that begins on the second part of that line.

13   The word "defendant" is the beginning of the sentence.

14   A    What page?  I'm sorry.

15   Q    It's the first page, line 27, the sentence that begins on

16   that line with the word "defendant."

17   A    Oh.  "Defendant does not admit liability for the

18   allegations in the complaint except jurisdictional facts, but

19   agrees to the entry of the following stipulated final order

20   for permanent injunction and other equitable relief."

21   Q    So you didn't admit to liability in that case?

22   A    No.

23   Q    Do you think if you would have fought it you would have

24   won?

25   A    Yes.

```
 1   Q    So what -- Ms. Burton described that case as being about

 2   your software, but I don't know if that's right.  Can you

 3   talk a little bit about what the case was about?

 4   A    I didn't have any software.  This was a tutorial I had

 5   built to show users how to download music and file sharing,

 6   how to file share.

 7   Q    So you created a tutorial program that was an instruction

 8   manual for how to do certain things?

 9   A    Right.

10   Q    And about how many customers were involved in this?

11   A    About a thousand.

12   Q    So at that time was that your own business, or did you

13   have others?

14   A    I had other businesses.

15   Q    Was this a large part or a small part of your --

16   A    Very small part.

17   Q    If you could let me finish each question, the reporter

18   has to take it down.

19            So this was a relatively smart part of your

20   business?

21   A    Yes.

22   Q    If you were to estimate, approximately what percentage of

23   your overall revenue for that year was related to this

24   company with the FTC action?

25   A    Maybe one percent or less.
```

1    Q    And once you agreed to enter into this order, you had a

2    compliance period that Ms. Burton talked about, right?

3    A    Correct.

4    Q    And what -- did anything happen during that compliance

5    period?  Did the FTC ever reach out to you?

6    A    No.

7    Q    Has the FTC ever given any indication, before filing a

8    TRO in this case, that they believe that you were in any way

9    not complying with the order?

10   A    No.

11   Q    Had they ever filed any kind of a contempt action or

12   other action in the court in which the previous order was

13   pending that would suggest that they believed you weren't

14   following along?

15   A    No.

16   Q    Okay.

17   A    I also want to mention that they didn't just -- they

18   didn't shut me down.  They said I could continue to do it,

19   run the file sharing business, it just have to make a

20   modification that I agreed to do.  But I just decided not to

21   run it anymore, although I did make a modification.

22   Q    Okay.  So the FTC agreed with you that you could continue

23   to sell the tutorial, as long as you made a modification to

24   the language of it?

25   A    Correct, and I did.

```
 1    Q    And you did make that modification?

 2    A    Yes.

 3    Q    And you've never sold the tutorial without the

 4    modification since?

 5    A    No.

 6    Q    Have you ever heard had any involvement with fire sharing

 7    since entering into this order?

 8    A    No.

 9    Q    And had you ever sold file sharing software before or

10    afterward?

11    A    No.

12    Q    Okay.  Ms. Burton talked a little bit about the Web of

13    Trust program.

14    A    Yes.

15    Q    Which, as I understood your testimony, was part of an

16    overall strategy to try to create visibility for your company

17    on the Internet?

18    A    Correct.

19    Q    In your understanding, this is a common strategy for

20    companies that sell software over the Internet, to use

21    different sources to try to generate --

22              MS. BURTON:  Objection, Your Honor, testifying.

23              THE COURT:  Sustained.  Rephrase your question.

24    BY MR. EDMONSON:

25    Q    What was your reason for getting involved with the Web of
```

```
 1    Trust program?

 2    A    When I noticed it was a complaint on their site, and I

 3    was trying to get familiar with the site and why was

 4    complaints, you know, and was it true complaints or just

 5    competitors are posting stuff, you know.

 6    Q    So you were trying to figure out whether or not they were

 7    legitimate complaints to address or they were competitors

 8    trying to malign you?

 9    A    Correct.

10    Q    We talked about the Safe Card merchant descriptor.  Do

11    you remember that?

12    A    Yes.

13    Q    What is Safe Card?

14    A    A processing company to process credit cards for

15    customers' transactions.

16    Q    Is Safe Card its own company or part of another company?

17    A    Part of Revenue Wire.

18    Q    And Revenue Wire is the company you testified earlier is

19    the company that put you in touch with your support

20    companies?

21    A    Correct.

22    Q    So the merchant descriptor, Safe Card with the asterisk

23    and then PC Cleaner, was that something that you created or

24    that Safe Card created?

25    A    Safe card created.
```

```
1    Q   And Safe Card is the one that actually processes the

2    transactions, correct?

3    A   Correct.

4    Q   Okay.  So you're not really familiar with the ins and

5    outs of exactly how they do that because you essentially are

6    in the business --

7              MS. BURTON:  Objection.

8              THE COURT:  Sustained.

9              Please don't lead the witness.

10   BY MR. EDMONSON:

11   Q   What, if anything, do you know about how Safe Card

12   decides what merchant descriptors to use or how to process

13   the credit cards?

14   A   Just based on the product, yeah, of the company.

15   Q   Understood.

16              Why did you -- why did you switch from TLC to ICE?

17   A   Well, quality customer service is what I've heard from

18   Revenue Wire would be much better, and they did mention

19   bringing down, you know, better on charge-back and refunds,

20   you know, customer satisfaction, and overall, it's better

21   service.

22   Q   And where did you get the impression that they were doing

23   those things better than TLC?

24   A   Feedback from other partners and just, you know, just

25   general research.
```

```
1    Q   Were you aware of -- putting aside whether any of it's
2    correct or not, were you aware of any of the allegations that
3    you've heard during this last three days pertaining to ICE
4    when you decided to retain them?
5    A   No.
6    Q   Did you become aware of it at any point when you were
7    using their services?
8    A   Never.
9    Q   So did you learn about any of it before the Court entered
10   the TRO?
11   A   No.
12   Q   If you had, what would you have done?
13   A   I would have -- stopped, terminated and stopped using it,
14   just, you know -- software only.
15   Q   When did you terminate your relationship with ICE, if at
16   all?
17   A   After I found out about the TRO.
18   Q   Do you have any intention of working with them again?
19   A   No.
20   Q   Do you have any intention of working with any other
21   support companies?
22   A   Not at this point.  I just want to focus my software and
23   focus on improving whatever I got to do to get it in
24   compliance and so I can move forward, and, you know, just
25   keep making it a better product.  That's my goal now.
```

1   Q   Do you believe that the company can sell its product in a

2   viable manner without any kind of a support company involved?

3   A   Of course.

4   Q   So you can operate as a stand-alone entity?

5   A   Yes, yes.

6   Q   You talked a little bit earlier about different

7   businesses that you have been in in terms of when you started

8   PC Cleaner and then other businesses.

9        Do you have technical expertise?

10  A   No.  I mean, to a certain extent, yes.

11  Q   Do you make most of the technical decisions yourself, or

12  do you rely others to advise you as to how those decisions

13  will be made?

14  A   I rely on others and research.

15  Q   We went back to 2003.  What's your background prior to

16  that?

17  A   I've been selling auto auction directory, foreclosure

18  data listings for the last, since 2001 or 1999.

19  Q   So those are separate businesses from PC Cleaner?

20  A   Correct.

21  Q   Have either of those business, the foreclosure business

22  or the auto auction business, ever had any involvement with

23  the FTC or any other kind of law enforcement?

24  A   No.

25  Q   What about the PC antivirus product?  Has that ever been

1    implicated by any kind of investigation?

2    A    Never.

3    Q    Speaking about complaints from earlier, let's talk for a

4    minute about the BBB.  In your declaration, you discussed the

5    circumstances with regard to your BBB rating.  Do you

6    remember doing that?

7    A    Yes.

8    Q    What was your BBB rating shortly before the TRO was

9    entered?

10   A    It was A.

11   Q    And to the extent that you had a lower rating earlier,

12   what was the cause of that?

13   A    After the TRO.

14   Q    Prior to having an A rating, was there any sort of -- did

15   you have a lower rating?  And if so, why?

16   A    That was because of the change of ownership between the

17   BBB and the BCA, and a miscommunication.

18   Q    So you did receive notice of some complaints at some

19   time; is that correct?

20   A    Correct.

21   Q    And at another time, did you -- when you learned about

22   the complaints, what did you do?

23   A    I took care of them right away, although most of the

24   customers were already taken care of.  When I looked at the

25   complaints and looked back, they were already taken care of.

```
 1    Q    We heard a little bit about two cars that you have.  Do
 2    you have a family, Mr. Myricks?
 3    A    Yes, I do.
 4    Q    Do you have children?
 5    A    Yes, I do.
 6    Q    How many?
 7    A    Five.
 8    Q    How old are they?
 9    A    Two, eight, 15 and 16.
10    Q    Are you the primary source of support for all of them?
11    A    Yes, I am.
12    Q    Are you married?
13    A    Yes.
14    Q    You talked earlier about a money back guarantee.  Prior
15    to the TRO, did you offer a money back guarantee?
16    A    Yes, I did.
17    Q    And why did you do that?
18    A    I felt that customers should have a opportunity to try
19    the product.  If they're not satisfied, to give them time to,
20    you know, get their money back.
21    Q    How have you found your customers have received that?
22    Are they pleased with it?
23    A    Yes, yes.
24    Q    Now, if we could talk for just a moment here about the
25    log-in procedure when you do purchase the software.
```

```
1              Actually, scratch that.
2              Before that, can you tell me, is there a new version
3    of PC Cleaner that's been recently created?
4    A   Yes.
5    Q   What is it called?
6    A   PC Cleaner Pro 2015.
7    Q   And when did development of that product start?
8    A   It started probably around mid this year, about June,
9    July.
10   Q   So sometime during the summer of 2014?
11   A   Correct.
12   Q   At that time, did you have any indication that the FTC
13   was considering suing you?
14   A   No.
15   Q   Had the FTC ever reached out to you to talk about any of
16   the issues that have been raised during this hearing?
17   A   No.
18   Q   Have they reached out to you at all?
19   A   No.
20   Q   If the FTC had reached out to you, what would you have
21   done?
22   A   Made changes, you know, to comply.
23   Q   So you would have been open to a discussion about how to
24   make the product better?
25   A   Correct.
```

```
1    Q    And are you open to that discussion now?

2    A    Yes.

3    Q    Are you looking for ways to make the product better now?

4    A    Of course, always.

5    Q    Is one of those ways the PC Cleaner Pro 2015?

6    A    Yes, it is.

7    Q    And so that product differs from PC Cleaner Pro 2014 in

8    some way?

9    A    Yes.

10   Q    How?

11   A    Well, one, it blocks Active X, like it did before, but

12   now it doesn't display all the numbers on the result screen.

13   It's transparent, which it automatically blocks it for the

14   customer.  They can also go in the tools area and do it

15   manually, but it doesn't display on the result screen as a

16   high number.

17          We used to use color coded speedometer, now to show

18   the severity or the concern level of each item.

19          What's the other?  I'm a little nervous.

20          Concern level, we use concern level, we don't use

21   damage.  We have more descriptive information on each

22   feature.  They can click on view details and take them to the

23   details and have more details than the 2014, so that way they

24   can understand what they're cleaning and what the program's

25   actually doing.
```

```
1    Q    Okay.

2    A    I'm sorry.  Go ahead.

3    Q    No, please finish.

4    A    What they're doing.

5         We have free built-in tools they can also use along

6    with the free version, the free scan version.

7    Q    Okay.  So one of those things you mentioned was the

8    Active X blocker?

9    A    Yes.

10   Q    We've heard a fair bit about that during this hearing.

11   Can you explain a little bit about how it worked in the 2014

12   version versus the 2015 version?

13   A    Well, 2014, it scan and detect if you didn't have the

14   blocker on your computer, the ones you did have, it would

15   display the number to let you know that's important to block

16   to keep the security of your computer.

17        In the 2000 (sic) version it still scan, but it

18   doesn't show you in the result screen, so that way the number

19   would not display of how many.  It just block it regardless

20   to give you security.

21        Before, we had 2014, I think we blocked 926.  In the

22   2015, we now have collected 16,000 updated Active X controls.

23   Q    Okay.  So in the 2015 version, the Active X control

24   number is not included in the total that appears at the end

25   of the scan?
```

```
 1    A    Correct.
 2           MR. EDMONSON:  Your Honor, may I approach the
 3    exhibit table?
 4           THE COURT:  Yes.
 5           MR. EDMONSON:  May I now approach the witness?
 6           THE COURT:  Yes.
 7           MR. EDMONSON:  I've handed the witness exhibit
 8    number 10, Defendant's exhibit 10.
 9    BY MR. EDMONSON:
10    Q    Do you recognize exhibit 10?
11    A    Yes.
12    Q    What is that?
13    A    This is a page that the users get right after they
14    purchase the software.
15    Q    Okay.  And do you know where that document came from?
16    A    After I found out, you know, the -- I guess the shopper
17    who did the shopping, I went and put it up in a Revenue Wire
18    database to put the receipt, the actual receipt, to see
19    exactly what -- you know, was it really a license key, you
20    know, was it a error where it didn't show up?  I wanted to
21    make sure.
22    Q    And were you able to match that document with the
23    Government's exhibit relating to the same customer by using
24    the activation number, receipt number, on both documents?
25    A    Yes.
```

```
 1              MR. EDMONSON:  Your Honor, we would ask now that

 2   exhibit number 10 be moved into evidence.

 3              THE COURT:  Any objection?

 4              MS. BURTON:  No, Your Honor.

 5              THE COURT:  Admitted without objection.

 6         (Defendants' Exhibit No. 10 entered into evidence.)

 7   BY MR. EDMONSON:

 8   Q    If you look at exhibit number 10 and you compare it with

 9   the Government's exhibit that's up on the white board, does

10   it appear to be the same receipt, albeit putting aside

11   whether both are complete or not?  Is it for the same

12   purchase?

13   A    Same purchase.

14   Q    Do you see any significant differences between the two?

15   A    Significant differences, no.  Just chopped off.

16   Q    So when you say chopped off, one of them doesn't have the

17   bottom of the screen?

18   A    Correct.

19   Q    Which one doesn't have the bottom of the screen?

20   A    The board up here.

21   Q    And is there anything important at the bottom of the

22   screen?

23   A    A license key.

24   Q    And what does that mean?

25   A    The license key is what they use to activate the
```

```
 1   software.
 2   Q   So this is the code that, throughout the course of the
 3   proceedings, we've been hearing that in some cases the ICE
 4   personnel will enter in; is that correct?
 5   A   Say it again?  Yes, yes, yes.
 6   Q   Is that the only way to activate the software, is by
 7   calling a phone number?
 8   A   No.
 9   Q   How else can you activate the software?
10   A   You can activate it yourself once you get the license
11   key, and the software is already opened up on your computer.
12            MR. EDMONSON:  Just a moment.
13            I'd like to give the witness one page of an exhibit
14   that the Government gave to their expert yesterday.  In the
15   interest of moving things along, they'll look for the exhibit
16   number and we'll add it to the record afterward, if that's
17   okay with the Court.
18            THE COURT:  All right.
19            MR. EDMONSON:  May I approach the witness?
20            THE COURT:  Yes.
21   BY MR. EDMONSON:
22   Q   Do you recognize the document that I just handed you,
23   which is an exhibit that will be marked in a moment?
24   A   Yes.
25   Q   What is it?
```

1    A    It's the -- when the user click clicks "all" on the

2    software, this page pops up to let them know to register the

3    software first, and it shows a box to put the license key

4    also.

5    Q    So that document contains a place to enter the license

6    key?

7    A    Yes.

8    Q    And that screen is shown before or after the screen in

9    exhibit number 10 that contains the license key?

10   A    Before.

11   Q    So you see a screen that says, already have a license

12   key, enter it here?

13   A    Yes.

14   Q    And you see that prior to being given the license key?

15   A    Correct.

16   Q    So when the -- is it true that when the customer gets to

17   the screen that in the full version contains the license key,

18   they have already seen a screen that invited them to enter a

19   license key if they have one?

20   A    Correct.

21   Q    And this is how a customer would enter in a license

22   key -- is this how a customer would enter in a license key

23   without calling anybody?

24   A    Correct.

25   Q    Okay.

```
 1              MR. EDMONSON:  For the record, the FTC's advising
 2    that the page we just examined is from Government's 41,
 3    Plaintiffs' 41.
 4              THE COURT:  Thank you.
 5              MR. EDMONSON:  I have here an exhibit that I'd like
 6    to mark as Defendant's exhibit 6 for identification.
 7              THE COURT:  Okay.
 8              MR. EDMONSON:  May I approach to pass?
 9              THE COURT:  Thank you.
10    BY MR. EDMONSON:
11    Q   Do you recognize that document?
12    A   Yes.
13    Q   What is it?
14    A   The new license key confirmation page after a purchase.
15    Q   When you say the new, what do you mean?
16    A   Replacing exhibit 10.
17    Q   So is that for a particular version of the software?
18    A   2015 version.
19    Q   Okay.  And so in the 2015 version, that's the display
20    page that you would propose?
21    A   Exactly.
22    Q   In the event that the Court doesn't enter a preliminary
23    injunction, do you intend to sell only the 2015 version of
24    this software or other versions, as well?
25    A   Only 2015.
```

```
 1    Q    Okay.  Does that page contain any phone number?

 2    A    No.

 3    Q    Do you intend to add a phone number?

 4    A    No.

 5    Q    Do you intend for the life of this case to proceed with a

 6    confirmation page that doesn't contain a phone number?

 7    A    Yes.

 8         MR. EDMONSON:  At this point I would ask that

 9    Defendant's 6 be moved into evidence.

10         THE COURT:  Any objection?

11         MS. BURTON:  No, Your Honor.

12         THE COURT:  Admitted without objection.

13    (Defendants' Exhibit No. 6 entered into evidence.)

14    BY MR. EDMONSON:

15    Q    Really quickly, we talked a little bit about the class

16    action settlement when Ms. Burton was questioning you.  Do

17    you know whether or not that settlement requires you to have

18    already made changes, or if it requires you to make them by a

19    future date?

20    A    Make them by a future date.

21    Q    Do you intend to do so?

22    A    Yes.  I pretty much have already done most of everything,

23    I think I've done it all.

24    Q    In the 2015 version you've already made all the changes

25    required by the class action settlement?
```

```
 1   A    Oh yes, yes.

 2   Q    Finally, I want to talk with you a little bit, I want to

 3   hear you talk a little bit about the software's capabilities.

 4   I believe you have a copy of your declarations.  If you'd

 5   look at the first one dated December 11th.  If you'd turn to

 6   exhibit A to the declaration.

 7   A    I'm sorry, what page?

 8   Q    Exhibit A.  So after the declaration there should be

 9   exhibits.  If your version doesn't have exhibits, we can

10   switch.

11   A    Yeah, I don't have it.

12            MR. EDMONSON:  May I approach the witness?

13            THE COURT:  Yes.

14   BY MR. EDMONSON:

15   Q    Do you recognize exhibit A?

16   A    Yes.

17   Q    What is that?

18   A    That's a tally report.

19   Q    What's a tally report?

20   A    It's a third party testing company that tests different

21   software companies, comparison tests, performance tests and

22   different type of benchmark tests.

23   Q    And when was this report released?

24   A    It was released about a week ago, a week, two weeks ago,

25   but I started the process in July, testing it.
```

```
 1    Q    And what is it comparing your software to?

 2    A    It's comparing it to C Cleaner, CC Cleaner, which is a

 3    big cleaner software in the industry, Norton Utilities 16,

 4    RegClean Pro, Tune-Up Utilities by AVG software.

 5    Q    So this is a report that compares the performance of

 6    various types of software in the PC optimization industry?

 7    A    Correct.

 8    Q    And how did you do?

 9    A    I did very good.

10    Q    How did you do compared to the other companies?

11    A    Well, we outperformed them in each area we tested in.  As

12    far as the CPU utilization, we almost 50 percent better than

13    each competitor.

14         Yeah, we tested in multiple areas, system clutter

15    removal, privacy cleaner, CPU utilization, Windows ATK delete

16    operation, and in each area we outperformed our competitors.

17    Q    Okay.  Could you look at exhibits B, C and D?  You can

18    look at them collectively.  Each is a one-page certificate.

19    A    Okay.  I'm sorry.  B?

20    Q    B, C and D.

21    A    I'm lost.

22         MR. EDMONSON:  Can I show the witness?

23         THE COURT:  Yes.

24    BY MR. EDMONSON:

25    Q    Do you recognize these documents?
```

```
 1    A    Yes.

 2    Q    What are they?

 3    A    They're Ikos (phonetic) Lab's testing reports certifying

 4    PC Cleaner software.

 5    Q    What does that mean?

 6    A    It certifies that PC Cleaner truly detects the latest

 7    threats in the industry, viruses in malware industry.

 8    Q    So this is another third party that examines different

 9    companies' software?

10    A    Yes.  They're independent.  They're actually part of

11    Verizon.  So, yes, they're a big company.  They test all the

12    leaders in the industry, Microsoft, Symantec, Norton, McAfee.

13    We all use the same database, and they test it through the

14    same database, and you have to test with a 92 percent or

15    above detection rate or you fail, and you have to maintain

16    that monthly, on a monthly basis.  And we never failed since

17    2000 -- well, we never failed at all, but we started -- at

18    2012 we first started, and we test with anywhere from a

19    97 percent detection rate to a hundred percent for the last

20    three years.

21    Q    Okay.  What is Trustee, if you know?

22    A    Trustee is another certification company that certify

23    you, your application.  They base it on different behaviors,

24    you know, that the software, you know, take you from the

25    beginning of the download, installation, all the way up to
```

```
1    the running the program to make sure it have no behaviors
2    where it's malicious or misleading the user.
3    Q    Does Trustee examine the scan part of your program, the
4    free scan?
5    A    Yes.
6    Q    And what have been the results of your Trustee
7    examinations, if any?
8    A    Certification, passed.
9    Q    Have you ever failed?
10   A    No.
11   Q    So what -- as the principal of the company, having
12   received the results of all these different studies, what do
13   you think they say about your product's validity, value?
14   A    Who?  I'm sorry.
15   Q    What do you think that all the third party tests say
16   about your product's value?
17   A    Think it's great, you know.  They give me their
18   compliments, and they think it's really -- they know it's a
19   great product, they test it, and they confirm with the
20   results, you know.
21           MR. EDMONSON:  Just a moment, Your Honor.
22           Thank you, Mr. Myricks.
23           THE WITNESS:  You're welcome.
24           THE COURT:  Any other redirect?
25           MR. FERGUSON:  None here, Your Honor.
```

```
 1                 THE COURT:  Any recross?

 2                 MS. BURTON:  No.

 3                 THE COURT:  Thank you, sir.

 4                 MR. NICHOLSON:  We would rest, Your Honor.

 5                 THE COURT:  All right.  Any other evidence?

 6                 MR. FERGUSON:  None from us, Your Honor.

 7                 THE COURT:  All right.  You ready to argue the

 8     motion?  You ready to make argument?

 9                 MS. ROBBINS:  Sure.

10                 THE COURT:  How long do you need?  How long are you

11     going to need?

12                 MS. ROBBINS:  About 10 minutes.

13                 THE COURT:  Okay.  You may proceed.

14                 MS. ROBBINS:  Good afternoon, Your Honor.

15                 These Defendants, working in tandem, have

16     collectively made over $250 million in the last three years

17     by deceiving consumers into believing that they have problems

18     on their computers and that they must repair them

19     immediately.

20                 One set of Defendants, PC Cleaner, sets the stage by

21     offering a free scan that misleads consumers into thinking

22     that they have thousands of problems on their computer.  Then

23     the ICE Defendants take over when consumers are told that in

24     order to activate the software that they just purchased, they

25     have to call an 800 number.  And that 800 number leads to the
```

```
 1    ICE Defendants.  And it not only leads to the ICE Defendants,

 2    but it leads to their salesperson.  And this salesperson is

 3    not required to have any computer training, and this sales

 4    agent is required to read verbatim from a script that always

 5    ends the same way, that consumers need tech support, at the

 6    end of the day.

 7          It's no wonder that the BBB and the FTC don't have

 8    thousands of complaints, because consumers are first told

 9    they have problems that they may or may not have.  Then

10    they're sent to somebody to fix those problems.  And

11    consumers are none the wiser.  They have no idea that they

12    didn't have the problems to begin with.

13          And the issue in this case is not whether PC

14    Cleaner's product after the sale, post-purchase, or what it

15    does.  And it's not whether ICE provides tech support after

16    the fact.  The issue in this case is the deceptive free scan

17    and the script.

18          THE COURT:  Well, let me ask you this, if that's the

19    issue.  If they actually sell a product that works, and they

20    actually provide tech services and can adequately provide

21    tech services, and the only issue is how it's marketed, why

22    should the companies be put out of business completely as

23    opposed to correcting the marketing issues?

24          MS. ROBBINS:  Your Honor, we don't necessarily think

25    the companies should be put out of business, and we don't
```

```
 1    believe that a PI would put the companies out of business.

 2           THE COURT:  Well, if you put a receiver in charge of

 3    both of these companies for the remainder of the proceedings,

 4    you think the businesses are going to keep going?

 5           MS. ROBBINS:  Your Honor, what we believe is that if

 6    the companies really wanted to do tech support, they could do

 7    it in a way that doesn't deceive consumers.

 8           THE COURT:  That's my question to you.  Why do we

 9    need to put them out of business as opposed to correct their

10    marketing problems that you think exist?

11           MS. ROBBINS:  Well, I guess I -- so if there's an

12    injunction in place that tells them that they cannot mislead

13    consumers, and if there's an asset freeze in place that

14    preserves the money for consumer redress of the consumers

15    that have been harmed, there's nothing in there that would

16    prevent them from actually operating a legitimate business.

17    But what it does is it -- these Defendants are not

18    trustworthy.  They're not -- I don't think that the Court can

19    trust that going forward they're going to change their

20    business practices.

21           So to monitor them and to make sure that they're

22    going to change is something that is necessary, and an asset

23    freeze here is very necessary, because there have been --

24    there's over $250 million in consumer harm here, and we

25    have --
```

```
 1              THE COURT:  So you're assuming every customer was

 2       duped, defrauded?  There isn't a single customer that needed

 3       tech services and needed and had problems on the computer

 4       that were corrected?  Everyone is a victim?

 5              MS. ROBBINS:  Well, if the consumers -- the

 6       consumers for sure, if they came through after -- through a

 7       product activation code and were read the script, they are.

 8       Whether they needed tech service or not, they were deceived

 9       into and induced into purchasing that product.

10              The case law says that even if the product, the

11       value of the product -- even if the product is valid and

12       there's some value to it, you can't scare people and induce

13       people into purchasing that product.

14              THE COURT:  Okay.  I can accept that.

15              But does that mean if you -- you sold a car with

16       some kind of false advertising, you get the value of the car

17       back?  You get your entire purchase price back?

18              MS. ROBBINS:  Yeah.  I mean, that's what -- the case

19       law is clear that it's the inducement into purchasing that

20       product that you are then harmed.

21              THE COURT:  So if you get a car that's worth $10,000

22       based on false advertising, you get to keep the car and you

23       get your $10,000 back?

24              MS. ROBBINS:  You -- well, if you kept the car, then

25       the value -- you've received some value.  Here, there is no
```

```
 1    value that these consumers have received.  In this case,

 2    they've been offered tech support services that they may or

 3    may not have needed in the first place.

 4          THE COURT:  Okay.  But doesn't your approach assume

 5    that every one of them didn't need it?

 6          MS. ROBBINS:  It is, because they use a script, and

 7    the people have to read the script verbatim.  And if the

 8    business model was that they didn't use a script and they

 9    didn't have to do the same thing every single time, then

10    there may be customers that were not harmed and actually, you

11    know, called in legitimately, and maybe that's something that

12    ends up having to be parsed out throughout this litigation

13    whether they were -- you know, how many calls actually came

14    in through product activation, how many consumers were read

15    the script.  I mean, that's the issue here.

16          Because the script, the way that it was written and

17    the way that it was used, the salesperson wasn't trained, and

18    they were using a tool that was deceptive, and that's

19    deception.  So any person who purchased from that deception

20    has been harmed.

21          THE COURT:  Okay.

22          MS. ROBBINS:  So if you find that the PC Cleaner

23    free scan at issue in this case is deceptive, then the

24    Plaintiffs are likely to succeed on the merits.  And if you

25    find that the scripts are deceptive, then we would be likely
```

1    to succeed on the merits as to the ICE Defendants.

2         And, now, you heard from two experts regarding PC

3    Cleaner Pro.  You heard from Ed Skoudis and William Easttom.

4    And Mr. Skoudis told you that calling all cookies a problem

5    is deceptive.  He told you that counting the failure to block

6    926 old pieces of malware a problem is deceptive, that

7    calling every temp file, every temp file is a problem, is

8    deceptive.  And also, that aggregating all of this together

9    into one big number is deceptive.

10        And Mr. Skoudis analyzed the FTC's undercover calls,

11   and he did a test of his own, and he concluded that the PC

12   Cleaner free scan was deceptive.  And under the law,

13   solicitation is likely to mislead by virtue of the net

14   impression it creates, even though it may contain some

15   truthful disclosures.

16        And William Easttom testified for the defense, and

17   he wrote a 43-page declaration, yet he failed to write about

18   the issue in this case.  He did not include a single screen

19   shot of PC Cleaner Pro's free scan, the scan that induces

20   consumers to purchase.  And he claims to have also tested the

21   full version and ran a scan, but he didn't include that one

22   either.  And given that the issue in this case are the

23   deceptive scans, it's surprising that those were omitted.

24        And once consumers are induced to purchase the

25   product, they download the product onto their computers, but

 1   they can't readily activate it.  And as the Court can see

 2   from the screen shots and from the other exhibits that have

 3   come in, the most prominent piece on that activation page is

 4   that box in the middle that says, activate your software by

 5   calling this 800 number.  There may be a license key on some,

 6   there may not be a license key on some, but in every case

 7   there is a big box in the middle that tells consumers that

 8   they have to activate their software.  And they do.

 9          And so armed with the script, the telemarketers go

10   through a diagnostic, and that diagnostic is not designed to

11   diagnose that computer.  Its purpose is to appeal to the

12   emotions of the consumer, and it's designed to mislead them

13   into thinking that they need something.  And they may or may

14   not need tech help, and that's not the issue.  The issue is

15   how they are induced to pay for this tech support.

16          And these salespeople, who are disguised as

17   technicians, can't diagnose a computer with the script that

18   they are given, and it's the wrong person using the wrong

19   tool.  That combination is deceptive.

20          And Mr. Skoudis went through all of the

21   representations in his report.  In the first report and the

22   supplemental report, he went through all of the

23   representations that the Defendants make in that script and

24   concluded that those are deceptive, and ICE's expert didn't

25   even look at script.  So the testimony of Mr. Skoudis is

1    undisputed.

2         And the Plaintiffs have demonstrated through

3    consumers, corroborated by three undercover calls and

4    corroborated by a former employee, Phil Tomich, and the

5    testimony of the Defendants, that the Plaintiffs are likely

6    to succeed on the merits.

7         In order to issue a preliminary injunction, the

8    Court must also find that injunctive relief is in the public

9    interest.  And there is nothing to stop the Defendants from

10   continuing their scheme if the asset freeze -- or from

11   continuing their scheme, and the asset freeze is necessary to

12   preserve money for consumers.

13        And as for the PC Cleaner Defendants, Myricks

14   already had another call center that he testified to that he

15   has a contract with now, yet he testified he's done no due

16   diligence with any of the call centers that he's already

17   worked with.  And both call centers have proven that they've

18   had problems with their sales tactics.

19        And with this call center he will still have an

20   incentive to generate leads.  He makes 40 percent of a lead

21   that's generated to the call center.  He only makes $30 per

22   product, yet he could make upwards of a hundred dollars per

23   lead generating money -- or generating money from this call

24   center practice.

25        He's also a recidivist with the FTC, and he had a

 1    class action against him for the same practices.  He has a

 2    16 percent refund rate, which is way above the one percent

 3    that Visa and MasterCard have.

 4         And the new product, as Mr. Skoudis testified

 5    yesterday, that initial scan still induces consumers to

 6    purchase by aggregating all of those numbers together into

 7    one number.

 8         And as for the ICE Defendants, the price of their

 9    product varies depending on how much people are willing to

10    pay for it.  It has nothing to do with what's wrong with your

11    computer.  It has to do with what are you willing to pay.

12    They have at least 50 other software partners generating

13    leads to their call center, not just PC Cleaner.

14         They have an integral relationship with Revenue Wire

15    who processes their payments, gets them hooked up with

16    software partners; and that relationship still stands.  And,

17    in fact, the owners of Revenue Wire own 80 percent of ICE.

18    And they have stated that they intend to -- they have not

19    stated that they intend on changing the business model, the

20    very business model that creates the misleading scripts and

21    the misleading product activation leads that cause harm to

22    consumers.

23         And also, their refund and charge-back rate is 12 to

24    20 percent.  That means that close to one in five consumers

25    end up calling for a refund or for a charge-back.

 1          And you heard from the sales manager.  He tells

 2   every salesperson who's a trainee, you are an actor, you are

 3   posing as a technician, you are to read this script verbatim.

 4          And a PI with an asset freeze is warranted here.

 5          The Defendants claim that they have seen the error

 6   of their ways and have intent to change, but they're not

 7   trustworthy.  They submitted self-serving declarations that

 8   omitted important facts to suit their needs and to give the

 9   Court an impression of them.  The Defendants claim also that

10   the PI will shut them down, and as we just discussed,

11   although the TRO provisions prohibited the Defendants from

12   charging consumers, the FTC would not be seeking that in a

13   PI, that they could still charge consumers post-TRO if they,

14   in fact, change their practices.

15          And the PI will preserve money for consumer redress

16   and will stop the deceptive marketing practices.  And if they

17   can't survive without engaging in deceptive marketing

18   practices, then they shouldn't be operating in the first

19   place.

20          THE COURT:  What -- I know the receiver's filed a

21   report, and I, you know, glanced at it, I didn't study it

22   extensively, but what assets were frozen?

23          MS. ROBBINS:  So just all the corporate assets, and

24   there's about 6 million, I believe, 6.6 million that's been

25   frozen for the ICE Defendants.

1          THE COURT:  And it's in what form?  Bank accounts

2     and what kind of format is the money?

3          MS. ROBBINS:  Bank accounts.

4          THE COURT:  Are these operating accounts?  What kind

5     of accounts are they?  So if you have an asset freeze but you

6     say you want me to freeze the assets, enjoin them from

7     engaging in fraudulent practices, but they can go on

8     conducting the business, how are they going to do that

9     without any operating capital or cash?

10         MS. ROBBINS:  Well, each of the Defendants in July

11    were paid $4 million each for the sale of part of their

12    shares in the business.  So -- and the individual Defendants'

13    assets at this point are not frozen.  So if they wanted to

14    continue to operate, they have taken money from -- basically,

15    from the corporation because of selling their shares.

16         THE COURT:  They sold their shares.

17         MS. ROBBINS:  Well, but that at least would -- they

18    could get started and then use the money they make from sales

19    to continue to grow their business.  But they shouldn't be

20    allowed to use money that was from -- you know, from

21    deceiving consumers to continue on to their business.  This

22    money, there was over $200 million in the last three years

23    that they've made from this business model, and there's only

24    6.6 million frozen.  And so that's a lot of money that's not

25    available for consumer redress.

```
 1              THE COURT:  But that's gross income, right?  That's
 2    gross receipts.
 3              MS. ROBBINS:  That's minus refunds and charge-backs.
 4              THE COURT:  But they had to operate the business.
 5              MS. ROBBINS:  Right.
 6              But under the case law, it's gross minus refunds and
 7    charge-backs is typically the consumer redress number.
 8              THE COURT:  Okay.  But you're making it sound like
 9    they pocketed $200 million.
10              MS. ROBBINS:  No, you're correct.
11              THE COURT:  They didn't pocket $200 million.  They
12    generated $200 million in gross receipts.  Do you know how
13    much they expended to run the business and how much is
14    profit?
15              MS. ROBBINS:  I do not, but I do know that under the
16    case law, though, that's not taken into consideration.  But I
17    understand.  I do not know the number right now.
18              But the ICE Defendants knew in October of 2012 about
19    the FTC's actions against other tech support companies, and
20    they knew that the FTC alleged that the Event Viewer was a
21    deceptive sales tactic.  Yet, for two years after that, they
22    still used that script with the Event Viewer, putting in
23    there, do not say Event Viewer.  They knew.  They knew what
24    they were doing was wrong.
25              THE COURT:  How do you know they knew what the
```

```
 1    allegations were, just because they knew there was a lawsuit

 2    out there?

 3            MS. ROBBINS:  Well, there's a lot of circumstantial

 4    evidence here.  Because he received an article from someone

 5    at Revenue Wire telling him about the case.  Paul Herdsman

 6    claimed that he had read the FTC's ruling.  We know that the

 7    scripts --

 8            THE COURT:  What did the ruling say?  It probably

 9    said what mine said.

10            MS. ROBBINS:  It was a TRO.

11            THE COURT:  So did it say what the allegations were

12    in the complaint?

13            MS. ROBBINS:  Well, in the complaint it said what

14    the allegations were, and in the TRO --

15            THE COURT:  Did the TRO say what the allegations --

16            MS. ROBBINS:  Well, it has the findings of fact in

17    the TRO.

18            THE COURT:  Okay.

19            MS. ROBBINS:  I think the fact that they had -- they

20    knew about the tech support cases, Paul Herdsman testified he

21    knew about the Microsoft scam, they have a script that says

22    Event Viewer, and then it says, do not say Event Viewer, and

23    it was an escalated -- people could be fired for using the

24    term "Event Viewer."

25            Do I -- do I know for sure?  But I think it's highly
```

 1   suspect that they did not know.

 2           And we don't believe that they changed their script

 3   because they wanted to stop deceiving consumers.  We believe

 4   that they changed it because they were getting ready to try

 5   to get investors to come into the company, and they wanted to

 6   stay under the radar.

 7           And this is not the behavior of a company that's

 8   ready to comply with the law.  And we believe that a

 9   preliminary injunction is warranted in this case and is

10   necessary to stop consumers from being harmed, and we request

11   that the Court issue a preliminary injunction against all the

12   Defendants.

13           THE COURT:  Thank you.

14           MR. FERGUSON:  Your Honor, when I'm preparing a

15   closing I rarely can fight the temptation to go recap the

16   entire case.  I know you pay attention more than many, and I

17   know you're a smart Judge, and you get it.  I'm not going to

18   insult you by spoonfeeding you what we've all lived for the

19   last three days.  But I want to start with answering some of

20   the questions you raised to counsel.

21           A preliminary injunction will kill this company.

22   When the TRO was served the payroll was pulled back.  If we

23   can't get it lifted, I'm not here to say if you are enter one

24   we're going to give up, but it's going to be all but dead.

25           This whole investigation is, I'm sorry, but it's

sloppy, and they've come with a target on these guys for the industry they're in, and they want them dead.  They asked you to freeze their personal assets.  If you done that, I wouldn't even be able to be here to talk to you.

But I can talk about what was sloppy about the investigation, I can talk about misrepresentations in the case here, and you don't need to look any further than the closing argument that we just heard, where counsel conflates refund and charge-back rate.  Starts talking about him and then pours it over to us and says, well, he's got a 15 percent refund rate, and that's well over the one percent credit card company threshold.  That's the charge-back rate.

And it's the same stuff.  It's we used Event Viewer, we didn't use it as of the time that the TRO and the complaint was filed.  We're darned if we do, we're darned if we don't.

Oh, then they stopped using Event Viewer because "they just want investors."  "They're not trustworthy people."

The evidence is the exact opposite.  Receiver Schneider I think his testimony proves they are what they say they are.  They're trustworthy guys.  They're businessmen. They cooperated.

This case will continue on if you don't enter a preliminary.  Through the receivership and the TRO that's

```
 1    already been served they have all the discovery they need.

 2    My clients are not going anywhere.  They're not going

 3    anywhere.  And to just suggest that you've seen evidence that

 4    they're not trustworthy guys, and they're bad guys and the

 5    company won't be killed if you enter a preliminary

 6    injunction, and their refund rate is beyond the one percent

 7    threshold, which actually the charge-back rate, it's more of

 8    the same.

 9              Counsel suggests to you that all of our consumers

10    were mislead, all of them were tricked.  Funny, but everyone

11    that they brought in here didn't support that at all.  Every

12    one of them had malware, had problems.  Like Ophelia Dees, I

13    think it was, she had a virus.  One of the consumers had a

14    problem, we couldn't fix it, and then we actually saved her

15    data for her.  But she didn't like how one of our reps

16    talked, so she got rid of us, called the Better Business

17    Bureau.  The data was wiped out by a third party who came to

18    her home and wiped it out.

19              None of those witnesses said anything about, I got

20    mislead, I didn't need these products, I didn't need these

21    services.  In fact, one of the most shocking moments I've had

22    in, I don't know if it's -- I think I stopped counting at 21,

23    maybe it's 23 years.  I don't remember how long I've been a

24    lawyer, but it's over 20 years.  I'm preparing my cross for

25    Mr. Linder, Dr. Linder who comes here, and I read the
```

1   declaration that they spoonfed to him.  And it talks about

2   how, after two times in a row he couldn't get them on the

3   Internet and hated our service and was done with it.  So I'm

4   just walking him through that and he says to me, no, I tried

5   to call them, and I got the message from the receiver on the

6   line.  I still need them.  Their own witness who came here.

7          But there's no evidence before you that all of the

8   consumers are being tricked or any of the consumers are being

9   tricked.

10          THE COURT:  Well, let me ask you this.

11          MR. FERGUSON:  Yes.

12          THE COURT:  Let's assume that I find that there's

13  some problems in the marketing of these products.

14          MR. FERGUSON:  Sure.

15          THE COURT:  But I don't issue an injunction.

16          How do we solve the problem of potentially improper

17  marketing techniques being used in the interim?

18          MR. FERGUSON:  In the interim, Your Honor, we stand

19  before you this moment and continue to work with you.  We've

20  already -- I read 50 times preparing for this -- not 50,

21  probably 25 times your order in the Boost case, and when we

22  prepped our declarations.  These aren't self-serving

23  declarations.  These are sworn testimony from my clients of

24  what they are already willing to do, which is they're out of

25  the Event Viewer.  They were out of it before this case was

```
 1   filed.  So if you're talking about the Event Viewer, that's

 2   fine, and we can talk about it as this case proceeds, but

 3   it's not the basis for a TRO.

 4           THE COURT:  What about the activation phone number,

 5   which --

 6           MR. FERGUSON:  Your Honor, this is addressed -- I'm

 7   going to address everything.

 8           THE COURT:  Even though you might, you know, if you

 9   look at the first screen and it says, here's the key, and

10   then you go to the second screen and then it says the

11   activation number, but the key thing is down here below, and

12   you got to scroll down to see it.  And the average person is

13   going to call the number and not worry about --

14           MR. FERGUSON:  Not anymore.  It won't happen again.

15   You don't have to be worried about that, and I'll tell you

16   why.

17           In the declarations of all three of my clients, they

18   have all put in the same thing, that they're all willing and

19   committed to doing, and I'm going to tell you what that is,

20   and if that's -- if it needs further tooling, we're going to

21   work that out, too.  But here's what they've committed to do.

22           They've committed to never again partner with any

23   software provider that does not have a prominent,

24   sufficiently prominent activation key.  And then when you get

25   to the phone number, the phone number will say, call this
```

```
 1    phone number for assistance in activating, and when you do

 2    so, you will also be talked to about additional services and

 3    products, which is even further than I think your concern was

 4    in the Boost case.

 5              But my clients, I have the authority to commit for

 6    them, and they already have in their filings with this Court,

 7    that they will never use a single software provider who

 8    doesn't address those concerns, and dealing straight with

 9    that, that they will commit that they don't do any business

10    with anyone who's not willing to meet that standard, but that

11    the key has to be sufficiently prominent, right there, and

12    that the phone number makes it clear that you don't have to

13    call it because you've got access to the key.  And if you do,

14    you're going to get sold products and you're going to get

15    talked to about additional products and service.  Absolutely.

16              And, you know, if you want us to submit exactly what

17    those pages, or work with the Court, whatever.  But that's a

18    commitment that they've made, and if they violate that, I

19    think you know what to do because the case doesn't just

20    disappear.  It's not like you say, I'm not going to enter a

21    preliminary injunction, we walk out the door and we never

22    come back.  We're still in this.  We've still got to deal

23    with this.

24              Look, my clients, they get called to the mat for

25    working with the BBB.  They get called to the mat for trying
```

1   to --

2           THE COURT:  Well, let me ask you about the other

3   issue that I think the Plaintiffs are concerned about, and

4   that is, assuming at the end of the day there is a finding of

5   liability and there's been a finding of harm to consumers.

6   What's the -- what kind of security is going to be there if I

7   release the TRO and don't issue a preliminary injunction and

8   release the assets, what's going to preserve potentially for

9   any damages that might later be found?

10          MR. FERGUSON:  Well, at this time if you release the

11  money, there would -- I would be making it up if I told you

12  there's security sitting in any form anywhere.

13          What I suggest to you, though, is I believe on the

14  merits, if we go through and parse this out, I doubt very

15  seriously that we're looking at, they're going to be able to

16  prove these huge damages.  I believe the case will be

17  resolved.  But I've got no security to point to.

18          I can tell you this.  These gentlemen, they run a

19  good business, they provide a fine service, they intend to do

20  so in the future, and they're going to continue earning, and

21  they're committed to not going away and walking away.  These

22  aren't guys that came from securities industry, got their

23  tickets punched, went into mortgage relief and now they're on

24  to the next thing.  This is what they've been doing all of

25  their professional life.  They're going to be here working.

 1          They understand the FTC is a worthy agency.
 2     Sometimes they get it wrong, and we believe they got it wrong
 3     here.  And I understand if I was a Judge and I got that
 4     packet and read it, TRO granted.  But if I heard this, I
 5     don't believe a preliminary injunction would be appropriate.
 6          But they still are accountable to the FTC in the
 7     space that they're in.  We want to work this out.  We say in
 8     the declarations had they contacted us about any of these
 9     problems, they would have been addressed.
10          Now, I understand they're not a counseling agency,
11     they're an enforcement agency.  But if they're truly
12     concerned about the consumers a year ago about some things in
13     our script and they had reached out to us, we would have
14     irradicated it immediately.
15          I mean, but they hire compliance counsel.  That's a
16     problem.  You hire compliance counsel because you know you're
17     dirty.  You get out of the Event Viewer.  Because you know
18     you're dirty.  Well, which would you rather hear?  Okay,
19     we're still in it because we didn't want to get out of it
20     because we didn't want to be accused by you of being dirty.
21          There's no way to, with the arguments that they're
22     throwing, I believe they're, I don't want to say facetious,
23     but it's not a legitimate argument to say, well, you got D
24     listed by the BBB, when they know that they contacted the
25     BBB, had her sign the suspension the same day she sent out --

```
 1   signed her declaration, and then the receivership comes in
 2   for the last six weeks nonstop, they've been preparing here
 3   to put their best foot forward with you, yet somehow they're
 4   responsible for being suspended by the BBB because they
 5   didn't respond after the TRO was put in place.
 6            These guys want to run the business.  They want
 7   to -- they've made what I believe is sufficient suggestions
 8   and commitments to this Court that satisfy the very issues
 9   that you've pointed to in the Boost order.  They're not in
10   Event Viewer at all.  They've got no intention of going back.
11            And they do sell good products, and they do provide
12   an excellent service.  And Dr. Linder, the Plaintiffs'
13   witness, showed that.
14            There was a ton of work to do.  I got a list.  They
15   wanted to bring in -- we had to bring live people, so I got a
16   list of people who had done testimonials with phone numbers
17   in this area.  Called the first one, it was Dr. Cannon that
18   you met here.  Didn't spoonfeed him anything.  He sent me an
19   e-mail, and I typed it up and read it to him over the phone
20   and sent it to him, and that was his declaration, and he came
21   here.
22            If I close my eyes, it would have been hard to tell
23   the difference between him and Dr. Linder at the end because
24   they both like our service.
25            But it's not true that all of our customers are out
```

```
 1   there getting no services and getting products that are of no
 2   value.  It's the exact opposite.
 3            Even Mr. Skoudis, Mr. Skoudis said his product is a
 4   great product.  He said the Panda product that we sell is a
 5   great product.  The FTC calls in with two machines that they
 6   falsely report as slow, and then their expert says, well,
 7   nothing you did fixed it.  One of the third call, the guy
 8   calls in with no antivirus software on his machine, and we
 9   try to sell him Panda, which Mr. Skoudis sat right there and
10   said was a good product, but yet that's a problem.  That's a
11   problem.
12            The poisoning of the well that they've attempted
13   here and the attempt to argue that these guys, without any
14   support at all, are bad guys, and you should just take them
15   out of this business, Your Honor, we believe is completely
16   unnecessary and not supported by this record, and we believe
17   if you consider the balancing of the equities, you should
18   allow these 800 employees who are still out there, who hasn't
19   in the last six weeks found another job, come back.  You
20   should allow them to continue on with the corrected software
21   page and disconnecting any relationship with any software
22   providers that don't.
23            You shouldn't look back and decide that a
24   preliminary injunction is appropriate because in the past the
25   Event Viewer was used, and don't felt temptation of the
```

```
 1    Plaintiffs that what they did is anywhere akin to what's
 2    happened in the past with the Microsoft Event Viewer scams.
 3    That's not what's going on.
 4          When taken in its totality, the business model is
 5    there to provide real products and real services, and it's
 6    disingenuous to suggest that people calling in with real
 7    problems, like their own witnesses, are getting tricked to
 8    buy something they don't need.  And if we were selling
 9    products that didn't work or selling people things they
10    didn't need, we wouldn't have 323 complaints out of over half
11    a million customers.  This would be a much different case,
12    Your Honor.
13          And we request that you deny the preliminary
14    injunction.  We request that you accept our representations
15    that these pages are not going to look like that.  And if you
16    need some sort of further assurance or a status to deal with
17    that, we're here.  We're not going anywhere.  We want to
18    resolve it with the Plaintiffs.  We have -- the case is still
19    there.  If not, we'll try it on the merits.  But these aren't
20    bad guys.  These are guys who grew up in this industry and
21    want to continue on, believe in their products and believe in
22    their services, and the presentation that you've seen here we
23    do not believe supports entering a preliminary injunction,
24    and we request that you deny the motion, Your Honor.
25          THE COURT:  Thank you.
```

```
 1            MR. NICHOLSON:  Thankfully, Mr. Ferguson left me a
 2    few minutes, Judge.
 3            Judge, I was struck by a number of things that
 4    Ms. Robbins said to you in their closing, and the first was
 5    that the product doesn't matter.  And I understand they have
 6    their legal argument, but to suggest in this case, given the
 7    record that you've heard, that the product doesn't matter,
 8    frankly, I find absurd.
 9            You have heard from not only our expert, but their
10    own expert, as well as seen evidence from third party
11    independent testing companies that this is a really good
12    product.  It is not only comparable to Norton Utilities and
13    the AVG product, it actually is better than those products.
14    Their own witness on cross-examination, even before I could
15    even get the point out, was saying, no, it's a fine product.
16    It does what it says it does.
17            And we went through some of the pieces, and it does
18    a lot of different things.  And he acknowledged that there
19    are valuable things that this software does that helps
20    computers, that helps consumers.
21            Our own expert went through and even said,
22    completely unsolicited on cross-examination, that he's
23    thinking about putting it on his mother's computer.  I think
24    that is pretty significant.
25            One of the other points that I would ask the Court
```

1    to consider is there are a number of changes that were in the

2    works for this software to address the very issues that the

3    FTC raised in this complaint before their complaint even

4    existed.

5         As you heard from Mr. Myricks, two very significant

6    changes apropos to this trial were made.  One is the

7    activation phone number doesn't exist anymore.  And I'm

8    pointing to that one just because that screen is up there.

9    But it is introduced as Defendant's exhibit number 6, which

10   unfortunately, I have the only copy, but the Court will have

11   access to it, which shows that the activation screen has been

12   changed to remove the telephone number.

13        And although at the inception of this hearing it was

14   contemplated that we would associate with what we believe is

15   a above reproach tech support provider, based on the things

16   we heard in this hearing and their commentary about people in

17   this industry, as you heard from Mr. Myricks just a few

18   moments ago, that he has made the business decision not to

19   associate with another support company.

20        Perhaps Ms. Robbins did not hear that testimony,

21   because she got up and argued to you that he was intending to

22   do that.  Maybe she was working on her closing and not

23   listening to his testimony, but it was very clear he's not

24   going to associate.  He's going to sell the software as he

25   did before, as he can do again, just on its merits.  Not with

1    some third party tech support company, ICE, or anyone else.

2         I found it, as I'm sure the Court saw from my

3    reaction, disconcerting at several point in times (sic)

4    during this three-day hearing that the Federal Trade

5    Commission introduced and pointed to an exhibit that is, on

6    its face, misleading.

7         To show you a screen shot that cuts off just above

8    the license key in a case where their argument, one of their

9    principal arguments is premised on the notion that the

10   consumer wasn't given the license key, I find disconcerting.

11        THE COURT:  Well, even assuming the screen does show

12   the license key, that screen is directing the reader's

13   attention to the phone number.

14        MR. NICHOLSON:  Indeed it is.

15        THE COURT:  So that's where -- the average consumer

16   is going to be, oh, this is the phone number I need to call.

17        And how many are going to actually understand that,

18   oh, there's a key down here that will allow me to activate it

19   without calling this number.  Maybe some sophisticated people

20   will understand that, but I'm not sure the average person's

21   going to understand that there's an alternative to making the

22   phone call.

23        MR. NICHOLSON:  And, Judge, I'm certainly not trying

24   to argue with you, but I think the numbers bear out that the

25   majority of consumers did realize, because the predecessor

1    screen, as you heard from Mr. Myricks, says you can activate

2    by entering your license key in the next screen.  And if you

3    actually read the instructions here, it tells where you to

4    click and it gives the license's plate.

5           Is it possible that someone looked at the screen and

6    made the assumption that you had to?  It's possible.  Not

7    that there was a witness who testified to that in this

8    hearing.  In fact, the two consumers that the FTC called that

9    even talked about our product, neither one said that they

10   were deceived by that, and certainly neither one testified

11   that the scan screen deceived them.

12          At bottom, this case as to PC Cleaner Pro boils down

13   to two things.  This screen, which we've told you is changed

14   and was actually in the works before this case even existed,

15   and the scan screen.  Which I find it interesting that

16   Mr. Skoudis, when I went through that with him, I went

17   through very carefully and said, when it reports these

18   numbers, are those numbers accurate?  Multiple times we went

19   through that, and on each case he said, yes, it accurately

20   reports.

21          He even at times volunteered.  I'm not saying that

22   it doesn't accurately report the numbers.  Yep, that number

23   on this category is right, the number on this category,

24   right, the number on this category, right.  Now, he took

25   issue with the relative importance of some of those issues,

```
 1    but at bottom, their own expert admitted that the number was

 2    correct.

 3            He then came to the conclusion that somehow if you

 4    add up truthful number 1, truthful number 2, truthful

 5    number 3, et cetera, it somehow becomes less truthful.  And I

 6    don't know, it's concerning to me that we can be in a place

 7    where we're saying that the truth is misleading.

 8            THE COURT:  Well, it's because in his opinion all of

 9    the numbers are not equal weight, but they give the

10    appearance of all being of the same weight.

11            MR. NICHOLSON:  And I understand that perhaps was

12    his opinion, but one of the other components of the scan

13    screen in the exhibits is that they were also color coded to

14    give them relative weights.

15            But in any event, to avoid even the appearance of an

16    issue there, that item was also addressed in 2015, the

17    specific item that Mr. Skoudis pointed to and is in the

18    complaint was the malware number, the Active X -- I say

19    malware -- the Active X number.

20            As Mr. Myricks has testified, although the software

21    still checks for those malware issues, those Active X issues,

22    which even their own expert said is relevant even to today,

23    okay, their complaint suggested otherwise, but their

24    testimony from their expert was, it's a real issue even

25    today, that even though it still checks for those and blocks
```

1    them so that that number is less scary, if you will, it no

2    longer reports that number.  It just fixes it.

3          So the two items that they've pointed to have

4    already been addressed and were already being addressed

5    before this case even existed.

6          As I said, Judge, kind of at the beginning and to go

7    back to some of those points, come back to the theme here.

8    This is a real company.  This isn't some fly-by-night Indian

9    company or whatever company that's set up to do a get rich

10   quick scheme or Ponzi scheme.  This is a software company

11   that's been in business for several years, which has hundreds

12   of thousands of satisfied customers.  Only a fraction of a

13   percentage point was the -- of our customers was the FTC able

14   to find had complained about the company.

15         Even in connection with the class action suit, less

16   than one percent, less than one percent of the consumers in

17   the class action suit, which essentially raised the same

18   issues, responded and made a claim.

19         As I know the Court is well aware, at the end of a

20   class action suit such as that, all the other class members,

21   their claims or potential claims are deemed resolved.

22         So I'm kind of moving ahead there in terms of the

23   damages issue.  The vast majority of even potential -- I'm

24   not going to use the word -- customers that might seek

25   redress or the FTC would arguably be seeking redress on, have

```
1   already had their claims litigated, settled and discharged.

2   And only a fraction of a percentage, less than one percent of

3   all those customers even responded.

4          This company sells real software.  I've already gone

5   over this a lot, but I'm going to ask you to, when you're

6   looking at this issue, look at the certificates that were

7   introduced into evidence and look at the Tolly report which

8   compares our software against the major competitors, names

9   that you've already heard a million times through this trial

10  and were probably familiar with the Court, and see how this

11  third party independent testing company rated us, and yet the

12  FTC is asking you to essentially shut this company down.

13         And that doesn't make sense to take a competitor

14  product -- frankly, it's anticompetitive to take a competitor

15  product of some of these other companies off the market that

16  actually even works even by their own expert's estimation.

17         And the last thing, Judge, I would ask you to

18  consider, I've got more points, but I'm sure the Court may

19  have a question or two for me, is if you were to grant the

20  preliminary injunction in this case, you wouldn't just be

21  taking this good piece of software off the market, you

22  wouldn't just be putting this company out of business, you

23  would actually be hurting the consumers that purchased our

24  product and rely upon us for tech support and rely upon us

25  for the updates to the software that they've purchased.
```

```
 1              So just across the board, the relief that the FTC is
 2    asking for has not been factually established, it's not been
 3    legally established, and it most certainly is not -- they
 4    have not met their burden in terms of the equities; and we
 5    would ask that you deny the preliminary.
 6              2015 addresses the issues, and we think that that
 7    should be an adequate basis for the Court, along with the
 8    other evidence to deny the request for the injunction.
 9              THE COURT:  Thank you.
10              Anything else?
11              MS. BURTON:  A bit of housekeeping.  I just want to
12    make sure that before this ends, that we get some clarity to
13    make sure that the TRO is extended pending your decision on
14    the preliminary injunction.
15              THE COURT:  I thought that was agreed to.
16              MR. FERGUSON:  Well --
17              MS. BURTON:  It's not in the order --
18              MR. FERGUSON:  If it's not documented, it is agreed
19    to, whatever we need to do, Your Honor.
20              MR. EDMONSON:  Yes.
21              THE COURT:  I thought that was understood.
22              MR. FERGUSON:  Oh, it's understood.
23              MS. BURTON:  I just wanted something on the record.
24    It makes me sleep better at night.
25              THE COURT:  I wasn't going to write the order out
```

```
 1   here while you were waiting.
 2           MR. FERGUSON:  We'll wait if you want, but we --
 3           THE COURT:  We don't have time for that.
 4           MR. FERGUSON:  We agree, Your Honor, that it's
 5   documented, and if we need to follow up, that's fine.
 6           THE COURT:  And the other Defendants agree?
 7           MR. EDMONSON:  We do.
 8           THE COURT:  Anything else?
 9           MS. BURTON:  Thank you.
10           MR. FERGUSON:  Your Honor, we just want to thank you
11   for all your time on behalf of all my clients and my
12   colleagues.  Appreciate your attention.
13           MR. EDMONSON:  We do as well.
14           THE COURT:  You're welcome.  That's what I'm here
15   for.
16           All right.  I'm going to try and get an order out as
17   soon as I can.  I know everybody's waiting anxiously.  It's
18   not a good time of the year to have to deal with something
19   like this, but we'll try and get something out next week if
20   possible.  Thank you.
21       (Proceedings concluded.)
22                       *  *  *  *  *
23
24
25
```

```
 1                          * * * * *

 2                       I N D E X

 3   Testimony of Andrew von Ramin Mapp

 4           Cross by Ms. Robbins                3

 5           Redirect by Mr. Ferguson           20

 6           Recross by Ms. Robbins             28

 7   Testimony of Justin Wright

 8           Cross by Ms. Robbins               30

 9           Redirect by Mr. Streisfeld         56

10           Cross by Mr. Nicholson             69

11           Recross by Ms. Robbins             73

12   Testimony of Robert Deignan

13           Cross by Ms. Robbins               77

14           Redirect by Mr. Ferguson          108

15   Testimony of Paul Herdsman

16           Cross by Ms. Robbins              115

17           Redirect by Mr. Ferguson         131

18           Cross by Mr. Nicholson           131

19   Testimony of Cashier Myricks

20           Cross by Ms. Burton              137

21           Redirect by Mr. Edmonson         173

22   Closing Arguments

23           By Ms. Robbins                   198

24           By Mr. Ferguson                  211

25           By Mr. Nicholson                 221
```

```
1                        * * * * *

2                      E X H I B I T S

3   Plaintiffs' Exhibits in Evidence:

4           Plaintiffs' 42                    97

5           Plaintiffs' 46                   145

6           Plaintiffs' 47                   151

7   Defendants' Exhibits in Evidence:

8           Defendants' 10                    71

9           Defendants' 50                    76

10          Defendants' 51                   133

11          Defendants' 7                    136

12          Defendants' 10                   188

13          Defendants' 6                    192

14                       * * * * *

15                      CERTIFICATE

16      I, Stephen W. Franklin, Registered Merit Reporter, and

17  Certified Realtime Reporter, certify that the foregoing is a

18  correct transcript from the record of proceedings in the

19  above-entitled matter.

20      Dated this 2nd day of JANUARY, 2015.

21

22      /s/Stephen W. Franklin
        _____
23      Stephen W. Franklin, RMR, CRR

24

25
```

**$**
$10,000 [5] 104/16 152/7 153/2 200/21
  200/23
$15,000 [1] 45/1
$20 [1] 161/8
$20 million [1] 161/8
$200 [4] 207/22 208/9 208/11 208/12
$200 million [4] 207/22 208/9 208/11 208/12
$250 [2] 197/16 199/24
$250 million [2] 197/16 199/24
$30 [2] 161/10 204/21
$30 million [1] 161/10
$4 [2] 102/14 207/11
$4 million [2] 102/14 207/11
$4.8 [1] 161/13
$4.8 million [1] 161/13
$5.3 [1] 161/15
$5.3 million [1] 161/15
$500 [3] 105/5 105/6 106/25

**'**
'til [2] 9/20 129/6

**-**
-v [1] 1/6

**.**
.5 [1] 147/25
.5 percent [1] 147/25
.55 [1] 101/17
.55 percent [1] 101/17

**/**
/s/Stephen [1] 231/22

**1**
10 [21] 45/9 70/18 71/1 71/15 89/5 147/23
  152/11 152/18 152/22 152/23 187/8 187/8
  187/10 188/2 188/6 188/8 190/9 191/16
  197/12 231/8 231/12
10 million [1] 169/1
1002 [1] 73/17
1003 [1] 73/17
1038 [1] 6/7
106 [1] 141/7
108 [1] 230/14
10:54 [1] 75/22
10th [5] 103/14 103/22 122/25 123/6 123/14
11 [1] 3/12
115 [1] 230/16
1189 [3] 40/14 41/25 60/24
11:11 [1] 75/22
11th [3] 133/18 134/3 193/5
12 [11] 33/2 33/15 33/24 34/16 34/17 57/4
  103/13 103/21 105/14 106/17 205/23
12 percent [1] 169/7
1204 [1] 83/18
1218 [1] 86/24
123 [1] 90/21
1269 [1] 84/5
1279 [1] 100/24
12:02 [1] 115/11
12:11 [1] 115/11
12th [4] 2/13 91/7 122/7 122/13
13 [1] 35/12
131 [2] 230/17 230/18
133 [1] 231/10
136 [1] 231/11
137 [1] 230/20
1384 [1] 84/12

13th [1] 109/25
14-81395-CIV-MARRA [1] 1/2
1426 [1] 44/16
1428 [1] 44/17
145 [1] 231/5
14th [2] 103/14 103/22
15 [5] 75/20 75/21 162/11 162/13 183/9
15 percent [1] 211/11
150 [1] 106/13
151 [1] 231/6
1515 [1] 2/9
1537 [3] 40/13 40/14 40/15
1539 [1] 42/15
1544 [2] 42/16 62/11
1545 [1] 74/12
1571 [1] 50/13
15th [5] 122/22 124/12 133/20 134/4 145/6
16 [3] 162/20 183/9 194/3
16 percent [1] 205/2
16,000 [2] 136/5 136/22
16,000-plus [1] 135/10
1645 [1] 104/11
1665 [1] 85/12
17 [2] 117/17 162/22
173 [1] 230/21
1777 [2] 119/24 131/23
1784 [1] 83/2
1795 [2] 39/22 40/7
18 [2] 1/9 105/4
1850 [1] 2/18
188 [1] 231/12
1888 [1] 2/18
19 [1] 163/21
192 [1] 231/13
198 [1] 230/23
1999 [1] 181/18
1:00 o'clock [1] 172/16
1:28 [1] 172/25
1st [2] 2/12 124/3

**2**
2 million [1] 168/16
2.5 [1] 168/16
20 [6] 117/13 172/11 172/21 205/24 212/24
  230/5
20 million [1] 168/19
200 [2] 2/12 106/13
2000 [2] 186/17 195/17
2001 [1] 181/18
2002 [1] 142/10
2003 [1] 181/15
2005 [1] 137/11
2006 [2] 137/19 173/23
2007 [3] 118/18 149/24 149/25
2008 [2] 118/18 119/18
2009 [1] 138/24
2011 [8] 139/4 143/12 162/20 162/25 163/6
  163/9 163/11 163/15
2012 [15] 79/12 121/22 127/12 130/20
  130/24 150/9 152/16 158/14 158/15 161/7
  161/13 161/25 163/12 195/18 208/18
2012-2013 [1] 161/18
2013 [21] 80/9 95/9 116/23 122/22 123/6
  123/14 141/21 155/4 156/20 158/3 161/10
  161/15 161/18 162/17 163/10 163/14 163/19
  168/12 168/14 168/19 168/25
2014 [27] 1/9 78/13 81/6 81/19 81/21 91/7
  94/3 94/19 94/24 95/8 99/2 102/12 102/16
  105/13 107/6 124/3 124/15 130/25 142/6
  142/11 168/7 184/10 185/7 185/23 186/11
  186/13 186/21

2015 [15] 143/1 149/18 184/6 185/5 186/12
  186/22 186/23 191/18 191/19 191/23 191/25
  192/24 225/16 228/6 231/20
20580 [2] 2/3 2/6
21 [1] 212/22
211 [1] 230/24
21st [5] 81/6 81/9 81/11 81/19 81/21
22 [1] 77/22
220 [1] 140/16
221 [1] 230/25
23 [3] 77/22 77/25 212/23
24 [4] 77/22 77/25 121/20 124/23
24/7 [1] 124/19
25 [3] 77/22 77/25 213/21
25-minute [1] 88/8
2500 [1] 104/25
256 [1] 1/11
26th [1] 124/15
27 [4] 77/22 77/25 174/10 174/15
28 [3] 77/22 77/25 230/6
29 [3] 139/12 156/18 174/4
29th [1] 107/6
2:00 o'clock [1] 172/13
2nd [1] 231/20

**3**
30 [5] 73/16 123/10 167/20 168/8 230/8
30-day [1] 154/6
300 [1] 167/25
30025 [1] 141/7
301 [1] 2/16
323 [3] 96/6 96/10 220/10
33 percent [1] 117/12
33301 [1] 2/13
33304 [1] 2/16
33401 [2] 1/20 2/9
340 [1] 167/25
35 [1] 6/6
37 [12] 42/15 50/13 74/12 82/8 83/2 83/18
  84/5 84/12 85/11 86/24 100/24 119/23
3768 [1] 1/19
38 [4] 53/22 69/21 71/6 71/12
3:30 [2] 172/17 172/24
3:42 [1] 172/25

**4**
40 [6] 106/9 106/10 123/11 166/13 167/20
  167/21
40 percent [10] 117/1 117/3 117/7 117/13
  118/7 166/9 166/12 166/15 169/4 204/20
400 [2] 168/1 168/6
41 [2] 191/2 191/3
42 [3] 95/21 97/4 231/4
43 [1] 107/23
43-page [1] 202/17
44 [1] 127/18
45 percent [3] 160/11 160/14 166/10
46 [3] 143/24 144/25 231/5
460 [2] 139/12 139/15
462 [1] 140/8
464 [1] 140/22
466 [1] 141/4
47 [4] 51/11 151/1 151/5 231/6
471 [1] 139/12

**5**
50 [16] 76/7 76/7 76/11 76/20 100/21 101/3
  101/6 101/9 105/9 106/10 109/4 169/13
  205/12 213/20 213/20 231/9
50 percent [1] 194/12
50-dollar [2] 106/6 106/14

**5**

5000 [6]  104/15 104/15 104/15 104/15
105/20 106/19
51 [3]  135/5 133/10 231/10
514-3768 [1]  1/19
52 [1]  136/5
56 [1]  230/9
561 [1]  1/19
587 [2]  174/1 174/3
59 [2]  49/13 49/17
5th [5]  123/17 127/12 127/20 130/20 130/24

**6**

6 million [1]  206/24
6.6 million [2]  206/24 207/24
60 [2]  123/10 169/13
60 percent [3]  118/8 118/9 169/12
600 [2]  2/3 2/5
6000 [3]  104/15 106/17 106/19
64-1 [1]  76/13
665 [1]  156/19
67 [1]  46/5
68 [1]  46/5
69 [1]  230/10

**7**

7000 [2]  104/15 106/19
701 [1]  1/20
707 [1]  2/15
71 [1]  231/8
73 [1]  230/11
76 [1]  231/9
77 [1]  230/13

**8**

80 [1]  123/11
80 percent [2]  102/9 205/17
800 [5]  31/21 197/25 197/25 203/5 219/18
8000 [3]  104/15 104/15 106/19
807 [1]  134/24
8528 [1]  2/6

**9**

90 percent [1]  23/23
900 [1]  2/9
90067 [2]  2/19
92 percent [1]  195/14
926 [2]  186/21 202/6
92660 [1]  140/18
97 [1]  231/4
97 percent [1]  195/19

**A**

a.m [2]  75/22 75/22
Aaron [4]  78/6 78/10 78/22 79/7
abandon [1]  34/19
abide [1]  166/1
ability [3]  37/5 55/25 96/12
able [26]  14/4 24/3 60/4 64/24 71/20 78/11
79/4 81/1 87/10 107/3 107/4 110/14 111/7
113/4 113/11 113/13 113/15 113/25 114/5
133/2 171/13 171/18 187/22 211/4 216/15
226/13
above [6]  72/13 195/15 205/2 222/15 223/7
231/19
above-entitled [1]  231/19
absolute [1]  34/6
Absolutely [3]  60/18 70/2 215/15
absurd [1]  221/8
accelerated [1]  106/20

accept [4]  136/1 136/6 200/14 220/14
acceptable [1]  60/14
access [5]  122/4 123/18 164/15 215/13
222/11
accessed [1]  14/7
accessing [2]  164/12 164/25
according [3]  13/17 13/19 116/25
accordingly [1]  135/20
accountable [1]  217/6
accountant [2]  139/25 140/1
accounts [4]  207/1 207/3 207/4 207/5
accreditation [6]  48/16 80/8 81/2 81/6 81/22
94/14
accredited [1]  79/13
accumulate [1]  8/19
accurate [6]  42/23 77/13 92/10 117/15
145/10 224/18
accurately [2]  224/19 224/22
accused [1]  217/20
achieve [1]  110/14
acknowledged [1]  221/18
acknowledgment [1]  63/19
across [3]  25/5 131/13 228/1
act [3]  80/4 164/22 174/11
acted [1]  92/10
action [19]  109/16 111/12 112/1 127/14
127/21 141/22 149/5 154/14 173/23 174/2
175/24 176/11 176/12 192/16 192/25 205/1
226/15 226/17 226/20
actions [3]  34/24 59/19 208/19
activate [35]  14/11 27/3 27/16 27/19 36/13
37/14 51/20 55/2 55/9 72/7 72/8 72/12 72/14
72/19 72/21 73/3 74/9 74/19 75/7 75/17
119/7 121/10 158/5 159/25 171/20 188/25
189/6 189/9 189/10 197/24 203/1 203/4
203/8 223/18 224/1
activated [5]  38/19 38/19 69/7 75/6 160/1
activating [7]  27/6 39/10 51/24 52/5 92/25
118/4 215/1
activation [44]  26/16 31/22 52/1 52/7 52/18
52/20 52/21 52/24 53/7 53/19 54/24 59/4
61/22 67/13 67/16 68/18 68/18 69/1 69/22
72/24 73/3 105/23 117/21 118/1 118/10
118/15 119/5 119/19 119/25 120/2 131/24
132/2 132/19 160/1 187/24 200/7 201/14
203/3 205/21 214/4 214/11 214/24 222/7
222/11
active [20]  22/24 22/25 23/1 23/6 23/8 23/15
23/16 23/21 23/23 24/4 24/9 67/11 109/6
185/11 186/8 186/22 186/23 225/18 225/19
225/21
actively [1]  163/23
activities [1]  163/23
activity [2]  59/17 104/6
actor [1]  206/2
actors [2]  41/10 41/20
actresses [1]  41/10
actual [9]  4/10 78/14 102/23 105/5 110/25
125/5 132/21 140/19 187/18
actually [66]  4/14 6/3 6/4 7/17 9/4 12/20 13/4
15/19 15/19 18/19 23/10 40/14 54/14 63/21
76/4 76/10 77/7 78/23 81/1 82/11 83/3 83/7
90/10 90/12 94/23 97/14 101/11 101/14
101/17 102/9 102/12 103/18 107/23 110/18
110/22 112/7 112/10 116/19 119/25 121/10
124/14 132/20 134/11 138/9 140/1 145/2
152/20 154/7 166/9 179/1 184/1 185/25
195/10 198/19 198/20 199/16 201/10 201/13
212/7 212/14 221/13 223/17 224/3 224/14
227/16 227/23
ad [4]  56/10 57/19 57/22 58/2

adamant [1]  44/2
add [8]  40/25 42/6 61/6 88/2 133/24 189/16
192/3 225/4
added [3]  35/24 122/13 122/23
addition [3]  76/6 107/2 108/20
additional [6]  24/22 47/22 115/1 172/4 215/2
215/15
address [19]  64/24 65/23 66/7 76/13 123/18
140/14 141/1 141/5 141/8 141/9 141/10
144/8 144/14 144/17 150/17 178/7 214/7
215/8 222/2
addressed [6]  51/17 214/6 217/9 225/16
226/4 226/4
addresses [2]  141/18 228/6
adequate [1]  228/7
adequately [1]  198/20
adjustments [3]  145/18 148/7 149/4
admissible [2]  134/21 134/24
admit [8]  70/20 132/17 134/18 136/2 143/23
144/19 174/17 174/21
admitted [11]  70/25 76/18 97/3 133/9 136/18
144/21 151/1 151/4 188/5 192/12 225/1
ADP [1]  105/8
ads [3]  55/13 55/18 57/16
advanced [14]  9/23 11/14 15/8 15/15 44/21
48/24 67/11 80/8 81/22 94/20 95/11 98/9
116/17 116/20
advancedtechsupport.com [1]  47/3
advantage [1]  122/21
advertisements [1]  137/14
advertising [4]  137/12 153/10 200/16 200/22
advice [5]  153/6 153/9 153/21 154/4 166/6
advise [1]  181/12
advising [1]  191/1
Advisor [5]  84/3 84/6 84/8 124/13 125/4
advocacy [2]  65/2 66/14
AdWords [6]  33/10 49/19 49/19 56/24 57/2
57/16
affiliate [2]  165/14 165/16
after [48]  39/10 45/13 45/14 68/13 68/16
71/15 74/18 75/9 75/13 75/22 78/5 81/25
85/5 85/14 96/25 97/1 103/1 103/2 109/17
112/18 112/20 112/21 112/21 113/17 113/18
115/11 122/16 124/4 139/2 149/7 153/25
154/4 172/19 172/22 172/25 180/17 182/13
187/13 187/16 190/8 191/14 193/8 198/14
198/15 200/6 208/21 213/2 218/5
aftermarket [1]  17/6
afternoon [4]  116/7 137/7 173/8 197/14
afterward [2]  177/10 189/16
again [36]  10/10 16/15 42/8 48/3 68/20 72/5
82/1 93/15 94/7 96/1 96/24 98/17 105/2
106/20 112/21 119/17 129/11 130/6 136/6
144/22 146/4 148/2 149/3 153/1 153/14
155/16 159/19 161/22 170/10 170/17 171/8
180/18 189/5 214/14 214/22 222/25
age [11]  64/15
agencies [1]  170/25
agency [3]  217/1 217/10 217/11
agent [23]  13/14 22/1 23/6 23/13 24/2 26/20
36/23 37/7 43/5 43/18 50/16 51/5 55/19 56/4
59/8 59/15 59/20 59/24 60/13 74/2 75/12
139/20 198/4
agents [18]  24/17 25/13 36/21 38/8 41/20
43/14 50/1 50/4 51/13 55/16 58/17 58/20
61/9 62/1 85/17 127/1 161/2 164/2
aggregate [1]  152/4
aggregating [2]  202/8 205/6

**A**

aggressively [1] 106/5
ago [5] 142/14 193/24 193/24 217/12 222/18 229/6
agree [6] 62/24 100/15 101/6 138/22 229/4 229/6
agreed [7] 149/7 169/10 176/1 176/20 176/22 228/15 228/18
agreement [3] 45/12 65/20 138/13
agrees [2] 169/12 174/19
ahead [5] 39/18 101/8 109/5 186/2 226/22
Aiken [2] 45/11 45/23
Aiken's [1] 135/13
akin [1] 220/1
AL [1] 1/7
albeit [1] 188/10
alert [2] 7/2 7/7
alerts [1] 8/21
Alexander [3] 143/13 143/19 148/13
algorithm [1] 57/18
Alicia [1] 141/7
allegations [7] 141/24 174/18 180/2 209/1 209/11 209/14 209/15
alleged [3] 129/4 129/18 208/20
alleging [1] 141/25
allow [4] 59/21 219/18 219/20 223/18
allowed [5] 24/19 43/14 88/7 101/18 207/20
allows [1] 43/24
almost [2] 154/16 194/12
alone [1] 181/4
along [5] 128/21 176/14 186/5 189/15 228/7
already [32] 3/13 31/12 33/4 37/14 44/3 46/17 51/14 66/15 76/5 85/6 124/5 133/1 152/16 182/24 182/25 189/11 190/11 190/18 192/18 192/22 192/24 204/14 204/16 212/1 213/20 213/24 215/6 226/4 226/4 227/1 227/4 227/9
also [70] 7/19 7/20 14/19 14/20 15/11 15/11 15/14 17/7 18/10 19/22 23/1 23/8 42/15 43/9 48/14 57/25 59/15 66/4 67/22 79/15 80/3 80/22 81/4 83/7 83/16 84/2 84/2 84/9 84/16 84/20 84/25 85/10 85/16 85/22 86/21 93/25 101/24 102/7 102/18 111/11 117/6 117/20 124/2 128/10 137/2 141/1 141/8 141/13 141/16 143/10 146/10 147/14 149/17 160/18 166/3 166/15 167/11 176/17 185/14 186/5 190/4 202/8 202/20 204/8 204/25 205/23 206/9 215/2 225/13 225/16
alternative [1] 223/21
although [6] 16/12 176/21 182/23 206/11 222/13 225/20
always [5] 53/8 82/14 105/16 106/3 145/24 185/4 198/4
am [3] 138/9 142/12 183/11
amendment [3] 76/7 76/11 141/4
Amir [1] 2/18
among [1] 150/22
amongst [3] 37/9 37/10 106/9
amount [10] 10/23 11/5 45/3 104/16 105/17 106/11 106/12 106/12 118/5 123/7
amounts [4] 104/14 104/18 106/23 106/24
analyzed [1] 202/10
Andrew [4] 3/8 3/16 3/19 230/3
Angeles [1] 2/19
another [13] 34/19 34/23 35/5 64/3 83/16 158/16 178/16 182/21 195/8 195/22 204/14 219/19 222/19
answer [10] 5/5 12/11 36/20 37/7 37/7 37/10 39/18 86/1 146/22 170/22
answered [3] 129/20 154/16 173/17
answering [1] 210/19

anti [11] 31/7 33/5 34/4 34/4 34/7 34/12 35/21 47/5 57/4 67/23 68/7
anti-malware [4] 31/7 47/5 67/23 68/7
anti-spyware [6] 34/4 34/4 34/7 34/12 35/21 57/4
anticompetitive [1] 227/14
antivirus [6] 32/7 32/10 32/20 85/9 181/25 219/8
anxiously [1] 229/17
any [114]
anybody [2] 108/12 190/23
anymore [3] 176/21 214/14 222/7
anyone [6] 24/6 57/21 73/23 99/19 215/10 223/1
anything [38] 7/13 19/23 25/17 28/3 29/17 36/18 39/4 42/6 42/7 47/17 56/13 61/6 61/6 68/19 72/21 75/19 81/15 90/2 90/4 91/18 94/22 95/4 107/21 114/7 114/11 114/13 114/14 114/19 130/17 131/7 158/20 176/4 179/11 188/21 212/19 218/18 228/10 229/8
Anything's [1] 87/13
anyway [1] 95/25
anywhere [15] 14/15 17/25 18/13 19/8 20/1 22/16 27/23 40/10 169/6 195/18 212/2 212/3 216/12 220/1 220/17
aol.com [1] 1/21
apologize [3] 11/24 23/10 147/9
appeal [1] 203/11
appealing [1] 147/21
appear [8] 9/12 70/3 70/4 72/9 87/1 139/13 150/19 188/10
appearance [3] 25/9 225/10 225/15
Appearances [2] 1/16 2/1
appeared [2] 34/16 34/18
appears [3] 5/24 147/13 186/24
applicable [1] 14/9
application [2] 10/15 195/23
applications [1] 18/11
applied [1] 56/2
applies [1] 36/24
appreciate [2] 136/8 229/12
appreciation [1] 109/10
approach [13] 13/5 13/11 16/17 26/1 60/20 62/7 70/24 187/2 187/5 189/19 191/8 193/12 201/4
approached [3] 15/5 162/21 162/25
appropriate [4] 46/16 92/21 217/5 219/24
approximately [4] 122/2 122/3 122/12 175/22
April [4] 121/22 122/7 122/22 156/20
April 12th [1] 122/7
April 15th [1] 122/22
April 2013 [1] 156/20
apropos [1] 222/6
area [4] 185/14 194/11 194/16 218/17
areas [1] 194/14
aren't [5] 75/9 113/15 213/22 216/22 220/19
arguably [1] 226/25
argue [4] 12/7 197/7 219/13 223/24
argued [2] 136/4 222/21
arguing [1] 135/11
argument [5] 197/8 211/8 217/23 221/6 223/8
arguments [3] 217/21 223/9 230/22
arm [2] 33/16 36/17
armed [1] 203/9
around [13] 37/2 68/13 79/6 98/7 158/14 158/15 160/11 163/12 166/9 168/25 168/25 169/6 184/8
article [13] 17/19 17/25 18/13 19/8 19/12 19/15 19/19 20/1 20/15 20/21 21/5 21/8

209/4
Articles [1] 140/22
artifacts [1] 21/21
ASAP [1] 90/22
aside [2] 180/1 188/10
ask [36] 13/14 14/16 26/9 26/13 26/24 26/24 27/12 30/11 30/12 37/1 38/12 40/11 42/7 42/8 48/18 68/20 77/9 86/18 87/18 100/7 116/9 124/10 132/15 133/16 148/17 154/24 170/22 188/1 192/8 198/18 213/10 216/2 221/25 227/5 227/17 228/5
asked [41] 6/15 6/16 19/3 20/14 21/8 22/1 22/16 24/17 25/21 26/5 26/8 28/20 28/22 28/23 29/6 29/8 29/12 38/7 38/10 56/21 58/16 59/7 60/25 62/13 64/11 65/9 65/13 66/21 67/9 67/12 85/18 108/16 129/20 131/24 148/13 154/16 154/24 164/22 173/13 173/22 211/2
asking [10] 29/18 37/22 45/25 45/25 64/16 111/20 135/22 149/12 227/12 228/2
asks [1] 151/14
aspect [1] 23/7
assert [1] 153/1
assertion [2] 12/4 24/17
asset [9] 60/9 107/12 127/25 199/13 199/22 204/10 204/11 206/4 207/5
assets [6] 206/22 206/23 207/6 207/13 211/3 216/8
assist [2] 112/5 152/8
assistance [5] 66/1 66/4 150/9 151/14 215/1
associate [3] 222/14 222/19 222/24
associated [3] 70/4 106/23 120/13
assume [10] 27/2 27/4 27/6 27/18 27/18 28/5 67/4 113/8 201/4 213/12
assumes [1] 155/7
assuming [4] 144/2 200/1 216/4 223/11
assumption [3] 12/3 13/20 224/6
assumptions [1] 12/10
assurance [1] 220/16
asterisk [2] 155/21 178/22
ATK [1] 194/15
atmosphere [1] 104/24
ATS [13] 22/1 25/12 25/17 58/12 59/12 59/23 63/7 68/5 68/17 90/13 109/6 113/11 113/13
ATS's [2] 63/21 68/14
attach [2] 14/23 134/8
attached [7] 4/14 4/17 15/1 15/7 17/18 84/19 98/22
attachment [6] 17/18 17/22 18/7 19/18 19/19 174/5
attempt [4] 25/13 34/9 66/19 219/13
attempted [1] 219/12
attempting [1] 75/6
attempts [1] 74/25
attention [3] 210/16 223/13 229/12
attorney [7] 2/8 4/3 30/10 77/8 116/8 170/18 171/6
attorneys [1] 170/15
auction [3] 57/16 181/17 181/22
August [7] 80/9 124/12 130/25 141/21 142/6 142/9 142/11
August 15th [1] 124/12
August 2013 [1] 80/9
August 2014 [1] 142/11
authenticating [1] 70/21
author [1] 21/17
authority [1] 215/5
authorize [1] 59/19
auto [6] 169/11 169/12 169/14 169/21 181/17 181/22

**A**

automatically [1]  185/13
available [2]  143/2 207/25
Ave [1]  2/5
Avenue [3]  2/3 2/12 2/15
avenues [1]  91/2
average [6]  117/10 167/16 167/17 214/12
223/15 223/20
AVG [2]  194/4 221/13
avoid [2]  66/4 225/15
aware [18]  24/16 24/21 25/12 25/12 25/15
26/14 26/18 27/2 28/11 60/4 78/21 107/7
170/2 170/5 180/1 180/2 180/6 226/19
away [5]  88/3 149/10 182/23 216/21 216/21

**B**

back [59]  12/15 12/16 20/11 27/5 39/20 45/8
50/14 51/9 64/23 65/10 65/20 67/18 72/5
78/23 81/2 85/10 101/12 101/15 103/9 111/5
111/8 119/2 119/17 120/25 130/10 138/17
141/6 143/12 145/2 146/15 148/14 155/15
156/22 158/19 164/14 172/17 172/24 173/21
179/19 181/15 182/25 183/14 183/15 183/20
200/17 200/17 200/23 205/23 205/25 210/22
211/9 211/12 212/7 215/22 218/10 219/19
219/23 226/7 226/7
background [4]  37/4 56/9 70/1 181/15
backs [5]  52/1 157/12 157/18 208/3 208/7
Backup [1]  98/9
backwards [1]  145/4
bad [8]  48/14 114/6 154/10 154/10 154/22
212/4 219/14 220/20
balancing [1]  219/17
ball [2]  96/8 105/25
Bank [2]  207/1 207/3
Barge [1]  78/6
Barry [9]  126/9 126/10 126/18 126/20
127/13 127/20 130/20 130/23 130/23
base [2]  110/21 195/23
based [20]  12/10 19/2 28/8 32/10 41/2 49/6
57/18 57/19 61/7 61/10 132/24 143/8 152/5
154/2 161/2 163/21 171/6 179/14 200/22
222/15
baseless [1]  49/1
basically [5]  22/21 118/17 124/6 148/6
207/14
basing [1]  147/24
basis [8]  167/1 167/5 167/6 167/8 167/12
195/16 214/3 228/7
BBB [32]  47/7 48/5 48/5 48/15 79/8 79/13
79/16 79/18 79/24 80/13 80/16 81/5 81/20
81/21 82/2 91/24 92/12 93/3 94/17 95/5
112/5 112/13 112/24 182/4 182/5 182/8
182/17 198/7 215/25 217/24 217/25 218/4
BCA [1]  182/17
Beach [4]  1/8 1/20 2/9 140/18
bear [1]  223/24
became [2]  98/11 158/2
because [65]  5/8 5/14 8/8 13/24 27/3 36/5
47/4 47/25 48/8 49/25 53/24 65/22 80/12
80/17 81/11 82/5 89/6 89/15 90/8 90/10
94/12 96/6 105/24 106/20 107/14 107/17
109/25 112/7 119/13 129/2 129/11 130/10
130/14 132/20 134/14 134/24 147/25 159/7
160/16 160/24 179/5 182/16 198/8 199/23
201/6 201/16 207/15 209/1 209/4 210/3
210/4 211/17 215/13 215/19 217/16 217/17
217/19 217/20 218/4 218/23 219/24 222/8
222/21 223/25 225/8
become [2]  59/23 180/6
becomes [1]  225/5
becoming [1]  31/8
before [58]  1/13 5/3 5/5 7/13 12/24 13/15
13/18 23/19 24/19 30/22 35/16 36/6 40/18
44/7 44/8 44/20 45/8 50/2 62/10 65/15 78/7
86/25 87/7 88/14 88/18 88/25 98/20 99/4
109/22 111/7 142/22 146/6 149/10 158/2
158/16 165/22 171/22 171/23 171/24 173/9
176/7 177/9 180/9 182/8 184/2 185/11
186/21 190/8 190/10 213/7 213/19 213/25
221/14 222/3 222/25 224/14 226/5 228/12
beforehand [1]  36/25
begin [1]  198/12
beginning [13]  13/7 21/25 36/10 60/1 87/18
133/16 159/22 164/1 166/24 167/23 174/13
195/25 226/6
begins [2]  174/12 174/15
behalf [1]  229/11
behavior [1]  210/7
behaviors [4]  32/11 32/14 195/23 196/1
behind [1]  114/1
being [36]  11/9 14/4 17/13 22/22 32/4 43/16
47/24 47/25 48/8 48/13 60/4 60/25 63/15
64/19 66/14 87/10 93/1 99/9 109/6 124/14
130/3 142/24 149/18 156/20 157/11 165/2
175/1 190/14 210/10 213/8 213/8 213/17
217/20 218/4 225/10 226/4
believe [59]  3/11 9/1 19/19 21/22 59/2 61/25
76/12 79/17 79/22 83/9 91/3 96/4 101/16
105/4 105/9 107/13 108/11 108/15 109/21
109/22 111/25 112/11 112/13 112/19 113/5
114/22 134/11 135/6 140/10 143/22 146/10
154/13 157/4 157/6 158/3 159/3 172/22
173/25 176/8 181/1 193/4 199/1 199/5
206/24 210/2 210/3 210/8 216/13 216/16
217/2 217/5 217/22 218/7 219/15 219/16
220/21 220/21 220/23 222/14
believed [1]  176/13
believes [1]  51/14
believing [1]  197/17
belittle [1]  24/6
belonged [1]  120/18
below [6]  63/1 63/18 71/9 72/9 113/23
214/11
benchmark [1]  193/22
Bentley [2]  161/19 161/24
besides [1]  157/14
best [6]  35/10 65/7 122/5 123/16 159/13
218/3
better [31]  17/19 20/12 21/4 68/10 68/13
77/18 77/21 78/25 79/2 80/7 93/8 93/17
93/21 94/13 95/2 109/13 112/9 135/11 148/1
166/6 179/18 179/19 179/20 179/23 180/25
184/24 185/3 194/12 212/16 221/13 228/24
between [18]  28/6 46/11 46/11 65/5 65/14
87/14 103/13 103/22 116/17 116/17 116/20
117/4 130/25 132/6 143/12 182/16 188/14
218/23
beyond [2]  66/15 212/6
bid [2]  57/12 57/19
bidding [1]  57/17
big [7]  52/19 145/25 147/3 194/3 195/11
202/9 203/7
bill [1]  156/7
billing [7]  36/15 38/21 39/6 52/1 69/9 88/10
118/11
bit [16]  30/12 106/12 106/12 121/14 145/7
148/24 175/3 177/12 181/6 183/1 186/10
186/11 192/15 193/2 193/3 228/11
Blair [1]  91/6
Blare [3]  91/9 91/10 91/11
block [5]  31/18 72/7 186/15 186/19 202/5
blocked [10]  32/4 32/7 32/23 34/21 35/13
47/3 47/7 47/24 48/7 186/21
blocker [2]  186/8 186/14
blocking [4]  31/10 32/11 32/18 32/25
blocks [3]  185/11 185/13 225/25
blog [1]  18/8
blow [1]  130/11
blue [3]  18/5 19/13 20/2
board [5]  68/19 111/1 188/9 188/20 228/1
bogus [1]  34/8
boils [1]  224/12
bold [1]  52/19
bolded [1]  72/1
bonus [2]  106/14 107/3
bonuses [1]  106/6
Boost [3]  213/21 215/4 218/9
booting [1]  5/11
both [12]  23/11 28/8 28/9 76/18 82/13 86/3
107/14 187/24 188/11 199/3 204/17 218/24
bottom [7]  147/23 174/7 188/17 188/19
188/21 224/12 225/1
bought [5]  33/12 49/19 49/20 68/24 103/2
box [13]  32/3 33/7 35/2 55/1 71/25 72/1
118/19 118/21 118/24 169/14 190/3 203/4
203/7
break [2]  172/13 173/14
Briana [1]  105/19
brief [1]  92/16
briefly [2]  4/13 165/17
bring [4]  113/21 154/13 218/15 218/15
bringing [1]  179/19
broke [1]  111/1
brought [1]  212/11
browser [3]  19/5 83/17 83/24
Browsing [1]  97/24
BTW [1]  147/23
bucks [2]  105/10 105/11
bug [3]  149/18 149/18 149/22
build [1]  38/11
building [1]  21/21
built [3]  90/14 175/5 186/5
built-in [1]  186/5
bullet [1]  73/20
bunch [1]  83/5
burden [1]  228/4
Bureau [16]  68/11 68/14 77/18 77/21 78/25
79/2 80/7 93/9 93/17 93/17 93/21 94/13 95/2
109/13 112/9 135/12 212/17
burn [1]  135/10
Burton [7]  2/4 173/13 175/1 176/2 177/12
192/16 230/20
business [67]  42/25 58/20 58/20 63/7 68/11
68/14 70/1 77/18 77/21 78/25 79/2 80/7
82/12 93/9 93/13 93/17 93/21 94/13 95/2
95/13 105/21 109/13 110/1 110/2 112/9
112/19 127/3 135/11 140/20 141/10 152/22
171/5 171/5 171/9 171/18 175/12 175/20
176/19 179/6 181/21 181/21 181/22 198/22
198/25 199/1 199/9 199/16 199/20 201/8
205/19 205/20 207/8 207/12 207/19 207/21
207/23 208/4 208/13 212/16 215/9 216/19
218/6 219/15 220/4 222/18 226/11 227/22
businesses [5]  175/14 181/7 181/8 181/19
199/4
businessmen [1]  211/22
button [4]  32/1 35/1 35/22 71/7
buy [6]  60/13 85/23 86/7 87/19 98/12 220/8
buying [2]  49/4 106/2
bypass [2]  31/16 36/1

**C**

CA [1] 2/19
calculated [1] 124/21
California [2] 140/9 140/18
call-backs [1] 52/1
called [42] 17/19 34/3 35/13 36/8 36/18
36/19 36/21 38/10 39/7 39/10 42/25 46/24
50/17 51/4 63/2 72/19 82/13 82/14 83/16
87/16 96/11 98/3 98/5 100/6 104/9 111/14
116/10 116/13 149/24 159/16 159/20 159/24
164/12 164/20 167/15 184/5 201/11 212/16
215/24 215/25 218/17 224/8
caller [7] 27/24 59/17 60/10 60/12 87/15
87/16 92/14
caller's [2] 59/9 63/16
callers [1] 52/3
calling [20] 14/11 50/2 51/20 55/2 58/5 58/11
59/3 72/8 87/1 118/11 118/12 130/6 189/7
190/23 202/4 202/7 203/5 205/25 220/6
223/19
calls [67] 29/15 36/4 36/6 36/10 36/11 36/15
36/16 37/8 37/10 37/21 38/6 38/18 38/19
39/5 51/23 52/1 52/1 52/2 52/2 52/3 52/4
61/13 68/17 68/18 74/3 74/7 88/16 105/23
105/24 106/15 117/21 117/25 118/1 118/2
118/3 118/5 118/13 119/4 123/23 123/23
127/6 127/7 142/2 158/13 161/19 164/1
164/3 164/3 165/1 166/8 166/25 167/2 167/4
167/8 167/11 167/14 167/20 167/21 167/22
168/1 168/7 168/9 201/13 202/10 204/3
219/5 219/8
came [23] 26/21 34/5 36/7 37/4 38/6 61/14
88/19 101/25 107/17 122/19 128/12 159/8
168/23 169/2 169/24 187/15 200/6 201/13
212/17 213/6 216/22 218/20 225/3
Campeau [2] 41/8 41/13
can't [14] 45/3 55/6 70/8 89/7 93/8 93/15
124/11 128/8 135/21 200/12 203/1 203/17
206/17 210/23
cancel [1] 169/21
canceling [1] 170/6
cancellations [2] 169/8 169/9
Cannon [1] 218/17
cannot [3] 41/20 45/8 199/12
capabilities [3] 23/24 35/4 193/3
capability [1] 24/4
capital [4] 102/7 102/9 102/13 207/9
car [5] 200/15 200/16 200/21 200/22 200/24
card [18] 98/4 100/5 100/8 102/20 156/6
156/9 156/13 156/13 157/10 178/10 178/13
178/16 178/22 178/24 178/25 179/1 179/11
211/12
cards [4] 14/3 155/25 178/14 179/13
care [3] 182/23 182/24 182/25
careerbuilder.com [1] 55/14
carefully [1] 224/17
cars [1] 183/1
cart [1] 155/14
case [54] 1/2 4/12 11/25 15/6 28/20 67/1
74/20 77/11 77/14 103/12 106/25 127/24
135/6 137/18 141/24 142/6 142/22 142/25
174/21 175/1 175/3 176/8 192/5 198/13
198/16 200/10 200/18 201/1 201/23 202/18
202/22 203/6 208/6 208/16 209/5 210/9
210/16 211/7 211/24 213/21 213/25 214/2
215/4 215/19 216/16 220/11 220/18 221/6
223/8 224/12 224/14 224/19 226/5 227/20
cases [5] 93/18 99/3 129/18 189/3 209/20
cash [13] 103/13 103/21 104/1 104/4 104/8
105/5 105/6 105/13 106/14 133/16 144/8

150/17 207/9
Cashier [5] 116/25 136/21 136/24 137/3
230/19
catalog [1] 123/24
catchall [3] 135/2 135/3 135/4
category [3] 224/23 224/23 224/24
cause [20] 8/1 18/1 18/4 18/14 19/1 19/3 19/9
19/13 20/2 20/15 21/11 21/14 63/16 80/13
80/18 80/22 82/3 113/24 182/12 205/21
caused [4] 18/24 19/4 43/3 119/1
causing [2] 118/24 119/15
caveat [2] 136/7 136/11
CC [2] 2/6 194/2
CC-8528 [1] 2/6
center [10] 140/16 158/5 158/7 158/16 164/6
204/14 204/19 204/21 204/24 205/13
centers [4] 159/6 163/24 204/16 204/17
Century [1] 2/18
certain [14] 6/17 10/23 16/4 16/8 16/8 16/14
46/3 46/3 61/25 137/22 147/20 147/20 175/8
181/10
certainly [5] 38/11 57/5 223/23 224/10 228/3
certificate [2] 194/18 231/15
certificates [1] 227/6
certification [2] 195/22 196/8
certified [4] 43/16 63/15 89/12 231/17
certifies [1] 195/6
certify [2] 195/22 231/17
certifying [1] 195/3
cetera [3] 14/3 14/3 225/5
chain [2] 144/10 145/4
chance [6] 6/20 97/1 109/18 109/23 109/24
144/5
change [17] 123/13 124/12 142/21 142/24
145/14 148/14 148/20 149/13 149/18 153/22
154/1 168/10 182/16 199/19 199/22 206/6
206/14
changed [11] 123/10 124/24 125/2 145/8
145/20 146/2 149/10 210/2 210/4 222/12
224/13
changes [23] 23/19 23/20 124/22 125/4
125/16 147/17 147/24 148/24 149/1 149/6
149/9 149/10 149/12 154/2 154/5 171/5
171/9 171/10 184/22 192/18 192/24 222/1
222/6
changing [4] 146/8 149/6 153/11 205/19
charge [21] 101/12 101/15 102/25 102/25
103/9 156/7 156/22 157/12 157/18 158/19
166/16 179/19 199/2 205/23 205/25 206/13
208/3 208/7 211/9 211/12 212/7
charge-back [11] 101/12 101/15 103/9
156/22 158/19 179/19 205/23 205/25 211/9
211/12 212/7
charge-backs [4] 157/12 157/18 208/3 208/7
charges [3] 102/19 156/8 166/15
charging [1] 206/12
charity [1] 64/18
checked [1] 164/1
checking [1] 169/24
checkmark [1] 169/15
checks [2] 225/21 225/25
Chicago [1] 91/12
chief [1] 36/14
children [1] 183/4
Choice [1] 90/22
choosing [1] 145/11
chopped [2] 188/15 188/16
chose [2] 46/14 46/19
circumstances [3] 26/10 46/3 182/5
circumstantial [1] 209/3

CIV [1] 1/2
civil [2] 170/14 170/21
claim [4] 113/13 206/5 206/9 226/18
claimed [1] 209/6
claims [4] 202/20 226/21 226/21 227/1
clarify [5] 30/22 31/24 114/25 121/15 162/12
clarity [3] 134/9 159/12 228/12
class [9] 141/22 149/4 192/15 192/25 205/1
226/15 226/17 226/20 226/20
classified [1] 10/17
classify [1] 90/24
clean [3] 21/23 90/14 113/18
cleaner [85]
Cleaner's [3] 133/19 169/10 198/14
cleaners.com [1] 150/17
cleaning [1] 185/24
clear [5] 41/3 89/2 200/19 215/12 222/23
clearly [3] 8/8 24/3 25/4
Clematis [1] 1/20
click [16] 6/25 7/6 8/3 8/12 9/11 10/5 10/6
10/11 16/7 22/11 23/15 32/1 35/1 185/22
190/1 224/4
clicked [2] 35/22 57/22
clicks [1] 190/1
clients [7] 133/13 212/2 213/23 214/17 215/5
215/24 229/11
close [3] 169/4 205/24 218/22
closed [1] 27/4
closer [1] 70/11
closing [5] 210/15 211/8 221/4 222/22
230/22
closings [1] 172/23
clutter [8] 17/19 20/12 20/15 20/20 20/21
21/4 21/21 194/14
co [1] 114/20
co-defense [1] 114/20
code [6] 33/5 33/16 54/24 59/20 189/2 200/7
coded [2] 185/17 225/13
codes [2] 18/5 19/13
cold [1] 74/6
Colemeyer [1] 110/23
colleagues [1] 229/12
collect [1] 122/5
collected [1] 186/22
collectively [2] 194/18 197/16
Colleen [5] 2/2 4/2 30/9 77/7 116/7
colloquially [1] 17/12
color [7] 132/20 132/20 132/24 133/1 133/7
185/17 225/13
colors [1] 133/2
column [1] 23/1
combination [1] 203/19
Combined [1] 160/24
comes [2] 212/25 218/1
comfortable [1] 37/3
coming [6] 34/6 112/1 118/2 118/3 123/3
170/1
command [1] 129/14
comment [3] 6/16 45/23 64/16
commentary [1] 222/16
commented [1] 6/17
comments [3] 6/14 61/10 134/22
COMMISSION [13] 1/3 2/2 2/2 2/5 4/3
30/10 77/8 107/15 116/9 144/13 144/17
174/11 223/5
commit [2] 215/5 215/9
commitment [1] 215/18
commitments [1] 218/8
committed [4] 214/19 214/21 214/22 216/21
committee [1] 110/19
common [3] 32/9 69/10 177/19

**C**

communicate [1]  66/16
communicating [1]  91/15
communication [3]  65/6 88/24 92/15
communications [1]  66/22
community [3]  150/10 153/11 154/3
companies [22]  32/20 57/16 91/4 99/20
117/6 127/14 127/22 154/9 154/12 177/20
178/20 180/21 193/21 194/10 198/22 198/25
199/1 199/3 199/6 208/19 221/11 227/15
companies' [1]  195/9
company [86]
company's [5]  43/10 48/15 49/1 58/20 67/1
comparable [4]  147/5 147/15 147/6 221/12
compare [4]  29/9 29/12 29/13 188/8
compared [2]  71/4 194/10
compares [2]  194/5 227/8
comparing [2]  194/1 194/2
comparison [1]  193/21
compatibility [1]  117/22
competitor [4]  90/18 194/13 227/13 227/14
competitors [15]  89/18 90/21 90/22 90/25
91/3 145/20 145/22 145/23 146/10 146/25
147/2 178/5 178/7 194/16 227/8
competitors' [1]  148/5
complain [1]  92/24
Complainant [1]  96/12
complained [4]  48/12 79/18 103/5 226/14
complaining [4]  93/4 113/9 159/14 161/1
complaint [56]  44/11 45/17 47/9 47/12 47/15
47/18 48/10 65/10 65/15 78/3 78/14 79/1
79/3 80/4 90/15 91/24 92/3 92/9 92/10 93/2
93/15 93/25 94/3 94/8 94/9 94/10 94/24 95/2
95/5 95/6 95/7 95/10 95/14 95/16 96/11
98/13 99/23 99/24 100/11 107/16 112/24
127/1 128/6 128/25 129/1 129/4 136/7
174/18 178/2 209/12 209/13 211/15 222/3
222/3 225/18 225/23
complaints [62]  43/25 44/7 45/13 45/15
45/17 46/1 47/7 47/17 47/21 47/25 48/2 48/8
48/14 48/24 64/25 78/5 78/19 78/21 79/16
80/14 80/18 80/20 80/23 82/3 82/6 90/11
92/4 92/24 93/3 93/9 93/13 93/16 93/20
93/23 93/24 94/19 96/6 96/9 96/10 98/14
99/2 100/3 110/21 111/4 112/9 112/13
134/21 134/24 135/12 159/8 159/9 159/15
165/18 178/4 178/4 178/7 182/3 182/18
182/22 182/25 198/8 220/10
complete [5]  59/24 60/15 70/3 154/6 188/11
completed [2]  69/2 124/14
completely [7]  34/8 56/8 147/22 149/16
198/22 219/15 221/22
complex [1]  57/18
compliance [10]  137/22 137/25 138/17
138/24 139/2 176/2 176/4 180/24 217/15
217/16
complicated [1]  113/16
compliments [1]  196/18
comply [2]  184/22 210/8
complying [1]  176/9
component [5]  30/20 31/4 88/18 89/11 89/16
components [2]  88/13 225/12
compromised [2]  31/12 33/4
computer [127]
computer's [2]  5/17 119/10
computers [8]  24/7 37/3 43/14 113/16 124/1
197/18 202/25 221/20
concern [7]  8/1 149/21 149/21 185/18 185/20
185/20 215/3
concerned [3]  150/1 216/3 217/12

concerning [1]  225/6
concerns [2]  29/4 215/8
concluded [3]  202/11 203/24 229/21
conclusion [4]  14/8 135/19 142/3 225/3
conduct [1]  63/13
conducting [2]  58/19 207/8
config [6]  9/4 22/5 23/14 24/9 28/24 29/10
configuration [8]  14/19 14/25 15/9 16/2
16/23 17/2 22/8 28/24
confirm [4]  55/6 77/23 120/7 196/19
confirmation [5]  54/15 59/18 70/12 191/14
192/6
conflates [1]  211/8
conflicted [1]  23/11
connect [15]  59/8 59/21 72/13 158/10 158/13
159/10 159/16 160/8 160/12 160/17 160/22
161/5 161/19 164/8 164/18
connected [7]  49/8 59/16 159/17 160/16
160/18 163/7 163/13
connecting [1]  49/2
connection [3]  29/4 158/17 226/15
consequences [3]  63/2 74/22 75/3
consider [7]  91/3 128/15 128/21 129/15
219/17 222/1 227/18
consideration [1]  208/16
considered [3]  85/22 90/18 130/13
considering [2]  134/17 184/13
constantly [1]  34/6
constructed [1]  87/5
consult [1]  114/20
consumer [50]  2/8 13/14 14/16 17/5 19/23
19/24 26/14 27/16 37/21 38/5 38/5 40/11
43/15 44/8 44/19 44/20 45/7 45/9 45/20
50/17 51/4 51/14 52/7 55/9 55/12 57/14
57/21 59/7 60/9 61/13 85/14 87/14 88/5
88/13 88/24 92/13 94/11 101/22 120/2
120/24 121/10 156/6 199/14 199/24 203/12
206/15 207/25 208/7 223/10 223/15
consumer's [4]  32/5 32/24 33/3 34/22
consumers [63]  25/18 29/15 33/12 43/25
44/18 48/24 49/9 49/17 49/22 50/24 52/9
52/19 79/18 84/14 85/5 85/13 93/4 93/9 96/2
98/15 103/8 119/20 123/25 137/14 159/14
159/16 197/17 197/21 197/23 198/5 198/8
198/11 199/7 199/13 199/14 200/5 200/6
201/1 201/14 202/20 202/24 203/7 204/3
204/12 205/5 205/22 205/24 206/12 206/13
207/21 210/3 210/10 212/9 212/13 213/8
213/8 216/5 217/12 221/20 223/25 224/8
226/16 227/23
consumers' [3]  46/1 85/16 98/14
contact [8]  32/12 58/1 69/1 69/1 69/6 72/17
102/1 166/18
contacted [5]  116/13 170/18 170/20 217/8
217/24
contacting [1]  44/20
contain [4]  143/4 192/1 192/6 202/14
contains [3]  190/5 190/9 190/17
contemplated [1]  222/14
contempt [1]  67/7
content [4]  35/24 48/11 145/8 148/14
contents [1]  67/7
context [6]  42/22 61/19 61/21 67/20 95/25
118/16
continually [1]  70/20
continue [11]  172/3 176/18 176/22 207/14
207/19 207/21 211/24 213/19 216/20 219/20
220/21
continuing [2]  204/10 204/11
continuously [1]  79/12
contract [16]  43/22 44/6 44/6 44/11 44/13

44/18 45/4 45/6 45/14 46/2 65/8 116/25
158/25 165/25 166/1 204/15
contracted [1]  64/22
contracts [1]  126/22
contrary [1]  24/16
contribute [1]  21/15
contributor [1]  23/25
control [4]  14/8 33/6 98/5 186/23
controls [1]  186/22
conversation [8]  38/2 38/14 41/3 61/15 81/24
110/17 159/12 162/22
conversations [1]  38/4
conversion [2]  146/18
conversions [5]  146/16 146/17 146/18 148/2
148/11
converting [2]  146/19 147/25
cookies [1]  202/4
cooling [1]  44/21
cooperate [2]  80/12 82/2
cooperated [1]  211/23
copies [5]  97/5 98/21 125/16 133/25 143/21
copy [12]  103/17 107/15 127/18 134/7
135/15 138/9 138/10 138/13 143/22 173/25
193/4 222/10
corner [1]  105/19
Corp [3]  102/7 102/9 102/13
corporate [2]  45/13 66/14 206/23
corporation [2]  141/6 207/15
corporation's [1]  140/23
correct [217]
corrected [2]  200/4 219/20
correcting [1]  198/23
correctly [6]  48/6 51/15 62/20 67/7 105/3
133/23
correspondence [3]  79/8 92/13 143/11
corroborated [2]  204/3 204/4
costs [1]  124/8
cough [1]  115/21
couldn't [7]  61/9 67/16 89/14 114/3 161/1
212/14 213/2
counsel [8]  5/4 103/17 114/21 210/20 211/8
212/9 217/15 217/16
Counsel's [1]  25/2
counseled [1]  64/1
counseling [1]  217/10
count [6]  7/2 7/4 7/5 7/7 75/9 101/7
counting [2]  202/5 212/22
couple [4]  69/5 146/1 146/5 171/1
course [10]  5/8 7/25 8/21 15/4 34/24 77/16
170/15 181/3 185/4 189/2
court [36]  1/1 1/19 3/1 12/16 57/1 61/3 62/16
67/20 68/5 69/5 76/13 77/4 81/9 81/10 96/7
96/10 109/24 176/12 180/9 189/17 191/22
199/18 203/1 204/8 206/9 210/11 215/6
215/17 218/8 221/25 222/10 223/2 226/19
227/10 227/18 228/7
Court's [1]  132/25
covered [1]  106/5
CP [3]  22/22 23/2 23/23
CPE [1]  1/19
CPU [14]  5/16 5/19 7/10 7/14 22/17 22/20
23/4 23/14 23/17 23/23 24/2 24/3 194/12
194/15
Craigslist [1]  55/14
create [3]  99/22 104/24 177/16
created [6]  35/13 175/7 178/23 178/24
178/25 184/3
creates [2]  202/14 205/20
creating [1]  118/18
creators [1]  33/16
credit [9]  98/4 100/5 100/8 102/20 155/25

**C**

credit... [4]  156/6 178/14 179/13 211/12
criticisms [1]  134/18
CRM [1]  124/2
cross [26]  3/24 3/25 21/25 30/6 30/7 64/18
  69/18 77/4 77/5 96/4 96/12 116/3 116/5
  131/17 137/4 137/5 212/24 221/14 221/22
  230/4 230/8 230/10 230/13 230/16 230/18
  230/20
cross-examination [15]  3/24 3/25 21/25 30/6
  30/7 69/18 77/4 77/5 116/3 116/5 131/17
  137/4 137/5 221/14 221/22
cross-examine [1]  96/12
cross-examined [1]  96/4
crossed [1]  96/13
crossing [1]  96/5
CRR [2]  1/19 231/23
cull [1]  135/13
current [2]  109/11 118/9
currently [1]  126/11
customer [63]  7/2 7/8 27/8 31/15 31/16 36/9
  38/10 39/2 39/5 39/7 39/10 47/12 48/4 51/25
  59/8 59/12 59/19 60/2 60/10 61/10 61/11
  61/24 63/14 65/4 65/20 66/2 66/17 67/8
  67/11 68/6 72/19 73/2 73/6 74/9 74/19 74/20
  75/7 75/17 79/15 79/21 88/9 94/18 110/21
  113/9 124/7 127/2 135/10 152/2 152/4 152/5
  162/24 164/13 164/22 164/24 179/17 179/20
  185/14 187/23 190/16 190/21 190/22 200/1
  200/2
customer's [9]  37/12 37/14 43/10 67/9 73/6
  73/8 75/7 79/25 114/5
customers [44]  24/20 31/8 35/4 36/7 43/8
  43/13 47/23 51/19 59/23 59/24 72/17 84/9
  96/7 103/4 111/4 118/9 118/10 118/11
  118/12 118/14 152/11 152/12 152/14 159/20
  159/24 160/25 161/4 164/5 165/22 169/5
  169/10 171/19 172/3 175/10 182/24 183/18
  183/21 201/10 218/25 220/11 226/12 226/13
  226/24 227/3
customers' [1]  178/15
cut [10]  54/14 54/25 60/10 71/6 71/12 71/13
  117/7 160/14 168/13 169/2
cuts [1]  223/7

**D**

D-e-i-g-n-a-n [1]  77/1
Daddy [3]  155/4 155/19 155/19
daily [5]  167/5 167/6 167/8 167/10 167/12
damage [20]  10/23 11/6 11/9 63/16 142/18
  142/21 143/4 143/5 143/7 145/8 145/15
  145/19 148/15 148/20 149/7 149/14 149/16
  149/20 149/22 185/21
damages [4]  145/20 216/9 216/16 226/23
dangerous [1]  43/17
darned [2]  211/15 211/15
dash [2]  155/5 155/17
data [5]  10/20 122/5 181/18 212/15 212/17
database [3]  187/18 195/13 195/14
date [12]  81/8 81/15 111/10 130/24 138/1
  138/19 142/13 158/14 163/5 163/12 192/19
  192/20
dated [3]  81/21 193/5 231/20
dates [1]  162/12
David [4]  2/10 155/2 155/3 155/4
Davis [1]  63/12
days [12]  44/8 44/20 45/9 65/13 65/17 71/10
  106/18 106/18 141/15 168/3 180/3 210/19
DC [2]  2/3 2/6
DD [1]  174/5

De [3]  17/19 20/12 21/4
De-clutter [3]  17/19 20/12 21/4
dead [2]  210/24 211/2
deal [9]  66/4 110/18 126/18 126/18 126/21
  135/7 215/22 220/16 229/18
dealing [4]  8/7 27/8 96/6 215/8
dealings [1]  126/23
deals [1]  84/9
dealt [3]  93/23 126/20 126/24
deceive [1]  199/7
deceived [3]  200/8 224/10 224/11
deceiving [3]  197/17 207/21 210/3
December [10]  1/9 133/18 133/20 134/3
  134/4 143/11 145/6 162/20 163/15 193/5
December 11th [3]  133/18 134/3 193/5
December 15th [3]  133/20 134/4 145/6
deception [2]  201/19 201/19
deceptive [18]  129/5 129/19 137/11 198/16
  201/18 201/23 201/25 202/5 202/6 202/8
  202/9 202/12 202/23 203/19 203/24 206/16
  206/17 208/21
decide [4]  45/7 79/20 136/1 219/23
decided [7]  38/25 124/12 143/6 143/9 149/5
  176/20 180/4
decides [1]  179/12
deciding [2]  165/1 165/22
decision [8]  146/9 158/20 160/21 160/23
  160/24 160/24 222/18 228/13
decisions [2]  181/11 181/12
declaration [67]  3/11 4/5 4/15 4/16 4/17 4/20
  6/7 6/15 6/16 7/19 9/19 17/7 21/1 30/14
  30/16 31/1 31/6 33/15 33/19 44/2 45/22 46/4
  46/7 46/15 46/17 49/9 49/16 49/25 50/23
  51/11 76/3 76/4 76/7 76/11 77/9 77/11 77/22
  78/2 80/11 81/5 81/8 81/10 81/16 82/7 91/23
  92/8 94/2 101/11 101/14 109/15 111/11
  117/17 121/13 121/24 133/22 134/2 134/5
  135/13 138/11 162/11 182/4 193/6 193/8
  202/17 213/1 218/1 218/20
declarations [12]  4/6 133/17 135/9 136/12
  136/16 138/11 193/4 206/7 213/22 213/23
  214/17 217/8
decreased [2]  168/2 168/4
deemed [1]  226/21
Dees [1]  212/12
defendant [4]  29/24 174/13 174/16 174/17
Defendant's [11]  3/16 133/5 133/10 133/19
  133/20 133/24 136/5 187/8 191/6 192/9
  222/9
Defendant's 3 [1]  133/19
Defendant's 4 [1]  133/20
Defendant's 51 [1]  133/5
Defendant's 52 [1]  136/5
Defendant's 6 [1]  192/9
defendants [29]  1/8 2/10 45/14 76/8 114/22
  115/15 162/16 162/17 165/13 197/15 197/20
  197/23 198/1 198/1 199/17 202/1 203/23
  204/5 204/9 204/13 205/8 206/5 206/9
  206/11 206/25 207/10 208/18 210/12 229/6
Defendants' [16]  71/1 76/20 76/21 115/19
  136/20 136/21 188/6 192/13 207/12 231/7
  231/8 231/9 231/10 231/11 231/12 231/13
defense [5]  70/17 103/17 114/20 136/10
  202/16
definitely [4]  12/22 39/5 104/7 104/12
definition [1]  10/14
defrauded [1]  200/2
Deignan [8]  76/2 76/12 76/21 76/25 77/7
  95/2 97/9 230/12
delay [1]  65/14
delete [2]  21/23 194/15

deleted [1]  98/7
demands [2]  170/14 170/21
demonstrated [1]  204/2
denigrated [1]  154/14
deny [4]  220/13 220/24 228/5 228/8
department [1]  40/19
depend [3]  5/1 8/18 11/15
depended [1]  39/5
depending [3]  10/18 39/14 205/9
depends [4]  54/13 56/8 58/23 167/17
deposed [1]  173/11
depth [2]  4/13 4/19
derivatives [1]  57/11
described [2]  35/16 175/1
description [4]  62/20 73/17 146/2 146/8
descriptive [1]  185/21
descriptor [10]  155/14 155/21 155/24 156/7
  156/21 157/5 157/6 157/11 178/10 178/22
descriptors [5]  156/2 156/5 156/10 157/9
  179/12
design [2]  121/4 147/19
designates [1]  157/4
designed [4]  25/7 34/7 203/10 203/12
designing [1]  145/11
desired [1]  79/25
desk [2]  107/14 107/17
despite [2]  11/9 23/13
detail [3]  8/12 10/11 92/5
detailed [1]  8/4
details [10]  8/22 9/23 10/7 43/5 43/8 44/10
  97/10 185/22 185/23 185/23
detect [2]  113/17 186/13
detected [1]  142/19
detection [2]  195/15 195/19
detects [1]  195/6
determines [1]  57/18
develop [2]  126/13 126/15
developer [1]  126/13
developers [1]  143/20
developing [3]  143/1 143/2 143/12
development [4]  108/8 119/9 148/23 184/7
deviate [8]  38/11 38/13 38/14 38/16 39/12
  41/21 89/13 89/14
deviated [1]  38/24
Deviny [3]  12/1 41/13 41/15
diagnose [3]  72/15 203/11 203/17
diagnosis [2]  123/7 126/2 160/4
diagnostic [21]  13/15 13/19 15/20 15/24
  37/19 37/20 82/25 83/22 84/7 88/19 88/23
  89/2 124/14 124/25 125/1 125/6 129/5 131/4
  160/2 203/10 203/10
dialed [3]  27/16 59/12 61/22
dialing [1]  128/17
dialogue [7]  41/3 46/17 61/13 61/14 87/14
  88/6 88/23
dialogues [1]  38/4
dictated [1]  25/9
didn't [71]  8/8 20/19 21/17 31/18 32/3 35/4
  35/25 39/1 39/2 39/17 40/3 46/16 47/11
  47/21 47/24 48/14 50/21 53/8 59/24 81/10
  81/15 82/19 85/8 94/12 99/17 99/22 99/25
  100/7 109/23 109/24 111/9 111/14 112/1
  112/16 114/1 119/14 124/14 125/12 126/7
  126/8 128/21 130/18 149/21 154/24 171/19
  171/20 174/21 175/4 176/17 176/18 186/13
  187/20 198/12 201/5 201/8 201/9 202/21
  203/24 206/21 208/11 211/14 212/11 212/15
  212/20 212/20 217/19 217/20 218/5 218/18
  220/9 220/10
difference [1]  218/23
differences [2]  188/14 188/15

**D**

different [19]  15/4 49/10 49/17 58/23 82/20 119/3 148/23 152/2 156/5 158/4 177/21 181/6 193/20 193/22 195/8 195/23 196/12 220/11 221/18
differs [1]  185/7
difficult [6]  11/16 31/13 96/5 106/4 124/20 148/25
diligence [2]  165/21 204/16
dinner [1]  130/7
direct [1]  99/18
directed [4]  23/13 87/9 88/1 164/6
directing [5]  158/4 158/13 161/4 172/3 223/12
direction [2]  5/12 22/17
directions [1]  72/9
directly [4]  48/24 126/19 126/20 160/14
directors [1]  111/1
directory [1]  181/17
dirty [3]  217/17 217/18 217/20
disable [1]  31/17
disappear [1]  215/20
discharged [1]  227/1
disclosures [1]  202/15
disconcerting [2]  223/3 223/10
disconnecting [1]  219/21
discovery [1]  212/1
discuss [2]  80/25 107/18
discussed [5]  58/12 93/16 93/21 182/4 206/10
discussing [4]  58/6 147/13 149/11 156/21
discussion [7]  27/24 28/6 68/9 146/14 147/13 184/23 185/1
disguised [1]  203/16
disingenuous [1]  220/6
display [13]  34/9 45/13 49/23 50/10 50/25 57/17 57/23 57/25 185/12 185/15 186/15 186/19 191/19
displayed [4]  45/15 59/4 99/9 100/14
dispute [2]  97/10 97/11
distribution [1]  33/6
DISTRICT [3]  1/1 1/1 1/14
division [2]  2/8 92/22
divisions [1]  106/9
docket [2]  76/13 132/25
document [42]  11/4 14/23 15/1 15/7 15/11 15/23 15/25 17/25 18/18 40/15 40/16 40/22 42/9 42/20 42/24 60/23 61/1 62/10 62/13 62/16 131/24 132/19 138/5 138/7 139/17 139/22 140/10 140/24 143/21 150/12 151/7 151/14 157/4 157/6 163/4 170/22 174/8 187/15 187/22 189/22 190/5 191/11
documented [2]  228/18 229/5
documents [7]  42/17 135/19 139/13 144/12 170/23 187/24 194/25
Dodd [5]  126/9 126/10 127/13 127/20 130/20
does [108]
doesn't [47]  6/1 7/5 7/9 7/9 9/12 10/2 10/4 10/10 10/22 14/12 14/15 14/15 15/7 15/25 18/3 18/6 18/13 19/15 19/22 20/1 20/17 21/13 21/18 24/2 25/5 37/25 56/5 111/18 119/14 128/17 185/12 185/15 186/18 188/16 188/19 191/22 192/6 193/9 199/7 201/4 215/8 215/19 221/5 221/7 222/7 224/22 227/13
doing [21]  63/7 67/25 100/13 118/20 127/4 127/4 129/3 130/18 133/16 143/8 145/21 145/22 146/11 166/23 179/22 182/6 185/25 186/4 208/24 214/19 216/24
Doll [1]  2/18

dollar [3]  106/6 106/14 106/17
dollars [1]  204/22
domain [7]  47/3 49/22 155/3 155/5 155/16 155/17 155/23
Don [1]  102/4
don't [115]
done [18]  8/23 58/5 58/11 59/17 93/10 98/9 99/7 110/10 124/21 164/8 180/12 184/21 192/22 192/23 204/15 211/3 213/3 218/16
door [1]  215/21
double [3]  8/11 10/6 10/11
doubt [1]  216/14
down [26]  13/8 40/1 44/3 54/11 54/15 97/14 102/24 105/22 111/7 112/10 112/14 129/10 133/3 145/7 146/1 146/5 174/7 175/18 176/18 179/19 206/10 214/11 214/12 223/18 224/12 227/12
download [23]  31/19 32/1 35/1 35/2 35/22 37/24 53/1 53/3 53/3 71/7 71/13 71/16 71/24 98/15 99/19 99/25 117/22 119/11 119/20 120/13 175/5 195/25 202/25
downloaded [7]  31/22 35/7 53/6 53/10 69/12 93/4 120/3
downloading [5]  31/14 35/23 35/24 137/15 152/15
downloads [3]  52/8 119/6 152/17
dozen [1]  126/24
Dr. [4]  212/25 218/12 218/17 218/23
Dr. Cannon [1]  218/17
Dr. Linder [3]  212/25 218/12 218/23
dreaded [3]  18/5 19/13 20/2
drive [3]  2/9 14/2 140/16
driven [1]  118/1
driver [4]  74/17 117/21 117/24 119/4
driving [1]  60/6
drop [4]  140/19 141/2 141/13 141/17
dropped [1]  110/6
dropping [1]  127/7
due [6]  47/7 117/21 118/14 119/4 165/21 204/15
duped [1]  200/2
during [12]  59/3 60/12 61/11 64/3 142/19 161/18 176/4 180/3 184/10 184/16 186/10 223/4
duties [1]  108/7

**E**

e-mail [33]  1/21 45/7 46/8 46/11 46/14 47/6 48/21 48/22 67/6 67/16 73/6 73/7 79/2 116/22 127/13 128/4 128/9 130/21 130/22 143/11 143/17 143/22 144/8 144/10 144/14 150/8 150/17 150/19 151/18 153/1 154/1 155/12 218/19
e-mailed [1]  36/8
e-mails [9]  44/19 144/15 150/22 155/6 166/22 169/19 169/21 169/24 169/25
each [17]  23/4 88/17 102/14 106/18 106/18 116/22 166/16 175/17 185/18 185/21 194/11 194/13 194/16 194/18 207/10 207/11 224/19
earlier [10]  12/24 49/8 99/1 141/15 168/18 178/18 181/6 182/3 182/11 183/14
early [2]  158/14 168/3
earned [2]  168/13 168/19
earning [1]  216/20
easel [2]  59/5 61/23
easier [3]  72/6 112/7 112/11
easily [1]  96/14
East [1]  2/18
Eastin [1]  2/15
Easttom [2]  202/3 202/16
easy [1]  148/24

eating [1]  130/7
Ed [2]  6/7 202/3
edits [1]  125/13
Edmonson [2]  2/17 230/21
educate [1]  51/14
educated [1]  57/7
Edwin [2]  108/22 125/23
effect [2]  28/3 155/12
efficiency [1]  58/25
efforts [3]  80/13 82/2 82/3
eight [1]  183/9
either [9]  18/6 27/8 91/20 103/1 104/1 105/1 134/8 181/21 202/22
elaborate [1]  121/4
elements [20]  17/8 17/11 17/23 18/1 18/4 18/10 18/14 19/1 19/3 19/9 19/12 20/2 20/14 20/20 21/5 21/8 21/11 21/14 21/21 29/1
eliminate [5]  80/13 80/18 80/22 82/3 142/18
elimination [1]  16/6
ELMO [1]  71/10
else [10]  36/11 36/18 47/17 108/12 114/13 114/14 189/9 223/1 228/10 229/8
Elton [1]  102/4
Ely [1]  2/18
Emily [1]  2/4
emotions [1]  203/12
emphasis [1]  87/11
emphasized [1]  162/23
employee [15]  42/18 42/25 43/2 43/3 62/17 63/18 63/21 64/1 64/3 64/8 74/13 74/14 89/21 108/4 204/4
employees [2]  74/8 219/18
end [18]  27/19 34/17 47/11 88/9 95/5 105/1 117/17 123/4 124/14 145/18 149/6 158/20 186/24 198/6 205/25 216/4 218/23 226/19
ended [4]  128/13 138/24 139/2 159/7
endorsements [1]  135/10
ends [3]  198/5 201/12 228/12
enforcement [3]  170/25 181/23 217/11
engaging [2]  206/17 207/7
engine [1]  67/23
enjoin [1]  207/6
enough [2]  48/15 60/13
ensure [1]  66/16
enter [15]  22/5 73/3 171/19 176/1 189/4 190/5 190/12 190/18 190/21 190/22 191/22 210/23 211/24 212/5 215/20
entered [15]  71/1 76/20 97/4 107/24 133/10 136/20 142/22 142/24 143/3 144/25 151/5 180/9 182/9 188/6 192/13
entering [3]  177/7 220/23 224/2
entire [10]  8/12 16/12 46/16 54/8 54/17 97/17 141/8 145/12 200/17 210/16
entirely [1]  59/25
entitled [1]  231/19
entity [1]  181/4
entries [1]  103/25
entry [4]  76/13 104/3 138/20 174/19
environment [1]  124/19
epidemic [1]  34/6
equal [1]  225/9
equated [1]  130/16
equation [1]  57/20
equitable [1]  174/20
equities [2]  219/17 228/4
Eric [5]  46/5 46/7 46/20 46/22 47/6
erroneously [1]  133/22
error [12]  10/14 10/17 10/19 10/22 12/20 18/4 19/13 23/10 76/14 134/6 187/20 206/5
errors [7]  8/21 9/14 20/15 21/11 21/15 49/3 51/15

**E**

escalated [1] 209/23
especially [2] 63/14 106/1
ESQ [8] 2/2 2/4 2/7 2/10 2/11 2/11 2/14 2/17
essential [2] 4/21 14/5
essentially [4] 16/5 179/5 226/17 227/12
established [2] 228/2 228/3
estimate [3] 117/25 168/12 175/22
estimation [2] 105/24 227/16
et [4] 1/7 14/3 14/3 225/5
et cetera [3] 14/3 14/3 225/5
evaluate [1] 11/16
evaluating [1] 112/5
even [44] 38/5 44/7 54/16 54/21 59/24 67/10
69/2 69/6 75/5 99/23 104/14 104/18 105/10
112/8 141/10 145/3 149/10 200/10 200/11
202/14 203/25 211/4 214/8 215/3 219/3
221/14 221/15 221/21 222/3 223/11 224/9
224/14 224/21 225/15 225/22 225/22 225/24
225/25 226/5 226/15 226/23 227/3 227/16
227/16
event [72] 7/20 7/23 8/3 8/6 8/8 8/10 9/2 9/11
9/19 9/24 10/2 10/6 10/6 10/7 10/11 10/18
10/25 12/19 25/4 25/5 25/7 25/9 28/24 29/10
49/3 51/12 51/12 51/14 51/16 82/24 83/8
83/11 83/15 83/21 89/14 89/17 110/4 124/13
125/3 125/19 128/10 128/22 129/5 129/9
129/18 130/3 130/16 130/21 131/1 131/2
131/4 131/5 131/6 131/12 131/14 160/4
191/22 208/20 208/22 208/23 209/22 209/22
209/24 211/13 211/17 213/25 214/1 217/17
218/10 219/25 220/2 225/15
events [5] 7/25 8/16 10/16 10/17 11/8
ever [34] 32/7 52/7 52/8 52/24 53/1 74/7
88/18 93/3 97/6 99/4 99/6 99/10 99/18
119/19 127/9 149/24 150/4 154/9 154/13
158/16 159/21 164/18 173/9 173/11 173/14
176/5 176/7 176/11 177/6 177/9 181/22
181/25 184/15 196/9
every [33] 16/13 40/23 41/5 41/10 42/5 58/23
59/1 61/15 78/3 79/15 80/4 82/5 91/24 92/3
92/6 92/9 92/10 93/15 94/3 96/11 99/13
100/16 114/3 135/13 169/11 200/1 201/5
201/9 202/7 202/7 203/6 206/2 212/11
everybody [1] 79/19
everybody's [1] 229/17
everyone [7] 3/2 75/24 115/13 143/22 173/2
200/4 212/10
everything [7] 60/6 78/11 122/5 123/3
135/14 192/22 214/7
evidence [35] 3/13 12/2 46/18 48/3 51/16
71/1 76/3 76/5 76/20 95/21 97/4 132/13
133/10 133/18 136/20 143/24 144/19 144/25
151/1 151/5 155/8 188/2 188/6 192/9 192/13
197/5 209/4 211/20 212/3 213/7 221/10
227/7 228/8 231/3 231/7
evidences [2] 10/23 11/5
evolution [1] 119/17
evolving [1] 118/23
exact [13] 5/7 34/24 35/6 45/3 50/4 138/1
142/12 151/19 158/14 163/12 168/17 211/20
219/2
exactly [13] 50/1 87/16 87/23 90/24 100/13
100/23 124/7 124/7 147/19 179/5 187/19
191/21 215/16
exaggerated [1] 152/18
examination [22] 3/24 3/25 20/7 21/25 28/18
30/6 30/7 56/17 69/18 73/14 77/4 77/5
107/25 116/3 116/5 131/10 131/17 137/4
137/5 173/6 221/14 221/22

examinations [1] 196/7
examine [3] 5/18 96/12 196/3
examined [3] 96/4 173/14 191/2
examines [1] 195/8
example [13] 8/7 23/21 48/9 48/11 59/3
68/18 68/21 68/25 96/22 123/9 149/7 153/10
168/19
examples [1] 69/5
excellent [1] 217/22
excels [1] 73/23
except [2] 104/18 174/18
excepting [1] 144/4
exception [2] 133/21 134/25
exceptionally [1] 101/15
exceptions [1] 22/15
excess [1] 168/19
excessive [4] 156/22 157/12 157/18 158/19
exchange [7] 46/8 46/11 46/14 47/6 128/4
150/8 166/22
exclusive [1] 31/10
exclusively [3] 30/23 30/23 125/7
excuse [5] 28/2 40/3 60/19 81/20 91/11
executable [2] 35/3 35/25
execute [1] 16/14
executed [1] 16/13
executive [1] 141/9
exhibit [82]
exhibit 10 [3] 187/8 187/10 191/16
exhibit 29 [3] 139/12 156/18 174/4
exhibit 3 [1] 134/3
exhibit 30 [1] 73/16
exhibit 35 [1] 6/6
exhibit 37 [11] 42/15 50/13 74/12 83/2 83/18
84/5 84/12 85/11 86/24 100/24 119/23
exhibit 38 [2] 53/22 71/6
exhibit 4 [1] 134/4
exhibit 42 [1] 95/21
exhibit 43 [1] 107/23
exhibit 44 [1] 127/18
exhibit 46 [1] 143/24
exhibit 47 [1] 151/1
exhibit 50 [2] 76/7 76/11
exhibit 6 [1] 191/6
exhibit first [1] 53/21
exhibits [10] 4/6 4/8 134/11 193/9 193/9
194/17 203/2 225/13 231/3 231/7
exist [3] 96/9 199/10 222/7
existed [3] 222/4 224/14 226/5
expanded [1] 128/13
expect [4] 24/12 37/1 70/15 71/19
expected [2] 6/1 74/5
expended [1] 208/13
expensive [1] 49/5
experience [7] 8/15 11/19 12/22 22/5 24/13
36/25 55/19 55/22 55/22 55/22 55/24 56/3
56/6 56/11 73/23 88/11 164/4
experiencing [2] 36/1 36/8
expert [14] 3/9 6/12 12/9 26/6 115/1 189/14
203/24 219/6 221/9 221/10 221/21 225/1
225/22 225/24
expert's [1] 227/16
expertise [2] 126/3 181/9
experts [25] 1/7 50/5 51/20 51/23 52/10
73/18 98/16 158/3 160/18 160/22 163/1
163/10 163/18 164/4 165/2 165/3 165/19
165/22 166/8 166/14 166/19 167/9 167/15
168/24 202/2
explain [5] 30/21 35/17 57/1 124/6 186/11
explained [1] 48/21
explaining [1] 110/20
Explorer [2] 18/20 19/5

extended [2] 124/8 228/13
extensively [1] 206/22
extent [2] 181/10 182/11
extremely [2] 34/1 43/17
eyes [4] 23/19 27/4 71/19 218/22

**F**

face [1] 223/6
facetious [1] 217/22
facility [1] 112/22
fact [37] 19/15 19/16 21/17 21/18 21/20
23/13 24/18 25/18 48/25 50/23 59/11 64/8
64/14 64/22 81/16 82/11 83/3 101/14 103/1
103/2 106/20 110/17 119/12 132/24 140/19
141/13 144/4 152/12 153/21 164/3 198/16
205/17 206/14 209/16 209/19 212/21 224/8
facts [3] 155/7 174/18 206/8
factual [1] 90/7
factually [1] 228/2
fail [2] 81/4 195/15
failed [6] 80/11 80/12 195/16 195/17 196/9
202/17
failure [4] 80/17 80/22 82/2 202/5
failures [1] 14/9
fair [3] 150/1 161/4 186/10
fake [2] 34/4 34/9
fall [2] 134/24 134/25
false [3] 32/18 200/16 200/22
falsely [1] 219/6
familiar [12] 8/5 40/17 53/15 53/20 54/7
54/9 69/21 69/25 83/6 178/3 179/4 227/10
familiarity [1] 8/11
family [2] 86/15 183/2
far [6] 5/15 8/9 52/25 160/25 164/12 194/12
fashion [1] 112/6
Fast [1] 90/21
fathom [1] 135/21
FBI [5] 49/18 57/8 57/10 57/10 57/11
feasible [2] 24/15 172/2
feature [3] 147/20 169/22 185/22
features [1] 65/2
February [1] 123/17
February 5th [1] 123/17
FEDERAL [11] 1/3 2/2 2/5 4/3 30/10 77/8
107/15 116/8 144/13 144/17 223/4
fee [1] 45/2
Feedback [1] 179/24
feel [2] 114/4 114/6
fell [1] 57/20
felt [6] 94/16 111/6 112/10 161/2 183/18
219/25
Ferguson [6] 2/10 221/1 230/5 230/14
230/17 230/24
few [15] 22/15 26/9 44/8 60/25 65/17 73/13
74/18 75/13 108/17 109/18 127/10 141/15
173/21 221/2 222/17
fifties [1] 105/20
fight [1] 210/15
figure [1] 178/6
figures [1] 106/17
file [8] 43/25 63/23 175/5 175/6 176/19 177/9
202/7 202/7
filed [14] 76/13 81/11 103/12 109/15 111/11
112/21 132/25 140/9 141/15 141/21 176/11
206/20 211/15 214/1
files [2] 15/15 16/9
filing [1] 176/7
filings [1] 215/6
fill [1] 78/18
filled [1] 141/16
filling [1] 109/15

**F**

final [1] 174/19
finally [2] 109/18 193/2
finding [2] 216/4 216/5
findings [1] 209/16
fine [10] 26/3 96/18 98/10 132/17 132/22
 156/16 214/2 216/19 221/15 229/5
finish [8] 5/4 39/17 39/18 115/4 115/9 172/24
 175/17 186/3
finished [2] 104/20 172/16
fire [2] 32/2 177/6
fired [1] 209/23
Firm [1] 2/12
first [47] 13/7 25/22 25/25 30/12 39/23 40/10
 40/15 42/20 43/3 43/18 53/21 54/8 71/3
 73/20 73/20 79/12 80/21 88/17 90/22 96/23
 97/9 97/14 109/8 110/19 115/25 134/2 137/1
 137/8 143/7 148/14 152/25 153/5 163/5
 163/7 173/14 173/23 174/15 190/3 193/5
 195/18 198/8 201/3 203/21 206/18 214/9
 218/17 221/4
fit [1] 78/10
five [17] 95/9 95/10 42/2 44/20 69/16 83/9
 83/13 84/8 100/20 106/8 112/9 115/8 124/13
 146/15 166/11 183/7 205/24
Five9 [2] 120/16 120/19
fix [18] 47/11 60/3 66/19 86/16 90/21 97/12
 97/23 98/12 113/4 113/11 113/15 114/3
 114/5 132/5 132/6 149/22 198/10 212/14
fixed [7] 48/13 60/14 93/17 93/22 149/18
 149/19 219/7
fixes [1] 226/2
fixing [1] 43/15
FL [3] 2/9 2/13 2/16
flag [2] 10/22 11/5
flagged [4] 156/22 157/12 157/17 157/21
Flagler [1] 2/9
flat [1] 106/24
flip [7] 138/16 140/8 140/22 141/4 146/13
 147/8 152/25
floor [4] 2/13 24/24 58/22 125/7
FLORIDA [6] 1/1 1/4 1/8 1/20 91/1 91/5
fly [1] 226/8
fly-by-night [1] 226/8
focus [3] 50/21 180/22 180/23
focused [4] 40/19 88/12 108/8 110/5
folks [1] 108/20
follow [10] 26/9 48/5 48/21 48/22 67/6 87/9
 87/10 89/3 89/4 229/5
follow-up [5] 26/9 48/5 48/21 48/22 67/6
following [7] 43/9 63/8 75/23 115/12 173/1
 174/19 176/14
food [1] 104/9
foot [1] 218/3
footnote [1] 135/14
forbid [1] 94/12
foreclosure [2] 181/17 181/21
foregoing [1] 231/17
forget [1] 44/10
forgot [2] 12/14 94/13
form [5] 62/21 141/1 141/9 207/1 216/12
format [4] 25/9 64/6 71/5 207/2
former [1] 204/4
Fort [2] 2/13 2/16
forth [4] 64/23 65/10 65/20 99/15
Forty [2] 144/23 166/11
Forty-five percent [1] 166/11
Forty-six [1] 144/23
forward [5] 28/7 171/19 180/24 199/19
 218/3

forwarded [2] 167/1 167/14
fought [1] 174/23
found [11] 18/22 42/24 57/6 83/3 119/25
 180/17 183/21 187/16 216/9 219/19 223/2
foundation [4] 53/14 53/16 144/1 144/6
four [5] 9/1 9/4 51/1 59/19 105/15
fraction [2] 226/12 227/2
Franklin [4] 1/19 231/16 231/22 231/23
frankly [2] 221/8 227/14
fraud [2] 48/1 48/9
fraudulent [1] 207/7
free [14] 72/12 100/7 154/6 171/14 171/15
 186/5 186/6 186/6 196/4 197/21 198/16
 201/23 202/12 202/19
freeze [9] 107/12 199/13 199/23 204/10
 204/11 206/4 207/5 207/6 211/3
freezes [1] 128/1
frequently [2] 92/24 146/20
Friday [1] 106/10
friend [1] 86/16
from -- you [1] 207/20
front [1] 62/6
frozen [4] 206/22 206/25 207/13 207/24
FTC [47] 37/21 46/7 61/1 107/7 107/11
 111/11 111/16 112/1 127/24 128/4 128/6
 129/4 129/16 129/17 129/23 130/16 137/8
 137/11 137/18 137/24 138/14 141/25 150/23
 173/23 174/2 174/11 175/24 176/5 176/7
 176/22 181/23 184/2 184/15 184/20 198/7
 204/25 206/12 208/20 217/1 217/6 219/5
 222/3 224/8 226/13 226/25 227/12 228/5
FTC's [8] 127/14 127/21 128/25 129/1 191/1
 202/10 208/19 209/6
full [5] 53/24 164/12 172/10 190/17 202/21
fully [1] 110/7
fun [1] 104/24
function [2] 18/21 23/7
functionalities [1] 6/17
functions [1] 14/6
Funny [1] 212/10
further [21] 6/4 6/5 20/4 28/14 56/13 63/2
 69/13 73/11 75/3 75/19 107/21 114/7 131/7
 131/15 132/9 132/23 136/4 211/7 214/20
 215/3 220/16
future [5] 11/1 107/5 192/19 192/20 216/20
FYI [2] 128/10 130/21

**G**

games [1] 137/15
gave [6] 48/9 75/8 111/3 154/10 154/10
 189/14
Geek [2] 60/6 113/21
general [6] 2/8 13/3 70/1 125/13 170/15
 179/25
generally [7] 8/13 69/22 69/25 145/11 170/3
 170/4 170/6
Generals [2] 170/18 171/7
generate [2] 177/21 204/20
generated [3] 166/8 204/21 208/12
generating [3] 204/23 204/23 205/12
generation [1] 117/2
gentleman [1] 104/9
gentlemen [1] 216/18
gets [2] 190/16 205/15
getting [25] 12/3 12/4 19/7 36/3 57/6 78/21
 88/4 91/18 106/4 106/6 106/21 118/19
 118/19 123/24 149/6 149/13 151/14 156/15
 168/6 168/8 177/25 210/4 219/1 219/1 220/7
GFI [2] 46/22 46/23
give [30] 12/9 15/25 18/16 27/14 66/18 67/24
 69/5 77/13 103/8 103/16 106/8 107/3 114/2

132/19 136/2 138/10 152/2 152/3 152/4
154/22 156/17 156/18 183/19 186/20 189/13
196/17 206/8 210/24 225/9 225/14
given [8] 59/1 135/15 176/7 190/14 202/22
 203/18 221/6 223/10
gives [2] 59/20 224/4
giving [3] 26/5 106/6 138/9
glance [1] 147/16
glanced [1] 206/21
Global [2] 141/16 161/12
Global's [1] 161/7
goal [4] 145/18 147/17 148/10 180/25
God [1] 94/12
goes [1] 121/6
going [108]
golden [2] 40/23 41/4
gone [2] 149/20 227/4
good [25] 3/2 4/2 4/4 8/13 20/9 20/10 30/9
 56/19 56/20 77/7 111/6 114/1 116/7 118/22
 137/7 147/7 151/15 194/9 197/14 216/19
 218/11 219/10 221/11 227/21 229/18
Google [8] 33/10 49/18 49/19 49/22 57/5
 57/5 57/17 87/20
got [37] 21/7 27/4 31/23 66/18 70/12 72/11
 79/9 88/12 88/18 96/9 100/2 105/5 105/6
 106/20 110/1 110/2 127/15 143/21 147/9
 180/23 211/10 212/16 212/19 213/5 214/12
 215/13 215/22 216/17 216/22 217/2 217/3
 217/23 218/10 218/14 218/15 222/21 227/18
Government [3] 69/20 133/25 189/14
Government's [4] 64/21 187/23 188/9 191/2
Government's 41 [1] 191/2
grabbed [1] 73/7
grant [1] 227/19
granted [2] 127/24 217/4
graph [1] 22/21
graphic [1] 14/3
great [6] 8/10 110/3 196/17 196/19 219/4
 219/5
green [4] 151/15 151/20 151/21 153/2
grew [1] 220/20
gross [15] 161/7 161/9 161/10 161/11 168/20
 168/21 168/25 208/1 208/2 208/6 208/12
group [4] 91/12 128/14 130/18 141/21
groups [2] 90/25 130/6
grow [1] 207/19
guarantee [2] 183/14 183/15
guaranteed [1] 137/16
guess [9] 17/18 39/19 49/20 63/12 85/22
 123/23 151/24 187/16 199/11
guessing [1] 117/12
guide [4] 42/10 42/13 57/23 126/3
guideline [5] 38/10 51/1 82/14 121/24 122/2
guidelines [2] 82/8 82/13
guy [1] 219/7
guys [15] 88/16 104/10 113/25 145/25 147/3
 211/1 211/22 212/4 212/4 216/22 218/6
 219/13 219/14 220/20 220/20

**H**

H-e-r-d-s-m-a-n [1] 116/1
hadn't [2] 81/11 129/6
Haimovitch [1] 2/11
half [7] 54/8 96/7 101/20 135/13 169/2
 172/10 220/10
hand [8] 3/14 83/2 103/23 105/19 115/18
 139/11 143/21 150/12
handed [2] 187/7 189/22
handle [2] 78/11 92/20
handled [1] 94/17
handling [2] 11/23 79/24

**H**

handwritten [1]  63/5
happen [8]  57/13 57/14 57/21 80/21 82/5
 94/12 176/4 214/14
happened [13]  35/3 35/7 48/21 80/2 92/19
 94/9 100/1 112/18 127/3 159/17 159/20
 159/24 220/2
happens [2]  16/10 60/1
happy [10]  65/8 66/17 66/20 92/17 93/6
 93/10 103/6 152/7 152/11 164/2
hard [5]  14/2 24/6 72/15 169/9 218/22
harder [4]  18/2 18/14 19/1 19/10
hardware [4]  14/2 14/9 113/17 113/19
harm [4]  142/18 199/24 205/21 216/5
harmed [5]  199/15 200/20 201/10 201/20
 210/10
hasn't [1]  219/18
hated [1]  213/3
Haus [10]  46/5 46/7 46/12 46/20 46/22 66/22
 67/5 67/6 68/9 68/15
haven't [5]  53/10 66/18 76/9 144/4 172/13
having [19]  17/14 27/9 27/9 27/20 28/8 28/9
 38/14 60/3 64/19 66/6 91/21 131/22 150/8
 157/12 160/25 164/24 182/14 196/11 201/12
he's [20]  3/9 12/9 48/2 53/14 53/15 66/11
 67/25 75/1 75/1 115/17 116/16 126/4 126/11
 204/15 204/16 204/25 211/10 221/22 222/23
 222/24
head [3]  89/11 100/3 125/21
heading [1]  70/9
Health [2]  132/5 132/6
hear [6]  40/4 114/4 164/10 193/3 217/18
 222/20
heard [28]  17/12 17/13 24/24 41/8 60/13
 67/19 97/7 109/13 112/24 113/1 113/6 177/6
 179/17 180/3 183/1 186/10 202/2 202/3
 206/1 211/8 217/4 221/7 221/9 222/5 222/16
 222/17 224/1 227/9
hearing [1]  184/16 186/10 189/3 222/13
 222/16 223/4 224/8
hearings [1]  172/12
hearsay [2]  96/1 135/19
held [3]  78/9 94/11 94/16
help [17]  14/20 27/17 27/19 43/14 57/10
 57/11 60/3 65/6 66/4 89/24 90/14 106/15
 108/12 150/5 153/7 156/17 203/14
helped [1]  145/13
helpful [1]  9/24
helps [2]  221/19 221/20
Herdsman [10]  108/24 108/25 114/23
 115/16 115/19 116/1 116/7 209/5 209/20
 230/15
here [64]  7/6 11/9 16/12 18/19 23/10 24/8
 26/8 32/24 37/22 38/4 38/6 41/3 70/10 71/12
 71/23 71/24 75/1 85/10 87/22 92/6 95/5 96/4
 96/14 97/14 105/17 119/3 121/2 121/23
 122/1 131/25 140/23 141/25 153/24 183/24
 188/20 190/12 191/5 196/25 199/23 199/24
 200/25 201/15 206/4 209/4 210/23 211/4
 211/7 212/11 212/25 213/6 214/11 216/25
 217/3 218/2 218/18 218/21 219/13 220/17
 220/22 223/18 224/3 226/7 229/1 229/14
here's [3]  94/9 214/9 214/21
hers [1]  136/1
heuristic [1]  32/10
Heuristics [1]  32/15
hey [2]  119/2 128/18
hi [2]  88/7 130/8
hide [1]  17/3
hiding [1]  96/8

high [4]  7/2 7/7 106/13 185/16
highlighted [1]  153/18
highlights [1]  73/21
highly [1]  209/25
hijack [1]  83/17
hijackers [2]  83/17 83/24
hire [2]  217/15 217/16
hired [1]  58/21
hiring [2]  58/16 60/7
historically [1]  51/13
hit [2]  105/5 106/25
hold [5]  44/7 86/22 87/1 147/11 153/17
Holt [3]  155/2 155/3 155/4
home [3]  128/17 130/7 212/18
honest [3]  24/7 40/17 106/22
Honor [76]  3/5 3/6 3/23 6/11 11/20 11/25
 12/6 12/8 20/19 20/25 24/25 26/1 26/22
 27/11 28/12 29/21 54/2 56/16 58/14 60/19
 62/7 66/9 69/14 70/19 70/23 75/19 76/1
 76/17 81/14 94/23 95/20 95/24 97/5 98/20
 103/16 107/23 111/18 114/8 114/15 114/22
 115/7 115/15 116/4 127/17 129/21 131/15
 132/12 132/15 132/23 133/4 133/13 133/15
 135/8 172/17 173/4 177/22 187/2 188/1
 188/4 192/11 196/21 196/25 197/4 197/6
 197/14 198/24 199/5 210/14 213/18 214/6
 219/15 220/12 220/24 228/19 229/4 229/10
HONORABLE [1]  1/13
hooked [1]  205/17
hope [1]  103/10
hopeful [1]  110/14
hour [3]  98/6 135/12 172/10
hours [1]  146/15
housekeeping [1]  228/11
HR [1]  105/7
huge [3]  60/9 60/9 216/16
huh [17]  7/1 18/9 22/6 22/12 39/11 39/24
 40/21 41/18 43/1 52/13 122/9 122/15 143/14
 146/12 148/16 168/15 169/20
Humphreys [1]  116/16
hundred [7]  22/21 50/22 105/10 110/9
 137/16 195/19 204/22
hundred percent [1]  110/9
hundreds [2]  105/20 226/11
hung [1]  18/21
hurting [1]  227/23
husband [1]  86/18
hypothetical [4]  26/24 26/25 27/12 27/14

**I**

I'd [12]  13/6 60/13 84/22 86/4 86/23 95/20
 117/12 127/17 144/19 167/10 189/13 191/5
I'll [22]  9/20 16/16 26/9 70/8 82/7 84/23
 85/11 85/21 85/23 86/7 86/24 97/21 98/19
 135/7 136/1 136/6 136/11 146/14 152/7
 153/17 172/14 214/15
I'm [160]
I've [33]  15/1 17/13 17/13 40/17 52/25 57/3
 60/13 86/25 87/6 92/6 97/6 100/15 110/5
 111/10 126/24 127/10 129/6 133/25 143/21
 145/24 152/22 153/17 157/16 170/20 179/17
 181/17 187/7 192/23 212/21 212/23 216/17
 227/4 227/18
i.e [1]  49/2
ICE [41]  29/15 36/21 36/24 40/20 45/13
 51/12 55/13 58/12 63/7 72/17 89/24 90/1
 95/13 102/7 102/9 102/10 102/13 117/25
 118/2 120/13 120/16 120/18 162/17 162/23
 166/7 167/1 169/3 179/16 180/3 180/15
 189/3 197/23 198/1 198/1 198/15 202/1
 205/8 205/17 206/25 208/18 223/1

ICE's [9]  55/4 55/5 82/8 120/5 120/10
 163/22 163/23 168/13 203/24
icon [1]  71/25
ID [3]  8/9 85/3 122/13
idea [4]  8/13 48/20 106/8 198/11
identical [1]  145/6
identically [1]  154/17
identification [1]  191/6
identified [1]  68/5
identify [4]  8/9 72/15 118/22 123/23
identity [1]  122/20
Ikos [1]  195/3
immediately [4]  23/16 68/16 197/19 217/14
implicated [1]  182/1
importance [1]  212/16
important [6]  94/17 107/4 146/14 186/15
 188/21 206/8
impossible [1]  87/12
impression [3]  179/22 202/14 206/9
improper [1]  213/16
improve [1]  150/5
improved [1]  153/12
improvement [2]  62/21 63/1
improvements [1]  148/22
improving [1]  180/23
inaccurate [1]  12/5
inaccurately [2]  32/8 32/21
inadmissible [1]  134/22
inapplication [1]  118/12
inbound [31]  1/7 36/4 36/10 36/11 37/8
 37/10 51/20 51/23 52/4 52/9 73/17 74/3
 98/16 158/2 160/18 160/22 163/1 163/9
 163/14 163/17 164/4 165/2 165/3 165/18
 165/22 166/8 166/14 166/18 167/8 167/15
 168/24
Inc [7]  102/2 139/18 140/12 140/15 141/5
 141/16 141/22
Inc.'s [1]  140/22
incentive [1]  204/20
inception [1]  222/13
include [3]  160/4 202/18 202/21
included [3]  103/13 107/12 186/24
including [3]  59/20 64/8 127/25
income [2]  161/12 208/1
inconvenience [1]  92/16
incorporation [3]  139/14 139/17 140/23
incorporator [4]  139/19 139/21 140/1
 140/24
incorrect [2]  45/19 45/24
incorrectly [1]  133/22
increase [1]  148/10
increased [1]  123/7
incredibly [1]  98/11
incubator [1]  24/23
incur [1]  35/6
indeed [2]  98/3 223/14
independent [3]  195/10 221/11 227/11
India [7]  128/14 129/2 129/11 130/6 159/4
 159/7 159/17
Indian [1]  226/8
indicate [3]  11/1 14/12 70/14
indicated [1]  65/21
indicating [1]  63/11
indication [2]  176/7 184/12
indicator [2]  5/9 5/12
individual [5]  11/16 58/1 150/4 165/12
 207/12
individuals [1]  154/10
induce [1]  200/12
induced [3]  200/9 202/24 203/15
inducement [1]  200/19

## I

induces [2] 202/19 205/5
industry [13] 32/10 57/4 130/15 143/8 194/3 194/6 195/7 195/7 195/12 211/2 216/22 220/20 222/17
infected [3] 33/4 34/25 97/25
infection [25] 31/16 36/2 43/9 43/16 50/1 50/4 50/9 50/10 50/12 50/17 50/19 50/25 51/1 51/4 52/2 56/21 57/2 57/8 57/24 63/15 84/14 84/15 87/2 118/11 122/19
infections [7] 43/9 43/13 49/10 49/17 84/10 113/22 122/19
information [17] 4/10 5/16 8/4 8/18 10/17 47/22 70/4 77/14 90/7 98/14 109/20 112/4 123/24 140/8 141/5 141/15 185/21
informing [1] 153/11
infraction [14] 38/22 43/5 43/8 43/13 43/19 62/20 63/16 74/15 74/23 75/1 75/5 75/10 75/12 75/14
infractions [2] 63/2 75/3
initial [10] 78/12 79/5 79/6 79/8 92/13 92/25 94/7 94/17 122/8 205/5
initially [2] 79/24 80/17
injunction [20] 1/12 107/11 174/20 191/23 199/12 204/7 210/9 210/11 210/21 212/6 213/15 215/21 216/7 217/5 219/24 220/14 220/23 227/20 228/8 228/14
injunctions [1] 127/25
injunctive [1] 204/8
inputted [1] 57/14
inquire [1] 165/2
inquiries [1] 171/6
inquiry [1] 110/8
ins [1] 179/4
install [11] 18/23 31/10 31/13 31/17 32/2 32/3 35/13 35/23 36/2 67/12 98/1
installation [5] 17/16 19/20 69/2 117/22 195/25
installed [7] 17/6 17/22 21/22 67/8 67/14 98/7 98/8
instance [4] 18/20 19/4 19/6 65/23
instances [1] 16/7
instead [1] 56/3
instructed [6] 25/13 72/18 72/18 74/19 75/16 87/6
instructing [1] 74/9
instruction [3] 121/10 121/12 175/7
instructions [3] 70/13 72/9 224/3
insult [1] 210/18
integral [1] 205/14
Intellinet [1] 139/10
intend [8] 134/13 191/23 192/3 192/5 192/21 205/18 205/19 216/19
intended [1] 61/8
intending [1] 222/21
intent [1] 206/6
intention [5] 110/7 112/4 180/18 180/20 218/10
interact [1] 61/9
interacted [1] 99/15
interactions [1] 77/18
interest [2] 189/15 204/9
interesting [1] 224/15
interim [2] 213/17 213/18
interlaced [1] 28/6
internally [1] 35/12
Internet [18] 14/7 18/20 19/5 19/6 19/7 46/25 47/2 57/15 64/15 67/22 67/23 79/1 97/24 134/6 137/11 177/17 177/20 213/3
interpretation [1] 96/2

interrupt [2] 5/5 27/23
interview [1] 37/1
introduce [2] 95/20 165/17
introduced [7] 163/5 163/6 163/11 166/21 222/9 223/5 227/7
introducing [1] 116/22
introduction [1] 116/19
investigate [1] 65/6
investigated [1] 67/10
investigation [3] 182/1 210/25 211/6
investigative [2] 170/14 170/21
investment [3] 91/12 91/16 91/18
investors [4] 91/14 91/21 210/5 211/18
invited [1] 190/18
involve [2] 13/23 113/3
involved [12] 64/23 66/14 108/21 108/23 113/3 125/10 145/10 155/17 158/2 175/10 177/25 181/2
involvement [2] 177/6 181/22
IP [1] 91/2
irradicated [1] 217/14
is -- I [1] 159/5
iS3 [8] 30/14 30/16 30/20 30/23 36/18 118/17 119/9 128/13
ish [1] 112/20
isn't [82]
issuance [1] 66/25
issue [33] 5/24 5/25 8/1 10/21 18/24 19/4 27/20 27/21 66/5 96/25 113/17 113/19 119/15 198/13 198/16 198/19 198/21 201/15 201/23 202/18 202/22 203/14 203/14 204/7 210/11 213/15 216/3 216/7 224/25 225/16 225/24 226/23 227/6
issues [32] 11/8 13/2 15/9 19/4 27/9 27/9 39/6 98/12 117/21 117/22 117/23 118/10 118/11 118/12 118/15 118/24 118/25 119/1 119/5 126/25 134/17 160/2 160/25 184/16 198/23 218/8 222/2 224/25 225/21 225/21 226/18 228/6
it's [119]
item [4] 61/3 185/18 225/16 225/17
items [2] 127/8 226/3
iterations [2] 55/21 124/22
itself [3] 27/23 62/4 122/18

## J

January [2] 155/4 231/20
January 2013 [1] 155/4
job [10] 55/19 73/17 73/25 74/1 74/2 108/7 108/17 108/19 114/1 219/19
John [2] 89/21 130/8
Jonathan [1] 2/11
judge [14] 1/14 67/25 71/19 76/6 113/1 115/17 136/10 210/17 217/3 221/2 221/3 223/23 226/6 227/17
judgment [1] 174/1
July [10] 79/12 95/9 102/12 102/16 122/25 123/6 123/14 184/9 193/25 207/10
July 10th [3] 122/25 123/6 123/14
July 2012 [1] 79/12
July 2013 [1] 95/9
July 2014 [1] 102/12
June [1] 184/8
junk [1] 19/15
jurisdictional [1] 174/18
just [144]
Justin [5] 29/23 29/24 30/3 128/12 230/7

## K

Katherine [1] 2/7
keep [6] 78/16 92/17 180/25 186/16 199/4

200/22
KENNETH [1] 1/13
kept [2] 78/23 200/24
kernel [1] 113/24
Keroski [3] 143/13 143/19 148/13
key [45] 32/17 33/12 37/6 52/20 65/2 67/13 67/16 70/12 70/15 71/8 71/17 71/25 72/3 72/24 73/3 121/1 121/2 171/19 171/21 187/19 188/23 188/25 189/11 190/3 190/6 190/9 190/12 190/14 190/17 190/19 190/22 190/22 191/14 203/5 203/6 214/9 214/11 214/24 215/11 215/13 223/8 223/10 223/12 223/18 224/2
keywords [1] 57/12
kill [1] 210/21
killed [1] 212/5
kind [17] 36/24 92/19 105/22 106/24 152/2 152/18 164/4 176/11 181/2 181/23 182/1 200/16 207/2 207/4 216/6 226/6 226/22
kinda [1] 167/6
kit [2] 90/13 90/13
Kiziah [1] 2/7
knew [17] 107/11 107/19 129/2 129/2 129/3 130/3 130/6 130/15 138/16 208/18 208/20 208/23 208/23 208/25 209/1 209/20 209/21
know [160]
knowledge [13] 11/15 13/18 17/11 17/11 29/14 35/10 48/17 49/6 59/23 61/7 64/14 108/21 122/6
known [7] 127/10 128/14 128/15 128/21 129/11 129/12 130/14
knows [1] 27/20
Kopelowitz [1] 2/12

## L

Lab's [1] 195/3
land [2] 32/2 57/23
landed [4] 31/25 35/22 105/9 105/10
landing [1] 32/1
language [2] 153/20 176/24
large [4] 14/1 54/16 134/5 175/15
last [30] 3/18 19/18 30/2 30/3 34/17 67/19 76/25 114/23 115/23 115/25 117/17 134/4 136/23 136/24 138/18 148/1 167/18 167/20 170/16 170/19 171/1 180/3 181/18 195/19 197/16 207/22 210/19 218/2 219/19 227/17
later [9] 12/7 98/10 134/17 135/7 136/2 136/4 163/15 168/7 216/9
latest [1] 195/6
Lauderdale [2] 2/13 2/16
launched [1] 112/25
law [8] 170/25 181/23 200/10 200/19 202/12 208/6 208/16 210/8
lawsuit [4] 81/11 81/13 112/21 209/1
lawyer [1] 212/24
lay [3] 62/6 144/2 144/6
lead [7] 11/8 12/21 117/2 117/7 179/9 204/20 204/23
leaders [2] 143/8 195/12
leads [10] 14/8 36/12 36/13 168/13 197/25 198/1 198/2 204/20 205/13 205/21
lean [1] 99/8
learn [3] 42/7 61/16 180/9
learned [7] 111/2 117/20 118/16 119/9 123/3 124/20 182/21
Leased [1] 162/9
least [13] 7/11 14/6 14/9 59/17 59/18 65/5 76/24 96/23 99/23 115/5 153/2 205/12 207/17
leave [6] 17/23 41/1 42/7 61/6 66/6 121/5
leaves [1] 19/20

**L**

led [2] 93/1 111/24
left [9] 16/9 17/15 20/11 89/24 90/2 90/5 105/19 109/18 221/1
left-hand [1] 105/19
legal [4] 137/16 142/2 154/13 221/6
legally [1] 228/3
legit [2] 98/2 98/4
legitimate [5] 33/5 34/8 178/7 199/16 217/23
legitimately [1] 201/11
lengthy [1] 92/5
less [12] 54/21 69/16 101/18 117/9 166/9 168/9 175/25 225/5 226/1 226/15 226/16 227/2
lesson [1] 124/20
let [30] 5/4 9/20 26/13 27/14 31/24 39/17 51/9 53/13 68/20 70/17 71/9 72/5 78/23 92/17 114/20 120/25 122/20 127/16 138/9 150/15 156/17 156/18 164/15 171/18 175/17 186/15 190/2 198/18 213/10 216/2
let's [10] 24/7 27/2 44/13 113/8 115/4 115/8 168/21 172/24 182/3 213/12
letter [10] 80/16 81/20 81/21 81/24 82/1 82/4 109/14 109/17 111/9 111/10
letters [2] 52/20 136/7
level [21] 113/24 142/18 142/22 143/4 143/7 145/8 145/9 145/15 145/15 148/15 148/15 148/20 149/7 149/14 149/16 149/21 149/22 149/22 185/18 185/20 185/20
liability [3] 174/17 174/21 216/5
liaison [1] 116/20
license [28] 70/12 70/15 71/8 71/17 72/3 121/1 171/19 171/21 187/19 188/23 188/25 189/10 190/3 190/5 190/9 190/11 190/14 190/17 190/19 190/21 190/22 191/14 203/5 203/6 223/8 223/10 223/12 224/2
license's [1] 224/4
life [5] 19/16 64/14 135/21 192/5 216/25
lifted [1] 210/23
liked [1] 65/3
likely [7] 5/18 120/10 153/12 201/24 201/25 202/13 204/5
limine [2] 134/14 134/15
limited [1] 122/4
Linder [4] 212/25 212/25 218/12 218/23
line [16] 49/7 63/18 96/5 96/13 97/9 109/9 123/15 123/15 125/16 146/5 174/10 174/12 174/15 174/16 213/6
line 27 [2] 174/10 174/15
lines [3] 129/14 146/1 146/5
lingering [1] 119/1
link [4] 47/9 47/15 127/13 127/21
list [13] 15/11 83/24 100/25 101/4 109/4 109/10 109/11 109/12 120/15 125/5 165/5 218/14 218/16
listed [12] 32/9 32/13 51/15 67/3 68/15 124/25 139/19 139/21 140/14 140/23 141/5 217/24
listened [1] 67/10
listening [1] 222/23
listings [1] 181/18
lists [1] 140/14
literally [1] 135/12
litigated [1] 227/1
litigation [3] 90/10 90/11 201/12
little [19] 8/14 11/18 24/18 30/12 57/7 78/10 106/11 106/12 121/14 148/24 175/3 177/12 181/6 183/1 185/19 186/11 192/15 193/2 193/3
live [13] 158/10 158/13 159/10 159/16 160/8

160/12 160/16 160/21 161/5 161/19 164/8 164/18 218/15
lived [1] 210/18
living [2] 60/7 130/7
LLC [1] 1/7
LLP [2] 2/15 2/18
load [2] 15/16 34/18
loading [1] 16/5
loads [1] 147/15
located [2] 158/23 158/24
locked [3] 110/1 110/2 112/22
log [15] 8/17 9/15 10/6 37/12 42/5 74/18 74/23 75/6 75/12 79/3 87/18 98/5 100/6 131/19 183/25
log-in [1] 183/25
log-on [1] 131/19
logged [1] 73/8
logs [1] 9/11
long [15] 78/10 94/12 95/23 96/16 97/2 128/15 129/9 130/15 137/24 165/25 172/8 176/23 197/10 197/10 212/23
longer [1] 226/2
longest [2] 97/6 112/25
looked [9] 4/13 4/18 98/1 111/3 130/17 147/18 182/24 182/25 224/5
looking [14] 6/2 12/19 12/20 13/24 13/24 13/25 23/3 23/4 24/9 54/23 145/20 185/3 216/15 227/6
looks [10] 52/14 53/19 53/20 54/9 83/5 95/4 101/6 121/22 124/25 147/21
lookup [1] 73/5
Los [1] 2/19
lose [1] 94/14
loss [1] 10/20
lost [3] 39/19 134/1 194/21
lot [18] 8/7 8/20 8/21 60/1 60/3 77/17 79/23 87/11 87/22 88/14 100/2 135/10 147/24 148/22 207/24 209/3 221/18 227/5
low [5] 101/12 101/15 105/16 110/22 110/24
lower [6] 105/19 106/12 106/12 146/16 182/11 182/15
luxury [1] 162/7

**M**

M-a-p-p [1] 3/21
M-f-o-n-i-s-o-e-k-a [1] 139/23
M-y-r-i-c-k-s [1] 136/25
ma'am [1] 28/2
machine [8] 23/25 27/10 67/9 88/20 93/2 98/10 113/4 219/8
machines [4] 90/14 113/11 113/15 219/5
mail [38] 1/21 2/6 45/7 46/8 46/11 46/14 47/6 48/21 48/22 67/6 67/16 73/6 73/7 79/2 116/22 127/13 128/4 128/9 130/21 130/22 140/19 141/1 141/13 141/17 143/11 143/17 143/22 144/8 144/10 144/14 150/8 150/17 150/19 151/18 153/1 154/1 155/12 218/19
mailed [1] 36/8
mails [9] 44/19 144/15 150/22 155/6 166/22 169/19 169/21 169/24 169/25
main [9] 48/4 48/6 117/20 117/24 119/4 146/15 159/15 166/18 166/20
maintain [2] 38/15 195/15
maintenance [2] 39/3 124/8
major [2] 118/24 227/8
majority [6] 17/5 51/19 91/16 93/8 223/25 226/23
makes [6] 104/9 114/6 204/20 204/21 215/12 228/24
making [11] 89/5 93/5 145/14 145/17 148/3 148/7 149/4 180/25 208/8 216/11 223/21

malfunctions [1] 14/2
malicious [2] 31/9 196/2
malign [1] 178/8
malware [43] 5/25 14/1 31/7 31/7 31/9 31/18 32/4 32/5 32/15 32/20 32/23 33/4 33/4 33/16 33/17 33/17 33/18 34/3 34/7 34/11 34/22 35/4 35/8 35/10 46/20 47/5 50/5 57/6 67/23 68/7 87/20 118/18 118/21 118/23 118/25 119/13 119/18 195/7 202/6 212/12 225/18 225/19 225/21
management [1] 64/1
manager [13] 4/21 4/25 5/15 6/24 12/25 13/23 23/7 23/12 23/15 28/23 29/11 64/2 206/1
managers [2] 42/19 62/18
manner [1] 181/2
manual [2] 31/15 175/8
manually [1] 185/15
Mapp [4] 3/9 3/16 3/19 230/3
March [6] 116/23 137/18 138/24 158/3 162/17 163/13
March 2013 [1] 116/23
mark [10] 18/8 41/8 41/12 41/13 41/15 70/17 76/6 129/11 134/9 191/6
marked [8] 6/6 62/11 103/25 119/23 133/18 133/20 139/11 189/23
market [4] 33/8 34/12 227/15 227/21
marketed [1] 198/21
marketing [9] 57/3 153/11 163/14 198/23 199/10 206/16 206/17 213/13 213/17
MARRA [2] 1/2 1/13
married [1] 183/12
MasterCard [4] 101/19 155/24 157/17 205/3
MasterCard's [1] 156/22
mat [2] 215/24 215/25
match [4] 120/19 145/22 161/3 187/22
material [1] 111/25
math [1] 76/14
Matt [2] 116/16 116/20
matter [10] 35/7 51/4 57/22 65/17 65/22 67/10 110/17 221/5 221/7 231/19
May 1st [1] 124/3
May 2014 [5] 94/3 94/19 94/24 95/8 99/2
maybe [20] 62/3 90/6 91/20 98/18 112/20 138/18 147/16 152/14 152/18 167/10 167/20 167/25 168/25 172/10 172/10 175/25 201/11 212/23 222/22 223/19
McAfee [2] 145/24 195/12
McAffe [1] 31/11
me [87] mean [37] 17/15 21/18 23/14 33/17 34/21 40/12 50/21 56/5 61/19 61/21 67/4 78/9 92/3 92/5 104/23 118/15 119/6 119/8 119/14 126/1 128/6 128/12 146/17 147/19 152/1 152/18 163/25 167/17 169/13 181/10 188/24 191/15 195/5 200/18 201/15 217/15
meaning [1] 18/21
means [3] 34/23 61/24 205/24
meant [1] 31/25
meet [4] 91/17 165/12 165/15 215/10
meeting [10] 41/25 42/11 61/1 80/25 91/6 91/13 110/25 111/1 116/17 116/19
member [2] 67/11 86/15
members [1] 226/20
memory [3] 5/17 5/21 23/4
mention [9] 80/11 81/4 101/10 101/11 104/23 111/9 112/1 176/17 179/18
mentioned [11] 12/24 14/19 17/7 30/15 46/4 57/14 80/7 101/10 103/20 104/5 186/7
menu [1] 24/10
Mercedes [1] 162/5

## M

merchant [13]  155/14 155/21 155/24 156/2 156/5 157/5 157/5 157/9 157/14 157/20 178/10 178/22 179/12
merely [2]  8/2 105/14
Merit [1]  231/16
meritorious [1]  111/5
merits [7]  94/8 201/24 202/1 204/6 216/14 220/19 222/25
message [2]  97/25 213/5
messages [1]  109/18
messed [1]  41/14
met [5]  165/14 165/14 165/16 218/18 228/4
method [2]  15/20 16/4
Microsoft [18]  14/24 15/1 15/6 15/11 17/3 25/8 25/11 89/11 89/12 128/15 128/19 128/23 129/15 130/9 130/13 195/12 209/21 220/2
mid [1]  79/7 184/8
middle [6]  55/1 145/5 146/13 151/9 203/4 203/7
might [6]  9/23 11/1 16/7 16/8 16/9 63/13 66/5 68/25 69/6 86/12 142/10 156/17 165/5 214/8 216/9 226/24
Miguel [1]  74/17
million [25]  96/7 102/14 152/11 152/14 152/14 152/16 161/8 161/10 161/13 161/15 168/16 168/19 169/1 197/16 199/24 206/24 206/24 207/11 207/22 207/24 208/9 208/11 208/12 220/11 227/9
millions [1]  152/12
mine [1]  209/9
Minnesota [1]  105/25
minus [2]  208/3 208/6
minute [2]  88/8 182/4
minutes [10]  69/16 74/18 75/13 75/20 75/21 115/8 172/11 172/21 197/12 221/2
mirror [2]  146/10 147/18
misclassification [1]  105/18
miscommunication [1]  182/17
misconfiguration [1]  5/25
mislead [5]  199/12 202/13 203/12 212/10 212/20
misleading [7]  53/25 89/7 196/2 205/20 205/21 223/6 225/7
misleads [1]  197/21
misrepresentations [1]  211/6
miss [1]  31/23
missing [1]  38/3
mistake [1]  155/19
miswrote [1]  50/3
mocked [1]  147/21
model [5]  201/8 205/19 205/20 207/23 220/4
modes [1]  15/20
modification [5]  176/20 176/21 176/23 177/1 177/4
moment [8]  18/16 22/22 23/3 183/24 189/12 189/23 196/21 213/19
moments [2]  212/21 222/18
money [21]  42/7 42/8 85/25 86/10 86/12 106/25 183/14 183/15 183/20 199/14 204/12 204/23 204/23 206/15 207/2 207/14 207/18 207/20 207/22 207/24 216/11
monitor [12]  27/5 54/13 54/13 54/16 54/19 159/22 163/23 166/25 167/2 167/4 167/11 199/21
monitored [2]  163/25 167/7
month [2]  106/16 112/8
monthly [4]  166/15 166/16 195/16 195/16
months [5]  105/12 105/14 142/14 148/20

169/11
morning [11]  3/2 4/2 4/4 20/9 20/10 30/9 56/19 56/20 56/22 77/7 172/13
mortgage [1]  216/23
most [15]  22/15 24/12 64/18 79/19 82/17 85/7 102/24 153/12 157/1 181/11 182/23 192/22 203/3 212/21 228/3
mostly [1]  108/8
mother's [1]  221/23
motion [4]  134/14 134/15 197/8 220/24
motivation [2]  145/14 145/17
mouse [1]  98/7
move [8]  91/19 76/3 98/7 132/13 133/17 133/21 166/5 180/24
moved [3]  166/6 188/2 192/9
movies [1]  137/15
moving [2]  189/15 226/22
Mr [9]  230/5 230/9 230/10 230/14 230/17 230/18 230/21 230/24 230/25
Mr. [53]  46/4 4/15 4/16 6/14 6/17 12/1 30/9 32/15 45/11 45/23 46/12 56/19 60/25 62/10 63/12 66/22 67/5 67/6 68/9 68/15 68/19 70/21 73/16 77/7 95/2 97/9 108/24 108/25 110/23 114/23 114/23 116/7 133/17 137/7 173/8 183/2 196/22 202/4 202/10 203/20 203/25 205/4 212/25 219/3 219/3 219/9 221/1 222/5 222/17 224/1 224/16 225/17 225/20
Mr. Aiken [2]  45/11 45/23
Mr. Colemeyer [1]  110/23
Mr. Davis [1]  63/12
Mr. Deignan [3]  77/7 95/2 97/9
Mr. Deviny [1]  12/1
Mr. Ferguson [1]  221/1
Mr. Haus [6]  46/12 66/22 67/5 67/6 68/9 68/15
Mr. Herdsman [4]  108/24 108/25 114/23 116/7
Mr. Linder [1]  212/25
Mr. Myricks [11]  70/21 114/23 133/17 137/7 173/8 183/2 196/22 222/5 222/17 224/1 225/20
Mr. Nicholson [1]  68/19
Mr. Skoudis [12]  6/17 32/15 202/4 202/10 203/20 203/25 205/4 219/3 219/3 219/9 224/16 225/17
Mr. Skoudis' [4]  4/6 4/15 4/16 6/14
Mr. Wright [5]  30/9 56/19 60/25 62/10 73/16
MRI [4]  68/7 84/25 85/1 103/2
MS [14]  9/4 17/2 22/5 23/14 24/9 28/24 230/4 230/6 230/8 230/11 230/13 230/16 230/20 230/23
Ms. [17]  40/3 60/23 62/13 62/19 65/9 68/10 109/14 110/18 114/14 131/22 173/13 175/1 176/2 177/12 192/16 221/4 222/20
Ms. Burton [5]  173/13 175/1 176/2 177/12 192/16
Ms. Robbins [10]  40/3 60/23 62/13 62/19 65/9 68/10 114/14 131/22 221/4 222/20
Ms. Taylor [2]  109/14 110/18
much [23]  8/18 222/21 23/17 24/3 29/6 69/10 69/10 69/15 77/14 85/25 86/10 106/22 146/16 163/15 167/24 168/12 172/19 179/18 192/22 205/9 208/13 208/13 220/11
multiple [5]  30/22 34/2 157/2 194/14 224/18
music [2]  137/15 175/5
must [3]  44/20 197/18 204/8
Myricks [17]  70/21 114/23 117/1 133/16 133/17 136/21 136/24 137/7 173/8 183/2 196/22 204/13 222/5 222/17 224/1 225/20

## N

name [26]  3/17 3/18 4/2 30/1 30/2 30/3 30/3 30/9 67/9 76/23 76/24 76/25 76/25 77/7 115/23 115/23 116/7 126/10 136/22 136/23 136/24 137/1 155/16 155/17 155/23 158/7
name's [2]  115/25 115/25
named [3]  107/9 143/13 157/2
names [4]  41/14 139/8 155/3 227/8
nasty [1]  113/22
Nathan [1]  108/2
natural [2]  28/7 38/2
nature [3]  97/10 97/11 130/17
near [1]  105/14
necessarily [6]  11/1 14/12 16/13 93/14 94/8 198/24
necessary [7]  55/19 56/11 115/2 199/22 199/23 204/11 210/10
need [45]  5/7 5/11 10/5 11/13 12/25 13/1 13/23 15/13 16/7 16/9 24/2 24/23 28/3 38/25 39/2 42/22 50/14 57/10 65/8 70/11 86/1 94/10 109/4 109/9 128/19 130/9 130/12 197/10 197/11 198/5 199/9 201/5 203/13 203/14 211/7 212/1 212/20 212/20 213/6 220/8 220/10 220/16 223/16 228/19 229/5
needed [7]  11/13 85/9 98/12 200/2 200/3 200/8 201/3
needs [2]  206/8 214/20
negatively [1]  154/11
negatives [1]  135/16
negotiated [1]  117/3
neither [2]  224/9 224/10
nervous [2]  173/19 185/19
net [3]  168/16 168/20 202/13
Netcom3 [7]  139/9 139/9 140/22 141/5 141/16 161/7 161/12
Netcom3.com [1]  144/8
never [23]  25/13 46/1 53/3 80/7 86/25 87/7 89/8 99/6 99/18 100/6 116/19 129/6 130/16 164/11 164/15 177/3 180/8 182/2 195/16 195/17 214/22 215/7 215/21
new [11]  52/3 72/8 85/23 86/7 107/9 123/18 128/12 184/2 191/14 191/15 205/4
Newport [2]  140/16 140/18
news [2]  127/13 127/21
next [19]  3/7 3/8 7/12 29/22 29/23 57/15 73/25 75/25 83/13 98/6 105/2 115/14 123/6 133/12 146/13 153/23 216/24 224/2 229/19
nexus [2]  123/19 124/20
Nicholson [6]  2/14 2/15 68/19 230/10 230/18 230/25
night [5]  106/10 106/11 106/12 226/8 228/24
nine [1]  169/6
no [202]
non [3]  97/6 113/1 118/10
non-activation [1]  118/10
non-objection [2]  97/6 113/1
none [4]  196/25 197/6 198/11 212/19
nonstop [1]  218/2
normal [5]  36/15 36/15 89/5 123/9 125/2
Normally [1]  92/15
North [1]  2/9
Northeast [1]  2/15
Northwest [2]  2/3 2/5
Norton [7]  31/11 145/23 147/3 147/7 194/3 195/12 221/12
notebook [3]  76/5 76/12 115/17
notebooks [1]  3/12
notes [3]  41/9 123/1 129/10
Notetaker [2]  122/23 123/1

**N**

nothing [11] 19/24 20/4 28/14 35/3 39/8
69/13 128/12 199/15 204/9 205/10 219/7
notice [5] 96/10 129/8 129/10 147/15 182/18
noticed [1] 178/2
notification [3] 92/14 94/7 158/19
notified [3] 68/15 156/20 157/11
notifies [1] 95/4
notify [1] 32/9
notifying [2] 32/2 79/3
notion [1] 223/9
November [11] 91/7 103/14 103/22 106/1
109/25 112/8 112/8 112/11 112/19 112/20
122/13
November 10th [2] 103/14 103/22
November 12th [2] 91/7 122/13
November 13th [1] 109/25
November 26th-ish [1] 112/20
number [114]
number 1 [2] 105/5 225/4
number 10 [6] 70/18 71/15 187/8 188/2
188/8 190/9
number 106 [1] 141/7
number 11 [1] 3/12
number 2 [2] 61/3 225/4
number 3 [3] 40/24 104/19 225/5
number 38 [1] 69/21
Number 4 [1] 61/16
number 6 [1] 222/9
number 7 [3] 133/24 134/9 136/10
numbers [17] 7/4 7/5 9/14 55/5 104/14 105/4
120/16 134/1 168/17 185/12 205/6 218/16
223/24 224/18 224/18 224/22 225/9
numerous [2] 47/7 130/14

**O**

o'clock [2] 172/13 172/16
oath [1] 173/17
object [3] 11/20 53/23 81/14
objection [47] 6/11 20/19 24/25 26/22 27/11
28/12 45/11 52/21 53/14 66/9 66/10 70/22
70/25 76/15 76/19 95/22 96/1 96/16 96/16
97/2 97/3 97/6 111/18 113/1 113/1 129/20
132/18 133/9 134/10 136/12 136/19 142/2
143/25 144/5 144/20 144/21 151/2 151/3
151/4 155/7 161/20 177/22 179/7 188/3
188/5 192/10 192/12
objections [3] 61/24 134/15 136/15
observe [1] 24/3
obtained [2] 107/7 107/11
obviously [1] 23/24
occasionally [1] 159/23
occasions [1] 11/10
occur [3] 14/2 34/24 40/12
occurring [3] 23/2 31/9 38/1
occurs [1] 61/15
October [15] 81/6 81/9 81/11 81/19 81/21
103/14 103/22 105/13 112/8 127/12 127/20
130/20 130/24 150/8 208/18
October 14th [2] 103/14 103/22
October 2014 [1] 105/13
October 21st [5] 81/6 81/9 81/11 81/19
81/21
October 5th [4] 127/12 127/20 130/20
130/24
odd [1] 105/9
off [18] 20/11 43/5 43/9 43/13 43/18 44/22
54/14 54/25 71/6 71/12 71/13 92/21 105/6
188/15 188/16 223/7 227/15 227/21
offer [7] 39/3 39/4 39/7 39/9 150/4 171/20

183/15
offered [4] 6/12 98/2 154/6 201/2
offering [1] 197/21
offers [1] 74/20
office [8] 2/8 83/3 119/25 120/9 141/9 141/10
159/5 159/6
offices [3] 159/5 170/15 170/18
Official [1] 1/19
often [3] 15/13 60/2 126/18
oh [14] 41/13 49/12 83/7 107/22 107/23
118/7 121/18 150/16 174/17 193/1 211/17
223/16 223/18 228/22
okay [207]
old [4] 18/23 109/12 183/8 202/6
OMG [2] 89/24 90/18
omitted [2] 202/23 206/8
once [9] 53/3 65/10 80/7 89/2 149/2 165/14
176/1 189/10 202/24
one [155]
one percent [8] 101/18 175/25 205/2 211/11
212/6 226/16 226/16 227/2
one's [1] 72/5
one-page [1] 194/18
ones [4] 6/4 6/5 92/4 186/14
online [11] 33/9 33/13 43/24 106/2 146/15
150/2 150/6 154/11 165/18 170/8 170/11
only [28] 22/25 23/7 28/11 30/25 47/14 50/20
60/5 60/8 60/8 75/13 113/20 123/13 125/4
145/11 159/14 180/14 189/6 191/23 191/25
198/1 198/21 204/21 207/23 221/9 221/12
222/10 226/12 227/2
open [6] 22/7 25/4 129/13 131/12 184/23
185/1
opened [3] 23/21 65/3 189/11
opening [1] 129/7
operate [4] 37/5 181/4 207/14 208/4
operating [5] 113/24 199/16 206/18 207/4
207/9
operation [1] 194/16
Operational [1] 127/8
Ophelia [1] 212/12
opinion [6] 26/6 28/25 29/3 29/7 225/8
225/12
opinions [2] 6/13 12/10
opponent [1] 95/25
opportunity [6] 64/24 65/22 66/7 105/1
111/25 183/18
opposed [4] 63/22 89/5 198/23 199/9
opposite [2] 211/20 219/2
opposition [1] 134/14
optimization [1] 194/6
optimize [1] 27/17
options [2] 9/7 60/8
order [31] 3/1 15/12 49/3 54/15 58/21 59/15
59/21 64/24 66/25 70/12 72/24 73/3 99/7
107/8 124/4 124/6 124/10 124/11 128/7
174/19 176/1 176/9 176/12 177/7 197/24
204/7 213/21 218/9 228/17 228/25 229/16
orders [1] 127/25
organization [1] 47/20
original [3] 38/20 39/6 55/21
originally [3] 121/17 123/9 168/6
Ostrow [1] 2/12
others [5] 157/16 158/11 175/13 181/12
181/14
otherwise [2] 5/8 225/23
our [69] 3/7 3/8 3/9 31/8 31/10 31/10 35/22
47/4 47/21 47/23 48/3 55/21 57/19 57/23
68/7 71/19 72/13 74/4 76/5 85/8 87/15 89/11
89/11 90/12 90/13 90/13 90/15 91/14 91/16
95/23 96/1 96/1 102/23 103/6 105/21 113/18

113/25 119/8 119/8 122/5 124/2 124/8
124/20 125/20 125/21 127/1 128/13 131/2
134/13 134/23 134/25 135/9 135/15 136/5
194/16 212/9 212/15 213/3 213/22 217/13
218/24 218/25 220/14 221/9 221/21 224/9
226/13 227/8 227/23
ours [1] 135/22
ourselves [1] 165/17
outbound [3] 58/5 58/11 130/18
outperformed [2] 194/11 194/16
outrageously [1] 49/4
outs [1] 179/5
over [35] 17/15 70/8 78/11 78/22 79/7 96/7
97/21 98/6 110/6 125/12 129/14 133/14
146/13 147/8 152/11 152/22 152/25 161/7
161/10 170/1 170/15 170/15 170/19 173/21
177/20 197/16 197/23 199/24 207/22 211/10
211/11 212/24 218/19 220/10 227/5
overall [5] 62/3 167/18 175/23 177/16
179/20
Overruled [8] 6/18 53/17 54/1 111/21 142/4
154/18 155/9 161/21
own [24] 43/10 49/6 55/10 69/3 90/13 102/7
141/10 148/10 161/12 161/19 161/24 162/8
175/12 178/16 202/11 205/17 213/6 220/7
221/10 221/14 221/21 225/1 225/22 227/16
owned [1] 102/4
owners [3] 64/22 91/16 205/17
ownership [1] 182/16
owns [1] 102/9

**P**

p.m [4] 115/11 115/11 172/25 172/25
PA [1] 2/12
packet [1] 217/4
page [122]
page -- I [1] 173/25
page 1 [2] 145/3 153/17
page 10 [1] 147/23
page 1002 [1] 73/17
page 1038 [1] 6/7
page 1189 [1] 41/25
page 1204 [1] 83/18
page 1218 [1] 86/24
page 1269 [1] 84/5
page 1279 [1] 100/24
page 1384 [1] 84/12
page 1426 [1] 44/16
page 1428 [1] 44/17
page 1537 [1] 40/13
page 1539 [1] 42/15
page 1544 [2] 42/16 62/11
page 1545 [1] 74/12
page 1571 [1] 50/13
page 1665 [1] 85/12
page 1777 [2] 119/24 131/23
page 1784 [1] 83/2
page 1795 [1] 39/22
page 2 [2] 152/25 153/16
page 4 [2] 33/24 151/7
page 460 [2] 139/12 139/15
page 462 [1] 140/8
page 464 [1] 140/22
page 466 [1] 141/4
page 5 [3] 117/16 117/19 162/14
page 587 [1] 174/1
page 665 [1] 156/19
page 7 [4] 121/13 121/18 121/19 121/19
page 9 [1] 147/8
pages [6] 1/11 121/4 121/6 138/18 215/17
220/15

# P

paid [4]  44/24 45/1 120/16 207/11
Pairsys [1]  107/9
Palm [3]  1/8 1/20 2/9
Panda [6]  84/24 84/25 88/20 103/1 219/4 219/9
pane [1]  10/6
Papi [1]  104/9
paragraph [24]  7/14 33/2 33/15 33/24 34/16 34/17 35/12 46/5 49/13 49/17 51/9 51/11 76/14 82/8 97/18 117/17 121/19 121/20 124/23 153/15 162/11 162/13 162/20 163/21
paragraph 12 [5]  33/2 33/15 33/24 34/16 34/17
paragraph 13 [1]  35/12
paragraph 15 [2]  162/11 162/13
paragraph 16 [1]  162/20
paragraph 17 [1]  117/17
paragraph 19 [1]  163/21
paragraph 24 [2]  121/20 124/23
paragraph 3 [1]  76/14
paragraph 37 [1]  82/8
paragraph 47 [1]  51/11
paragraph 59 [2]  49/13 49/17
paragraph 67 [1]  46/5
paragraphs [2]  77/22 80/6
paragraphs 22 [1]  77/22
Pardon [1]  136/14
ParetoLogic [3]  126/11 126/12 126/13
Park [1]  2/18
Parkway [1]  141/7
parse [1]  216/14
parsed [1]  201/12
partial [1]  164/11
participating [1]  162/21
particular [15]  8/9 9/16 15/6 19/4 33/18 34/14 63/12 64/17 64/17 84/14 84/15 85/18 156/21 157/4 191/17
particularly [1]  47/4
partner [5]  53/4 91/3 117/6 126/16 214/22
partnered [5]  99/25 100/12 100/17 100/22 101/1
partnering [2]  99/11 99/20
partners [7]  69/23 101/25 102/12 151/10 179/24 205/12 205/16
partners' [1]  68/25
party [8]  95/24 193/20 195/8 196/15 212/17 221/10 223/1 227/11
pass [4]  58/21 92/21 123/4 191/8
passed [1]  196/8
past [5]  67/17 98/20 110/10 219/24 220/2
path [2]  38/15 111/7
pattern [8]  80/13 80/18 80/20 80/23 82/3 82/6 93/16 93/20
Paul [10]  89/21 115/15 115/19 115/25 165/16 166/20 166/20 209/5 209/20 230/15
pay [7]  150/4 152/7 153/2 203/15 205/10 205/11 210/16
paycheck [1]  105/7
payment [2]  104/8 116/10
payments [3]  101/22 160/12 205/15
payroll [1]  210/22
PC [103]
PC-cleaners.com [1]  150/17
PCs [1]  49/2
peek [1]  150/15
pending [4]  81/6 81/23 176/13 228/13
Pennsylvania [2]  2/3 2/5
people [48]  24/12 31/21 35/2 36/4 36/8 36/13 36/20 38/18 38/20 39/6 56/1 57/5 57/5 57/6

57/9 60/4 63/8 64/16 68/24 69/6 74/3 92/24 106/6 106/9 106/13 106/21 119/2 121/7 128/16 128/23 130/7 152/15 159/9 170/2 170/5 170/11 200/12 200/13 201/7 205/9 209/23 211/19 218/15 218/16 220/6 220/9 222/16 223/19
People's [1]  73/16
per [7]  7/6 21/13 118/2 167/21 167/22 204/21 204/22
perceive [1]  96/8
percent [44]  22/21 23/23 50/22 101/17 101/18 101/20 102/9 110/9 117/1 117/3 117/7 117/12 117/13 118/7 118/8 118/9 137/16 147/25 160/11 160/14 166/9 166/10 166/11 166/12 166/15 169/4 169/7 169/12 175/25 194/12 195/14 195/19 195/19 204/20 205/2 205/2 205/17 205/24 211/11 211/11 212/6 226/16 226/16 227/2
percentage [15]  23/2 51/23 117/10 117/25 118/3 160/6 160/10 166/7 168/23 169/5 169/6 169/10 175/22 226/13 227/2
percentages [1]  52/4
perfect [3]  32/16 78/10 161/3
perform [1]  6/1
performance [12]  5/24 6/25 7/7 13/2 13/22 27/17 146/3 146/3 146/8 146/9 193/21 194/5
performing [1]  5/10
perhaps [2]  222/20 225/11
period [6]  44/22 138/24 139/2 161/18 176/2 176/5
periodically [1]  166/22
permanent [1]  174/20
permission [2]  124/10 124/11
Perrera [1]  102/4
person [23]  7/16 27/18 27/19 31/25 47/10 48/12 48/12 50/2 50/6 55/23 56/6 59/2 59/11 59/12 63/12 119/6 154/22 165/12 166/21 173/17 201/19 203/18 214/12
person's [1]  223/20
personal [5]  17/11 29/14 48/17 161/12 211/3
personality [2]  56/8 58/25
personally [8]  48/23 48/23 78/3 78/20 82/14 92/9 99/17 99/18
personnel [1]  189/4
pertain [1]  157/3
pertaining [2]  173/23 180/3
Perusing [4]  9/6 16/24 18/18 163/4
phase [1]  96/3
Phil [2]  89/7 204/4
phone [52]  27/16 27/19 28/7 31/14 36/20 37/7 50/8 50/24 51/13 52/19 55/4 55/5 87/23 91/2 93/5 98/2 99/9 100/14 105/24 111/24 117/21 117/25 118/1 118/2 119/4 119/7 120/5 120/5 120/7 120/8 120/10 120/16 120/17 121/6 130/8 171/20 172/4 189/7 192/1 192/3 192/6 214/4 214/25 214/25 215/1 215/12 218/16 218/19 222/7 223/13 223/16 223/22
phonetic [5]  110/23 118/12 143/13 150/20 195/3
phrase [3]  142/21 143/4 149/13
phraseology [1]  57/13
phrases [1]  57/17
PI [5]  199/1 206/4 206/10 206/13 206/15
pick [1]  172/17
picked [1]  74/17
picking [2]  76/7 130/8
piece [8]  20/13 33/17 119/13 125/25 126/1 126/2 203/3 227/21
pieces [2]  202/6 221/17
pipeline [1]  65/4

pitch [4]  43/10 89/11 164/10 164/16
place [15]  56/10 87/14 88/6 88/14 88/17 88/23 129/14 143/7 190/5 199/12 199/13 201/3 206/19 218/5 225/6
placed [2]  13/21 31/13
places [1]  55/14
plaintiffs [11]  1/5 109/16 141/21 143/23 150/25 201/24 204/2 204/5 216/3 220/1 220/18
Plaintiffs' [17]  69/21 95/21 97/4 127/18 139/12 141/24 143/24 144/25 151/1 151/5 156/18 191/3 218/12 231/3 231/4 231/5 231/6
Plaintiffs' 41 [1]  191/3
plan [3]  62/21 63/1 166/14
planning [1]  134/16
plate [1]  224/4
platform [2]  123/20 123/22
platforms [1]  148/23
play [1]  105/23
please [42]  3/2 3/15 3/18 6/8 8/25 9/3 10/15 12/13 12/15 13/9 15/22 16/15 16/21 29/25 30/2 39/25 40/15 42/2 42/17 43/2 53/21 61/4 74/1 74/12 75/15 75/24 76/22 76/24 83/8 83/19 97/9 97/20 115/13 115/20 115/24 136/23 138/8 145/6 146/14 173/2 179/9 186/3
pleased [1]  183/22
plenty [1]  38/18
plus [1]  135/10
pocket [1]  208/11
pocketed [1]  208/9
point [29]  14/7 30/19 32/19 43/15 47/2 53/17 59/11 60/6 60/12 67/19 68/13 71/20 71/23 88/22 147/17 152/13 152/21 152/22 153/21 159/18 166/18 180/6 180/22 192/8 207/13 216/17 221/15 223/3 226/13
pointed [4]  218/9 223/5 225/17 226/3
pointing [1]  222/8
points [3]  221/25 226/7 227/18
poisoning [1]  219/12
policies [2]  60/15 63/9
policy [7]  44/23 63/21 74/24 79/15 79/17 102/18 103/4
Ponzi [1]  226/10
poorly [2]  5/10 75/11
pop [6]  32/3 35/25 97/11 97/22 98/1 98/11
pop-up [3]  97/11 97/22 98/1
pop-ups [1]  98/11
popped [1]  97/24
popping [1]  90/2
pops [3]  50/20 52/9 190/2
populated [1]  169/15
Porsche [1]  162/3
portion [2]  12/16 83/8
portions [2]  46/14 46/19
posed [1]  142/18
posing [1]  206/3
position [4]  73/21 73/24 96/6 134/25
positive [5]  32/18 134/12 134/22 163/1 163/17
positives [3]  134/19 135/16 135/16
possible [12]  11/1 63/6 75/4 77/14 87/12 87/13 127/10 127/11 157/13 224/5 224/6 229/20
possibly [3]  23/25 112/25 158/22
post [9]  45/8 66/5 117/21 118/14 119/5 119/19 152/3 198/14 206/13
post-purchase [5]  117/21 118/14 119/5 119/19 198/14
post-TRO [1]  206/13

**P**

posted [6]  44/4 44/7 44/9 45/21 46/2 55/13
posting [1]  178/5
posts [2]  44/3 154/3
potential [3]  64/25 226/21 226/23
potentially [7]  8/1 8/20 32/4 69/9 91/15
  213/16 216/8
pours [1]  211/10
powered [2]  47/5 68/7
practice [1]  204/24
practices [8]  171/6 171/9 199/20 205/1
  206/14 206/16 206/18 207/7
pre [1]  169/15
pre-populated [1]  169/15
predecessor [1]  223/25
prejudiced [1]  96/13
preliminary [17]  1/12 191/22 204/7 210/9
  210/11 210/21 211/25 212/5 215/21 216/7
  217/5 219/24 220/13 220/23 227/20 228/5
  228/14
premise [1]  42/25
premised [1]  223/9
premises [1]  140/20
preparation [1]  127/5
prepare [1]  68/19
preparing [5]  110/4 210/14 212/24 213/20
  218/2
prepped [1]  213/22
Prequalified [1]  74/3
present [1]  168/3
presentation [4]  26/17 88/8 88/9 220/22
preserve [3]  204/12 206/15 216/8
preserves [1]  199/14
president [2]  40/20 110/24
press [1]  107/15
pressure [1]  49/4
pretty [7]  29/6 32/9 63/15 113/22 161/5
  192/22 221/24
prevalent [3]  34/1 34/5 57/9
prevent [1]  199/16
prevented [1]  19/6
prevention [1]  33/5
preventive [1]  39/3
previous [4]  18/23 18/24 49/7 176/12
price [3]  57/19 200/17 205/8
primarily [1]  93/13
primary [1]  183/10
principal [4]  141/9 141/10 196/11 223/9
printed [3]  132/24 133/22 133/23
printing [1]  134/6
printouts [1]  134/5
prior [20]  25/24 30/13 66/25 92/25 93/5 94/3
  94/19 94/24 95/7 99/2 105/12 105/12 139/5
  142/24 158/3 173/13 181/15 182/14 183/14
  190/14
privacy [1]  194/15
Pro [21]  26/15 72/17 93/24 94/20 95/11 98/1
  98/8 99/4 99/6 102/1 119/21 132/2 132/7
  171/13 172/3 184/6 185/5 185/7 194/4 202/3
  224/12
Pro's [1]  202/19
probably [18]  8/6 8/11 8/13 56/3 78/9 100/20
  126/24 127/6 129/2 145/20 167/17 167/25
  168/25 169/6 184/8 209/8 213/21 227/10
problem [41]  5/2 5/3 5/8 5/24 7/24 8/20
  10/19 11/2 12/21 13/15 13/18 13/21 14/4
  14/12 14/17 16/1 23/24 35/20 36/14 38/20
  40/11 51/16 69/10 87/19 88/25 96/9 96/24
  113/25 114/3 115/22 128/18 128/24 130/19
  202/4 202/6 202/7 212/14 213/16 217/16

problems [27]  7/21 8/22 9/24 13/25 14/1
  14/20 60/2 64/19 72/16 74/4 74/21 118/19
  128/19 146/3 146/9 197/17 197/22 198/9
  198/10 198/12 199/10 200/3 204/18 212/12
  213/13 217/9 220/7
procedure [3]  99/19 99/22 183/25
proceed [3]  3/4 192/5 197/13
proceeding [2]  96/4 110/4
proceedings [8]  1/12 75/23 115/12 173/1
  189/3 199/3 229/21 231/18
proceeds [1]  214/2
process [27]  7/2 8/16 8/23 9/10 14/5 15/4
  16/6 23/5 37/1 59/3 59/7 65/10 65/10 65/21
  78/12 98/3 105/6 124/4 124/4 124/6 124/10
  124/11 160/12 164/24 178/14 179/12 193/25
processed [1]  155/25
processes [29]  5/17 5/23 6/2 6/3 7/3 7/17
  16/5 17/23 22/2 22/13 22/24 22/25 23/1 23/6
  23/8 23/15 23/16 23/21 23/23 24/4 24/9
  63/25 89/5 89/6 89/16 123/8 125/2 179/1
  205/15
processing [1]  178/14
processor [3]  5/17 101/21 116/10
produce [2]  144/15 170/23
produced [3]  144/12 147/9 150/22
product [89]
product's [3]  154/14 196/13 196/16
productive [1]  135/24
products [42]  30/23 31/11 34/21 49/5 52/5
  53/4 53/6 68/25 84/21 85/13 93/14 98/15
  99/10 99/19 99/24 100/22 100/25 108/8
  108/14 108/15 108/18 109/4 109/6 120/4
  120/12 126/15 126/22 139/3 139/4 139/6
  165/5 212/20 213/13 215/3 215/14 215/15
  218/11 219/1 220/5 220/9 220/21 221/13
professional [1]  216/25
proficient [1]  24/7
proficiently [1]  24/13
profit [1]  208/14
profitable [1]  161/5
program [13]  18/24 39/3 52/8 65/2 66/15
  124/9 132/4 156/23 175/7 177/13 178/1
  196/1 196/3
program's [1]  185/24
programs [4]  16/8 17/6 17/6 35/1
prohibited [1]  206/11
prominent [4]  203/3 214/23 214/24 215/11
promise [1]  137/14
prompt [1]  129/14
properly [5]  19/7 47/11 88/20 93/22 127/7
propose [1]  191/20
Protection [1]  2/8
protocol [1]  22/14
prove [2]  154/7 216/16
proven [1]  204/17
proves [1]  211/21
provide [10]  28/25 29/3 29/7 47/21 91/1
  198/20 198/20 216/19 218/11 220/5
provided [9]  3/13 6/13 29/17 47/14 48/3 98/4
  100/5 123/19 133/25
provider [4]  121/5 214/23 215/7 222/15
providers [1]  219/22
provides [3]  5/15 153/6 198/15
providing [1]  91/4
provisions [1]  206/11
proxy [1]  65/5
public [1]  204/8
published [1]  44/12
pulled [1]  210/22
punched [1]  216/23

purchase [23]  26/14 52/8 53/8 53/9 67/17
  72/21 85/14 117/21 118/14 119/5 119/19
  156/12 169/14 183/25 187/14 188/12 188/13
  191/14 198/14 200/17 202/20 202/24 205/6
purchased [14]  26/19 26/20 27/3 37/15 85/6
  92/25 99/4 99/6 159/10 164/5 197/24 201/19
  227/23 227/25
purchasers [3]  158/4 167/15 168/7
purchases [4]  100/15 100/16 146/21 156/6
purchasing [5]  34/10 124/7 200/9 200/13
  200/19
purpose [4]  36/4 66/14 70/20 203/11
purposes [3]  46/8 134/16 135/1
put [28]  33/5 45/11 45/24 46/14 46/16 46/19
  58/22 58/24 86/21 87/5 87/11 89/12 105/19
  112/4 126/4 135/17 178/19 187/17 187/18
  190/3 198/22 198/25 199/1 199/2 199/9
  214/18 218/3 218/5
putting [8]  59/20 63/22 115/1 180/1 188/10
  202/22 221/23 227/22
PX37 [8]  39/22 40/5 40/13 41/25 44/16 60/24
  62/11 131/23

**Q**

quality [4]  57/19 162/23 164/2 179/17
queried [1]  57/7
query [2]  57/8 57/9
question [28]  8/5 12/11 12/12 12/14 15/21
  20/14 37/22 38/11 38/21 39/14 45/20 65/13
  66/12 81/17 85/19 87/25 88/1 88/10 100/10
  111/22 129/10 132/12 156/4 156/15 175/17
  177/23 199/8 227/19
questioned [1]  49/7
questioning [1]  192/16
questions [28]  24/17 26/8 26/9 28/16 30/11
  38/7 56/21 58/16 61/1 61/10 64/11 65/9
  66/21 69/9 73/11 73/13 77/9 85/17 116/9
  118/11 131/15 132/9 132/10 164/22 170/23
  173/13 173/17 210/20
quick [2]  114/21 226/10
quickly [3]  72/12 172/14 192/15
quote [2]  28/24 145/8 145/8 146/2
quoted [1]  153/9

**R**

R-a-m-i-n [1]  3/20
radar [1]  210/6
raise [2]  3/14 115/18
raised [4]  184/16 210/20 222/3 226/17
Ramin [4]  3/9 3/16 3/19 230/3
Ramirez [2]  108/22 125/23
ran [2]  74/21 202/21
randomly [1]  76/8
range [2]  117/14 118/13
rank [1]  57/19
rapport [1]  38/12
rare [1]  55/23
rarely [1]  210/15
rate [14]  64/17 101/12 101/15 117/3 158/19
  195/15 195/19 205/2 205/23 211/9 211/11
  211/12 212/6 212/7
rated [2]  151/22 227/11
rather [4]  52/20 135/10 149/6 217/18
rating [9]  152/3 152/5 153/13 154/23 182/5
  182/8 182/11 182/14 182/15
ratings [3]  150/5 154/10 154/11
reach [3]  80/1 170/25 176/5
reached [4]  184/15 184/18 184/20 217/13
react [2]  164/13 164/23
reaction [1]  223/3
read [72]  9/3 9/7 10/14 12/15 12/16 13/9

**R**

read... [66] 16/21 18/19 27/25 28/3 28/20 28/22 38/9 39/20 39/25 40/15 40/25 41/5 41/10 42/2 42/5 42/12 43/12 51/6 61/3 61/5 70/7 72/6 72/8 73/20 74/1 74/13 79/4 83/11 83/12 87/3 87/6 91/23 92/5 92/6 97/9 97/14 97/15 100/7 113/5 113/6 125/6 128/2 128/4 128/25 128/25 129/1 129/6 129/17 129/23 141/6 144/5 146/5 151/12 163/2 174/10 198/4 200/7 201/7 201/14 206/3 209/6 212/25 213/20 217/4 218/19 224/3
reader's [1] 223/12
readily [1] 203/1
reading [8] 4/15 13/14 39/12 93/23 97/15 100/4 145/3 151/9
ready [7] 3/4 40/2 75/25 197/7 197/8 210/4 210/8
real [7] 114/21 220/5 220/5 220/6 225/24 226/8 227/4
realize [1] 223/25
realizing [1] 110/20
really [11] 11/15 40/19 93/20 113/19 122/5 179/4 187/19 192/15 196/18 199/6 221/11
realtime [2] 23/20 231/17
reason [8] 48/4 80/21 103/9 106/23 147/24 148/19 168/10 177/25
reasonable [1] 28/5
reasons [4] 94/11 146/16 170/2 170/5
rebilled [1] 124/9
rebut [5] 6/13 42/7 61/16 97/1 111/15
rebuttal [9] 61/25 85/23 85/24 86/7 86/9 86/12 86/15 86/18 115/6
rebuttals [3] 85/20 85/21 85/22
recall [29] 22/2 25/20 45/3 47/16 53/2 58/17 60/25 62/19 66/22 68/4 93/8 93/23 94/1 94/19 94/21 99/8 100/23 105/3 143/11 150/7 150/8 155/1 155/4 156/20 157/11 157/24 157/25 160/5 165/7
recalling [2] 48/6 67/7
recap [1] 210/15
receipt [5] 63/19 187/18 187/18 187/24 188/10
receipts [4] 161/7 161/10 208/2 208/12
receive [22] 8/22 24/19 36/11 51/25 52/1 65/14 79/2 79/5 81/24 106/14 117/3 117/7 117/11 117/13 117/13 119/20 129/1 160/10 160/14 166/7 170/14 182/18
received [21] 47/20 48/2 48/23 67/6 67/7 78/19 78/19 80/16 81/19 81/21 91/24 92/13 100/10 127/12 158/20 168/23 183/21 196/12 200/25 201/1 209/4
receiver [5] 103/12 103/20 199/2 211/20 213/5
receiver's [3] 103/20 104/5 206/20
receivership [3] 110/6 211/25 218/1
receives [2] 51/24 117/1
receiving [6] 28/8 36/6 98/11 153/25 154/4 159/9
recent [1] 58/19
recently [3] 48/15 142/14 184/3
recess [4] 75/20 75/22 115/11 172/25
recidivist [1] 204/25
recognize [11] 50/8 50/24 83/4 144/10 156/24 174/8 187/10 189/22 191/11 193/15 194/25
recollection [7] 93/12 94/22 94/24 120/17 123/16 138/4 156/18
recollection's [1] 47/10
recommend [2] 19/22 21/20
recommendable [1] 21/22

recommendation [2] 163/22 166/3
recommended [2] 15/6 166/5
record [15] 11/22 11/25 12/2 12/5 60/24 133/1 135/17 174/1 174/4 189/16 191/1 219/16 221/7 228/23 231/18
recording [1] 29/17
records [1] 120/19
recross [7] 28/17 28/18 73/12 73/14 197/1 230/6 230/11
Recross-examination [2] 28/18 73/14
recruit [1] 107/4
recruiting [3] 40/19 55/15 55/16
recurring [2] 166/15 166/16
red [4] 10/22 11/5 64/18 125/16
redirect [15] 20/5 20/7 56/15 56/17 107/25 131/9 131/10 173/3 173/6 196/24 230/5 230/9 230/14 230/17 230/21
redress [6] 199/14 206/15 207/25 208/7 226/25 226/25
refer [6] 9/18 42/13 82/8 82/16 121/23 142/18
reference [3] 17/13 20/13 68/10
referenced [1] 135/9
references [1] 140/10
referred [2] 82/11 132/19
referring [16] 4/8 4/10 9/4 13/22 15/17 20/23 31/18 33/25 34/25 45/22 45/23 67/5 67/21 139/20 147/1 147/4
reflects [1] 11/25
refresh [5] 94/22 94/23 120/17 138/4 156/17
refund [24] 66/18 66/18 66/19 74/20 75/8 79/15 79/16 79/18 79/20 79/23 80/1 80/1 92/17 103/4 103/6 114/2 169/5 169/19 205/2 205/23 205/25 211/9 211/11 212/6
refunded [1] 92/18
refunds [5] 103/8 170/3 179/19 208/3 208/6
regard [6] 6/12 58/5 58/12 68/21 108/22 182/5
regarding [4] 137/25 149/13 159/12 202/2
regardless [1] 186/19
regards [9] 88/4 89/10 89/16 91/18 105/21 109/20 110/19 118/24 146/15
RegClean [1] 194/4
register [2] 36/14 190/2
Registered [1] 231/16
registry [7] 18/22 19/15 28/25 32/17 67/13 119/11 139/5
regular [1] 167/1
regulations [1] 166/2
rehabilitate [1] 150/5
rehabilitating [1] 150/9
reinstalled [1] 67/14
relate [1] 52/5
related [1] 175/23
relates [2] 74/23 119/17
relating [1] 187/23
relation [1] 56/24
relationship [9] 132/6 158/21 159/7 162/17 167/7 180/15 205/14 205/16 219/21
relative [3] 111/4 224/25 225/14
relatively [2] 110/22 175/19
release [4] 107/15 216/7 216/8 216/10
released [2] 193/23 193/24
relevance [1] 161/20
relevant [2] 141/18 225/22
relied [1] 126/2
relief [4] 174/20 204/8 216/23 228/1
rely [4] 181/12 181/14 227/24 227/24
remain [1] 33/6
remainder [1] 199/3
remarks [1] 129/8

remediation [1] 49/5
remember [13] 64/12 92/12 93/8 93/15 128/8 138/1 153/25 158/22 160/5 167/25 178/11 182/6 212/23
remind [1] 62/16
reminder [1] 122/23
remnants [1] 17/15
remote [10] 14/7 29/4 59/18 60/5 60/9 74/25 100/8 123/18 124/1 164/15
remoted [1] 100/6
remotely [7] 37/12 49/2 59/8 59/16 72/14 73/8 98/6
removal [1] 194/15
remove [11] 43/8 43/13 45/17 57/10 57/11 57/24 63/14 113/25 118/22 118/25 222/12
removed [1] 125/3
removing [2] 43/16 57/10
renew [3] 169/11 169/12 169/21
renewal [1] 169/15
rep [2] 73/2 89/13
repair [4] 25/13 25/18 74/5 197/18
repeat [5] 12/12 15/21 52/3 80/15 149/3
rephrase [4] 66/12 81/17 98/19 177/23
replaced [1] 125/3
Replacing [1] 191/16
reply [2] 134/13 134/23
report [51] 4/10 42/25 43/3 43/22 43/24 44/3 44/19 45/1 45/6 45/7 45/8 45/9 45/11 45/13 45/17 45/21 47/19 47/19 48/10 62/17 62/18 63/11 63/22 64/6 64/9 64/11 64/19 64/23 65/3 65/4 65/14 65/21 65/24 66/5 74/14 103/12 103/20 104/5 137/24 138/19 193/18 193/19 193/23 194/5 203/21 203/21 203/22 206/21 219/6 224/22 227/7
reporter [6] 1/19 1/19 12/16 175/17 231/16 231/17
reporting [5] 48/25 130/10 137/22 138/17 152/1
reports [5] 42/18 195/3 224/17 224/20 226/2
represent [1] 53/24
representation [2] 24/16 25/16
representations [4] 163/22 203/21 203/23 220/14
representative [3] 40/11 60/15 87/15
representative's [1] 61/8
representatives [2] 25/17 49/1
representing [1] 128/23
reproach [1] 222/15
reps [1] 212/15
reputable [2] 35/9 64/18
reputation [4] 150/2 150/6 154/15 162/23
reputational [1] 153/12
request [11] 72/15 135/14 135/15 150/25 169/19 170/22 210/10 220/13 220/14 220/24 228/8
requested [1] 12/16
required [8] 36/23 137/24 138/19 149/4 149/9 192/25 198/3 198/4
requirement [1] 96/2
requirements [1] 137/22
requires [4] 59/16 142/17 192/17 192/18
research [7] 18/22 119/9 127/2 165/21 170/13 179/25 181/14
researcher [1] 46/20
resell [1] 42/8
resolve [1] 220/18
resolved [7] 65/22 79/22 113/20 155/18 155/20 216/17 226/21
respect [1] 69/20
respond [8] 45/9 78/23 85/18 94/10 94/14 110/7 134/13 218/5

**R**

responded [12] 67/18 78/3 78/5 78/7 92/9
94/3 95/13 95/14 99/1 99/3 226/18 227/3
responding [5] 45/8 79/11 94/15 95/16 98/13
responds [1] 153/5
response [14] 26/12 39/15 42/23 79/5 79/6
79/25 94/17 95/23 95/24 98/21 98/22 112/16
148/18 153/15
responses [1] 85/16
responsibilities [2] 37/6 109/2
responsible [1] 218/4
rest [2] 54/11 114/19 133/13 197/4
restart [2] 15/14 16/9
restarted [1] 15/16
restate [1] 98/18
restore [1] 68/14
restraining [4] 66/25 107/8 127/25 128/7
result [6] 63/13 110/15 153/12 185/12
185/15 186/18
results [9] 34/9 57/17 145/12 146/2 148/21
149/17 196/6 196/12 196/20
resume [1] 56/9
retain [1] 180/4
retrieve [2] 68/1 71/9
revenue [29] 101/21 101/24 102/4 116/11
116/13 116/16 116/25 117/4 160/12 160/15
160/16 160/22 161/2 162/21 162/25 163/22
165/24 165/25 166/3 166/25 167/11 175/23
178/17 178/18 179/18 187/17 205/14 205/17
209/5
review [19] 4/11 4/18 7/25 8/12 18/16 26/5
29/7 29/8 65/8 78/7 78/20 80/3 84/6 92/7
92/23 165/8 169/19 169/24 169/25
reviewed [7] 4/5 79/11 91/25 92/10 99/1 99/3
154/11
reviewing [4] 78/8 78/13 78/14 79/10
reviews [6] 134/12 152/2 152/4 152/5 152/6
170/8
revocation [6] 47/7 48/5 48/5 80/12 81/6
81/23
revoked [4] 48/15 48/17 80/8 80/17
rhyme [1] 106/22
rich [1] 226/9
rid [5] 142/21 148/20 149/6 149/13 212/16
Ridley [2] 150/19 153/5
right [160]
ring [1] 91/2
Ripoff [21] 43/22 43/24 44/3 44/19 45/1 45/6
45/7 45/8 45/12 45/17 47/18 47/19 48/10
64/11 64/19 64/22 65/3 65/4 65/14 65/21
66/5
RMR [2] 1/19 231/23
Robbins [22] 2/2 4/2 30/9 40/3 60/23 62/13
62/19 65/9 68/10 77/7 114/14 116/8 131/22
221/4 222/20 230/4 230/6 230/8 230/11
230/13 230/16 230/23
Robby [1] 107/17
Robert [2] 2/14 76/1 76/12 76/21 76/25
230/12
robots [1] 61/9
rocket [1] 24/8
rogue [6] 33/15 34/3 34/4 34/7 34/12 35/21
rogues [2] 33/25 34/15
role [3] 40/18 140/4 140/5
roll [1] 113/20
rolling [1] 124/19
rollout [1] 124/15
room [3] 60/7 128/16 130/7
rooms [1] 42/1
rootkits [1] 113/23

routine [1] 49/3
row [1] 213/2
rude [1] 127/1
rules [4] 40/23 41/4 156/23 166/1
ruling [9] 16/4 128/4 128/6 129/1 129/17
129/23 130/16 209/6 209/8
run [21] 18/1 18/14 19/1 19/9 20/15 21/12
21/14 34/8 37/19 99/14 100/15 100/16
100/19 119/16 123/8 125/2 176/19 176/21
208/13 216/18 218/6
running [13] 5/18 6/4 6/5 7/17 22/2 23/22
23/25 71/11 88/21 97/25 119/11 135/23
196/1
Russinovich's [1] 18/8
Ruth [2] 150/20 153/5

**S**

safe [15] 4/21 27/6 155/14 156/9 156/12
156/13 157/10 178/10 178/13 178/16 178/22
178/24 178/25 179/1 179/11
safecard.com [4] 155/21 156/3 156/11 157/7
sale [9] 102/14 103/9 113/17 117/7 124/5
146/18 146/19 198/14 207/11
sales [77] 13/14 15/14 16/15 23/6 25/13
25/17 26/20 29/13 29/14 36/21 36/23 37/4
37/7 38/8 40/19 41/13 41/15 41/20 42/19
43/14 50/1 50/16 50/21 51/5 55/16 55/18
56/4 58/16 58/20 59/8 59/15 59/20 59/24
60/13 60/15 61/7 61/9 61/19 61/25 62/17
72/18 73/23 74/2 82/8 85/17 89/13 104/25
104/25 105/22 106/9 117/1 121/24 122/2
127/6 127/9 128/10 130/4 130/22 148/3
148/5 153/22 160/6 160/8 164/3 164/10
164/16 165/8 166/8 166/23 168/13 168/24
169/3 198/3 204/18 206/1 207/18 208/21
salespeople [12] 10/3 12/1 29/15 82/15 84/13
87/8 88/1 123/8 123/22 124/24 125/5 203/16
salesperson [20] 6/10 7/3 7/10 7/14 7/16 8/14
9/13 10/10 11/18 13/17 14/16 16/22 17/1
38/24 39/12 42/20 198/2 198/2 201/7
same [37] 26/2 34/24 35/6 64/6 71/5 81/8
90/9 93/25 106/11 109/14 110/15 111/7
135/25 136/7 136/11 141/8 141/17 143/9
145/21 145/23 146/4 146/5 187/23 188/10
188/11 188/13 195/13 195/14 198/5 201/9
205/1 211/13 212/8 214/18 217/25 225/10
226/17
Sara [6] 81/9 81/10 81/25 109/16 111/2
111/9
sat [1] 219/9
satisfaction [4] 66/2 93/18 114/5 179/20
satisfied [3] 47/13 183/19 226/12
satisfy [1] 218/8
Saturday [2] 106/10 106/11
saved [1] 212/14
saw [4] 22/16 23/22 99/24 223/2
say [122]
saying [17] 18/25 32/19 33/3 35/24 47/10
75/5 75/11 119/3 130/8 147/7 147/21 162/25
163/10 170/11 221/15 224/21 225/7
says [57] 6/25 7/6 9/23 10/5 10/15 10/19
10/25 12/9 15/17 17/22 19/22 19/23 21/3
25/4 34/17 40/16 40/23 40/25 41/7 42/5
42/11 42/12 43/5 43/18 44/6 54/14 55/1
61/16 70/9 71/23 72/7 74/17 75/3 79/6 79/25
83/11 83/12 117/20 122/4 128/2 131/3 132/5
145/5 146/1 147/23 190/11 200/10 203/4
209/21 209/22 211/10 213/4 214/9 214/10
219/6 221/16 224/1
scam [8] 48/1 48/9 128/16 128/22 128/22
129/15 130/13 209/21

scams [1] 220/2
scan [24] 34/8 142/19 143/6 149/17 149/19
171/14 171/15 186/6 186/13 186/17 186/25
196/3 196/4 197/21 198/16 201/23 202/12
202/19 202/19 202/21 205/5 224/11 224/15
225/12
scanning [4] 143/5 149/17 149/19 149/20
scans [1] 202/23
scare [1] 200/12
scaremongering [1] 49/1
scareware [1] 153/10
scary [1] 226/1
scheme [4] 204/10 204/11 226/10 226/10
Schneider [1] 211/21
science [2] 24/8 32/16
scope [2] 29/6 69/11
scoring [1] 59/1
Scott [1] 108/2
scratch [2] 100/3 184/1
screen [53] 8/3 18/5 19/13 20/2 23/3 54/10
54/16 70/3 70/5 70/9 71/3 73/9 119/20
129/15 131/19 131/24 132/2 145/7 145/12
145/18 146/2 146/21 148/7 148/21 148/21
169/14 185/12 185/15 186/18 188/17 188/19
188/22 190/8 190/8 190/11 190/17 190/18
202/18 203/2 214/9 214/10 222/8 222/11
223/7 223/11 223/12 224/1 224/2 224/5
224/11 224/13 224/15 225/13
screens [2] 69/22 69/25
script [122]
scripters [2] 157/14 157/20
scripts [31] 4/9 4/11 4/14 4/17 6/13 6/14 26/5
28/20 28/22 29/8 29/9 82/1 82/13 82/16
82/19 82/20 82/23 87/8 88/22 90/4 121/23
125/10 125/11 125/12 125/13 125/17 127/9
165/8 201/25 205/20 209/7
scroll [3] 54/11 54/15 214/12
SDK [1] 67/23
se [2] 7/6 21/13
Seal [1] 151/16
search [7] 33/12 33/13 49/18 49/19 49/20
170/8 170/11
season [1] 127/5
seated [7] 3/3 29/25 75/24 76/22 115/13
115/20 173/2
second [12] 3/20 4/15 4/16 6/14 43/7 43/12
67/24 85/21 134/3 147/11 174/12 214/10
Secretary [1] 140/9
section [7] 7/11 63/1 63/2 63/19 79/24
138/16 138/17
sections [1] 62/21
securely [1] 72/13
securities [1] 216/22
security [22] 17/19 20/12 21/4 29/3 35/8 35/9
46/21 46/22 46/25 47/2 57/3 57/4 67/22
67/23 103/1 139/10 145/8 186/16 186/20
216/6 216/12 216/17
seeing [6] 8/20 31/8 52/20 94/19 118/18
145/21
seek [1] 226/24
seeking [4] 169/21 170/2 206/12 226/25
seem [2] 70/14 96/25
seemed [2] 98/3 98/10
seems [1] 109/12
seen [21] 22/4 25/16 25/17 37/20 40/18 52/7
52/9 52/12 52/24 52/25 53/8 53/9 86/25 87/7
119/19 169/23 190/18 206/5 212/3 220/22
221/10
sees [1] 146/20
select [2] 15/15 16/8
selection [1] 15/20

**S**

selective [1]  15/24
self [2]  206/7 213/22
self-serving [2]  206/7 213/22
sell [25]  38/17 39/13 55/25 74/4 74/6 85/1
  85/9 85/13 102/18 122/16 122/17 122/18
  149/24 165/6 171/13 172/3 176/23 177/20
  181/1 191/23 198/19 218/11 219/4 219/9
  222/24
selling [12]  84/25 91/19 91/20 139/3 152/20
  152/23 165/4 171/25 181/17 207/15 220/8
  220/9
sells [2]  168/24 227/4
send [4]  109/19 109/21 130/22 155/12
sending [3]  127/13 155/5 161/18
senior [1]  110/23
sense [1]  227/13
sent [13]  67/6 92/14 109/14 111/9 116/22
  127/20 128/9 130/21 130/23 198/10 217/25
  218/18 218/20
sentence [10]  33/25 34/14 34/17 45/18 61/8
  117/18 174/10 174/12 174/13 174/15
separate [3]  62/3 131/23 181/19
separately [2]  102/19 102/20
September [3]  107/6 124/15 130/25
September 2014 [1]  130/25
September 26th [1]  124/15
September 29th [1]  107/6
series [3]  15/25 16/2 149/5
serious [5]  11/11 63/15 63/16 69/10 128/19
seriously [2]  11/13 216/15
served [5]  109/7 124/2 170/21 210/22 212/1
service [22]  31/16 36/9 43/24 44/24 47/25
  48/8 51/25 60/10 64/23 73/2 74/4 85/8
  139/20 162/24 179/17 179/21 200/8 213/3
  215/15 216/19 218/12 218/24
services [19]  17/3 49/5 52/5 60/14 84/21 91/1
  102/23 103/6 165/4 180/7 198/20 198/21
  200/3 201/2 212/21 215/2 219/1 220/5
  220/22
serving [2]  206/7 213/22
session [1]  14/8
set [8]  80/25 88/22 92/12 101/24 116/17
  134/5 197/20 226/9
Seth [1]  2/11
sets [1]  197/20
settle [1]  137/18
settled [4]  142/6 142/10 149/10 227/1
settlement [10]  137/21 138/13 142/8 142/16
  142/16 149/5 149/8 192/16 192/17 192/25
seven [1]  166/13
several [7]  82/19 82/20 129/12 142/14
  170/19 223/3 226/11
severity [5]  10/18 145/15 145/19 148/15
  185/18
SFranklinUSDC [1]  1/21
shake [1]  129/14
shape [1]  93/19
share [1]  175/6
shares [4]  102/13 207/12 207/15 207/16
sharing [4]  175/5 176/19 177/6 177/9
shift [3]  105/2 106/5 118/18
shifts [1]  106/9
shocking [1]  212/21
shopper [1]  187/16
shopping [1]  187/17
shortly [1]  182/8
shot [5]  70/3 145/7 148/21 202/19 223/7
shots [1]  203/2
should [23]  8/23 8/23 11/10 16/9 18/21 19/24

33/21 51/16 98/18 132/25 152/14 152/19
  153/7 156/13 174/1 183/18 193/8 198/22
  198/25 219/14 219/17 219/20 228/7
shouldn't [4]  39/8 206/18 207/19 219/23
show [36]  16/16 22/25 39/16 39/22 39/23
  51/16 53/11 53/13 53/19 55/23 57/19 60/23
  65/8 70/17 82/18 82/18 83/18 84/2 84/23
  85/11 86/24 88/5 102/19 103/14 119/24
  127/16 127/17 156/7 156/13 175/5 185/17
  186/18 187/20 194/22 223/7 223/11
showed [5]  60/23 120/15 131/22 145/7
  218/13
showing [14]  6/6 40/13 41/25 42/15 42/24
  49/2 50/12 73/16 74/12 84/12 88/13 100/24
  119/23 138/5
shown [3]  26/8 64/3 190/8
shows [9]  22/13 22/20 22/21 23/2 23/4
  123/4 154/2 190/3 222/11
shut [3]  176/18 206/10 227/12
sic [2]  186/17 223/3
side [2]  127/3 149/11
sides [2]  28/8 28/9
sign [3]  63/22 64/8 217/25
signature [1]  63/18
signed [7]  43/22 45/12 45/14 105/6 111/11
  138/14 218/1
significant [12]  10/19 11/1 11/5 11/8 12/21
  74/25 105/17 110/21 188/14 188/15 221/24
  222/5
silo [1]  109/1
similar [9]  32/11 32/14 32/17 50/5 141/25
  145/19 147/24 148/9 152/1
simple [1]  74/6
simply [2]  34/18 94/15
simultaneous [1]  111/10
since [8]  46/17 72/5 79/12 110/3 177/4 177/7
  181/18 195/16
single [14]  47/9 58/23 59/2 61/15 92/6 93/15
  96/11 99/13 100/16 114/3 200/2 201/9
  202/18 215/7
sir [15]  3/14 3/17 21/3 28/2 29/20 30/1 54/5
  76/23 114/16 115/18 115/23 132/11 133/3
  136/22 197/3
sit [2]  87/22 92/6
site [9]  47/24 48/7 151/15 152/2 152/3
  152/10 165/10 178/2 178/3
sitting [2]  128/16 129/10 130/7 216/12
situation [2]  14/6 14/10
six [13]  100/20 122/2 122/3 122/3 122/10
  124/22 124/22 127/14 127/21 144/23 169/11
  218/2 219/19
size [1]  54/13
skills [1]  10/3
skimmed [1]  92/4
skimming [1]  113/5
skip [2]  145/7 146/1
Skoudis [13]  6/17 32/15 202/3 202/4 202/10
  203/20 203/25 205/4 219/3 219/3 219/9
  224/16 225/17
Skoudis' [5]  4/6 4/15 4/16 6/7 6/14
SKU [1]  102/23
SKUs [1]  102/22
sleep [1]  228/24
sloppy [2]  211/1 211/5
slow [19]  18/1 18/14 19/1 19/9 20/16 21/12
  21/14 23/22 23/25 87/21 88/18 88/21 97/25
  98/11 98/12 119/11 119/14 119/16 219/6
slowness [1]  13/2
slows [1]  105/22
small [3]  54/13 175/15 175/16
smaller [1]  54/19

smart [7]  36/19 36/20 128/13 139/9 139/9
  175/19 210/17
software [131]
software's [1]  193/3
softwares [3]  98/8 98/8 157/2
sold [12]  68/5 85/5 102/12 139/5 154/1 165/3
  166/14 177/3 177/9 200/15 207/16 215/14
solicitation [1]  202/13
solution [2]  35/5 60/5
solve [1]  213/16
somebody [12]  85/7 85/18 87/1 87/13 88/6
  92/19 94/13 100/8 104/25 106/25 107/2
  198/10
somebody's [1]  103/6
somehow [3]  218/3 225/3 225/5
someone [23]  8/10 14/11 23/22 37/4 56/2
  59/3 61/22 63/12 64/1 86/21 87/2 87/6
  119/10 119/10 122/19 128/17 130/18 139/21
  143/13 146/20 159/17 209/4 224/5
something [28]  12/25 13/3 28/2 32/17 49/22
  63/22 64/21 66/6 68/5 87/4 87/6 89/7 94/12
  97/12 97/23 100/7 105/18 106/4 139/11
  143/9 178/23 199/22 201/11 203/13 220/8
  228/23 229/18 229/19
something's [1]  119/2
sometime [3]  118/17 130/25 184/10
sometimes [8]  17/22 32/16 53/9 79/22 101/25
  113/22 113/25 217/2
Somewhat [1]  167/13
somewhere [1]  70/14
son [1]  106/1
soon [2]  139/2 229/17
sophisticated [1]  223/19
sorry [51]  5/6 5/14 6/20 9/5 10/15 11/21 12/4
  13/10 20/23 26/20 33/22 37/17 39/17 41/13
  41/13 46/4 49/11 49/12 51/8 51/9 55/16
  60/11 79/10 86/1 92/16 98/18 103/25 104/5
  115/21 118/6 122/25 139/9 142/9 142/10
  143/16 144/22 149/3 153/17 155/15 159/19
  161/22 163/2 167/3 170/17 171/8 174/14
  186/2 193/7 194/19 196/14 210/25
sort [8]  5/11 38/3 58/21 134/12 135/18
  170/21 182/14 220/16
sought [2]  150/9 169/5
sound [3]  138/2 161/15 208/8
sounds [3]  17/10 24/15 138/3
source [1]  183/10
sources [1]  177/21
South [2]  90/25 91/5
SOUTHERN [1]  1/1
Southwest [1]  2/12
space [4]  76/8 89/19 91/5 217/7
spam [1]  155/5
speak [3]  24/19 64/24 109/19
speaking [2]  69/22 182/3
specific [7]  45/24 50/4 57/2 57/8 75/12
  112/25 225/17
specifically [9]  7/5 7/11 9/12 10/24 11/7
  13/22 23/9 28/22 28/23
specifics [4]  13/23 44/11 73/25 74/1
specified [1]  11/9
specifies [2]  18/19 138/18
specify [7]  10/4 18/3 18/6 19/11 19/14 20/3
  21/13
spectrum [1]  28/9
speed [2]  78/16 119/12
speedometer [1]  185/17
Speedy [6]  146/16 146/25 147/14 147/15
  147/18 147/24
spell [6]  3/17 30/1 76/23 115/23 136/23
  137/1

**S**

spelled [1] 3/20
spend [2] 85/25 86/9
spent [2] 77/17 110/3
spiff [7] 104/1 104/2 104/4 104/8 104/13
104/19 105/18
spiffs [4] 104/22 104/23 105/13 105/20
spin [1] 105/1
spoke [2] 109/16 111/24
spoonfed [1] 213/1
spoonfeed [1] 218/18
spoonfeeding [1] 210/18
spun [1] 105/2
spyware [6] 34/4 34/4 34/7 34/12 35/21 57/4
Squad [2] 60/6 113/21
staff [1] 72/18
staffed [1] 127/7
stage [1] 197/20
stand [3] 158/9 181/4 213/18
stand-alone [1] 181/4
standard [1] 215/10
standardized [1] 58/25
stands [1] 205/16
Staples [1] 113/21
start [13] 17/3 77/24 97/21 98/2 105/24
118/24 123/3 139/3 145/3 151/9 158/13
184/7 210/19
started [20] 18/22 33/16 36/3 57/6 79/7
89/24 98/11 105/2 118/18 118/23 121/22
163/8 163/13 171/24 181/7 184/8 193/25
195/17 195/18 207/18
starting [2] 121/19 140/7
starts [4] 44/16 105/23 174/10 211/9
startup [8] 15/13 15/20 15/24 15/24 16/10
22/9 22/13 24/10
state [16] 1/4 2/7 9/12 10/24 11/7 11/16
13/16 31/6 33/15 35/12 93/10 132/21 140/9
170/14 170/18 171/6
stated [8] 7/19 38/5 61/12 80/24 117/16
128/3 205/18 205/19
statement [5] 95/25 140/8 141/4 141/15
156/13
statements [1] 102/20
states [6] 1/1 1/14 19/19 159/1 159/3 159/6
stating [4] 15/1 75/1 80/16 81/22
status [9] 67/1 68/14 150/10 151/15 151/18
152/2 153/2 153/7 220/16
stay [2] 171/18 210/6
Ste [1] 2/9
steal [1] 122/20
step [34] 6/8 6/21 7/13 8/25 9/1 9/4 9/5 9/10
13/8 13/10 16/21 16/22 25/24 25/24 40/1
42/2 42/3 42/12 61/1 61/3 61/16 78/23 83/9
83/13 83/22 84/7 84/8 120/25 123/7 123/13
124/13 125/1 133/3 153/23
Stephen [4] 1/19 231/16 231/22 231/23
steps [6] 14/24 15/25 16/3 42/2 60/16 153/25
stick [3] 38/9 88/2 89/17
still [28] 45/15 79/4 79/7 80/1 119/1 119/2
119/11 119/12 126/5 143/3 143/5 149/20
155/18 186/17 204/19 205/5 205/16 206/13
208/22 213/6 215/22 215/22 217/6 217/19
219/18 220/18 225/21 225/25
stipulated [1] 174/19
stood [1] 114/1
stop [7] 2/6 33/5 78/8 204/9 206/16 210/3
210/10
stopped [12] 74/17 75/6 75/12 78/13 78/14
79/10 79/11 149/20 180/13 180/13 211/17
212/22

stopthehacker.com [1] 150/20
STOPzilla [15] 30/16 30/20 30/24 30/25 31/4
31/17 32/7 32/20 32/25 33/8 34/18 34/19
36/2 36/14 118/17
Storage [3] 17/20 20/13 21/4
story [2] 127/13 127/21
straight [1] 215/8
strategy [2] 177/16 177/19
stream [2] 163/6 163/12
Street [1] 1/20
Streisfeld [2] 2/11 230/9
strictly [1] 45/23
strike [6] 46/19 55/12 60/11 61/20 103/11
134/4
string [1] 96/19
strong [1] 162/23
struck [1] 221/3
studies [1] 196/12
study [2] 4/19 206/21
stuff [4] 21/23 111/14 178/5 211/13
subject [2] 70/21 137/21
submit [2] 81/10 215/16
submitted [4] 46/7 81/15 133/17 206/7
subscription [2] 98/12 165/4
subsection [1] 16/14
subsequently [1] 109/15
substantially [2] 112/10 168/2
substitution [1] 134/7
succeed [3] 201/24 202/1 204/6
successfully [2] 69/7 110/12
such [17] 5/16 10/20 14/2 61/9 61/22 118/10
226/20
sue [4] 154/9 154/12 154/22 154/25
sued [4] 111/16 137/8 137/11 154/24
sufficient [1] 218/7
sufficiently [2] 214/24 215/11
suggest [7] 1/2 134/8 176/13 212/3 216/13
220/6 221/6
suggested [2] 98/1 225/23
suggestion [1] 135/9
suggestions [1] 218/7
suggests [1] 212/9
suing [1] 184/13
suit [4] 206/8 226/15 226/17 226/20
Suite [2] 2/16 2/18
summary [2] 124/4 124/6
summer [3] 105/22 105/25 184/10
summit [2] 165/14 165/16
Sunday [2] 106/11 106/12
Super [1] 121/16
supplemental [1] 203/22
supplied [1] 47/9
support [55] 28/9 30/19 31/4 36/15 36/17
36/19 36/20 38/17 38/25 39/2 39/13 44/21
48/25 60/14 67/12 70/1 74/17 80/8 81/22
91/1 91/5 94/20 95/11 98/9 102/19 102/23
102/25 107/8 116/18 116/20 117/1 121/16
122/17 127/14 127/22 128/13 128/14 172/1
178/19 180/21 181/2 183/10 198/5 198/15
199/6 201/2 203/15 208/19 209/20 212/11
219/14 222/15 222/19 223/1 227/24
Support.com [1] 123/19
supported [2] 109/6 219/16
supports [1] 220/23
supposed [5] 38/8 44/21 50/9 129/22 149/21
sure [78]
surprising [2] 47/4 202/23
survive [1] 206/17
suspect [1] 210/1
suspended [6] 80/17 81/5 81/23 82/1 112/19
218/4

suspension [3] 109/20 112/5 217/25
Sustained [6] 25/1 26/23 28/13 66/12 177/23
179/8
switch [6] 160/21 165/1 165/1 165/22 179/16
193/10
sworn [8] 3/16 29/24 76/21 80/11 81/4
115/19 136/21 213/23
Symantec [1] 195/12
symptom [1] 36/1
symptoms [1] 36/7
system [24] 5/25 14/19 14/23 14/25 15/8 16/1
16/23 21/23 22/8 28/24 29/10 50/8 50/24
59/21 84/3 84/6 84/8 87/5 113/24 124/13
125/4 146/3 146/8 194/14
systems [1] 60/2

**T**

tab [10] 6/25 7/7 20/11 22/9 22/17 22/20
23/15 33/21 76/5 115/17
tab 1 [1] 76/5
Tab 2 [1] 33/21
tab 3 [1] 115/17
table [1] 187/3
tactic [4] 128/10 130/4 130/22 208/21
tactics [8] 47/21 49/2 61/25 130/14 130/19
153/11 153/22 204/18
tagged [2] 32/20 32/23
take [44] 8/19 9/2 14/24 16/15 25/21 28/23
29/15 33/10 44/3 50/13 51/9 59/19 71/3 71/4
75/20 77/23 78/23 86/5 88/2 90/2 90/4 98/5
105/7 105/22 115/8 122/21 123/1 123/3
123/23 135/11 135/12 135/15 135/16 136/11
148/19 150/15 153/21 175/18 185/22 195/24
197/23 219/14 227/13 227/14
taken [10] 11/10 11/13 75/22 115/11 172/25
182/24 182/25 207/14 208/16 220/4
takes [1] 88/23
taking [5] 79/7 91/15 96/10 153/25 227/21
talk [23] 21/2 31/3 46/5 50/23 51/11 80/6
88/7 124/23 126/2 127/3 127/14 127/9 168/21
175/3 182/3 183/24 184/15 193/2 193/3
211/4 211/5 211/6 214/2
talked [18] 10/8 30/13 30/25 77/21 88/20
112/24 125/1 163/9 176/2 177/12 178/10
181/6 183/14 192/15 212/16 215/2 215/15
224/9
talking [18] 20/11 21/7 24/8 24/8 32/24
33/18 34/11 34/11 34/14 35/8 75/1 77/17
98/21 129/16 129/16 148/2 211/9 214/1
talks [6] 9/1 18/10 83/17 84/20 84/24 213/1
tally [2] 193/18 193/19
tandem [1] 197/15
target [1] 211/1
targeting [2] 32/15 35/8 35/10
task [12] 4/21 4/24 5/15 6/24 12/24 13/23
23/7 23/11 23/14 28/23 29/11 96/11
taught [1] 24/13
Taylor [8] 81/9 81/10 81/25 109/14 109/17
110/18 111/2 111/9
team [3] 78/16 125/21 169/25
teams [1] 99/12
tech [63] 26/19 27/2 28/8 30/19 31/4 36/17
38/17 38/25 39/2 39/13 44/21 48/24 55/25
56/3 56/7 67/12 70/1 80/8 81/22 89/24 89/25
91/1 91/4 94/20 95/11 98/9 102/18 102/25
107/8 116/17 116/20 117/1 122/17 125/21
127/14 127/22 158/10 158/13 159/10 159/16
160/8 160/12 160/16 160/21 161/5 161/19
164/8 164/18 198/5 198/15 198/20 198/21
199/6 200/3 200/8 201/2 203/14 203/15
208/19 209/20 222/15 223/1 227/24

**T**

technical [9]  88/4 89/10 118/21 125/20
125/25 126/1 128/14 181/9 181/11
technician [9]  31/15 43/17 51/17 60/7 74/4
89/12 123/1 123/5 206/3
technicians [5]  72/13 74/6 90/14 113/18
203/17
techniques [1]  213/17
technology [2]  60/4 60/9
telemarketer [2]  6/24 9/11
telemarketers [1]  203/9
telemarketing [5]  4/9 4/11 4/14 4/17 8/25
telephone [2]  57/25 222/12
tell [42]  3/17 4/24 6/8 6/9 6/20 6/23 7/9 7/9
7/16 9/10 10/10 14/16 16/22 17/1 17/5 24/2
25/18 30/1 30/15 31/3 39/25 42/17 43/2
47/24 48/14 52/9 53/20 60/2 70/8 71/4 76/23
109/8 109/17 109/24 115/23 123/8 136/22
184/2 214/15 214/19 216/18 218/22
telling [8]  43/8 43/13 63/14 63/23 88/24
128/18 128/23 209/5
tells [14]  6/9 6/23 7/3 7/14 9/13 15/14 15/14
16/22 41/9 41/19 199/12 203/7 206/1 224/3
temp [3]  67/8 202/7 202/7
temporary [4]  66/25 107/8 127/25 128/7
temptation [2]  210/15 219/25
tend [3]  90/6 90/8 100/3
tentatively [1]  136/5
term [6]  17/15 21/5 142/18 143/6 148/20
209/24
terminate [1]  180/15
terminated [7]  63/8 63/13 74/8 89/9 89/15
90/1 180/13
termination [2]  63/6 75/4
terms [15]  33/12 49/20 49/20 52/3 61/21
65/19 123/13 124/15 124/24 125/6 126/21
142/16 181/7 226/22 228/4
terrible [1]  88/11
test [20]  13/15 53/9 59/1 99/7 99/8 99/10
99/19 99/25 100/13 100/15 100/16 108/17
120/12 159/21 195/11 195/13 195/14 195/18
196/19 202/11
tested [4]  108/17 194/11 194/14 202/20
testified [12]  12/1 28/21 32/16 41/17 41/22
53/15 61/14 66/15 99/1 146/10 168/18 173/9
178/18 202/16 204/14 204/15 205/4 209/20
224/7 224/10 225/20
testify [1]  126/7
testifying [4]  25/2 53/16 66/11 177/22
testimonials [1]  218/16
testimony [15]  47/14 64/4 177/15 203/25
204/5 211/21 213/23 222/20 222/23 225/24
230/3 230/7 230/12 230/15 230/19
testing [14]  58/21 58/25 70/10 108/10 108/13
108/15 108/16 108/22 109/1 193/20 193/25
195/3 221/11 227/11
tests [9]  58/25 59/1 100/19 159/22 193/20
193/21 193/21 193/22 196/15
text [3]  28/6 93/3 93/25
thank [42]  3/22 12/8 29/19 29/20 29/21 30/5
31/14 35/23 35/24 56/14 58/14 68/2 69/13
75/18 75/21 77/2 77/3 114/10 114/16 114/17
116/2 116/4 121/4 131/8 131/21 132/11
133/11 137/4 141/20 144/24 149/23 172/6
191/4 191/9 196/22 197/3 210/13 220/25
228/9 229/9 229/10 229/20
thanked [3]  67/3 67/4 67/18
Thankfully [1]  221/1
thanks [2]  51/10 88/9
Thanksgiving [3]  109/22 111/15 112/16

that's [122]
their's [3]  135/4 135/21 148/8
theme [1]  226/7
themselves [8]  69/7 74/10 74/20 75/8 75/17
121/11 128/23 171/19
there's [50]  12/2 22/9 23/1 41/3 50/19 52/11
52/22 53/15 55/25 57/16 59/7 61/15 63/1
64/20 79/1 84/2 87/22 87/23 92/12 102/21
102/22 102/22 113/16 113/22 113/23 117/14
130/10 133/18 133/19 138/17 144/1 144/5
157/1 157/2 160/2 199/11 199/13 199/15
199/24 200/12 206/24 207/23 209/3 213/7
213/12 216/5 216/12 217/21 223/18 223/21
they'd [1]  36/5
they'll [2]  76/18 189/15
they're [63]  12/3 12/4 27/3 27/5 27/5 27/8
27/20 37/2 44/7 55/24 60/3 91/12 104/15
104/18 124/7 124/8 124/9 127/4 129/12
134/12 147/2 147/5 147/5 147/6 147/6 147/7
148/3 152/6 159/3 183/19 185/24 186/4
195/3 195/10 195/10 195/11 198/10 199/18
199/19 199/21 206/6 211/2 211/18 211/22
211/22 212/2 212/4 212/4 213/24 214/18
216/15 216/20 216/21 216/23 216/25 217/7
217/10 217/11 217/11 217/21 217/22 218/3
218/9
they've [18]  27/4 85/6 120/3 129/8 201/2
204/17 207/23 211/1 214/21 214/22 215/18
216/24 218/2 218/7 218/10 219/12 226/3
227/25
thing [131]  35/6 38/3 52/19 132/15 143/9
145/21 145/24 159/14 201/9 214/11 214/18
216/24 227/17
things [32]  15/12 37/10 58/24 62/2 62/2 75/9
82/21 85/5 87/22 89/10 90/16 106/3 113/18
124/19 127/3 129/3 142/19 148/13 163/1
163/17 173/21 175/8 179/23 186/7 189/15
217/12 220/9 221/3 221/18 221/19 222/15
224/13
think [69]  11/15 11/18 23/10 38/3 46/16 48/4
52/4 53/2 60/5 60/8 70/12 84/19 87/10 87/11
90/6 90/8 96/10 96/13 99/12 100/19 105/17
106/20 110/23 110/24 112/9 116/19 118/16
119/1 126/11 129/8 132/20 135/23 145/19
154/22 156/12 158/14 158/15 160/11 162/2
165/14 165/16 166/10 166/20 168/18 171/25
172/7 172/8 174/23 186/21 192/23 196/13
196/15 196/17 196/18 198/24 199/4 199/10
199/18 209/19 209/25 211/21 212/13 212/22
215/3 215/19 216/3 221/23 223/24 228/6
thinking [7]  91/20 97/12 97/22 168/16
197/21 203/13 221/23
third [18]  2/15 3/20 71/7 71/13 71/15 71/24
88/19 104/3 104/7 153/15 193/20 195/8
196/15 212/17 219/7 221/10 223/1 227/11
Thirty [2]  166/13 167/21
Thirty-seven [1]  166/13
thoroughly [1]  92/6
those [63]  5/18 18/25 21/17 29/9 36/6 38/6
41/4 42/17 45/15 53/6 55/18 57/12 57/17
60/8 62/2 62/2 69/6 71/10 75/9 75/9 79/5
82/23 84/19 85/13 86/3 90/22 99/24 102/7
109/5 118/13 121/6 125/4 125/17 129/18
134/17 136/18 137/14 139/8 139/13 156/8
157/17 167/11 179/23 181/12 181/19 181/21
185/5 186/7 198/10 202/23 203/24 205/6
212/19 215/8 215/17 221/13 224/18 224/25
225/21 225/21 225/25 226/7 227/3
though [19]  31/1 34/2 35/18 37/25 59/24
69/2 69/6 75/5 99/23 104/14 121/7 128/3
142/14 145/3 202/14 208/16 214/8 216/13

225/25
thought [10]  39/19 90/12 97/24 98/22 112/5
112/7 143/9 172/15 228/15 228/21
thousand [1]  175/11
thousands [3]  197/22 198/8 226/12
threaten [1]  154/9
threatened [2]  154/13 154/25
threats [1]  195/7
ThreatTrack [4]  46/20 46/22 66/22 67/2
three [19]  16/21 16/22 55/9 59/18 88/16 105/15
106/18 138/2 138/18 138/19 138/22 170/16
180/3 195/20 197/16 204/3 207/22 210/19
214/17 223/4
three-day [1]  223/4
threshold [2]  211/12 212/7
through [45]  15/25 16/2 58/24 60/16 62/19
62/20 65/20 82/23 88/8 92/4 105/4 105/7
110/17 112/13 113/5 119/8 121/14 123/15
126/3 135/13 135/18 139/12 147/16 151/12
160/15 164/11 164/16 164/24 195/13 200/6
200/6 201/14 203/10 203/20 203/22 204/2
211/25 213/4 216/14 221/17 221/21 224/16
224/17 224/19 227/9
throughout [7]  43/6 43/19 79/12 141/8 167/7
189/2 201/12
throwing [2]  105/25 217/22
thumbs [1]  111/3
tickets [1]  216/23
timeframe [1]  106/5
timeline [1]  121/14
timely [1]  112/6
times [25]  32/8 58/19 68/17 68/24 79/23 85/7
87/16 87/17 99/13 100/2 102/22 113/16
122/2 122/3 122/3 122/10 124/23 126/24
213/2 213/20 213/21 223/3 224/18 224/21
227/9
title [2]  146/2 146/8
TLC [13]  158/8 158/9 158/21 158/23 158/24
163/7 163/13 166/4 166/9 166/10 171/24
179/16 179/23
to -- I [1]  109/21
today [6]  87/20 134/16 135/23 155/19 225/22
225/25
together [7]  89/12 94/21 112/4 126/4 160/24
202/8 205/6
told [22]  5/10 22/2 41/4 47/6 48/22 49/6
67/15 75/7 87/16 89/17 109/19 109/22
110/18 111/6 128/10 163/1 197/23 198/8
202/4 202/5 216/11 224/13
toll [1]  72/12
Tolly [1]  227/7
Tomich [3]  24/24 89/7 204/4
ton [2]  55/24 218/14
too [5]  55/25 78/10 118/20 138/11 214/21
took [14]  62/19 62/20 68/19 78/11 87/14 88/6
88/14 88/17 90/12 126/3 131/25 166/6
182/23 224/24
tool [16]  4/21 4/25 7/20 8/16 14/19 14/20
14/25 16/23 17/2 73/5 90/13 90/13 129/5
129/19 201/18 203/19
tooling [1]  214/20
tools [3]  129/12 185/14 186/5
top [9]  13/8 25/5 40/1 70/9 83/11 131/13
145/23 146/25 169/16
total [6]  96/6 96/24 118/2 118/5 169/2
186/24
totality [1]  220/4
touch [1]  178/19
towards [2]  99/8 138/17
trace [21]  17/7 17/11 17/23 18/1 18/4 18/10
18/14 18/25 19/3 19/9 19/12 20/2 20/13

**T**

trace... [8]  20/20 21/5 21/8 21/11 21/14 21/21
 28/25 29/1
traces [2]  18/11 19/20
tracking [1]  148/5
TRADE [11]  1/3 2/2 2/5 4/3 30/10 77/8
 107/15 116/8 144/13 144/17 223/4
traditionally [1]  35/2
train [2]  39/19 82/15
trained [3]  51/13 62/3 201/17
trainee [1]  206/2
trainees [1]  41/9
trainer [1]  41/15
trainers [1]  82/15
training [11]  12/1 12/4 12/5 24/18 24/18
 24/19 24/22 41/9 41/19 62/3 198/3
transaction [2]  60/16 104/6
transactions [4]  102/21 102/24 178/15 179/2
transcript [3]  1/12 12/17 231/18
transcripts [2]  41/2 61/12
transparent [1]  185/13
trending [1]  112/14
trial [5]  52/25 154/6 154/6 222/6 227/9
trick [1]  34/9
tricked [6]  97/11 97/22 212/10 213/8 213/9
 220/7
tricky [1]  8/5
tried [2]  123/15 213/4
TRO [29]  46/8 109/6 109/25 110/6 112/12
 142/22 142/24 143/3 149/14 176/8 180/10
 180/17 182/8 182/13 183/15 206/11 206/13
 209/10 209/14 209/15 209/17 210/22 211/14
 211/25 214/3 216/7 217/4 218/5 228/13
troubleshoot [6]  5/9 7/24 13/1 15/8 15/12
 16/1
troubleshooting [12]  4/21 4/25 5/1 7/20 8/7
 9/24 14/5 14/20 15/5 16/6 18/20 29/10
truck [1]  113/20
true [73]  9/13 22/24 37/6 38/8 41/11 41/15
 41/16 41/21 41/22 44/18 45/6 46/1 47/2 48/7
 48/22 49/5 51/17 51/19 52/18 55/9 55/13
 55/18 74/8 78/3 79/16 80/23 81/12 81/19
 81/20 82/12 82/16 82/20 82/25 83/18 83/25
 84/3 84/10 84/17 84/21 84/25 87/9 88/3
 89/18 89/24 90/16 93/1 95/6 95/7 95/10
 95/13 95/17 100/21 101/21 102/1 105/12
 107/6 107/12 107/14 121/9 125/11 127/12
 127/20 127/24 128/3 128/9 129/17 130/20
 131/1 131/3 152/6 178/4 190/16 218/25
truly [2]  195/6 217/11
trust [11]  135/18 150/10 150/13 150/14
 151/16 151/24 151/24 153/9 177/13 178/1
 199/19
Trust's [1]  153/6
trusted [2]  165/24 166/3
Trustee [4]  195/21 195/22 196/3 196/6
trustworthy [5]  199/18 206/7 211/18 211/22
 212/4
truth [1]  225/7
truthful [7]  77/13 113/8 202/15 225/4 225/4
 225/4 225/5
try [16]  66/4 94/25 103/4 115/4 115/8 118/20
 119/12 122/20 177/16 177/21 183/18 210/4
 219/9 220/19 229/16 229/19
trying [13]  33/6 44/15 64/21 74/18 74/23
 75/12 87/18 113/18 178/3 178/6 178/8
 215/25 223/23
Tune [1]  194/4
Tune-Up [1]  194/4
turn [8]  7/12 18/7 82/7 111/5 145/2 151/7

173/25 193/5
turned [3]  67/11 78/22 111/8
turning [2]  121/13 133/14
tutorial [4]  175/4 175/7 176/23 177/3
TV [1]  54/16
Twenty [1]  77/25
Twenty-two [1]  77/25
two [29]  7/13 29/12 60/8 75/9 77/25 88/17
 94/21 102/7 106/18 112/20 114/22 114/23
 124/23 125/4 133/17 170/16 183/1 183/9
 188/14 193/24 202/2 208/21 213/2 219/5
 222/5 224/8 224/13 226/3 227/19
type [14]  5/1 13/21 14/4 14/6 33/18 50/6 50/7
 58/24 73/23 87/20 87/21 119/13 125/16
 193/22
typed [1]  218/19
types [6]  35/20 82/19 82/20 118/13 145/17
 194/6
typical [5]  106/16 106/16 106/19 155/19
 167/15
typically [2]  85/14 208/7
typing [1]  22/5

**U**

U.S. [1]  161/2
U.S.-based [1]  161/2
uh [17]  7/1 18/9 22/6 22/12 39/11 39/24
 40/21 41/18 43/1 52/13 122/9 122/15 143/14
 146/12 148/16 168/15 169/20
uh-huh [17]  7/1 18/9 22/6 22/12 39/11 39/24
 40/21 41/18 43/1 52/13 122/9 122/15 143/14
 146/12 148/16 168/15 169/20
Um [2]  148/19 157/23
un [6]  17/16 17/22 19/20 21/22 67/14 98/7
un-installation [2]  17/16 19/20
un-installed [4]  17/22 21/22 67/14 98/7
under [26]  10/15 13/20 23/14 23/14 42/3
 42/12 46/2 60/15 61/3 65/19 71/23 71/24
 72/7 73/25 74/1 74/15 74/22 75/14 104/16
 134/24 134/25 173/17 202/12 208/6 208/15
 210/6
undercover [2]  202/10 204/3
underlying [3]  8/22 104/6 119/15
understand [18]  17/17 26/10 37/3 38/23
 95/24 134/16 151/10 161/1 185/24 208/17
 217/1 217/3 217/10 221/5 223/17 223/20
 223/21 225/11
understanding [3]  117/5 156/25 177/19
understood [5]  163/20 177/15 179/15 228/21
 228/22
undisputed [1]  204/1
unethical [1]  153/10
unfortunately [3]  93/18 109/23 222/10
unhappy [1]  69/8
unhooking [1]  60/6
UNITED [5]  1/1 1/14 159/1 159/3 159/6
unless [1]  27/4
unnecessary [2]  49/4 219/16
unsolicited [1]  221/22
until [9]  44/19 78/4 79/6 113/17 124/15
 130/24 149/1 162/17 168/3
up-selling [1]  84/25
up-sells [1]  168/24
upcoming [1]  127/5
update [2]  155/5 155/17
updated [6]  122/1 122/10 123/18 124/3
 124/22 186/22
updates [1]  227/25
upfront [1]  45/2
upon [8]  12/10 61/7 61/10 80/4 92/10 132/24
 227/24 227/24

ups [1]  98/11
upsetting [1]  93/19
upstate [1]  107/9
upwards [2]  106/9 204/22
us [46]  3/17 5/15 16/22 30/1 31/3 31/13 32/4
 43/2 47/21 59/19 60/2 65/4 67/12 68/15 71/4
 72/12 76/23 87/16 88/24 90/14 91/3 91/17
 93/19 96/3 106/4 106/15 107/4 108/9 110/19
 111/5 115/23 126/3 126/14 128/12 130/10
 136/22 147/9 197/6 211/10 212/16 215/16
 217/8 217/13 227/11 227/24 227/24
usage [6]  22/17 22/20 23/2 23/4 23/14 24/3
used [32]  7/12 17/13 17/14 17/15 22/22
 26/11 35/3 49/1 57/2 66/1 76/9 76/10 96/3
 98/4 100/5 121/16 124/1 124/24 125/7 129/5
 129/18 130/3 130/14 141/8 152/10 157/16
 185/17 201/17 208/22 211/13 213/17 219/25
useful [3]  7/20 8/15 14/20
user [6]  11/14 15/15 34/18 35/20 190/1 196/2
users [5]  9/23 15/8 153/10 175/5 187/13
users' [1]  49/2
using [24]  12/24 16/1 23/16 23/23 24/4 29/10
 68/18 90/8 121/22 122/23 128/10 129/12
 130/19 130/21 130/25 137/15 148/23 180/7
 180/13 187/23 201/18 203/18 209/23 211/17
usually [1]  105/15
utilities [4]  6/16 194/3 194/4 221/12
utility [2]  22/8 51/13
utilization [3]  5/16 194/12 194/15
utilize [2]  15/2 19/5
utilizing [1]  5/15

**V**

V-o-n [1]  3/20
valid [1]  200/11
validity [1]  196/13
valuable [1]  221/19
value [10]  42/8 196/13 196/16 200/11 200/12
 200/16 200/25 200/25 201/1 219/2
values [1]  18/23
variation [1]  50/6
variations [3]  38/1 52/11 83/5
varies [1]  205/9
variety [2]  14/1 64/15
various [6]  69/12 69/22 98/7 126/25 130/19
 194/6
vast [2]  89/25 226/23
Vasto [1]  89/21
vehicles [2]  161/24 162/7
vendor [1]  32/12
vendors [2]  32/7 35/11
Venture [3]  102/7 102/9 102/13
verbatim [6]  38/9 87/9 87/10 198/4 201/7
 206/3
verify [1]  47/22
Verizon [1]  195/11
version [20]  28/11 67/8 133/7 133/23 143/1
 184/2 186/6 186/6 186/12 186/12 186/17
 186/23 190/17 191/17 191/18 191/19 191/23
 192/24 193/9 202/21
versions [1]  191/24
versus [3]  118/5 127/4 186/12
very [28]  8/15 11/10 25/25 44/2 45/24 54/13
 54/16 57/9 92/16 98/3 101/12 110/4 111/10
 115/10 124/20 124/21 141/24 169/16 175/16
 194/9 199/23 205/20 216/14 218/8 222/2
 222/5 222/23 224/17
viable [1]  181/2
vice [1]  110/24
victim [2]  34/9 200/4
view [3]  10/7 63/11 185/22

**V**

Viewer [57]  7/20 7/23 8/8 9/2 9/19 10/2 25/4
25/5 25/7 25/10 28/24 29/11 49/3 51/12
51/12 51/14 51/16 82/24 83/8 83/12 83/15
83/21 89/14 89/17 124/13 125/3 125/19
128/10 128/22 129/5 129/9 129/18 130/3
130/17 130/21 131/1 131/2 131/4 131/5
131/6 131/12 131/14 160/4 208/20 208/22
208/23 209/22 209/22 209/24 211/13 211/17
213/25 214/1 217/17 218/10 219/25 220/2
Viewers [2]  8/6 9/24
violate [1]  215/18
violating [1]  156/22
Viper [11]  46/25 47/2 47/5 67/8 67/12 67/14
67/15 67/20 67/22 68/4 68/7
virtually [3]  91/23 92/3 100/4
virtue [1]  202/13
virus [8]  49/18 50/7 57/8 57/10 57/10 57/11
130/11 212/13
viruses [1]  195/7
Visa [3]  101/18 157/20 205/3
visibility [1]  177/16
visit [1]  165/10
voicemail [1]  87/5
volume [4]  1/11 3/12 76/5 166/25
Volume 1 [1]  76/5
Volume 2 [1]  3/12
volunteered [1]  224/21
von [4]  3/8 3/16 3/19 230/3

**W**

W-r-i-g-h-t [1]  30/4
wait [8]  9/20 44/8 44/19 44/20 45/7 107/22
149/5 229/2
waited [1]  149/1
waiting [2]  229/1 229/17
walk [2]  70/11 215/21
walking [2]  213/4 216/21
want [58]  8/21 9/18 18/7 19/18 26/24 30/22
36/5 38/14 39/16 39/20 39/22 54/3 55/22
66/17 82/23 85/8 85/25 86/9 87/12 88/10
89/4 89/4 92/16 94/12 95/25 96/7 96/25
97/17 109/9 111/15 118/20 122/20 127/11
131/21 132/18 134/18 145/24 162/12 176/17
180/22 193/2 193/2 207/6 210/19 211/2
211/18 215/16 217/7 217/19 217/20 217/22
218/6 218/6 220/17 220/21 228/11 229/2
229/10
wanted [23]  30/12 38/19 38/20 58/1 66/20
68/20 77/13 79/16 91/17 106/24 106/25
107/18 109/19 109/21 121/14 163/20 187/20
199/6 207/13 210/3 210/5 218/15 228/23
wants [1]  8/18
warning [20]  10/17 10/25 11/5 11/8 11/10
11/12 12/20 39/1 42/18 42/25 43/3 62/17
62/21 63/11 63/19 63/22 64/3 74/13 74/14
155/4
warnings [2]  9/14 9/17
warranted [3]  79/23 206/4 210/9
Warren [1]  102/5
Washington [2]  2/3 2/6
wasn't [21]  30/23 31/10 36/9 38/22 53/12
79/23 87/25 88/6 88/21 93/22 106/16 106/19
106/22 108/17 108/19 109/1 109/8 159/12
201/17 223/10 228/25
wasting [1]  43/10
watch [1]  98/6
Watchdog [2]  85/3 122/13
watched [1]  145/24
ways [4]  15/4 185/3 185/5 206/6

we'd [4]  22/4 127/2 127/3 127/4
we'll [8]  75/20 75/20 115/8 145/2 189/16
220/19 229/2 229/19
we're [33]  13/24 13/24 13/25 24/7 24/8 26/2
58/6 70/17 76/3 92/18 96/4 96/6 96/8 96/11
98/21 127/4 127/7 127/7 133/4 133/13
135/23 173/3 173/21 210/24 211/15 211/15
214/20 215/22 216/15 217/19 220/17 220/17
225/7
we've [26]  82/13 83/5 87/11 96/9 96/13 122/4
123/3 128/14 128/15 128/21 129/10 129/11
129/11 130/14 130/14 130/16 133/18 133/20
135/9 135/14 186/10 189/3 210/18 213/19
215/22 224/13
Web [9]  150/10 150/13 150/14 151/24
151/24 153/6 153/9 177/12 177/25
website [8]  45/14 45/15 45/16 45/18 50/6
65/24 73/18 143/3
websites [1]  64/15
week [7]  24/14 24/19 24/22 148/1 193/24
193/24 229/19
weekend [4]  106/4 106/7 106/21 107/3
weekends [1]  104/10
weekly [1]  167/5
weeks [4]  112/20 193/24 218/2 219/19
weigh [1]  135/19
weight [3]  136/2 225/9 225/10
weights [1]  225/14
welcome [4]  132/13 133/7 196/23 229/14
well [78]
went [19]  34/23 35/5 73/6 87/23 91/2 93/16
102/24 127/6 164/11 181/15 187/17 203/20
203/22 216/23 221/17 221/21 224/16 224/16
224/18
weren't [8]  29/8 29/11 36/13 40/20 93/6 93/9
113/4 176/13
West [3]  1/8 1/20 2/9
what's [17]  6/6 12/5 24/10 35/13 39/14 66/10
71/9 119/23 120/19 181/15 185/19 193/19
205/10 216/6 216/8 220/1 220/3
whatever [7]  103/2 118/20 130/11 180/23
215/17 226/9 228/9
Whatever's [1]  144/14
whatsoever [1]  24/13 35/3
wheel [5]  104/24 104/25 105/1 105/3 105/4
106/25
where [53]  5/25 9/1 11/8 11/10 14/7 20/11
22/1 32/8 32/10 32/11 38/18 38/19 39/6 47/9
49/11 54/14 57/20 61/22 65/4 67/6 68/24
71/7 71/7 71/10 72/7 72/24 73/1 73/2 74/24
77/24 83/11 102/23 112/25 126/2 127/1
128/16 131/19 146/4 147/13 153/17 154/6
158/23 158/24 170/22 179/22 187/15 187/20
196/2 211/8 223/8 223/15 224/3 225/7
whether [17]  13/2 22/16 25/12 37/2 48/3
68/4 71/5 109/10 136/1 178/6 180/1 188/11
192/17 198/13 198/15 200/8 201/13
while [6]  11/7 23/3 67/25 118/16 138/10
229/1
white [4]  32/12 67/3 68/15 188/9
white-listed [1]  68/15
who's [5]  3/7 11/23 27/8 206/2 215/10
whoever [1]  165/25
whole [8]  43/6 43/19 54/11 66/17 78/12
121/19 167/7 210/25
whose [1]  45/16
why [26]  37/23 37/23 48/17 69/5 80/24 94/11
94/16 106/23 109/24 113/15 135/21 137/1
152/23 159/7 166/5 168/2 168/4 168/11
178/3 179/16 179/16 182/15 183/17 198/21
199/8 214/16

widespread [3]  47/25 48/8 118/24
wife [1]  86/19
William [5]  2/17 91/10 91/11 202/3 202/16
Williams [2]  91/6 91/9
willing [6]  153/1 205/9 205/11 213/24 214/18
215/10
Win [1]  35/21
window [1]  131/13
Windows [8]  4/20 4/22 7/19 7/23 9/25 19/16
49/3 194/15
winter [1]  105/23
wiped [2]  212/17 212/18
Wire [25]  101/21 101/24 102/4 116/11
116/13 116/16 116/25 117/4 160/12 160/15
160/16 160/22 161/2 162/21 162/25 163/22
165/24 165/25 178/17 178/18 179/18 187/17
205/14 205/17 209/5
Wire's [1]  166/3
wiser [1]  198/11
wish [2]  71/10 138/16
withdrawals [6]  103/13 103/21 105/13
105/14 105/15 106/17
withdrawn [1]  103/21
within [4]  45/9 82/12 93/25 106/18
without [27]  43/16 60/16 63/15 66/6 70/25
76/18 96/11 97/3 132/18 133/9 136/18
144/21 151/4 164/24 171/14 171/15 171/25
172/3 177/3 181/2 188/5 190/23 192/12
206/17 207/9 219/13 223/19
witness [32]  3/7 3/8 3/16 6/12 11/23 13/11
16/17 24/24 29/22 29/23 29/24 70/20 70/24
75/25 76/21 115/14 115/19 133/12 136/21
172/22 173/15 179/9 187/5 187/7 189/13
189/19 193/12 194/22 213/6 218/13 221/14
224/7
witness' [1]  21/1
witnesses [10]  37/21 38/6 61/14 114/23
114/24 115/5 115/6 115/9 212/19 220/7
won [1]  174/24
won't [2]  212/5 214/14
wonder [1]  198/7
words [8]  21/17 41/1 42/6 42/12 61/5 88/2
88/3 110/25
work [16]  18/2 18/14 19/1 19/9 36/24 61/8
74/6 98/10 106/21 154/8 213/19 214/21
215/17 217/7 218/14 220/9
worked [5]  30/13 164/21 165/25 186/11
204/17
workflow [1]  16/12
workforce [1]  74/5
working [10]  51/15 88/20 88/21 155/18
180/18 180/20 197/15 215/25 216/25 222/22
works [8]  46/23 78/25 105/21 126/10 198/19
222/2 224/14 227/16
worlds [1]  40/25
worried [4]  27/9 27/20 96/14 214/15
worry [1]  214/13
worse [1]  93/19
worth [1]  200/21
worthy [1]  217/1
WOT [2]  151/16 151/23
wouldn't [19]  5/7 5/8 8/15 11/13 14/9 14/14
23/24 39/7 56/6 78/20 88/6 91/2 104/8
104/12 135/22 211/4 220/10 227/20 227/22
wow [1]  110/24
wrap [3]  84/16 85/10 124/4
wrap-up [3]  84/16 85/10 124/4
Wright [10]  29/23 29/24 30/3 30/9 45/12
56/19 60/25 62/10 73/16 230/7
writing [1]  125/11
written [5]  43/4 45/18 74/1 75/11 201/16

## W

**wrong [14]**  37/23 38/12 39/8 39/14 42/21
97/12 97/23 119/2 203/18 203/18 205/10
208/24 217/2 217/2
**wrote [11]**  45/12 77/11 118/16 125/21
125/24 125/25 128/11 129/9 145/6 151/18
202/17

## X

**X blocker [1]**  186/8
**X control [1]**  186/23
**X controls [1]**  186/22
**X issues [1]**  225/21
**X number [1]**  225/19

## Y

**yeah [56]**  30/22 40/21 45/5 71/25 78/1 78/1
78/9 78/16 80/21 87/4 92/1 95/5 95/5 95/9
100/15 101/9 101/20 102/3 104/7 104/20
107/13 107/17 108/25 110/2 113/2 118/5
120/19 120/22 122/4 125/9 126/20 138/3
145/13 145/23 145/25 147/5 150/16 152/15
152/19 154/2 154/3 154/8 157/8 157/16
162/1 163/5 163/19 164/11 167/10 167/13
170/1 170/13 179/14 193/11 194/14 200/18
**year [12]**  78/4 78/5 106/1 142/9 167/18
167/20 171/24 171/25 175/23 184/8 217/12
229/18
**years [22]**  57/4 127/10 138/2 138/19 138/22
152/11 152/18 152/20 152/22 152/23 161/4
161/5 170/16 170/19 171/1 195/20 197/16
207/22 208/21 212/23 212/24 226/11
**Yep [1]**  224/22
**yes [296]**
**yesterday [11]**  12/2 34/5 41/8 41/17 41/19
76/9 89/8 103/11 128/4 189/14 205/5
**yet [14]**  59/12 66/19 76/10 81/11 94/2 96/14
143/16 202/17 204/15 204/22 208/21 218/3
219/10 227/11
**York [1]**  107/9
**you'd [8]**  5/3 54/11 56/3 111/25 122/16
138/4 193/4 193/5
**you'll [3]**  71/20 134/23 135/18
**you're [53]**  8/5 9/21 15/17 23/3 29/18 31/18
32/15 32/19 32/24 34/11 34/11 34/25 35/8
35/25 40/2 45/22 67/5 69/21 70/10 75/5 88/7
89/5 100/17 101/5 106/2 106/2 111/15 119/3
134/16 135/22 138/19 140/23 146/25 147/13
148/2 154/21 154/21 156/16 163/10 171/3
179/4 196/23 200/1 208/8 208/10 210/17
214/1 215/14 215/14 217/16 217/18 227/5
229/14
**you've [22]**  17/12 25/17 37/20 52/12 53/6
91/23 91/24 99/6 100/19 108/16 110/3
124/25 177/3 180/3 192/24 200/25 212/3
215/13 218/9 220/22 221/7 227/9
**yours [6]**  89/21 90/18 90/23 131/20 135/4
135/25
**yourself [7]**  9/3 13/9 16/21 39/25 53/1
181/11 189/10

## Z

**zero [1]**  37/5